UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>HRB WINDDOWN INC., *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-12689-BLS<br><br>Jointly Administered |
| ALAN D. HALPERIN, AS LIQUIDATING TRUSTEE OF THE HIGH RIDGE BRANDS CO. LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ARAWAK IX, L.P., CLAYTON, DUBILIER & RICE, LLC, JOHN C. COMPTON, VINDI BANGA (A/K/A MANVINDER BANGA), KENNETH A. GIURICEO, GREGORY L. PASQUA, AND JAMES A. DANIELS,<br><br>Defendants. | Adversary Proceeding<br><br>Adv. Proc. Case No. 21-51412-BLS |

**SECOND AMENDED COMPLAINT**

---

[1] The term "Debtors" as used in this Complaint shall mean the debtors in the chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: High Ridge Brands Holdings, Inc. (5996); HRB Midco, Inc. (8170); HRB Buyer, Inc. (3945); HRB Winddown, Inc. (f/k/a High Ridge Brands Co.) (5871); GSI Winddown, Inc. (f/k/a Golden Sun, Inc.) (4712); CFL Winddown, Inc. (f/k/a Continental Fragrances, Ltd.) (2541); FCI Winddown, Inc. (f/k/a Freshcorp, Inc.) (3238); COC Winddown, LLC (f/k/a Children Oral Care, LLC) (disregarded entity for tax purposes); and DRF Winddown, LLC (f/k/a Dr. Fresh, LLC) (5167).

Alan D. Halperin, the Liquidating Trustee (the "<u>Plaintiff</u>" or the "<u>Trustee</u>") of the High Ridge Brands Co. Liquidating Trust (the "<u>Liquidating Trust</u>") established in connection with the above-captioned chapter 11 cases of the Debtors, by and through his undersigned counsel, hereby alleges against the above-named Defendants, on personal knowledge as to all matters regarding himself and on information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. This Complaint is brought by the Liquidating Trustee of the Liquidating Trust as successor in interest and representative of the above-captioned Debtors' estates (each, an "<u>Estate</u>," and collectively, the "<u>Estates</u>") pursuant to 11 U.S.C. § 1123(b)(3)(B), and transferee and/or assignee of certain claims and causes of action that arose in favor of the Debtors before creation of their bankruptcy Estates, namely the Liquidating Trust Debtor Assets (as such term is defined in the Plan). This Complaint is also brought by the Liquidating Trustee of the Liquidating Trust as assignee of the Retained Non-Estate Causes of Action (as such term is defined in the Plan), which claims originally belonged to holders of Notes and the Indenture Trustee for the Notes (as such terms are defined herein).

2. This lawsuit is a necessary step to remedy the wrongs perpetrated on the Debtors and on holders of unsecured claims of the Debtors, by Clayton, Dubilier & Rice, LLC ("<u>CD&R</u>"), as well as by employees and affiliates of CD&R that served as members of the Board of Directors of High Ridge Brands Co. ("<u>HRB Co.</u>," and with its subsidiaries and affiliates, "<u>High Ridge Brands</u>").

3. In June 2016, High Ridge Brands was purchased by funds affiliated with CD&R. The acquisition of High Ridge Brands was financed with the proceeds of (i) $220 million in first lien term loans provided by seven different banks, (ii) $83 million in 11.5% second lien term loans provided by Arawak, L.P. ("<u>Arawak</u>"), as explained further herein, an affiliate of CD&R, and

(iii) $130 million as equity capital from CD&R HRB Holdings, L.P., an affiliate of CD&R. Prior to filing for bankruptcy protection in 2019, High Ridge Brands engaged in the sale of everyday household personal care items.

4. In December 2016 High Ridge Brands acquired DR. Fresh Blocker LLC, funded with the proceeds of a $160 million bridge loan (the "Bridge Loan"), as well as by a $45 million of equity capital provided by CD&R HRB Holdings, L.P. The Bridge Loan was provided by many of the same third-party banks who loaned High Ridge Brands the first lien term loans used to finance CD&R's acquisition of High Ridge Brands.

5. Shortly after the Dr. Fresh acquisition closed, CD&R turned its full attention to recapitalize High Ridge Brands' balance sheet, and returning 100% of Arawak's capital. CD&R achieved this on March 22, 2017 when High Ridge Brands used the proceeds of its newly issued $250 million of 8.875% Unsecured Notes (the "Notes") to: (i) repay the Bridge Loan, (ii) prepay the $83 million of second lien term loans owed to Arawak (the "Arawak Loan"), (iii) pay a $8.3 million prepayment penalty to Arawak (the "Arawak Prepayment Penalty"), and (iv) pay transaction fees.

6. The March 2017 recapitalization of HRB Co.'s balance sheet was driven by CD&R through its employees who controlled HRB Co.'s Board of Directors, and whose employees provided consulting services to HRB Co. In order to entice investors to purchase Notes, the CD&R Directors (as defined herein) sanctioned dissemination of the Offering Memoranda (as defined herein) for the Notes, as well as presentations to investors. At least one CD&R Director engaged in direct discussions with potential investors in Notes. Through the bond offering documents and presentations, the CD&R Directors worked to shape a rosy picture of HRB Co.'s financial and operational condition, describing HRB Co. as having: (i) a strong financial condition, with

promising prospects, (ii) a strong and stable cash flow generation, and (iii) a strong and experienced management team with a "proven track record of acquiring, integrating, revitalizing and managing a wide variety of brands." The CD&R Directors also strongly endorsed the leadership prospects of HRB Co. Chief Executive Officer, Defendant James "Jim" A. Daniels, and the relationship between HRB Co.'s management and their key customers, most notably Walmart.

7. At the same time as the CD&R Directors touted the caliber of HRB Co.'s management leadership team representing that it was pivotally important to investors, and the business prospects of High Ridge Brands, the CD&R Directors concluded that (i) they had made a mistake about CD&R's investment in HRB Co., (ii) HRB Co.'s financial performance was declining, (iii) HRB Co. would not make financial and sales targets, (iv) HRB Co.'s financial performance trends were concerning, and (v) the CD&R Directors had "overestimated the team's capabilities." Internal communications tell a starkly different tale than the one set out in the Offering Memoranda (as defined herein) and the presentations and discussions with potential investors in the Notes: CD&R Director Compton wrote that he was "so mad at these guys. Truly incompetent, lazy, etc." At the same time they were selling Daniels to the outside world, the CD&R Directors had already started the process to replace Daniels, commenting that "its increasingly unclear whether Jim Daniels is the right long-run leader for the business." The CD&R Directors privately critiqued Daniels' "[l]evel of engagement and nature of dialogue with top customers (notably Walmart) has been inadequate," and noted that HRB Co.'s "sales team [was] … horribly weak." Finally, the CD&R Directors expressed misgivings about CD&R's investment in HRB Co. for CD&R and the limited partners of CD&R HRB Holdings, L.P.

8.      The Offering Memoranda for the Notes omitted and/or misrepresented material facts then known to the CD&R Directors and Daniels. These omissions and misrepresentations were intended to and were in furtherance of the sale and trading of Notes to and by investors.

9.      Examples of such omissions and misrepresentations in the Offering Memoranda are the omission of the fact that HRB Co. had terminated its Chief Sales Officer (the "CSO") in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of the CSO. The Offering Memoranda omitted the material fact that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and because Walmart only makes such changes on an annual basis, could not be changed until 2018 at the earliest. CD&R Director Pasqua and the HRB Co. team conducting the "Roadshow Meetings" omitted the material fact that Walmart's January 2017 planogram/modular change and the real time impact of that decision on HRB Co.'s sales. The Offering Memoranda omitted that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time the Offering Memoranda were finalized and disseminated to potential investors of Notes. The Offering Memoranda omitted the material fact that HRB Co. was 'pencils down' on new strategic acquisitions when the Notes were marketed and sold to investors. This last omission holds particular significance because CD&R's whole acquisition thesis was premised on HRB Co.'s strategic acquisition and integration of orphaned products to bolster HRB Co.'s financial performance.

10.      Based on the private communications among the CD&R Directors, and contrary to the statements made to investors in the Notes, it is clear that the CD&R Directors concluded that they had overestimated HRB Co.'s own management team's capabilities. The CD&R Directors

took no steps to adjust HRB Co.'s statements to purchasers of Notes when they became aware that High Ridge Brands was not meeting its promised financial and operating projections. CD&R, through its employees, was thrilled to find new, third-party investors to replace Arawak on HRB Co.'s recapitalized balance sheet, shifting the risks that CD&R had not identified at the time of its acquisition of High Ridge Brands from its affiliated lender (i.e., Arawak) to third party investors that did not and *could not know*, based on the information provided by CD&R and HRB Co's management to those outside investors. CD&R Director Pasqua and a more senior CD&R partner ████████ celebrated the fact that the Notes would be priced at 8.875%, essentially offloading the lending risk from Arawak to third-party investors. *See* CDR_00023908. ████ wrote that such a rate was a "[g]reat outcome" and "[m]uch better than that Arawak rate!" *Id.* Pasqua responded in glee, "[a]greed – highway robbery!" *Id.* Pasqua's comment proved to be an unvarnished glimpse into how CD&R felt when it enticed investors to refinance the Arawak Loan, with the Notes, knowing full well that the HRB Co. financial condition and prospects were significantly riskier than what had been portrayed to those investors.

11.     The sale of the Notes was important to CD&R because it essentially financed out the Arawak Loan. In doing so, CD&R was able to reallocate the capital that Arawak had been repaid to its other CD&R portfolio companies. There was internal demand within CD&R for capital from Arawak, and ████ was more than willing to accommodate this demand. At the same time, HRB Co.'s issuance of the Notes 'at par' was significant because it provided CD&R with a smokescreen to continue their efforts to realize on their investment thesis while putting third-party investors at risk for that turn-around.

12.     This lawsuit intends to hold CD&R, the CD&R Directors, Arawak and Daniels accountable for their material omissions, misrepresentations, wildly contradictory statements, and

irresponsible conduct as it relates to the prepayment of the Arawak Loan, the recapitalization of HRB Co.'s balance sheet at the expense of the purchasers of Notes, and the issuance of the Notes.

13. This lawsuit also seeks to hold CD&R and the CD&R Directors responsible for omissions and misstatements with respect to false disclosures on November 16, 2018. On November 16, 2018, HRB Co. made a presentation to lenders (the "November 2018 Lender Presentation"), wherein HRB Co. discussed a new hair care line, and stated that the new product had the "[m]ost points of distribution of any HRB launch to date at 83,600 and counting!!!!" This statement is referred to herein as the "SGX Points of Distribution Disclosure" since it is believed that HRB Co. was referring to its new brand, "SGX NYC". Neither HRB Co. nor its employees specifically stated during the November 16, 2018 presentation to lenders that "points of distribution" is not a reference to the number of stores that SGX NYC will be sold in.

14. That statement was false and lacked considerable context which would have been informative to potential investors. The truth came out on April 29, 2019 when HRB Co. stated that the "Actual Distribution" of SGX NYC were in a measly 19,460 retailers' locations. The "points of distribution", without more, has no custom and usage, or market acceptance. Moreover, there was no further context that would indicate to lenders, including the "Holders" of Notes, that the 83,600 figure signifies anything other than the number of retail stores where the SGX product will be sold. Plaintiff is not aware that HRB Co. management ever told lenders what it intended by "points of distribution," or how any such figure relates to the number of retailers at which SGX NYC was to be sold. Following the April 2019 corrective disclosure, the Notes sold off from $40.01 per $100 principal amount of Notes to $22.50 per $100 principal amount on May 1, 2019, reflecting a single-day loss in trading value for all Notes of $43.775 million. Over the following

three weeks, the value of all Notes declined by another $38.75 million, trading from $22.50 per $100 principal amount on May 1, 2019 to $7.00 per $100 principal amount on May 23, 2019.

15. This lawsuit (i) seeks to avoid actual and constructive fraudulent transfers to Arawak for the prepayment of the Arawak Loan, and payment of the Arawak Prepayment Penalty, (ii) alleges breach of fiduciary duties against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels related to the prepayment of the Arawak Loan, and payment of the Arawak Prepayment Penalty, (iii) seeks to avoid from CD&R certain payments and transfers under the Bankruptcy Code and under state law, (iv) seeks to disallow CD&R's claims versus HRB Co. under the Bankruptcy Code, (v) alleges violations of the securities laws of North Carolina and California related to the material omissions in the Offering Memoranda, as well as the material omissions and misstatements made during the Roadshow Meetings, (vi) alleges state common law fraud under the laws of the Commonwealth of Massachusetts, New York, North Carolina, and California related to the material omissions and misstatements in the Offering Memoranda, as well as the material omissions and misstatements made during the Roadshow Meetings, and (vii) alleges state common law fraud under the laws of the Commonwealth of Massachusetts, New York, North Carolina, and California related to the material omissions and misstatements in the November 16, 2018 Lender Presentation.

II. PARTIES

16. Plaintiff Alan D. Halperin is the Liquidating Trustee of the Liquidating Trust. Halperin is a citizen of the United States of America, and a resident of New York state. Halperin was appointed as Trustee of the Liquidating Trust pursuant to the Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of High Ridge Brands Co. and its Affiliated Debtors (the "Plan"). *See* D.I. 609, 619 (confirmation order confirming the Plan). The Plan authorized the creation of the Liquidating Trust for the express purpose of, among other

things, pursuing all "Claims and Causes of Action" held by the Debtors, the Estates and certain non-debtor entities against the Debtors' former directors, officers and managers as well as against CD&R and its affiliates. The Liquidating Trustee is authorized under the Plan and the Liquidating Trust Agreement to investigate, prosecute and liquidate claims against Defendants on behalf of the Liquidating Trust.

17. Arawak is an exempted limited partnership organized under the laws of the Cayman Islands. Arawak is "an investment vehicle managed by CD&R." *See* Final Offering Memorandum (as defined herein), at 102, F-26, F-44. Arawak's business address at 375 Park Avenue, New York, NY 10152, the same address of CD&R. Arawak's 'Registered Office' is Maples Corporate Services Limited, P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

18. Arawak is a special purpose vehicle owned indirectly by Clayton, Dubilier & Rice Fund IX (Credit), L.P., Clayton, Dubilier & Rice Fund IX-A (Credit), L.P., and Clayton, Dubilier & Rice Fund IX (892 Credit), L.P. Clayton, Dubilier & Rice Fund IX (Credit), L.P., is an alternative investment funds of Clayton, Dubilier & Rice Fund IX, L.P. Clayton, Dubilier & Rice Fund IX-A (Credit), L.P., is an alternative investment funds of Clayton, Dubilier & Rice Fund IX-A, L.P. Clayton, Dubilier & Rice Fund IX (892 Credit), L.P., is an alternative investment fund of CD&R Advisor Fund IX, L.P. Arawak's general partner is Clayton, Dubilier & Rice Fund IX (Credit Investor), Ltd.

19. ████████████████████████████, Arawak loaned money to CD&R portfolio companies, where CD&R Fund IX had invested in the borrower company's equity. Examples of this were Arawak's loans to ████████████████████████████████████ ████████████████████████████ High Ridge Brands. *See* CDR_00026816.

20. CD&R is a Delaware limited liability company. CD&R's business address is at 375 Park Avenue, New York, NY 10152. CD&R is a private investment firm.

21. John C. Compton was the Chairman of the Board of Directors of HRB Co. from June 2016 through December 18, 2019 (the "Petition Date"). During all times relevant to this complaint, Compton was employed by, and was a partner at, CD&R. Compton was employed by CD&R as a "full-time operating executive" and specifically as an "Operating Partner / Advisor" with respect to High Ridge Brands. *See* CDR_00014719; CDR_00022687.

22. Vindi Banga, a/k/a Manvinder Banga, was a Director of HRB Co. from June 2016 through the Petition Date. During all times relevant to this complaint, Banga was employed by, and was a partner at, CD&R. Banga currently resides in London, England, United Kingdom. Banga is a member of CDR LLP, an entity affiliated with CD&R. *See* CDR_00003759. Banga was employed by CD&R as a "full-time operating executive" and specifically as an "Operating Partner / Advisor" with respect to High Ridge Brands. *See* CDR_00014719; CDR_00022687.

23. Kenneth A. Giuriceo was a Director of HRB Co. from June 2016 through the Petition Date. During all times relevant to this complaint, Giuriceo was employed by, and was a partner at, CD&R. Giuriceo led or co-led CD&R's investment with respect to High Ridge Brands. *See* CDR_00014726. CD&R characterized Giuriceo's role in respect to CD&R's investment in High Ridge Brands as a "Financial Partner." *See* CDR_00022687.

24. Gregory Pasqua was a Director of HRB Co. from June 2016 through the Petition Date. During all times relevant to this complaint, Pasqua was employed by, and was a principal at, CD&R.

25. James "Jim" A. Daniels was a Director and Chief Executive Officer of HRB Co. from June 30, 2016 through June 30, 2017.

## III.  NON-PARTIES

26.    Debtor High Ridge Brands Holdings, Inc. was formerly known as CDR HRB Holdings, Inc.

27.    Debtor HRB Co. was, at all times relevant to this complaint, a corporation organized under the laws of the state of Delaware. HRB Co. was an indirect subsidiary of High Ridge Brands Holdings, Inc. HRB Co.'s principal executive offices were located in Connecticut at all times relevant to this action.

28.    Clayton, Dubilier & Rice Fund IX, L.P. a/k/a Clayton, Dubilier & Rice IX ("CD&R Fund IX") is an exempted limited partnership organized under the laws of the Cayman Islands. CD&R Fund IX's 'Registered Office' is Maples Corporate Services Limited, P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands. CD&R Fund IX is a private fund affiliated with CD&R, falling under the CD&R's umbrella registration with the U.S. Securities and Exchange Commission. CD&R Fund IX's Form D filed with the U.S. Securities and Exchange Commission states that Clayton, Dubilier & Rice, LLC is a "Related Person," and that certain employees of CD&R were "Executive officer[s] of the general partner of the general partner." CD&R Fund IX's Form D also states that CD&R Associates IX, L.P. is the "promoter" of CD&R Fund IX. CD&R Fund IX's Form D was signed by Theresa A. Gore, as "Vice President, Treasurer & Assistant Secretary of GP of GP" and was dated August 23, 2013.

29.    CD&R HRB Holdings, L.P. is a limited partnership organized under the laws of the Cayman Islands. CD&R HRB Holdings, L.P. is an investment vehicle controlled and managed by CD&R, and was formed to hold CD&R's investment in the Debtors. CD&R HRB Holdings, L.P. is believed to be owned by CD&R Fund IX, and through which CD&R Fund IX invested in High Ridge.

10

30.     CD&R Advisor Fund IX, L.P. was the advisor to the CD&R Fund IX. CD&R Advisor Fund IX, L.P. is a private fund affiliated with CD&R, falling under the CD&R's umbrella registration with the U.S. Securities and Exchange Commission.

31.     CD&R Associates IX, L.P. was the general partner of CD&R Fund IX. CD&R Associates IX, L.P. is related to CD&R. Defendant Compton is a limited partner of CD&R Associates IX, L.P.

32.     CD&R Investment Associates IX, Ltd. was the general partner of CD&R Associates IX, L.P.

33.     ███████████████, during all times relevant to this complaint, was employed by, and was a partner at, CD&R. ██████ participated in the structuring and issuance of the Notes. *See* CDR_00021186. CD&R characterized ██████'s role in respect to CD&R as being "[r]esponsible for financing transactions and managing lender relationships." *See* CDR_00014726.

34.     ███████████ was, in March 2017, the ████████████████████████ ██████████████████████████████████████████████ was also an employee of CD&R at all times relevant to this complaint. ████ held various positions for the Debtors from June 30, 2016 through August 14, 2019.

35.     Richard S. Kirk, Jr. was, in March 2017, the Chief Financial Officer of HRB Co.

IV.   <u>JURISDICTION AND VENUE</u>

36.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, Section 15.1 of the Plan. This adversary proceeding contains claims that are core and non-core claims under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(2)(F).

37.     Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

38.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## V.  FACTUAL ALLEGATIONS

### A.     Overview of the Debtors' Business

### 1.     Description of the Debtors' Operations, History, and Businesses

39.     High Ridge Brands was formed to acquire the rights to Zest soap brand in the U.S., Canada, Puerto Rico, and certain other Caribbean countries from The Procter & Gamble Company in January 2011. From 2011 to 2015, High Ridge Brands focused their portfolio on skin cleansing and hair care products, developing a broad mix of value brands and channels of distribution. After acquiring the Zest rights in 2011, High Ridge Brands built a multi-brand personal care platform by integrating six additional acquisitions, the last of which was being the Dr. Fresh Acquisition (as defined below).

### B.     The Debtors' Corporate and Capital Structure

40.     Starting on June 30, 2016 with the completion of the Acquisition (as defined below) through the Petition Date, HRB Inc., the top parent company, (i) CD&R HRB Holdings, L.P. owned 1,692,500 shares, or 98.4% of the common stock equity of High Ridge Brands Holdings, Inc., and (ii) certain members of management owned 1.6% of the common stock equity of High Ridge Brands Holdings, Inc. *See In re High Ridge Brands Holdings, Inc.*, 19-12690 (Bankr. D. Del.), D.I. 1, 186, Question 28. Certain members of the Debtors' management also held options that, on an exercised basis, would increase the ownership percentage for the Debtors' management to 10.4%. *See* CDR_00008844.

41.     CD&R HRB Holdings, L.P. acquisition of 1,692,500 shares, or 98.4% of High Ridge Brands Holdings, Inc.'s common stock equity, was funded by transfers of cash from CD&R Fund IX, from Clayton, Dubilier & Rice Fund IX-A, L.P., and CD&R Advisor Fund IX, L.P.

42.     CD&R has expressly identified High Ridge Brands as one of its portfolio companies. *See* https://www.cdr-inc.com/investments#portfolio (last accessed 10/10/2022). On June 30, 2016, "Clayton, Dubilier & Rice announced … that it completed the previously announced acquisition of High Ridge Brands, the largest North American consolidation platform focused on acquiring orphaned personal care brands." *See* https://www.cdr-inc.com/news/press-release/clayton-dubilier-rice-completes-high-ridge-brands-acquisition (last accessed 10/10/2022).

43.     The Debtors' capital structure is as follows in **Figure 1**.

### Figure 1



44.     HRB Co. is the successor in merger to CDR HRB Merger Sub, Inc.

45. As of the Petition Date, the Debtors had (i) $263.4 million of indebtedness under a "First Lien Credit Facility" dated June 30, 2016, (ii) $261 million in outstanding Notes, and (iii) $28.7 million in "trade debt."

**C. CD&R, through its CD&R Directors, Controlled HRB Co. Board's Decision Making and Was Responsible for HRB Co.'s Management**

46. Following the Acquisition on June 30, 2016, HRB Co.'s Board of Directors (the "HRB Co. Board") had five directors. Four of the HRB Co. Board's members were CD&R employees, namely Defendants Compton, Banga, Giuriceo, and Pasqua (collectively, the "CD&R Directors"). The CD&R Directors served on the HRB Co. Board through the Petition Date.

47. Daniels also sat on the HRB Co. Board from June 30, 2016, and through June 30, 2017.

48. Pursuant to HRB Co.'s Bylaws (the "Bylaws"), at each meeting of the HRB Co. Board, HRB Co.'s Secretary (or assistant secretaries) was required to keep the minutes of such a meeting of the HRB Co. Board. *See* Bylaws, § 3.08.

49. The Bylaws permitted action by the consent of the members of the HRB Co. Board. *Id.*, at § 5.01.

50. The Bylaws empower the HRB Co. Board to manage the business, property and affairs of HRB Co. *Id.*, § 3.01. The Bylaws required a quorum composed of a majority of the members of the HRB Co. Board for the transaction of business at any meeting, and to take any action by the HRB Co. Board. *Id.* Pursuant to the Bylaws, the HRB Co. Board were permitted, by resolution passed by a majority of the whole HRB Co. Board, to designate one or more committees, and such committee to consist of two or more of the directors of HRB Co. *See id.*, § 4.08. Pursuant to the Bylaws, "[e]ach committee so formed shall keep regular minutes of its meetings and report the same to the [HRB Co. Board] when required." *Id*. The Bylaws also provided that the HRB Co.

Board was able, by resolution passed by a majority of the whole HRB Co. Board, to designate one or more committees… to consist of two or more directors of HRB Co. *Id.*, § 4.09.

51. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████.

### D.     *The High Ridge Brands Acquisition by CD&R*

52.     On June 30, 2016, HRB Co. was purchased by CD&R HRB Holdings, L.P., for $415 million. This transaction is defined for the purposes of this complaint, as the "Acquisition." The Acquisition was financed with the proceeds of (i) $220 million in "First Lien Term Loans," (ii) the $83 million Arawak Loan, and (iii) $130 million in equity capital from CD&R through CD&R HRB Holdings, L.P. by CD&R Fund IX, Clayton, Dubilier & Rice Fund IX-A, L.P., and CD&R Advisor Fund IX, L.P.

### 1.     Terms of the First Lien Credit Agreement

53.     The First Lien Term Loans were made pursuant to the "First Lien Credit Agreement," dated as of June 30, 2016. The First Lien Term Loans were made by seven banks, and/or their affiliates, (i) BMO Harris Bank N.A., directly or through Bank of Montreal, (ii) Jefferies Finance LLC, (iii) Natixis, New York Branch, (iv) HSBC Bank USA, N.A. ("HSBC"), (v) ING Capital LLC ("ING"), (vi) The Governor and Company of the Bank of Ireland, and (vii) Societe Generale, with BMO Harris Bank N.A. serving as administrative agent and collateral agent thereunder.

### 2. Terms of the Arawak Loan

54. The Arawak Loan was made pursuant to the Second Lien Credit Agreement, dated as of June 30, 2016, among (i) HRB Co., as successor in merger to CDR HRB Merger Sub, Inc., (ii) CDR HRB Buyer, Inc., a Delaware corporation, (iii) the "Subsidiary Borrowers" (as defined therein), (iv) the Lenders (as defined therein), and (v) Cortland Capital Market Services LLC, as collateral agent for the "Lenders," as amended, supplemented or otherwise waived from time to time (the "Arawak Credit Agreement").

55. Arawak was the sole lender of the Arawak Loan. The "Applicable Lending Office and Address for Notice to Arawak was to CD&R at 375 Park Avenue, New York, NY 10152, with the contact email ███████████. *See* Arawak Credit Agreement, Schedule II.

56. The Arawak Credit Agreement was scheduled to mature on June 30, 2023. The Arawak Loan had an interest rate of 11.5%.

57. Debevoise & Plimpton, LLP ("Debevoise") served as counsel to HRB Co., advising HRB Co. with respect to the negotiation of the Arawak Credit Agreement and the incurrence of Arawak Loan.

### 3. The CD&R Consulting Agreement

58. On June 30, 2016, a Consulting Agreement (the "CD&R Consulting Agreement") was executed by and among the CDR HRB Merger Sub, Inc. (prior to the Acquisition), HRB Co. (following the Acquisition), and CD&R. Pursuant to the CD&R Consulting Agreement, CD&R provided management, consulting and advisory services to HRB Co., and its parents and subsidiaries. The CD&R Consulting Agreement states that

> [CD&R] in conjunction with its role as manager of such affiliated investment funds and in order to support and enhance the operational and financial performance of such funds' investments, is willing and able to provide certain consulting services to the Company, Parent, Opco and their respective divisions and subsidiaries (the "Company Group"),…

Consulting Agreement, at 1.

59. The CD&R Consulting Agreement provides that CD&R agrees to provide, among other related entities, HRB Co., with "General Consulting Services" as defined therein, "as may reasonably be requested from time to time by the board of directors … of [CDR HRB Holdings, Inc.] and agreed to by [CD&R]." CD&R Consulting Agreement, § 2(a). The CD&R Consulting Agreement provides that CD&R will provide "Special Consulting Services," as defined therein, and that the services provided by CD&R are not-exclusive to HRB Co., and the other Debtors. See CD&R Consulting Agreement, §§ 2(b), (c).

60. Over the course of the term of the CD&R Consulting Agreement, the Debtors' paid CD&R approximately $1 million per year, in four installments, plus expenses. In the year prior to the Petition Date, CD&R was paid a total of $352,718.68, including a single payment of $250,000 on January 23, 2019.

**E.**   ***The Dr. Fresh Acquisition by High Ridge Brands and the Bridge Loans that Funded that Acquisition***

61. On December 29, 2016, HRB Co. purchased all of Dr. Fresh Holdings LLC's right, title and interest in and to all of the outstanding limited liability company membership interests. The acquisition of Dr. Fresh Blocker LLC ("Dr. Fresh") was funded, in part, with the proceeds of $160 million in "Bridge Loans" borrowed under an Interim Term Loan Facility (the "Bridge Loan Credit Facility").

**1.   Terms of the Bridge Loans**

62. The Bridge Loan Credit Facility was a senior unsecured credit facility, with BMO Harris Bank, N.A. as administrative agent. The lenders under the Bridge Loan Credit Facility were the following entities, and/or their affiliates: (i) BMO Harris Bank, N.A.; (ii) HSBC; (iii) ING; and (iv) Societe Generale.

63.     The Bridge Loan Credit Facility had a maturity date of December 29, 2017, and had an interest rate of LIBOR plus 775 basis points (i.e., 7.75%), with a step-up of 50 basis points (i.e., 0.50%) on a quarterly basis through the term of the Bridge Loan Credit Facility.

64.     Debevoise served as counsel to HRB Co., advising HRB Co. with respect to the negotiation of the Bridge Loan Credit Facility and the incurrence of the Bridge Loans.

> **2.      The CD&R Directors Used the Dr. Fresh Acquisition to Start a Process to Recapitalize HRB Co.'s Capital Structure and the Cash-Out on a Related-Party Loan to HRB Co.**

65.     In a November 21, 2016 CD&R Investment Committee Presentation (the "November CD&R Presentation"), CD&R wrote that they planned on using the Dr. Fresh Acquisition "as an opportunity to recapitalize HRB and create a more permanent capital structure that will facilitate M&A going forward." CDR_00028523. The November CD&R Presentation highlighted the opportunity to recapitalize the Arawak Loan with Notes arranged by BMO and third-party investment banks. *See* CDR_00028524. Specifically, the November CD&R Presentation states that "BMO has provided commitment papers for 100% of the required debt financing ($250M Notes - 8.75% indicative, 10.75% cap) that will be used to fund the transaction and repay the existing 2nd Lien Term loan (delivering 2.0x MOI and 202% IRR to Arawak)." *Id*. Thus, CD&R, through the efforts of its employees, had lined up a back-stop in order to ensure that it could cash-out the Arawak Loan, at a significant internal rate of return, no matter what the prospects of HRB Co.'s business were. In doing so, CD&R would offload risk to investors in Notes irrespective of whether it would have been in the best interests of HRB Co.

> **F.      *Corporate Decision Making Before the March 2017 Recapitalization***

66.     From October 2016 through March 2017, the HRB Co. Board held two meetings, one on October 26, 2016 and one on December 15, 2016.

67. On October 26, 2016, the HRB Co. Board "held a general discussion on the acquisition opportunity, "Project Fresco," likely the Dr. Fresh Acquisition, and "[i]t was agreed by the [HRB Co.] Board that [HRB Co.] would pursue the opportunity and increase the level of diligence activity." *See* CDR_00001048 (HRB Co. meeting minutes dated October 26, 2016 (the "October 2016 Meeting Minutes")).

68. The October 2016 Meeting Minutes do not evidence any specific consideration of the prepayment of the Arawak Loan or the payment of the Arawak Prepayment Penalty. Similarly, the October 2016 Meeting Minutes do not evidence any attention paid to the CD&R Directors' conflict of interest in matters related to the prepayment of the Arawak Loan or the payment of the Arawak Prepayment Penalty. The October 2016 Meeting Minutes do not evidence that any attorney, in-house or otherwise, attended that October 2016 HRB Co. Board meeting to ensure that the HRB Co. Board members were acting consistent with their fiduciary duties to HRB Co. The October 2016 Meeting Minutes do not evidence that the HRB Co. Board formed a committee thereof, independent from CD&R or otherwise, or any report by any standing HRB Co. Board committee, concerning the prepayment of the Arawak Loan or the payment of the Arawak Prepayment Penalty.

69. On December 15, 2016, the HRB Co. Board "held a general discussion on the acquisition of the Dr. Fresh business, integration plans and financing requirements." *See* HRB Co. meeting minutes dated December 15, 2016 (the "December 2016 Meeting Minutes").

70. The December 2016 Meeting Minutes do not evidence the HRB Co. Board's consideration, approval or authorization for HRB Co. prepay the Arawak Loan or to pay the Arawak Prepayment Penalty. Similarly, the December 2016 Meeting Minutes do not evidence that the HRB Co. Board paid any attention to the CD&R Directors' conflict of interest in matters related

to the prepayment of the Arawak Loan or the payment of the Arawak Prepayment Penalty. The December 2016 Meeting Minutes do not evidence that any attorney, in-house or otherwise, attended that December 2016 HRB Co. Board meeting. The December 2016 Meeting Minutes do not evidence that the HRB Co. Board formed a committee thereof, independent from CD&R or otherwise, or any report by any standing Board committee, concerning the prepayment of the Arawak Loan or the payment of the Arawak Prepayment Penalty.

71. The HRB Co. Board's members entered into an undated "Unanimous Written Consent of the HRB Co. Board to Action Without a Meeting" to approve of the Dr. Fresh Acquisition and the entry into the Bridge Loan's Interim Term Loan Facility. That Unanimous Written Consent did not approve or authorize the prepayment of the Arawak Loan (and thus did not approve the Arawak Principal Transfer), or the payment of the Arawak Prepayment Penalty (and thus did not approve the Arawak Prepayment Transfer).

72. The lack of corporate formality here is not surprising. CD&R, through the actions of the CD&R Directors, had a loyalty problem. Instead of recognizing that problem and proactively taking steps to afford HRB Co. the duties it was owed, the CD&R Directors pushed forward with the Arawak Principal Transfer and the Arawak Prepayment Transfer, transfers that served the interests of CD&R, the CD&R Directors, and Arawak, but did not serve the interests of HRB Co.

### G. *The March 2017 Recapitalization by High Ridge Brands*

73. On March 22, 2017, HRB Co. recapitalized its capital structure. On March 22, 2017 HRB Co. issued $250 million of Notes. On March 22, 2017 HRB Co. used the proceeds of the issuance of the Notes to (i) repay the $160.1 million Bridge Loans, (ii) prepay the Arawak Loan, (iii) pay Arawak a $8.3 million for the Arawak Prepayment Penalty, and (iv) pay transaction fees. The issuance of the Notes and these payments are referred to as the "March 2017 Recapitalization."

74. Arawak, HRB Co., and HRB Co.'s subsidiaries who were borrowers and/or guarantors under the Arawak Credit Agreement, executed a "Payoff Letter" dated March 22, 2017 (the "Payoff Letter"). Pursuant to the terms of the Payoff Letter, HRB Co., and HRB Co.'s subsidiaries who were borrowers and/or guarantors under the Arawak Credit Agreement, agreed to transfer to Arawak (i) $83 million to prepay the Arawak Loan (the "Arawak Principal Transfer"), (ii) $8.3 million to pay the Arawak Prepayment Penalty (the "Arawak Prepayment Transfer"), (iii) $2,121,111.12 to pay accrued interest (the "Arawak Interest Transfer"). HRB Co. also transferred $9,693.38 to Arnold & Porter Kaye Scholer LLP for fees incurred on behalf of Cortland Capital Market Services LLC, as collateral agent and Administrative Agent.

75. On March 22, 2017, HRB Co. made each of the following transfers to Arawak: (i) the Arawak Principal Transfer, (ii) the Arawak Prepayment Transfer, and (iii) the Arawak Interest Transfer. The Arawak Principal Transfer, the Arawak Prepayment Transfer, and the Arawak Interest Transfer were accomplished through a transfer to Arawak's account at JPMorgan Chase Bank. JPMorgan Chase Bank did not serve as an agent of Arawak with respect to the Arawak Principal Transfer, the Arawak Prepayment Transfer, and the Arawak Interest Transfer. Arawak has not allowed JPMorgan Chase Bank to act on Arawak's behalf, subject to Arawak's control. Similarly, JPMorgan Chase Bank did not serve as a "custodian" of Arawak with respect to the Arawak Principal Transfer, the Arawak Prepayment Transfer, and the Arawak Interest Transfer, as a "custodian" is defined in 11 U.S.C. §101(11). Rather, Arawak and JPMorgan Chase Bank had a bank account holder's relationship, rendering it a mere creditor-debtor relationship, not a principal and agent relationship. This is best evidenced by the fact that Arawak used the same bank account at JPMorgan Chase Bank from which to fund the Arawak Loan on June 30, 2016 as

21

to which the Arawak Principal Transfer, the Arawak Prepayment Transfer, and the Arawak Interest Transfer were made into.

76.     One week later, on March 29, 2017, CD&R discussed the recapitalization of High Ridge Brands in an internal presentation entitled "High Ridge Brands Operating Review; CD&R Deal Team Discussion Materials". CDR_00004476. In this presentation, CD&R stated that ███ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████ CDR_00004477.

### 1.     The Amount of the Arawak Prepayment Penalty

77.     The amount of the Arawak Prepayment Penalty represented approximately 10% of the principal amount of Arawak Loan then outstanding under the Arawak Credit Agreement. This 10% figure was dictated by CD&R, one or more of the CD&R Directors, and Arawak.

78.     Because the March 2017 Recapitalization was never an arms-length transaction between HRB Co. and the HRB Co. Board's transaction committee, on the one hand, and CD&R, CD&R Fund IX, and Arawak, on the other hand, it doesn't come as a surprise that CD&R and the CD&R Directors decided that a flat ten percent (10%) prepayment penalty would be paid by HRB Co. to Arawak. After all, the CD&R Directors, CD&R, CD&R Fund IX, and Arawak, were just "thrilled" to shift the risk away from Arawak to the third-party Notes' investors while returning Arawak's capital with a 202% internal rate of return (IRR) to Arawak, and enabling Arawak to make new loans to other, more deserving, CD&R portfolio companies.

79.     In fact, the $8.3 million Arawak Prepayment Penalty did not correspond to the Applicable Premium calculated under the Arawak Credit Agreement.

80.     Section 2.12(d) of the Arawak Credit Agreement provided that, prior to June 30, 2018 (i.e., two years after the Acquisition), HRB Co. may prepay the Arawak Loan, subject to

payment to Arawak, a prepayment penalty equal to the "Applicable Premium." Section 1.1 of the Arawak Credit Agreement defined "Applicable Premium" as (i) all required interest payments due on the Arawak Loan being prepaid from the "Voluntary Prepayment Date" through and including the "Applicable Premium Termination Date" **PLUS** (ii) 2% of the principal amount of Arawak Loan being repaid. In each case (i) and (ii), the resulting figure is then discounted to present value at a rate equal to the "Treasury Rate" **PLUS** 0.50%.

81.     The Arawak Credit Agreement then defines "Applicable Premium Termination Date" as June 30, 2018. The "Voluntary Prepayment Date", as defined in section 2.12(d) of the Arawak Credit Agreement, is the date of an optional prepayment of the Initial Term Loans. *See* Arawak Credit Agreement, § 2.12(d). The "Initial Term Loans" means the amount of each Initial Term Loan Lender's Initial Term Loan Commitment. *See id.,* § 2.01. Schedule I(A) to the Second Lien Credit Agreement states that Arawak's Initial Term Loan Commitment was $83,000,000. *Id.*, at Schedule I(A). The "Treasury Rate" as of March 22, 2017, was 1.04%. *See* Exhibit A.

82.     The amount of the "Applicable Premium" under the Arawak Credit Agreement is as follows in **Figure 2**:

**Figure 2**

| Arawak Loan Balance | A | $83,000,000 | |
|---|---|---|---|
| Voluntary Prepayment Date | B | 3/22/2017 | |
| Applicable Premium Termination Date | C | 6/30/2018 | |
| Number of Days between Voluntary Prepayment Date and Applicable Premium Termination Date | D | 465 days | 465 days = C – B |
| Interest Rate | E | 11.5% | |
| Annual Interest on the Arawak Loan Balance | F | $9,545,000 | $9,545,000 = A * E |
| Daily Interest – calculated on 360 days per calendar year | G | $26,513.89 | $26,513.89 = F / 360<br>OR<br>$26,513.89 = $9,545,000 / 360 |
| Incremental Interest Amount | H | $12,328,958 | $12,328,958 = D * G<br>OR<br>$12,328,958 = 465 * $26,513.89 |
| Present Value of Incremental Interest Amount | I | $12,087,970 | $12,087,970 = H / (((1+(1.05% + 0.5%))^(D/360))<br>OR<br>$12,087,970 = $12,328,958 / (((1+(1.05% + 0.5%))^(465/360)) |
| | | | |
| 2.0% of Arawak Loan Balance | J | $1,660,000 | $1,660,000 = A * 2%<br>OR<br>$1,660,000 = $83,000,000 * 2% |
| Present Value of Incremental Interest Amount | K | $1,627,553 | $1,627,553 = J / (((1+(1.05% + 0.5%))^(D/360))<br>OR<br>$1,627,553 = $1,660,000 / (((1+(1.05% + 0.5%))^(465/360)) |
| Total Applicable Premium | L | $13,715,523 | $13,715,523 = I + K<br>OR<br>$13,715,523 = $12,087,970 + $1,627,553 |

83. When the cost to HRB Co. of the prepayment of the Arawak Loan is combined with the amount paid by HRB Co. for the Arawak Prepayment Penalty, it apparent that HRB Co. would receive no benefit from the March 2017 Recapitalization until the end of 2022, at the earliest. This fact is best illustrated by the following **Figure 3**.

24

**Figure 3**
**(in $'s)**

| | Interest Rate | 3/22/17 to 12/31/17 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| **$83,000,000 (Prepayment of Arawak Loan), at Notes' Interest Rate** | 8.875% | 5,811,153 | 7,366,250 | 7,366,250 | 7,366,250 | 7,366,250 | 7,366,250 |
| **$8,300,000 (Arawak Prepayment Penalty) at Notes' Interest Rate** | 8.875% | 581,115 | 736,625 | 736,625 | 736,625 | 736,625 | 736,625 |
| **Total Cost of Financing Prepayment of Arawak Loan AND Arawak Prepayment Penalty** | 8.875% | 6,392,268 | 8,102,875 | 8,102,875 | 8,102,875 | 8,102,875 | 8,102,875 |
| | | | | | | | |
| **Arawak Loan Interest Rate** | 11.5% | 7,529,944 | 9,545,000 | 9,545,000 | 9,545,000 | 9,545,000 | 9,545,000 |
| | | | | | | | |
| **Cumulative Savings to HRB Co., Net of the Arawak Prepayment Penalty** | | (7,162,324) | (5,720,199) | (4,278,074) | (2,835,949) | (1,393,824) | 48,301 |

84. As illustrated by **Figure 3**, any savings that HRB Co. could realize from an 8.875% interest rate on the Notes as compared to the 11.5% interest rate on the Arawak Loan, would only be realized in late 2022, when the cumulative savings would exceed the Arawak Prepayment Penalty. The economic benefits to HRB Co. of the replacement of obligations under the Arawak Loan with obligations represented by the Notes are further reduced by three factors. First, HRB Co. paid approximately $6 million in transaction fees in connection with the issuance of the Notes, and those fees were paid by HRB Co. *See* Exhibit B, at 9. It also stands to reason that the $6 million in transaction fees would have been materially reduced if HRB Co. was looking to refinance $160.1 million of Bridge Loan indebtedness rather than $250.4 million of Bridge Loan, Arawak Loan, and Arawak Prepayment Penalty indebtedness. Second, the Arawak Loan was issued at an origination price of 98% of par. *See* CDR_00000520. Thus, of the $83 million Arawak Loan, $1.66 million represented repayment of the original issuance discount on the Arawak Loan. Third, the economic benefits to HRB Co. of the replacement of obligations under the Arawak Loan with

obligations represented by the Notes is further reduced when the time value of money is considered, insofar as prepayment on March 22, 2017 is worth more than the eventual benefit that HRB Co. could expect to receive in the future.

**2.      Terms of the Notes**

85.      The Notes had a principal amount of $250,000,000. The Notes had a coupon rate of 8.875%, and had a maturity date of March 15, 2025. The Notes were issued at 100% of the principal amount (i.e., at par). Interest was payable on the Notes each March 15, and September 15, commencing on September 15, 2017. The CUSIP number for the Notes issued under Rule 144A was 42979BAA2, and the CUSIP number for the Notes issued under Regulation S was U4323BAA2.

86.      The Notes were initially sold to (i) BMO Capital Markets Corp., (ii) HSBC Securities (USA) Inc., (iii) ING Financial Markets LLC, and (iv) SG Americas Securities, LLC, collectively as the "Initial Purchasers." The Notes were resold by the Initial Purchasers in reliance on Rule 144A of the Securities Act of 1933, to qualified institutional buyers ("QIBs") or in reliance on Regulation S to non-United States investors.

87.      The Notes were resold upon the disclosures found in the Preliminary Offering Memorandum, dated March 10, 2017 (the "Preliminary Offering Memorandum"), and in the Final Offering Memorandum, dated March 17, 2017 (the "Final Offering Memorandum," and with the Preliminary Offering Memorandum, the "Offering Memoranda"). The Preliminary Offering Memorandum and the Final Offering Memorandum are attached hereto as Exhibit B and C, respectively.

88.      Debevoise served as counsel to HRB Co., advising HRB Co. with respect to the Notes. The Final Offering Memorandum stated that Debevoise passed on the validity of the Notes.

The Final Offering Memorandum also stated that Debevoise "has in the past provided, and continues to provide, legal services to CD&R and its affiliates."

89.     The Notes were issued pursuant to an indenture dated March 22, 2017 (the "Base Indenture," attached as Exhibit D) between HRB Co., as issuer, certain Subsidiary Guarantors party thereto, and Wilmington Trust, National Association, as indenture trustee (the "Indenture Trustee"), as supplemented by the first supplemental indenture dated March 22, 2017 (the "First Supplemental Indenture," attached as Exhibit E), among HRB Co., the certain Subsidiary Guarantors party thereto and the Indenture Trustee providing for the issuance of the Notes. As used herein, the term "Indenture" shall mean the Base Indenture, as supplemented by the First Supplemental Indenture.

90.     The Base Indenture provides "[a]ll rights of action and claims under this Indenture or the [2017] Notes may be prosecuted and enforced by the [Indenture] Trustee without the possession of any of the [2017] Notes or the production thereof in any proceeding relating thereto…" Base Indenture, § 605.

91.     The Base Indenture provides that the Base Indenture and the Notes are governed by New York law. *Id.*, § 115. The Base Indenture also provides that HRB Co., the Indenture Trustee, and the holders of the Notes agree to submit to the jurisdiction of the Courts located in New York with respect to any action or proceeding arising out of or relating to the Indenture or the Notes. *Id.*

92.     As noted above, CD&R partner ████████, upon hearing that the Notes would be priced at 8.875%, wrote on March 17, 2017 that such a rate was a "[g]reat outcome" and "[m]uch better than that Arawak rate!" *See* CDR_00023908. CD&R Director Pasqua responded in glee, "[a]greed – highway robbery!" *Id.* Pasqua's words are telling. He bragged that he, along with

27

the CD&R Directors and HRB Co. management team, convinced the Initial Purchasers, and the investors as well as the investment managers acting on behalf of investors who would soon repurchase Notes, to refinance out the high interest rate, secured Arawak Loan, with lower interest rate, unsecured Notes. All the while the CD&R Directors' true opinions of HRB Co.'s prospects had been masked behind their official party line sold to investors.

93. Following issuance of the Notes, HRB Co. was required to make financial information available to holders of Notes and prospective investors in Notes. *See* Base Indenture, § 405. For example, within fifty (50) days after the end of each of the first three fiscal quarters in each fiscal year of HRB Co., beginning with the first fiscal quarter of HRB Co. and ending after the issuance date of the Notes, HRB Co. was required to provide condensed consolidated financial statements of HRB Co. for the quarter to the Indenture Trustee and to the holders of Notes and prospective investors in Notes. *See* Base Indenture, § 405(a)(ii), (b). Also, the Base Indenture required that, within one hundred twenty days (120) days after the end of each fiscal year of HRB Co., beginning with the first fiscal year of HRB Co. and ending after the issuance date of the Notes, HRB Co. must provide condensed consolidated financial statements of HRB Co. for the year to the Indenture Trustee and to the holders of Notes and prospective investors in Notes. *See* Base Indenture, § 405(a)(ii), (b). The Base Indenture also mandated that HRB Co. make reports as a disclosure requirement of the Indenture. These requirements obligated HRB Co. to make reports within in the time for making a report on Form 8-K under the U.S. Securities and Exchange Commission rules.

94. The Base Indenture required HRB Co. to use its commercially reasonable efforts to post copies of the periodic, quarterly and annual reports to HRB Co.'s website, or to a website (which may be nonpublic) to which access is given to holders or Notes, prospective investors in

the Notes who are QIBs, securities analysts (to the extent providing research and analysis of investment in the Notes to investors and prospective investors therein) and market-making financial institutions. *See* Base Indenture, § 405(b). The Base Indenture also gives HRB Co. the flexibility to offer reports to the holders of the Notes, "upon their request." *Id*.

### 3. Resale of the Notes to Investors

95. Because the Notes were resold in reliance on Rule 144A, there was no "underwriter" for the Notes. Rather, the Notes were initially sold to the Initial Purchasers pursuant to a Purchase Agreement dated March 17, 2017 between the Initial Purchasers, HRB Co., and certain Subsidiary Guarantors party thereto.

96. BMO Capital Markets Corp. was initially allocated $118.75 million principal amount of Notes, which it immediately resold to investors. HSBC Securities (USA) Inc. was initially allocated $43.75 million principal amount of Notes, which it immediately resold to investors. ING Financial Markets LLC was initially allocated $45.75 million principal amount of Notes, which it immediately resold to investors. SG Americas Securities, LLC was initially allocated $43.75 million principal amount of Notes, which it immediately resold to investors. The Initial Purchasers resold their Notes to investors upon the disclosures contained in the Offering Memoranda as well as upon the contents of the Investor Presentation and the oral statements made during the Roadshow Meetings. Some of the investors (or investment managers acting on behalf of their managed accounts and clients) purchasing Notes made investment decisions based on these documents and statements.

97. From March 14, 2017 to March 17, 2017, CD&R Director Pasqua, HRB Co. Chief Executive Officer Daniels, and HRB Co. Chief Financial Officer Scott Kirk held a series of in-person and telephonic road-show meetings with investors (the "Roadshow Meetings"). Many of the one-on-one, in-person or telephonic Roadshow Meetings were led by Daniels, with Pasqua

actively participating. Additionally, CD&R Directors Giuriceo, Pasqua, Defendant Daniels, as well as CD&R employees ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ participated in an investor lunch on March 13, 2013 in New York.

**4. Credit Rating Agency Ratings of HRB Co. and the Notes in connection with the March 2017 Recapitalization**

98. Following meetings with Moody's and Standard & Poor's on February 8, 2017 and/or February 9, 2017, each of Moody's and Standard & Poor's assigned HRB Co. and the Notes with ratings. *See* CDR_00021164. On March 13, 2017, Moody's Investors Service assigned "B2" Corporate Family Rating to HRB Co., and rated the Notes "Caa1". *See* CDR_00021164. On March 13, 2017, S&P Global Ratings assigned a "B" corporate family rating to HRB Co., and rated the Notes "CCC+". *See* CDR_00021168.

**5. Corporate Decision Making with Respect to the March 2017 Recapitalization**

99. On March 8, 2017, the HRB Co. Board executed a Unanimous Written Consent of the Board of Directors of HRB Co. adopting certain resolutions attached thereto as Annex A (the "March 8 Resolutions"). The March 8 Resolutions expressed HRB Co.'s desire to issue the Notes and to use the proceeds of that offering to refinance the Bridge Loan, prepay the Arawak Loan, and pay related premiums, penalties, fees and expenses. The March 8 Resolutions also expressed the HRB Co. Board's desire to constitute, and to delegate certain responsibilities relating to the offering, issuance and sale of the Notes to a "Transaction Committee."

100. In the March 8 Resolutions, the HRB Co. Board resolved to establish a Transaction Committee comprised of Defendants Giuriceo, Pasqua and Daniels. The March 8 Resolutions also delegated to the Transaction Committee, acting by a majority vote thereof or by unanimous consent in writing, full power and authority of the HRB Co. Board "to approve, ratify and confirm, if

required, the terms of, and any documents and agreements relating to the Transactions," i.e., relating to the March 2017 Recapitalization.

101. The March 8 Resolutions, approved by all the CD&R Directors and Daniels, approved the Preliminary Offering Memorandum, and authorized the Transaction Committee to approve the final form, terms and provisions of any offering memorandum, purchase agreement, indenture, and related agreements in connection with the offering of the Notes.

102. The March 8 Resolutions did not approve the prepayment of the Arawak Loan (and thus did not approve the Arawak Principal Transfer), or the payment of the Arawak Prepayment Penalty (and thus did not approve the Arawak Prepayment Transfer).

103. On March 17, 2017, Defendants Giuriceo, Pasqua and Daniels executed a Unanimous Written Consent of the Transaction Committee of the HRB Co. Board, adopting certain resolutions attached thereto (the "March 17 Resolutions"). The March 17 Resolutions, did not approve the prepayment of the Arawak Loan (and thus did not approve the Arawak Principal Transfer), or the payment of the Arawak Prepayment Penalty (and thus did not approve the Arawak Prepayment Transfer).

104. On March 22, 2017, Defendants Compton, Banga, Giuriceo, Pasqua, and Daniels executed a Unanimous Written Consent of the HRB Co. Board, adopting certain resolutions attached thereto (the "March 22 Resolutions"). The March 22 Resolutions did not approve the prepayment of the Arawak Loan (and thus did not approve the Arawak Principal Transfer), or the payment of the Arawak Prepayment Penalty (and thus did not approve the Arawak Prepayment Transfer).

105. The HRB Co. Board did not approve the Arawak Principal Transfer, or the Arawak Prepayment Transfer. The HRB Co. Board did not adopt board resolutions specifically authorizing the Arawak Principal Transfer and the Arawak Prepayment Transfer.

106. The CD&R Directors were not independent when the Arawak Principal Transfer and the Arawak Prepayment Transfer occurred.

107. The HRB Co. Board did not consider whether the CD&R Directors were independent when the Arawak Principal Transfer and the Arawak Prepayment Transfer occurred.

108. The HRB Co. Board did not consult with outside counsel with respect to the Arawak Principal Transfer and the Arawak Prepayment Transfer.

109. The HRB Co. Board did not create a HRB Co. Board committee independent from CD&R to review and approve the Arawak Principal Transfer and the Arawak Prepayment Transfer.

**6.      Arawak Served As CD&R's Captive Lender, Makes Loans to CD&R's Portfolio Companies**

110. ███████████████████████, Arawak loaned money to CD&R portfolio companies (where CD&R Fund IX had invested in the borrower company's equity). Examples of this were ████████████████████████████████████ ████████████ High Ridge Brands. *See* CDR_00026816. CD&R employees looked to Arawak as a source of funding for CD&R's portfolio companies, i.e., where CD&R had directed its funds, including CD&R Fund IX, to invest in the borrower company's equity.

111. This was evident here, when on March 21, 2017, immediately before the March 2017 Recapitalization occurred, CD&R employees lobbied for loans from Arawak that would be made from the proceeds of the Arawak Principal Transfer and the Arawak Prepayment Transfer. *See, e.g.,* CDR_00004460; CDR_00004342. In this example, CD&R employees asked ████ for

████████ from Arawak in order to fund financing needs for ████████, another of CD&R's portfolio companies where ████████ had invested in ████████ equity. *See* CDR_00004460; CDR_000041394. ████'s responded, on behalf of Arawak, saying that "[s]ince Arawak is getting repaid tomorrow by High Ridge, we have the capital ready to go." *See* CDR_00004460. ████ made this statement all the while he served as a CD&R Partner and had previously been involved in the issuance of the Notes.

112. Thus, CD&R orchestrated the prepayment of the Arawak Loan and the related payment of the Arawak Prepayment Penalty, while at the same time seeking to use that recovered capital to fund other CD&R portfolio companies. CD&R received a direct benefit for seeing that CD&R would have an available and captive source of money to fund other CD&R portfolio companies. The March 2017 Recapitalization also served to offload the risk of default of the Arawak Loan from Arawak to the third-party investors who purchased Notes.

**H.** ***HRB Co., Under the Control and Oversight of CD&R and the CD&R Directors, Made Materially False and Misleading Statements as well as made Omissions of Material Facts When Marketing the Notes***

113. HRB Co., under the control and oversight of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████) and the CD&R Directors themselves, made materially false and misleading statements, as well as made omissions of material facts when marketing the Notes. HRB Co., under the control and oversight of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), the CD&R Directors themselves, articulated two vastly different visions of HRB Co.'s prospects when marketing the Notes.

**1. Through the Offering Memoranda, Investor Presentations, and Discussions with Potential Investors in the Notes, the CD&R Directors and Daniels Painted an Optimistic Portrait of High Ridge Brands' Prospects**

114. HRB Co., at the direction of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), the CD&R Directors and Daniels, highlighted HRB Co.'s financial condition and prospects. HRB Co.'s investor presentation to potential purchasers of Notes in March 2017 (the "Investor Presentation," attached as Exhibit F) as well as the accompanying Offering Memoranda highlighted the Debtors' financial growth and suggested the Debtors' ability to capture additional market share.

115. HRB Co., at the direction of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), the CD&R Directors and Daniels, highlighted HRB Co.'s cash flow and prospects. The Offering Memoranda stated that HRB Co. had

> ***Strong Cash Flow Generation.*** Our capital-efficient business model enables us to generate strong operating margins and stable free cash flow. Our strategy to primarily outsource manufacturing, warehousing and distribution activities to third parties reduces the investment requirements in fixed assets and working capital. On a pro forma basis, for the twelve-month period ended December 31, 2016, our operating margin and Adjusted EBITDA margin were 8.7% and 21.7%, respectively, and our free cash flow conversion (defined as Adjusted EBITDA less net capital expenditures divided by Adjusted EBITDA) was 98.7% for the same period. We have grown Adjusted EBITDA every year since we were founded in 2011, including growth through acquisitions.

Exhibit B, p. 6 (emphasis in original); Exhibit C, p. 6 (emphasis in original).

116. HRB Co.'s Investor Presentation stated that last twelve-month pro forma adjusted EBITDA as of December 31, 2016, giving effect to the Dr. Fresh Acquisition, would be $80 million. *See* Exhibit F (Investor Presentation), pp. 4, 9, 28.

117. HRB Co., at the direction of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), the CD&R Directors and Daniels,

touted the caliber of HRB Co.'s management leadership team. The Offering Memoranda describe

HRB Co.'s management team as follows:

> ***Management Team with Proven Ability to Acquire, Integrate and Manage Brands.*** Our management team has extensive industry experience and a proven track record of acquiring, integrating, revitalizing and managing a wide variety of brands in several personal care categories. Moreover, our senior management team has expertise in building and scaling a highly efficient supply chain to support growth while maintaining a disciplined approach to cost and quality management.

Exhibit B, p. 6 (emphasis in original); Exhibit C, p. 6 (emphasis in original).

118. HRB Co., at the direction of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), the CD&R Directors and Daniels, highlighted the leadership of Daniels. HRB Co. stated that HRB Co. had a "[s]trong and experienced management team with proven track record of execution." *See* Exhibit F, p. 7. HRB Co.'s Investor Presentation stated that HRB Co. had an "[e]xperienced management team with a track record of success." *See id.*, p. 9. HRB Co.'s Investor Presentation stated that HRB Co. had a "[c]ommitted Senior Management Team with a Strong Track Record" Investor." *See id.*, p. 14. HRB Co. endorsed Daniels' occupancy of the role of Chief Executive Officer of HRB Co. *See id.*, p. 2.

119. HRB Co., at the direction of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), the CD&R Directors and Daniels, highlighted HRB Co.'s strength of customer relationships. The Offering Memoranda emphasized the strength of customer relationships, stating,

> ***Deep and Strategic Customer Relationships.*** We have deep and strategic relationships with our diverse retail partners, which are driven by our scale, consumer brand affinity, flow of innovation, high service standards and speed to market capabilities. Given the decades-long history of many of our brands, our brands have been sold at several of our retail customers since prior to the founding of High Ridge. We are a value-added partner to our retail customers, offering advisory services to assess product categories and consumer needs, collaborating on product development, and jointly exploring white space opportunities. We also

provide customer-oriented services, including delivery, channel and customer specific SKUs and packaging formats, customer pickup programs and replenishment support. Our products are sold by 19 of the top 20 U.S. retailers operating in our product category markets (by revenue), with most of these retailers carrying multiple High Ridge SKUs across each of our product categories. Our key customers include Walmart, Dollar Tree, Dollar General, Walgreens, Kroger, Family Dollar, 99 cents, CVS, HEB, Wakefern and other blue chip retailers. In addition, our experienced management team maintains direct relationships with senior management of many of our key customers, further enhancing the strength of our customer relationships.

Exhibit B, p. 6 (emphasis in original); Exhibit C, p. 6 (emphasis in original).

120. According to HRB Co., "Walmart and Dollar Tree [were] High Ridge's two largest customers, representing approximately 30% and 11% of High Ridge's net sales during the fiscal year ended June 30, 2016 and approximately 28% and 10% for the fiscal year ended June 30, 2015, respectively." Exhibit B, p. 1-2, 29, 89, 95, F-14; Exhibit C, p. 1-2, 29, 89, 95, F-14.

121. The Offering Memoranda are filled with financial projections of net sales, revenues, cash flows, EBITDA, Adjusted EBITDA, net income, gross profits, operating income, among others, pro forma consolidated, with and without Dr. Fresh, as of December 31, 2016. *See, e.g.,* Exhibit B, at 15-17, 23-25, 54-65, 77; Exhibit C, at 15-17, 23-25, 54-65, 77.

122. HRB Co., at the direction of CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ██████), the CD&R Directors and Daniels, highlighted HRB Co.'s ability to "***Pursue Strategic Acquisitions***." Exhibit B, p. 7, 94 (emphasis in original); Exhibit C, p. 7, 94 (emphasis in original). To that end, the Offering Memoranda, each stated that "***[w]e continue to evaluate opportunities*** to scale our platform in existing and adjacent product categories and subcategories through acquisitions." Exhibit B, p. 7, 94; Exhibit C, p. 7, 94 (emphasis added).

123. The statements in the foregoing paragraphs in this section V.H.1 were false and misleading because they were contradicted by the private communications by and between the

CD&R Directors. The statements in the foregoing paragraphs in this section V.H.1 were materially false and misleading and/or failed to disclose material adverse information, required to be disclosed in order to render them not materially misleading or incomplete, because they did not accurately depict HRB Co.'s financial condition and prospects, HRB Co.'s strength of management, HRB Co.'s statements highlighting the leadership of Daniels, and HRB Co.'s strength of customer relationships. As a result, Defendants' statements and omissions made in connection with the marketing and resale of the Notes were materially false and misleading at all relevant times.

### 2. The Offering Memoranda's Presentation of Historical Financial Data Includes Forward Looking Statements

124. The Offering Memoranda include historical EBITDA and Adjusted EBITDA information for the six months ended December 31, 2016. *See* Exhibit B, p. 16; Exhibit C, p. 16.

> We present High Ridge EBITDA and High Ridge Adjusted EBITDA because we believe that ***these measures assist investors in understanding our ongoing operating performance*** by presenting the financial results between periods on a more comparable basis and ***are important supplemental measures of our historical performance***. We also believe these measures are frequently used by investors in the evaluation of companies in our industry.

Exhibit B, p. 16 (emphasis added); Exhibit C, p. 16 (emphasis added); *see also* Exhibit B, p. 21, 24 (same); Exhibit C, p. 21, 24 (same).

### 3. The Offering Memoranda omitted and/or misrepresented material facts then known to the CD&R Directors and Daniels

125. The Offering Memoranda omitted and/or misrepresented material facts then known to the CD&R Directors and Daniels. These omissions and misrepresentations were intended to and were in furtherance of the sale and trading of Notes to and by investors.

126. For example, the Offering Memoranda omitted the fact that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of the CSO.

127. The Offering Memoranda omitted the material fact that Walmart's January 2017 planogram/modular change was adversely impacting HRB Co.'s sales in March 2017. Yet, the Offering Memoranda merely addresses the possibility that

> changes in the strategies of our largest customers, including a … shift of shelf space to "private label" or competitors' products, may harm out net sales, reduce the visibility of our brands to consumers and limit our ability to offer new or improved products to consumers. Any loss of a key customer or a significant reduction in net sales to a key customer could have a material adverse effect on our business, financial condition and results of operations.

Exhibit B, at 29, Exhibit C, at 29.

128. Similarly, CD&R Director Pasqua and the HRB Co. team conducting the "Roadshow Meetings," namely Daniels and Kirk, omitted the material fact that Walmart's January 2017 planogram/modular change was adversely impacting HRB Co.'s sales in March 2017.

129. The Offering Memoranda omitted that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time the Offering Memoranda were finalized and disseminated to potential investors of Notes.

130. The Offering Memoranda omitted the material fact that HRB Co. was 'pencils down' on new strategic acquisitions when the Notes were marketed and sold to investors.

**4. The CD&R Directors' Internal Communications Evidence Omissions and Misstatements in the Offering Memoranda, Investor Presentations, and CD&R Director Pasqua's Discussions with Potential Investors in the Notes**

131. In spite of HRB Co.'s statements highlighting HRB Co.'s financial condition and prospects, some or all of CD&R Directors made private, contradictory statements.

132.    On January 4, 2017, Compton, Giuriceo, and Daniels possessed daily and weekly sales information as of January 1, 2017, that "reflected negative 3.91% year over year growth." *See* CDR_00000532; *see also* CDR_00000529. Giuriceo, and Daniels was aware that High Ridge Brands' sales were declining and missed its pro forma sales projections"by $3mm or so." CDR_00000535; *see also* CDR_00000529–33 (discussing -3.91% YoY growth).

133.    On January 6, 2017, Pasqua knew that HRB Co.'s management anticipated finishing $3.8 million below their 2017 goal for international markets, reflecting sales that were 35% *below* projections. *See* CDR_00008311–12; *see also* CDR_0008859 (noting, on February 8, 2017, that High Ridge Brands' then current gross sales forecast for 2017 was adjusted down by 1.6% from HRB Co.'s December 2016 forecast for 2017).

134.    CD&R also expressed concern about the High Ridge Brands' declining financial performance. On February 8, 2017, Compton emailed Daniels, copying Pasqua, Giuriceo, and CD&R employee ████████, stating that "[t]he last 8 weeks trends are very concerning and are disappointed that we could not better forecast. Feb. is a big month but the first week if off to a slow start against this new forecast." CDR_00001490.

135.    On February 12, 2017, Pasqua, Compton, Giuriceo, and Daniels were informed by Kirk, directly or by forwarded email, that HRB Co.'s January 2017 results and EBITDA were well below projections. *See* CDR_00026792. Kirk wrote that "w[e] have just finished scrubbing our January [2017] results and the EBITDA # is far from what we planned. The reported EBITDA for the month is $2.3MM, $3.1MM off plan primarily because of a $5.0 mm sales shortfall of our highest margin brands." CDR_00026972. Compton then emailed Giuriceo, writing "[d]isaster," and that Compton and Giuriceo "need[ed] to regroup on this team asap." *Id.* Defendant Giuriceo

acknowledged the disastrous effect on HRB Co. and CD&R's investment, writing "[y]es, this is awful." *Id.*

136. On February 13, 2017, Pasqua was informed that HRB Co.'s management was "concerned that we will not be able to hit our 6/30/17 target especially as it relates to the projection included in the [b]ond [o]ffering." CDR_00027465–66.

137. The Investor Presentation stated that the "LTM" or last twelve months ending December 31, 2016 would have a pro forma adjusted EBITDA of $80 million. *See* Exhibit F, at 9. Yet, as of February 13, 2017, Pasqua and Daniels were informed that the actual combined LTM January 2017 EBITDA was only $70.7 million. *See* CDR_00027465. Pasqua and Daniels were informed that the combined EBITDA projections for February 2017 through June 2017 were estimated to range from $69 million to $74.6 million, all less than the projected pro forma LTM Adjusted EBITDA. *See* CDR_00027465.

138. Notwithstanding these dismal results, and lower projections, the CD&R Directors did nothing to inform investors in the Notes, nor correct the information that ultimately was included in the Offering Memoranda and Investor Presentation.

139. On March 24, 2017, two days after the March 2017 Recapitalization closed, CD&R concluded that High Ridge Brands would miss their March 2017 forecast by $2 million in revenue. *See* CDR_00012608–09 (describing High Ridge Brands' performance as "pitiful"). Moreover, the financial metrics being tracked by CD&R showed a sharp decline performance during the first quarter of 2017, including, in particular, a sharp reduction in Adjusted EBITDA.

140. The CD&R Directors' internal communications indicate that the CD&R Directors were aware that HRB Co.'s EBITDA run rate was $77 million, as of March 28, 2017. *See* CDR_00004474.

141.     In spite of HRB Co.'s statements highlighting HRB Co.'s strength of management, some or all of CD&R Directors made contradictory statements in private. CD&R highlighted the strength of High Ridge Brands' senior management team during the March 2017 Recapitalization, noting their "[s]trong and experienced management team with proven track record of execution." But CD&R's internal communications show they concluded High Ridge Brands' management team was incompetent and needed to be replaced.

142.     In November 2016, Compton first warned Daniels to transform his approach to running the Debtors. *See* CDR_00000005.

143.     In early February 2017, Compton directed Daniels that he would take over Walmart sales for the remainder of the year. *See* CDR_0001374. Compton went on to say that even if HRB Co. hires a new CSO, Daniels would still need to lead the sales team. *Id*. Compton shared his email to Daniels with Giuriceo and Pasqua, commenting that the "[h]oneymoon is over." *Id*. Giuriceo wrote that he was "shocked" that Daniels "so easily delegates the Walmart relationship." *Id*.

144.     Daniels proved unable to handle the job and the CD&R Directors knew it. The CD&R Directors privately considered replacing Daniels, HRB Co.'s Chief Executive Officer, but said nothing to investors.

145.     On February 14, 2017, Compton wrote to Banga, copying Pasqua and Giuriceo, stating that Compton was aware that "High Ridge has had a rough couple of months – missing their revenue plan/forecast by abut $9mm. As we have dug in to understand their forecast misses we have discovered that they don't have good processes in place." CDR_00026815. Compton wrote to Banga, copying Pasqua and Giuriceo, stating that Compton was aware that HRB Co.'s management "were basically relying on the Sales Team (which is horribly weak) to give them a number." *Id*. Compton wrote to Banga, copying Pasqua and Giuriceo, stating that Compton was

aware, reflecting that he was "most concerned with Jim [Daniels] and knowledge to granularly manage the company – so will be spending much more 1:1 time with him." *Id*.

146. On February 28, 2017, Giuriceo interviewed potential replacement for Daniels, Joe Arcuri. *See* CDR_00014928.

147. Banga and Compton both were aware of Giuriceo's interview with a potential replacement for Daniels, and Banga offered to meet with the same candidate. *See* CDR_00014928; CDR_0001466–67.

148. By March 8, 2017, Giuriceo and Compton concluded that it was time to fire Daniels and discussed how that leadership change "increases/decreases anxiety with [the Debtors'] underperformance." CDR_00009121–22. On March 8, 2017, Compton wrote that he was "ready to move on" from Daniels, elaborating that Daniels "just doesn't get it. His attitude is laissez faire and constantly contradicts himself". CDR_00009121.

149. Pasqua, Giuriceo and Compton's frustration with Daniels continued throughout March 2017. *See* CDR_00001487–88; CDR_00000678–79; *see also* CDR_0000641 (complaining about Daniels's failure to engage with High Ridge Brands best customers). The CD&R Directors stated on March 9, 2017, "[u]nfortunately I think we are not going to get what we need from [Daniels]." CDR_00001487.

150. On March 23, 2017, the day after the March 2017 Recapitalization closed, Compton wrote Giuriceo, copying Pasqua, stating "I woke up at 1am pissed off that Jim Daniels refuses to consistently meet with our top customers. High Ridge now seems like the exception in that our CEO doesn't engage with our best customers." CDR_00000641.

151. CD&R prepared a March 29, 2017 internal presentation titled "High Ridge Brands Operating Review; CD&R Deal Team Discussions Materials" (the "March 29 CD&R

Presentation"). *See* CDR_00004476. The March 29 CD&R Presentation proclaimed that "[s]ince closing our initial investment in June 2016, we have made meaningful process at High Ridge on a number of key fronts." CDR_00004477. One of those key fronts, according to the March 29 CD&R Presentation, was to "[r]efinance[] the balance sheet via $250 million bond issuance, returning 100% of Arawak capital." *Id*.

152. The March 29 CD&R Presentation reflects the CD&R Directors' awareness that "[r]ecent underperformance has highlighted a number of weaknesses and opportunities at High Ridge that we have quickly begun to take action on." CDR_0004478.

153. The March 29 CD&R Presentation also restated the conclusion of many of the CD&R Directors that "[m]ost importantly, its increasingly unclear whether Jim Daniels is the right long-run leader for the business." *Id*. The March 29 CD&R Presentation repeated the conclusion that the "[n]ext six months will be critical to determining whether Jim's skillset can align with the key drivers of value creation at High Ridge," and reflected that the CD&R Directors "met a high potential replacement candidate … who unfortunately took another job." *Id*.

154. Internally, to CD&R, the CD&R Directors acknowledged their "disappointment with recent performance and questions around the leadership team." *Id*. They weren't just disappointed, though, they were furious, Compton declared to Pasqua his anger in an email copying Giuriceo, stating he was "so mad at these guys. Truly incompetent, lazy, etc." CDR_00000678. Separately, on April 4, 2017, Compton wrote to an executive search recruiter that they "need[ed] to move fast – current CEO is killing us." CDR_00023917. Based on these internal communications, which were so starkly different from the external information provided to Notes investors, CD&R hadn't just lost confidence in Daniels, they now believed he was damaging the business.

155.    In addition, the Offering Memoranda and the Investor Presentation omit the material fact that on January 10, 2017, HRB Co. terminated the employment of Steve Collins – HRB Co.'s CSO. *See* CDR_00008363; CDR_00014339, CDR_00014340, CDR_00014401. The CD&R Directors, and management were aware of Collins termination. *See* CDR_00026062.

156.    The Offering Memoranda and the Investor Presentation omit the material fact that upon Collins' termination, Daniels assumed the title and responsibilities of HRB Co.'s CSO. In fact, neither the Offering Memoranda, nor the Investor Presentation disclose the existence of the position of a chief sales officer. The absence of any discussion of Collins and the position of CSO serves to minimize that role, and Collins' importance to HRB Co. The Offering Memoranda make a generic risk factor disclosure, but omit key information, stating

> ***We depend on our key personnel, and the loss of the services provided by any of our executive officers or other key employees could harm our business, financial condition and results of operations.*** Our success depends to a significant degree upon the continued contributions of our senior management and sales force, many of whom would be difficult to replace. These employees have substantial experience within our industry and many serve multiple executive functions beyond the scope of traditional job titles. These employees may voluntarily terminate their employment with us at any time. We may not be able to successfully retain existing personnel or identify, hire and integrate new personnel at a reasonable cost. Our business may be adversely affected if one or more of these key individuals were to leave.

Exhibit B, at 36-37 (emphasis in original), Exhibit C, at 36-37 (emphasis in original).

157.    Yet, at the time of Collins' termination, Compton warned Daniels that Daniels "will have to take over [Walmart] personally…" CDR_00026040. Daniels informed Compton that "we will work with Steve [Collins] on talk points for key account including Walmart." CDR_00026036.

158.    In spite of HRB Co.'s statements highlighting HRB Co.'s strength of customer relationships, CD&R Directors' Compton, Giuriceo, and Pasqua concluded otherwise in private.

159. In January 2017, Walmart implemented changes to their modular, also known as their MOD or Planogram. Like all retailers, Walmart distributes to their retail locations visual diagrams that specify exact product placement on shelves and aisles in order to maximize sales. The "MOD" is essentially a blueprint to follow as a retailer builds the assortment (a section of facings for several products).

160. In January 2017 Walmart implanted changes to its MOD, resulting in a negative effect on High Ridge Brands' products and results of operations, including sales and revenues. *See* CDR_00012608. One example of this was High Ridge Brands' body wash, which was moved up from eye level to a higher shelf, resulting in a reduced presence compared with certain private label brands being sold by Walmart. *Id*. But the modular changes implemented in January 2017 by Walmart resulted in a more negative effect than HRB Co.'s management anticipated.

161. On February 17, 2017, CD&R employee ████████, held a sales forecasting meeting with Daniels and the HRB Co. management team. *See* CDR_00027092. ████████ provided his account of the meeting to Pasqua, including the fact that Daniels reported that HRB Co.'s management missed their sales forecast. *Id*. ████████ reported that Daniels told him that "his head [was] on the chopping block," and that Daniels owned all of the numbers. *Id*. Even though Daniels held the role of CSO at the time, ████████ reported that it was his impression that Daniels had "not been very involved" and that "he was learning the numbers along with" ████████. *Id*.

162. ████████ also wrote that Daniels and the sales team "have a tendency to project upside and ignore competitive threats and even seasonality." *Id*. ████████ continued "forecasting doesn't contemplate competitive pricing pressure or competitors' increased marketing until after it has hit them for a few months." Moreover, ████████ wrote that "the miss in

January [2017] was driven by retailers holding excess inventory that they're looking to sell down before FYE January (which happens every year). They admitted that this was foreseeable and they simply missed it…" *Id*.

163. On March 9, 2017, Daniels reported back to Compton on Daniels' sales activities with respect to Walmart. *See* CDR_00001487. In that regard, Daniels forwarded an email that he had sent to certain Walmart employees, and received an out of office response. *Id*. Compton wrote to Giuriceo, and Pasqua, that "[y]ou will see the email exchange below: note the time stamp ( yesterday at 6pm). So, no, he had not been in communication with the buyers. Troubling……" *Id*. Pasqua was frustrated with Daniels, and his lack of sales efforts. *Id*. Giuriceo wrote to Pasqua, copying Compton, concluding that Daniels' conduct was not as they expected, stating "[v]ery troubling. Unfortunately I think that we're not going to be able to get what we need from him. If January and February performance did not provide motivation then I don't know what will." *Id*.

164. The March 29 CD&R Presentation also states that the "[l]evel of engagement and nature of dialogue with top customers (notably Walmart) has been inadequate." CD&R_00004478.

165. The March 29 CD&R Presentation noted another troubling issue at Walmart – the Walmart planogram. CD&R_00004478. The March 29 CD&R Presentation noted that the "legacy HRB business ha[d] fallen materially short of plan and the outlook for the year was reduced." CDR_00004523. The March 29 CD&R Presentation also noted that "[d]eclines at Walmart, primarily due to: (i) price gap erosion to competitors on bar soap; (ii) VO5 price increase; (iii) planogram resets." *Id*.

166. As the March 29 CD&R Presentation observed, HRB Co.'s business had fallen off, and Walmart was a factor, leading to the shortfall relative to HRB Co.'s sales plan. This reality was known to the CD&R Directors not only after the March 2017 Recapitalization closed, but in

the months leading up to the March 2017 Recapitalization, yet this information was never conveyed to prospective or actual investors in the Notes.

167. Shortly after the March 2017 Recapitalization, on March 26, 2017, CD&R Director Compton wrote to Daniels, copying Giuriceo and Pasqua, stating "[t]he modular change is now the biggest factor – how did we miss, what is going to be different, etc." CDR_00001915.

168. Only three (3) days later, on March 29, 2017, CD&R Director Compton followed up with Daniels, copying Giuriceo and Pasqua, that "[w]e have so much work to do at WMT," a/k/a Walmart. *See* CDR_00021851. Compton continued that "[o]ur total business in $'s walking out the foot door is very scary… "[w]e need to huddle on this asap." *Id*. Compton also wrote that "[f]ixing WMT is our number one priority – this is largely all self-inflicted." *Id.* Giuriceo followed-up on that email, noting to Compton that Daniels "doesn't know what to do. Complete incompetence." CDR_00012640.

169. On April 4, 2017, CD&R Director Compton wrote that Walmart "is a Crisis: The more I dig into Wal-mart the more I discover issues. Business is currently declining 10%. Zest Body Wash is declining 20% post modular change. Our on the ground leader is not competent – has no idea how to look at business, etc." CDR_00000716. These findings were damning, all the signals were known to CD&R prior to and at the Notes offering. Yet, CD&R pressed ahead with the March 2017 Recapitalization, pushing the risks onto third-party investors who had no way of knowing what CD&R and its CD&R Directors had uncovered or believed. Investors who were misled by CD&R and the CD&R Directors purchased notes that enabled CD&R to repay its affiliated Arawak lenders 100% of their principal, together with a prepayment penalty and freed up capital to be allocated to other CD&R portfolio companies.

170. The Offering Memoranda and the Investor Presentation omit the material fact that HRB Co. was not actively pursuing acquisitions. However, on March 9, 2017, CD&R Director Compton, wrote to Daniels, copying CD&R Directors Giuriceo and Pasqua, that said the secret out-loud, saying that HRB Co. was internally "pencils down on any new deals right now." CDR_00009799. At the same time, at the Roadshow Meetings Daniels and Pasqua told investors that HRB Co. was actively pursuing acquisitions as it was central to CD&R's thesis for HRB Co.

171. Lastly, the CD&R Directors privately expressed misgivings and regret for risking CD&R's limited partners' capital in HRB Co. On February 13, 2017, Giuriceo wrote to Compton, expressing that he and the other CD&R employees had overestimated the capabilities of High Ridge Brands' management. *See* CDR_00026805. Giuriceo expressed that he felt "terribl[e] about the legacy HRB performance and [felt] like we have let down our partners." *Id.* It is telling that Giuriceo's loyalty ran to the limited partners of CD&R and its affiliates, rather than to HRB Co. or the eventual purchasers of Notes. Giuriceo continued "[u]nfortunately this is one of the worst misses following the initial investment that I've seen over my 13 years here." CDR_00026805. "What makes it even more difficult is that we invested another $65 million without having a handle on the team or the base business. We are going to have to get this back on track and this team is going to need a lot of help. Ugh…" *Id*.

172. The statements in section V.H.1, when reviewed in light of the CD&R Directors' private communications as outlined in section V.H.3 and the omissions and misstatements as outlined in section V.H.2, were false and misleading. The statements in section V.H.1 were materially false and misleading and/or failed to disclose material adverse information, required to be disclosed in order to render them not materially misleading or incomplete, because they did not accurately depict HRB Co.'s financial condition and prospects, HRB Co.'s strength of

management, HRB Co.'s statements highlighting the leadership of Daniels, and HRB Co.'s strength of customer relationships. As a result, Defendants' statements and omissions made in connection with the marketing and sale of the Notes were materially false and misleading at all relevant times.

**I.  HRB co., Under the Control of CD&R and the CD&R Directors, Made Material Misstatements concerning HRB Co.'s Skin Care and Hair Care Brands' Sales in November 2018 and April 2019**

173.    On November 16, 2018, HRB Co. made a presentation to lenders, wherein HRB Co. discussed a new hair care line, and stated that "[m]ost points of distribution of any HRB launch to date at 83,600 and counting!!!!" *See* Exhibit G (Presentation to Lenders – Quarter Ending September 30, 2018, dated November 16, 2018), at 11. It is believed that HRB Co. was referring to its new brand, "SGX NYC". The reference to 83,600 points of distribution in the SGX Points of Distribution Disclosure gave Notes' investors optimism of this particular product's prospects. However, this optimism was short lived when the investors in Notes learned that number of retailers at which SGX NYC would be sold was a mere 19,460 retailers' locations. Neither HRB Co. nor its employees specifically explained during the November 16, 2018 lender presentation what HRB Co. was referring to.

174.    That statement was verifiably false and shown to lack considerable context as HRB Co. corrected itself on April 29, 2019 when it presented to the lenders for the quarter ended December 31, 2018. That presentation outlined the sales prospects for the new brand, "SGX NYC" and illustrated key customer sales/marketing status for SGX NYC. However, the number of 'points of distribution' was far below the 83,600 previously disclosed by HRB Co.'s management. SGX NYC was to be sold at a mere 19,460 'points of distribution.' *See* Exhibit H (Presentation to Lenders – Quarter Ending December 31, 2018, dated April 29, 2019), at 11.

175.    The April 29, 2019 presentation also stated that:

A.     "as expected, our net sales continued to drop versus prior year … driven by the bar soap supplier issue."

B.     "[c]ustomer service challenges intensified in bar soap (order cuts spiked to 31% gross sales) while bar soap costs skyrocketed (tolling up 60% + $0.1 per lg incentive)."

C.     "[s]upply chain challenges beyond bar soap intensified as well: inflationary pressures on inputs, labor rates" and

176.     While HRB Co. had a number of different products, the launch and prospects of the SGX NYC product line were thought to be a life-line to a struggling company. In fact, it is HRB Co. that placed a high premium on SGX NYC's future, as a new product that could save the company while HRB Co. encountered extremely poor results in its bar soap product line while it transitioned from a sole source supplier model to a multi-supplier model.

177.     Plaintiff disputes Defendants' unverified argument that HRB Co. "disclosed in the April 2019 lender presentation that the number of points of distribution for SGX NYC had increased to 90,000." *See* Adv. D.I. 37, at 35 (citing Exhibit 4, at 5 (A-00629)). Defendants' Motion Opening Memorandum of Law in support of their motion to dismiss (Adv. D.I. 37) is unverified, and refers to a document that the Defendants' counsel describes as a "Draft Bondholder Call Script for High Ridge Brands Fourth Quarter Investor conference call". *See* Defendants' Appendix in Support of Defendants' Memorandum of Law in Support of their Motion to Dismiss. Fact discovery will reveal whether employees of HRB CO. made the statement that they allegedly made.

178.     Quarterly net sales were slightly down from $78.9MM to $76M, quarterly gross profits were down from $20.6MM to $18.6MM, core EBITDA was down from $9.1MM to $7.6MM.

179.     The Notes sold off from $40.01 per $100 principal amount of Notes to $22.50 per $100 principal amount on May 1, 2019, reflecting a single-day loss in trading value for all Notes

of $43.775 million. Over the following three weeks, the value of all Notes declined by another $38.75 million, trading from $22.50 per $100 principal amount on May 1, 2019 to $7.00 per $100 principal amount on May 23, 2019.

**J.     The Trading Prices of the Notes Evidence that HRB Co. Was Insolvent Far in advance of the Petition Date**

180.    The trading prices of the Notes furnish strong evidence that HRB Co. was insolvent. The market, per the trading prices of the debt, did not believe that the value of HRB Co. exceeded its debt. That a company's bonds are trading at a discount to part (100 cents) is a "useful, though not exclusive, indicator of insolvency." *E.g., In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002).

181.    The Notes traded at less than 90% of par starting on November 29, 2017. *See* Exhibit I. The Notes traded at less than 80% of par starting on April 25, 2018. *See id.* The Notes traded at less than 70% of par starting on May 10, 2018. *See id.* The Notes traded at less than 50% of par starting on May 16, 2018. *See id.* The Notes traded at 40% of par on August 16, 2018. *See id.*

182.    The lenders of the First Lien Term Loans executed a waiver and forbearance dated April 26, 2019. *See* Limited Waiver and First Amendment to First Lien Credit Agreement. The Limited Waiver and First Amendment to First Lien Credit Agreement waived the leverage ratio financial covenant under the First Lien Credit Agreement for the financial covenant periods ending March 31, 2019, and June 30, 2019.

**K.     The Debtor's Bankruptcy Filing and Plan of Reorganization**

183.    On the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court for the District of Delaware. *See*

*In re High Ridge Brands Holdings, Inc. et al.*, Case No. 19-12689-BLS (Bankr. D. Del.) (jointly administered).

184. The Debtors sold substantially all of their assets during the course of the Debtors' bankruptcy cases. Thereafter, the Bankruptcy Court confirmed the Plan.

185. The Plan was jointly proposed by the Debtors and the Official Committee of Unsecured Creditors of the Debtors (the "Creditors' Committee"), as the "Plan Proponents." *See* Plan, at 2.

186. The Plan embodied a settlement with the Creditors' Committee, as specified in the Committee Settlement Annex Agreement, attached to the Plan as Exhibit B. *See* Plan, § 3.3(f); Plan Exhibit B. A critical element of the Plan and the Committee Settlement Annex Agreement was the nonpriority general unsecured creditors of the Debtors bargained for the right to receive the right to net proceeds of "Retained Estate Causes of Action" and that a vehicle would be established to pursue such "Retained Estate Causes of Action."

187. The Committee Settlement Annex Agreement provided that the Plan will establish a trust whose trustee is to be appointed by the Creditors' Committee, which is effectuated by formation of the Liquidating Trust under Section 9.5 of the Plan. *See* Plan, § 3.3(f).

188. The Committee Settlement Annex Agreement also provided that the Plan shall not be deemed to prohibit the Creditors' Committee from establishing a second, separate litigation trust that may include non-estate claims, if contributed by the relevant holders of such claims. *See* Plan, § 3.3(f). The Creditors' Committee elected not to establish a second, separate trust, and instead has determined that non-estate claims contributed by holders of claims would be contributed to the Liquidating Trust, for administrative efficiency. *See* Plan, § 3.3(f). Accordingly,

Section 9.18 of the Plan provides for the transfer of the Retained Non-Estate Causes of Action to the Liquidating Trust. *See* Plan, § 3.3(f); *see also* Plan, § 9.18.

189. The Plan provides for the assignment of the Liquidating Trust Debtor Assets to the Liquidating Trust on the Plan's Effective Date. *See* Plan, § 5.8(a)(ii); *see also* Plan, § 9.1. The Plan also made clear that on the Effective Date, "the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of their rights, title, and interest in and to all of the Liquidating Trust Debtor Assets, and …, the Liquidating Trust Debtor Assets shall automatically vest in the Liquidating Trust …" *See id.*, § 9.5. The Plan also provides that the Liquidating Trustee is the representative of the Debtors' Estates (as defined in the plan, "appointed to administer the Liquidating Trust Debtor Assets pursuant to Bankruptcy Code section 1123(b)(3)(B)."). *Id.*

190. The Plan defines "<u>Liquidating Trust Debtor Assets</u>" as

> … (ii) Retained Estate Causes of Action to the extent that such claims or causes of action include Avoidance Actions or other litigation claims, but not including undisputed contract claims or rights to payment, (iii) any proceeds realized or received from the foregoing assets, (iv) all rights of setoff, recoupment, and other defenses against Claims, and (v) all documents, communications, and information protected by the attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges. For the avoidance of doubt, the Liquidating Trust Debtor Assets shall not include any Claims and Causes of Action that have been released pursuant to the Plan. Any issue with respect to whether a particular claim or right to payment is a Liquidating Trust Debtor Asset or Non-Liquidating Trust Debtor Asset shall be resolved consensually in good faith between the Liquidating Trustee and the Plan Administrator if possible, or absent such a consensual resolution, by the Bankruptcy Court.

*Id.*, § 1.95.

191. "Retained Estate Causes of Action" are all "Causes of Action held by the Debtors against any parties …, including, without limitation, Avoidance Actions…" *Id.*, § 1.133.

192. Pursuant to the Plan, a Liquidating Trust was established for the purpose of pursuing the Liquidating Trust Debtor Assets as well as the Retained Non-Estate Causes of Action (i.e., causes of action of the holders of Notes and the Indenture Trustee). *Id.*, § 9.5.

193. Liquidating Trust Debtor Assets include the "Retained Estate Causes of Action" to the extent that such claims or causes of action include "Avoidance Actions" as such terms are defined in the Plan or other litigation claims. *See id.*, § 1.95.

194. The Plan releases "Claims" and "Causes of Action" belonging to the Debtors and their bankruptcy estates against the "Debtors' Released Parties" who are (i) the Debtors' officers and directors, as of the Petition Date, (ii) the Creditors' Committee, (iii) the Secured Lender Parties (i.e., the First Lien Lenders and their Agent), and (iv) the chapter 11 Professionals (as those terms are defined in the Plan). *See id.*, §§ 1.22, 1.24, 1.43, 1.131, 14.1(b). The Debtors' officers and directors, as of the Petition Date, include the CD&R Directors. However, the Debtors' release excludes claims that arise out of gross negligence or willful misconduct. *See id.*, § 14.1(b).

195. The Plan also provided for third party releases of (i) the Debtors' officers and directors, as of the Petition Date, (ii) the Creditors' Committee, (iii) the Secured Lender Parties, (iv) the Professionals, and (v) the Sponsor (as defined in the Plan). *See id.*, §§ 1.22, 1.24, 1.131, 1.140, 14.1(c).

196. The "Sponsor," as the definition thereof in Section 1.140 of the Plan is applied, means CD&R HRB Holdings, L.P., but does not include any of the CD&R Directors, Arawak, or CD&R. *See id.*, § 1.140.

197. The third-party release under Plan section 14.1(c) excludes claims that arise out of gross negligence, willful misconduct, or fraud. *See id.*, § 14.1(c). The third-party release under

Plan section 14.1(c) excludes claims that are "Retained Non-Estate Causes of Action" as defined in the Plan. *See id*.

198. "Retained Non-Estate Causes of Action" are all "Causes of Action held by Holders of [] Notes or the Indenture Trustee on behalf of Holders of [] Notes under the Indenture, whether direct or derivative, against any parties …, arising from or related to the [] Notes and the Indenture, . . ." *Id.*, § 1.134. "Retained Non-Estate Causes of Action" were deemed transferred to the Liquidating Trust pursuant to Section 9.18 of the Plan and the Liquidating Trust Agreement. *See id.*, §§ 1.134, 9.18. Thus, the Liquidating Trust was vested with all the rights of the holders of Notes and/or the Indenture trustee to pursue causes of action "…, arising from or related to the [] Notes and the Indenture," for the benefit of Liquidating Trust beneficiaries.

199. Plan section 9.18 provides that as of the Plan's Effective Date, Holders of Notes and the Indenture Trustee "shall be deemed to transfer any Retained Non-Estate Causes of Action that they hold to the Liquidating Trust… without the need for any direction to the Indenture Trustee from Holders of [Notes] under the Indenture." *Id.*, § 9.18. The Plan also provides that the Liquidating Trust "shall have standing to pursue such Retained Non-Estate Causes of Action" and that "[o]nly Holders of Liquidating Trust Interests (which include only Holders of Allowed Notes Claims) shall be entitled to receive Distributions from the Liquidating Trust of proceeds of the Retained Non-Estate Causes of Action." *Id*.

200. Prior to the confirmation of the Plan and the Plan's Effective Date, on March 2, 2020, the Bankruptcy Court entered orders approving the sale, free and clear of all liens, claims and encumbrances, of (i) the Debtors' oral care assets (as well as certain non- debtors' oral care assets) to Ranir, LLC [D.I. 291] (the "Oral Care Sale Order") and (ii) the Debtors' hair and skin care assets to TCP HRB Acquisition, LLC [D.I. 294] (the "Hair and Skin Care Sale Order").

201.    Pursuant to the Oral Care Sale Order, the Buyers (as defined therein) are obligated to provide the Sellers (including HRB Co.) with access to books and records in connection with pursuing claims against third parties for a period of three years from the Closing Date (i.e., until April 1, 2023). *See* Oral Care Sale Order, Exhibit A (the Oral Care Sale Asset Purchase Agreement), § 4.9. The Oral Care Sale Order provides that the Bankruptcy Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of the Oral Care Sale Order and the Oral Care Sale Asset Purchase Agreement (as defined as the "Purchase Agreement" in the Oral Care Sale Order). *See* Oral Care Sale Order, ¶ 46.

202.    Pursuant to the Hair and Skin Care Sale Order, the Buyers (as defined therein) are obligated to provide the Sellers (including HRB Co.) with access to books and records in connection with pursuing claims against third parties for a period of three years from the Closing Date (i.e., until April 1, 2023). *See* Hair and Skin Care Sale Order, Exhibit A (the Hair and Skin Care Sale Asset Purchase Agreement), § 4.9. The Hair and Skin Care Sale Order provides that the Bankruptcy Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of the Hair and Skin Care Sale Order and the Hair and Skin Care Sale Asset Purchase Agreement (as defined as the "Purchase Agreement" in the Hair and Skin Care Sale Order). *See* Hair and Skin Care Sale Order, ¶ 47.

**L.    There is Substantial Overlap between the Holders of the Notes from the Initial Offering and the Holders of the Notes as of the Petition Date**

203.    Upon the original issuance of the Notes on March 22, 2017, the Notes were allocated to the following accounts, for each of themselves, and the funds and accounts that such investors managed, as set forth in **Figure 4**.

**Figure 4**

| Holder | Principal Amount of Notes Purchased Issuance (in $s) |
|---|---|
| Aegon USA Investment Management | 9,000,000 |
| Allstate Life Insurance Co. | 9,000,000 |
| Barings LLC ("Barings") | 8,000,000 |
| Beach Point Capital Management LP ("Beach Point") | 12,000,000 |
| Blackrock Financial Management ("BlackRock") | 5,000,000 |
| BlueCrest Capital Management | 250,000 |
| Brigade Capital Management ("Brigade") | 12,000,000 |
| Brown Advisory | 250,000 |
| Cedarview Capital Management | 500,000 |
| Chilian Partners LP | 250,000 |
| CI Financial Inc. | 1,000,000 |
| Citadel Investment Group | 7,500,000 |
| Credit Suisse Asset Management ("Credit Suisse") | 3,000,000 |
| DDJ Capital Management LLC (now known as Polen Capital Credit, LLC) ("DDJ") | 60,000,000 |
| Edgepoint Investment Group Inc. | 7,000,000 |
| Empyrean Capital Partners LP | 2,500,000 |
| Gables Asset Management | 1,000,000 |
| Geode Capital Management LLC ("Geode") | 2,000,000 |
| Global Credit Advisers LLC | 500,000 |
| Guardian Life Insurance Company of America | 1,000,000 |
| JP Morgan Investment Management ("JPM") | 12,000,000 |
| KLS Diversified Asset Management, L.P.("KLS") | 7,000,000 |
| Linnfield Capital Corp. | 500,000 |
| Loews Corporation ("Loews") | 3,500,000 |
| Logan Circle Partners LP | 4,000,000 |
| Lord Abbett & Co. ("Lord Abbett") | 10,000,000 |
| Lorne Steinberg Wealth Management | 1,500,000 |
| Marathon Asset Management ("Marathon") | 9,000,000 |
| Medley Capital LLC | 2,000,000 |
| MidOcean Credit Partners "(MidOcean") | 7,500,000 |
| Millstreet Capital Management LLC ("Millstreet") | 2,500,000 |
| Nomura Corporate Research & Asset Management | 10,000,000 |
| Nuveen Asset Mgmt. | 2,000,000 |
| Pacific Investment Management Co. ("PIMCO") | 6,000,000 |
| Pax World Management Corp. | 1,000,000 |
| Peritus Asset Management LLC | 500,000 |
| PPM America, Inc. | 4,000,000 |
| Putnam Investments LLC ("Putnam") | 9,000,000 |
| Riva Ridge Capital | 1,000,000 |

57

| RMB Capital Management LLC | 500,000 |
|---|---|
| Scott's Cove Management LLC ("Scott's Cove") | 500,000 |
| TCW Asset Management | 8,000,000 |
| TwentyFour Asset Management LLP | 1,000,000 |
| Voya Investment Management LLC | 2,000,000 |
| York Capital Management LP | 10,000,000 |

Source: CDR_00012613.

204. On the Petition Date, HRB Co., under the supervision of the CD&R Directors, filed Official Form 204, listing the Creditors who have the 50 largest unsecured claims. *See* Case No. 19-12689, D.I. 1 (HRB Co. Voluntary Petition). HRB Co.'s top 50 creditor list disclosed the names and contact information for each of the investors who owned Notes as of the Petition Date. *Id*. HRB Co.'s top 50 creditor list also disclosed the principal amount of Notes held by each of those investors, and in many cases, the contact information for the investment manager for the creditor Noteholder. *Id*. There is substantial overlap between the investment managers/investors listed in Figure 4 with the HRB Co.'s top 50 creditor list filed with HRB Co.'s voluntary petition.

205. As of the Petition Date, at least $96,000,000 of Notes were held by "Holders of 2017 Senior Unsecured Notes" as "Holders" is defined in the Plan. These "Holders" of Notes were Credit Suisse, DDJ, Barings (with DDJ, the "Par Noteholders"), JPM, Marathon, PIMCO, Millstreet, Geode, and Scott's Cove. Additionally, Plaintiff believes that such "Holders" held such Notes through the Plan's Effective Date, when the Plan assigned such "Holders" individualized claims to the HRB Co. Liquidating Trust.

**M.** **The Creditors' Committee Conducted a Limited Investigation of Claims and Causes of Action Against CD&R and its Affiliates, and the Trust Has Not Conducted Separate Document Discovery**

206. In connection with the Plan, the Creditors' Committee's counsel investigated potential claims possessed by the Debtors' estates against the Debtors, their directors and officers, and Clayton Dubilier & Rice LLC, and certain of its affiliates. *See* D.I. 643, at p. 24. This

investigation included, among other things, reviewing extensive documents and information received from the Debtors and Clayton Dubilier & Rice LLC, researching and analyzing the viability of potential claims among the Debtors, Clayton Dubilier & Rice LLC, affiliates, directors, and officers. *Id*.

207. While the Trustee has received the documents that were provided to the Creditors' Committee's counsel, the Trustee has not served its own document requests or document subpoenas on CD&R, Arawak, Daniels, or the CD&R Directors. Moreover, even though the Plan provides that the Plan Administrator on behalf of HRB Co. may request access to the debtors' books and records, the Trustee requested access to such documents, but such documents have not been made available by Ranir, LLC as the purchaser under the Oral Care Sale Order or by TCP HRB Acquisition, LLC as the purchaser under the Hair and Skin Care Sale Order. While Ranir has claimed that it has no such documents, TCP HRB Acquisition has been unresponsive and has ignored the Trustee's requests. Therefore, to date the Trustee has been limited to the minimal discovery that has been ascertained through the Creditors' Committee. The Trustee expects that through the completion of a full fact discovery period, the Trustee will uncover more information in support of the allegations in this complaint.

208. The Trustee's need to conduct his own discovery is underscored by the fact that the Trustee has not been employed by or retained to provide legal or other services to the Debtors. The Trustee has played no role in any of the transactions and conduct that give rise to the claims asserted in this complaint. The Trustee has no first-hand knowledge of the allegations in this complaint, except for certain allegations concerning his appointment as Trustee, the structure of the Trust, the claims vested in the Trust, and other related information.

209. Lastly, the Trustee, with the assistance of counsel, has conducted an informal, preliminary investigation of certain subjects relative to the "Holders" of Notes, such as the circumstances related to the representations made by certain Defendants Pasqua, Daniels and non-defendant Kirk at the Roadshow Meetings to investors in Notes, the subsequent disclosures made by Daniels, the CD&R Directors and other former HRB Co. employees to investors in Notes. The Trustee's an informal, preliminary investigation involved direct interviews, and interviews conducted by the Trustee's counsel, with "Holders" of Notes who purchased Notes from the Initial Purchasers in March 2017, and who purchased Notes in the secondary market following that March 2017 offering.

210. During this an informal, preliminary investigation, the Trustee asked and was informed on topics that bear on material misstatements or omissions, scienter, reliance, and loss causation. The Trustee intends to elicit admissible evidence concerning the topics of what was discussed during his informal, preliminary investigation through the mechanisms available under the Federal Rules of Civil Procedure.

VI.    ALLEGATIONS OF SCIENTER

211. The CD&R Directors, CD&R, through its employees, and Daniels acted with scienter in that they knew, or recklessly disregarded, that the Offering Memoranda, the Investor Presentation, and statements issued or disseminated in the name of HRB Co. were materially false and misleading; knew that such statements or documents would be issued or disseminated to investors; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The CD&R Directors, by virtue of their association with and control over HRB Co., which made them privy to confidential information, participated in the fraudulent scheme designed to mask HRB Co.'s financial condition and prospects, HRB Co.'s strength of management, the

leadership of Daniels, and HRB Co.'s strength of customer relationships. The following conduct evidences each Defendant's scienter.

### A. Defendants Compton, Banga, Giuriceo, Pasqua, And Daniels Participated in the Issuance of the Notes.

212. Prior to the creation of the Transaction Committee, Defendants Compton, Banga, Giuriceo, and Pasqua each approved the Preliminary Offering Memorandum. Since the Preliminary Offering Memorandum contains a number of statements that are directly contradicted by Defendants Compton, Banga, Giuriceo, and Pasqua's private internal communications with each other, this indicates that Defendants Banga, Giuriceo, and Pasqua knew or should have known that the Preliminary Offering Memorandum contained material misstatements or omissions.

213. Daniels also approved the Preliminary Offering Memorandum. Since the Preliminary Offering Memorandum contains a number of statements that are directly contradicted by the non-public financial information Daniels was privy to. This indicates that Daniels knew or should have known that the Preliminary Offering Memorandum contained material misstatements or omissions.

### B. Defendants Giuriceo, Pasqua, And Daniels Each Participated in the Drafting of the Offering Memoranda and the Investor Presentation for the Notes.

214. Defendants Giuriceo, Pasqua, and/or Daniels received drafts of the Offering Memorandum for the Notes, in whole or in part.

215. Discovery of privileged communications between Compton, Banga, Giuriceo, and/or Pasqua on one hand, and HRB Co.'s attorneys' at Debevoise & Plimpton, on the other, which privileged communications the Trustee is entitled to review under the Plan, will shed additional light on the comments that the CD&R Directors gave to HRB Co.'s counsel at Debevoise concerning the Offering Memoranda for the Notes. It is extremely likely that CD&R Directors Giuriceo and Pasqua, given their professional experience, took an active role in

supervising HRB Co.'s counsel at Debevoise in the drafting and negotiating the Offering Memoranda.

216. Defendant Pasqua participated in the drafting of the Investor Presentation for the Notes. Defendant Pasqua received drafts of the Investor Presentation for the Notes.

**C. Defendants CD&R, through its employees, Participated in the Issuance of the Notes, including the Drafting of the Offering Memorandum and the Drafting of the Investor Presentation for the Notes.**

217. CD&R employees ▮▮▮ and ▮▮▮▮▮, acting for HRB Co. under the CD&R Consulting Agreement, each received drafts of the Preliminary Offering Memorandum for the Notes.

218. Discovery of privileged communications between CD&R employees ▮▮▮ and ▮▮▮▮▮ on one hand, and HRB Co.'s attorneys' at Debevoise & Plimpton, which privileged communications the Trustee is entitled to review under the Plan, will shed additional light on the comments that CD&R employees ▮▮▮ and ▮▮▮▮▮, acting for HRB Co. under the CD&R Consulting Agreement, gave to HRB Co.'s counsel at Debevoise concerning the Offering Memoranda for the Notes. It is extremely likely that CD&R employees ▮▮▮ and ▮▮▮▮▮, given their professional experience, took an active role in supervising HRB Co.'s counsel at Debevoise in the drafting of the Offering Memoranda.

219. CD&R, through one or more of its employees, participated in the drafting of the Investor Presentation for the Notes. CD&R employees ▮▮▮ and/or ▮▮▮▮▮ each received drafts of the Investor Presentation for the Notes.

**D.**   **Defendants Compton, Banga, Giuriceo, And Pasqua, As CD&R Directors and also as CD&R Employees That Provided Services to HRB Co. Under The CD&R Consulting Agreement, Gained Extensive Knowledge And Insight Into (i) HRB Co.'s Financial Condition And Prospects, (ii) HRB Co.'s Strength Of Management, (iii) The Leadership Of Daniels, And (iv) HRB Co.'s Strength Of Customer Relationships.**

220.   Defendants Compton, Banga, Giuriceo, and Pasqua were members of the CD&R team that provided services to HRB Co. under the CD&R Consulting Agreement. As such, Defendants Compton, Banga, Giuriceo, and Pasqua, gained extensive knowledge and insight into (i) HRB Co.'s financial condition and prospects, (ii) HRB Co.'s strength of management, (iii) the leadership of Daniels, and (iv) HRB Co.'s strength of customer relationships.

### 1.   HRB Co.'s Financial Condition and Prospects

221.   Defendants Compton, Banga, Giuriceo, and Pasqua were well aware of HRB Co.'s poor financial prospects. For instance, as of January 4, 2017, Defendants Compton, Giuriceo, and Daniels possessed daily and weekly sales information as of January 1, 2017, that "reflected negative 3.91% year over year growth." *See* CDR_00000532; *see also* CDR_00000529. Defendants Compton, Giuriceo, and Daniels were aware that High Ridge Brands' sales were declining and missed its pro forma sales projections "by $3mm or so." CDR_00000535; *see also* CDR_00000529–33 (discussing -3.91% YoY growth).

222.   Moreover, as of January 6, 2017, Defendant Pasqua knew that HRB Co.'s management anticipated finishing $3.8 million below their 2017 goal for international markets, reflecting sales that were 35% *below* projections. *See* CDR_00008311–12; *see also* CDR_0008859 (noting, on February 8, 2017, that High Ridge Brands' then current gross sales forecast for 2017 was adjusted down by 1.6% from HRB Co.'s December 2016 forecast for 2017). Further, on February 8, 2017, Compton emailed Daniels, copying Pasqua, Giuriceo, and CD&R employee ▮▮▮▮▮▮, to shed his view concerning HRB Co.'s recent performance. Compton stated that

"[t]he last 8 weeks trends are very concerning and are disappointed that we could not better forecast. Feb. is a big month but the first week if off to a slow start against this new forecast." *See* CDR_00001490. 135. Then, on February 12, 2017, Defendants Pasqua, Compton, Giuriceo, and Daniels were informed by Kirk, directly or by forwarded email, that HRB Co.'s January 2017 results and EBITDA were well below projections. *See* CDR_00026792. Kirk wrote that "w[e] have just finished scrubbing our January [2017] results and the EBITDA # is far from what we planned. The reported EBITDA for the month is $2.3MM, $3.1MM off plan primarily because of a $5.0 mm sales shortfall of our highest margin brands." CDR_00026972.

223. Compton then emailed Giuriceo, writing "[d]isaster," and that Compton and Giuriceo "need[ed] to regroup on this team asap." *Id*. Defendant Giuriceo acknowledged the disastrous effect on HRB Co. and CD&R's investment, writing "[y]es, this is awful." *Id.*

224. Finally, on February 13, 2017, Pasqua was informed that HRB Co.'s management was "concerned that we will not be able to hit our 6/30/17 target especially as it relates to the projection included in the [b]ond [o]ffering." *See* CDR_00027465–66

225. Despite being aware of the above referenced information, the Offering Memoranda omitted that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time the Offering Memoranda were finalized and disseminated to potential investors of Notes. Since Defendants Compton, Banga, Giuriceo, and Pasqua knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from QIB investors, and that the representations that were being made to QIB investors were materially false, misleading and/or incomplete, Defendants Compton Banga, Giuriceo, and Pasqua are responsible and liable for the representations contained therein, or omitted therefrom.

## 2. HRB Co.'s Strength of Management and the Leadership of Daniels

226. Defendants Compton, Banga, Giuriceo and Pasqua were well informed concerning HRB Co.'s poor management, which was led by Daniels. Despite being aware of a blatant lack of leadership, HRB Co., at the direction of CD&R and the CD&R Directors, continued to highlight the leadership of Daniels to potential investors. HRB Co. stated that HRB Co. had a "[s]trong and experienced management team with proven track record of execution." *See* Exhibit F, p. 7. HRB Co.'s Investor Presentation stated that HRB Co. had an "[e]xperienced management team with a track record of success." *See id*., p. 9. Further, HRB Co.'s Investor Presentation stated that HRB Co. had a "[c]ommitted Senior Management Team with a Strong Track Record" Investor." *See id*., p. 14. And HRB Co. endorsed Daniels' occupancy of the role of Chief Executive Officer of HRB Co. *See id.*, p. 2.

227. Despite the rosy picture painted to investors, Defendant Compton was well aware and was the most critical of Daniels lack of leadership behind the scenes. Compton repeatedly expressed his view on Daniels shortcomings with the other CD&R Directors. As early as November 2016, Compton warned Daniels to transform his approach to running the Debtors. *See* CDR_00000005. A few months later, in early February 2017, Compton directed Daniels that he would take over Walmart sales for the remainder of the year. *See* CDR_0001374.

228. Moreover, despite propping Daniels and the HRB Co. management team up to potential investors, Defendants Compton, Banga, Giuriceo, and Pasqua began to seriously doubt Daniels' long-term presence at HRB Co. The March 29 CD&R Presentation expressed these doubts when it stated "[m]ost importantly, its increasingly unclear whether Jim Daniels is the right long-run leader for the business." *See* CDR_0004478 The March 29 CD&R Presentation repeated the CD&R Directors' conclusion that the "[n]ext six months will be critical to determining whether Jim's skillset can align with the key drivers of value creation at High Ridge," and reflected that

the CD&R Directors "met a high potential replacement candidate … who unfortunately took another job."

229. But it is clear from emails between, Defendants Compton, Banga, Giuriceo, and Pasqua that Daniels was not in serious consideration to remain as CEO of HRB Co., for even the projected six-month timeframe. On April 18, 2017, just weeks after the March 2017 Recapitalization, Compton stated in an email to Daniels, copying Banga, Giuriceo, and Pasqua among others: "Probably the worst Quarterly performance I have ever seen in CPG -- sales down 11%, profits down 55%, market share loses across every category, new products not performing as expected, customers making changes to our planograms without our knowledge or our value expertise…" and "Hopefully the worst is behind us and we can plot a path of sustainable growth going forward. *See* CDR_00000780. Banga responded to Compton's email, excluding Daniels, replying "Thanks John- not a pretty picture! *See* CDR_00000779. To which Compton replied "Need CEO asap." *Id.*

230. Therefore, since Defendants Compton, Banga, Giuriceo, and Pasqua were aware of serious inefficiencies concerning HRB Co.'s management, and specifically that Daniels was not suited to remain CEO of HRB Co., but failed to inform any potential investors of these facts, Defendants Compton, Banga, Giuriceo, and Pasqua acted with scienter and are responsible and liable for the inaccurate representations made to investors concerning HRB Co's management and the leadership of Daniels.

### 3. HRB Co.'s Strength of Customer Relationships

231. Defendants Compton, Banga, Giuriceo, and Pasqua publicly highlighted HRB Co.'s strength of customer relationships. So much so that the Offering Memoranda emphasized the strength of HRB Co's customer relationships, particularly the relationship with key customers Walmart and Dollar Tree. Despite HRB Co. making these representations to potential investors,

Defendants Compton, Banga, Giuriceo, and Pasqua concluded otherwise in private. These reservations were brought to light in the March 29 CD&R Presentation, which highlighted that HRB Co's strength of relationship with key customers was deteriorating.

232. Specifically, the March 29 CD&R Presentation stated that the "[l]evel of engagement and nature of dialogue with top customers (notably Walmart) has been inadequate." *See* CD&R 00004478. The March 29 CD&R Presentation noted another troubling issue at Walmart – the Walmart planogram. *See* CD&R_00004478. The March 29 CD&R Presentation noted that the "legacy HRB business ha[d] fallen materially short of plan and the outlook for the year was reduced." CDR_00004523. The March 29 CD&R Presentation also noted that "[d]eclines at Walmart, primarily due to: (i) price gap erosion to competitors on bar soap; (ii) VO5 price increase; (iii) planogram resets." *Id*. As the March 29 CD&R Presentation observed, HRB Co.'s business had fallen off, and Walmart was a factor, leading to the shortfall relative to HRB Co.'s sales plan.

233. Because Defendants Compton, Banga, Giuriceo, and Pasqua were aware of their dampening relationship with certain key customers including Walmart, but continued to highlight their strength of customer relationships with potential investors, Defendants Compton Banga, Giuriceo, and Pasqua are responsible and liable for the representations contained therein, or omitted therefrom.

**E. Daniels, As Chief Executive Officer Of HRB Co., Gained Extensive Knowledge And Insight Into (i) HRB Co.'s Financial Condition And Prospects, And (ii) HRB Co's Customer Relationships.**

234. Daniels as the Chief Executive Officer of HRB Co., gained extensive knowledge and insight into (i) HRB Co.'s financial condition and prospects, and (ii)HRB Co.'s strength of customer relationships. Like Defendants Compton and Giuriceo, Daniels possessed daily and weekly sales information as of January 1, 2017, that "reflected negative 3.91% year over year growth." *See* CDR_00000532; *see also* CDR_00000529. Giuriceo, and Daniels was aware that

High Ridge Brands' sales were declining and missed its pro forma sales projections"by $3mm or so." CDR_00000535; *see also* CDR_00000529–33 (discussing -3.91% YoY growth). Therefore, at a minimum, Daniels was aware of HRB Co.'s financial condition and lack of potential prospects, on a weekly basis.

235. Daniels was also aware of the deterioration of certain customer relationships, notably Walmart, which HRB Co. management, including Daniels, had continually represented as a strength. On February 17, 2017, most of this information was provided directly to Daniels by CD&R employee ▮▮▮▮▮▮. On February 17, 2017, ▮▮▮▮▮▮ held a sales forecasting meeting with Daniels and the HRB Co. management team. *See* CDR_00027092. ▮▮▮▮▮▮ provided his account of the meeting to Pasqua, including the fact that Daniels reported that HRB Co.'s management missed their sales forecast. *Id.* ▮▮▮▮▮▮ reported that Daniels told him that "his head [was] on the chopping block," and that Daniels owned all of the numbers. *Id.* Even though Daniels held the role of CSO at the time, ▮▮▮▮▮▮ reported that it was his impression that Daniels had "not been very involved" and that "he was learning the numbers along with" ▮▮▮▮▮▮. *Id.*

236. Thus, since Daniels was aware of these factors but failed to make this information known to potential investors, Daniels is responsible and liable for the representations contained therein, or omitted therefrom.

**F.     As Members Of The HRB Co. Board Defendants Compton, Banga, Giuriceo, Pasqua And Daniels Were Responsible For The Business, Property, And Affairs Of HRB. Co.**

237.  As members of the HRB Co. Board, Defendants Compton Banga, Giuriceo, Pasqua and Daniels were responsible for the business, property and affairs of HRB Co. Further, Defendants Compton Banga, Giuriceo, Pasqua and Daniels as members of the HRB Co. Board,

controlled the contents of HRB Co.'s public statements, and had access to material, adverse, nonpublic information concerning all aspects of HRB Co.'s business.

238. Additionally, because Defendants Compton Banga, Giuriceo, and Pasqua were also employees of CD&R, they were provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their use and had the ability and opportunity to prevent their use or cause them to be corrected. Moreover, like the CD&R Directors, Daniels, as Chief Executive Officer of HRB Co., had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their use and had the ability and opportunity to prevent their use or cause them to be corrected.

239. Because of their positions and access to material non-public information about HRB Co., Defendants Compton Banga, Giuriceo, Pasqua and Daniels knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from QIB investors, and that the representations that were being made to QIB investors were materially false, misleading and/or incomplete.

240. Therefore, Defendants Compton Banga, Giuriceo, Pasqua and Daniels are responsible and liable for the representations contained therein, or omitted therefrom.

**G.    As Members of the Transaction Committee, Defendants Giuriceo, Pasqua, and Daniels were directly responsible for the approval, ratification and confirmation of the terms of and any documents and agreements related to the March 2017 Recapitalization**

241. As members of the Transaction Committee, Defendants Giuriceo Pasqua and Daniels were directly responsible for the approval, ratification and confirmation of the terms of and any documents and agreements related to the March 2017 Recapitalization. Thus, Defendants Giuriceo, Pasqua and Daniels are directly responsible and liable for the material misstatements and/or omissions within the documents and agreements related to the March 2017 Recapitalization.

242. Moreover, Defendants Daniels and Pasqua approved the Final Offering Memorandum. The Final Offering Memorandum contains a number of material misstatements or omissions which were known or should have been known by Defendants Daniels and Pasqua.

243. Further, since the Final Offering Memorandum contains a number of statements that are directly contradicted by Pasqua's private communications with other CD&R Directors, as well as private communications received by Pasqua from the other CD&R Directors, this indicates that Pasqua knew or should have known that the Final Offering Memorandum contained material misstatements or omissions. Pasqua said that CD&R and HRB Co. had committed 'highway robbery' on the investors of Notes. *See* CDR_00023908

244. Since both Daniels and Pasqua approved the Final Offering Memorandum when they knew or should have known that the Final Offering Memorandum contained material misstatements or omissions, they are responsible and liable for the representations contained therein, or omitted therefrom.

**H.     Defendants Pasqua And Daniels Directly Interacted With Potential Investors In Connection With The Sale Of The Notes, And Presented Information That Was Materially False And Omitted Relevant Information Therein.**

245. Defendants Pasqua and Daniels directly interacted with potential investors in connection with the marketing and sale of the Notes. Defendants Pasqua and Daniels were among the attendees who presented on behalf of HRB Co. to potential investors. *See* Exhibit F, at 3.

246. Since Defendants Pasqua and Daniels presented information that they knew or should have known to be materially false to potential investors, Defendants Pasqua and Daniels are responsible and liable for the representations contained therein, or omitted therefrom.

70

**I.** **Defendants Pasqua and Daniels attempted to avoid the disclosure of High Ridge Brands financial problems in communications of potential purchasers of the Notes.**

247. Defendants Pasqua and Daniels attempted to avoid disclosure of High Ridge Brands' financial problems in communications with potential purchasers of Notes. Although CD&R was asked about the Debtors' 2017 performance during the March 2017 Recapitalization process, Defendants Pasqua and Daniel avoided disclosure of High Ridge Brands' then recent financial problems with prospective debt purchasers. *See* CDR_00033245–46. For example, on March 16, 2017, an employee of BMO anticipated that an analyst at Beach Point was very focused on how the first quarter of 2017 was shaping up, and how sales looked across the product segments for January and February 2017. *Id*. BMO, however, relayed their understanding that "it does not seem like there is much guidance [Pasqua, Daniels and Kirk] would be comfortable providing." *Id*. The BMO employee relayed in his email that HRB Co. may be uncomfortable disclosing this information "for competitive reasons or other disclosure concerns.")

248. Therefore, Defendants Pasqua and Daniels are responsible and liable for the representations contained therein, or omitted therefrom

**VII. ADDITIONAL LOSS CAUSATION ALLEGATIONS**

249. CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ██████ and ████████), the CD&R Directors' and Daniels' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by all holders of Notes. The Notes were issued at par, and investors in the Notes would have wanted to know the truth, which was materially contrary to the material statements in the Offering Memoranda, the Investor Presentation, and communications with investors. HRB Co.'s financial condition and prospects, HRB Co.'s strength of management, the leadership of Daniels, and HRB Co.'s strength of customer relationships was misrepresented by Defendants to purchasers of Notes, resulting in the

artificially inflated trading prices of the Notes. The true nature of HRB Co.'s financial condition and prospects, HRB Co.'s strength of management, the leadership of Daniels, and HRB Co.'s strength of customer relationships leaked out over the years as HRB Co.'s reported poor financial performance, and eventually resulted in the Debtors' bankruptcy filing, resulting in losses of approximately 95% of the principal amount of the Notes.

250. For example, HRB Co.'s annual report, for the year ending June 30, 2017, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, (B) the leadership of Daniels, and (C) HRB Co.'s strength of customer relationships, (iii) that HRB Co. had fired is Chief Sales Officer in early January 2017 and had not yet hired a replacement. *See* Exhibit J (HRB Co. 2017 Annual Report for period ending June 30, 2017). Similarly, HRB Co.'s presentation to Noteholders related to HRB Co.'s annual report, for the year ending June 30, 2017, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, (B) the leadership of Daniels, and (C) HRB Co.'s strength of customer relationships, (iii) that HRB Co. had fired is Chief Sales Officer in early January 2017 and had not yet hired a replacement. *See* Exhibit K (Presentation to Bond Holders – Quarter and Year Ended June 30, 2017, dated October 27, 2017).

251. HRB Co.'s quarterly report for the quarter ended September 30, 2017, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer

relationships, (iii) that HRB Co. had fired is Chief Sales Officer in early January 2017 and had not yet hired a replacement. *See* Exhibit L (HRB Co. Quarterly Report for period ending September 30, 2017). Similarly, HRB Co.'s presentation to Noteholders related to HRB Co.'s quarterly report for the quarter ended September 30, 2017, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships, (iii) that HRB Co. had fired is Chief Sales Officer in early January 2017 and had not yet hired a replacement. *See* Exhibit M (Presentation to Bond Holders – Quarter Ended September 30, 2017, dated November 17, 2017).

252. HRB Co.'s quarterly report for the quarter ended December 31, 2017, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships, (iii) that HRB Co. had fired is Chief Sales Officer in early January 2017 and had not yet hired a replacement. *See* Exhibit N (HRB Co. Quarterly Report for period ending December 31, 2017). Similarly, HRB Co.'s presentation to Noteholders related to HRB Co.'s quarterly report for the quarter ended December 31, 2017, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships. *See* Exhibit O (Presentation to Bond Holders – Quarter & Stub Year Ending December 31, 2017, dated April 20, 2018). While HRB Co.'s Presentation to Bond Holders – Quarter & Stub Year Ending December 31, 2017

nonchalantly discloses that HRB Co. had hired Rob Jelinek as the Chief Sales Officer, it did so in passing, without specific explanation. *See* Exhibit O, at 15.

253. HRB Co.'s quarterly report for the quarter ended March 31, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships. *See* Exhibit P (HRB Co. Quarterly Report for period ending March 31, 2018). Similarly, HRB Co.'s presentation to Noteholders related to HRB Co.'s quarterly report for the quarter ended March 31, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships. *See* Exhibit Q (Presentation to Lenders– Quarter Ending March 31, 2018, dated May 16, 2018).

254. HRB Co.'s quarterly report for the quarter ended June 30, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships. *See* Exhibit R (HRB Co. Financial Report for period ending June 30, 2018). Similarly, HRB Co.'s presentation to Noteholders related to HRB Co.'s quarterly report for the quarter ended June 30, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management,

(B) the leadership of Daniels, and (C) HRB Co.'s strength of customer relationships. *See* Exhibit S (Presentation to Lenders– Quarter Ending June 30, 2018, dated August 16, 2018).

255. HRB Co.'s quarterly report for the quarter ended September 30, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships. *See* Exhibit T (HRB Co. Financial Report for period ending September 30, 2018). Similarly, HRB Co.'s presentation to Noteholders related to HRB Co.'s quarterly report for the quarter ended September 30, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, (B) the leadership of Daniels, and (C) HRB Co.'s strength of customer relationships. *See* Exhibit G.

256. HRB Co.'s "Annual Report" for the year ended December 31, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships. *See* Exhibit U (HRB Co. Annual Report for period ending December 31, 2018). Similarly, HRB Co.'s presentation to Noteholders related to HRB Co.'s quarterly report for the quarter ended December 31, 2018, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management,

(B) the leadership of Daniels, and (C) HRB Co.'s strength of customer relationships. *See* Exhibit H.

257.    HRB Co.'s Financial Report for the period ended March 31, 2019, does not say anything about (i) the Walmart's 2017 planogram change and the material impact it was having on HRB Co.'s business performance, (ii) that HRB Co. no longer stood by their characterization of (A) the strength of HRB Co.'s management, and (B) HRB Co.'s strength of customer relationships. *See* Exhibit V (HRB Co. Financial Report for period ending March 31, 2019).

258.    Additionally, Daniels' termination from HRB Co. for performance related issues was not disclosed to investors in Notes. Rather, HRB Co. issued a press release stating that "Jim Daniels, previously Chief Executive Officer of the Company, will be leaving to explore other career opportunities." *See* Exhibit W (Press Release Dated July 6, 2017).

259.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions alleged herein would entice investors to purchase Notes at artificially inflated levels, since investors could not accurately evaluate the true nature of HRB Co.'s financial condition and prospects, HRB Co.'s strength of management, the leadership of Daniels, and HRB Co.'s strength of customer relationships, and the artificially inflated trading levels of the Notes was directly and proximately caused by Defendants' materially false and misleading statements and omissions.

VIII.   EVIDENCE OF RELIANCE

260.    As supported by his informal, preliminary investigation, Plaintiff will rely on evidence that will be elicited from the Par Noteholders purchased at least $68,000,000 principal amount of Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings.

261. As supported by his informal, preliminary investigation, Plaintiff will rely on evidence that will be elicited from the Par Noteholders that the Par Noteholders would not have purchased at least $68,000,000 principal amount of Notes from the Initial Purchasers had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

262. As supported by his informal, preliminary investigation, Plaintiff will rely on evidence that will be elicited from the Par Noteholders that the Par Noteholders also purchased at least $49,367,000 principal amount of Notes in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, and would not have purchased Notes in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation contained material misstatements or omissions about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and

that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

263. Plaintiff suspects that fact discovery of JPM, Marathon, PIMCO, Credit Suisse, Millstreet, Geode, and Scott's Cove, may reveal that such investors, as "Holders" of $28 million of Notes purchased at offering may have purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings.

264. Plaintiff suspects that fact discovery will also reveal the terms by which JPM, PIMCO, Credit Suisse, Millstreet, Geode, and Scott's Cove, as "Holders" of $72,355,000 principal amount of Notes, purchased such Notes, and whether such "Holders" purchased Notes in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings.

IX. DEFENDANT BANGA HAS MINIMUM CONTACTS TO ESTABLISH PERSONAL JURISDICTION

265. Defendant Banga has purposefully directed his actions at the United States of America with sufficiency to satisfy the minimum contacts requirement. A number of key facts supports this allegation.

266. Banga willfully and voluntarily served as a director of HRB Co. at all times relevant to this Complaint.

267. Banga participated in HRB Co. Board meetings and actively managed the affairs of HRB Co. and its operations in the United States.

268. As a director of HRB Co., Banga purposefully participated in the decisions related to the March 2017 Recapitalization, including, without limitation, the Arawak Principal Transfer, the Arawak Prepayment Transfer, and the issuance of the Notes. Banga could have reasonably anticipated that he would be sued in a court in the United States of America in connection with one or more of these transactions.

269. Banga executed a written consent that authorized one or more of the Debtors' bankruptcy filings. *See, e.g.*, Case No. 19-12689, D.I. 1.

270. Banga benefitted personally as a result of the confirmation of the Plan. This is because Banga qualifies as one of the "Debtors' Released Parties," and was released under the Plan from claims and Causes of Action belonging to the Debtors and their bankruptcy estates, except for claims that arise out of gross negligence or willful misconduct. *See* Plan, §§ 1.22, 1.24, 1.43, 1.131, 14.1(b). The Debtors' officers and directors, as of the Petition Date, include the CD&R Directors. However, the Debtors' third-party release excludes claims that arise out of gross negligence or willful misconduct. *See id.*, § 14.1(b). Moreover, Banga received the benefit of certain injunctions and other exculpations under the Plan. *See* Plan, § 14.1(a).

## X. DEFENDANT ARAWAK HAS MINIMUM CONTACTS TO ESTABLISH PERSONAL JURISDICTION

271. Defendant Arawak has purposefully directed its actions at the United States of America with sufficiency to satisfy the minimum contacts requirement. A number of key facts supports this allegation.

272. Arawak regularly conducts business in the United States of America. Arawak loaned money to HRB Co. under the Arawak Credit Agreement. The Arawak Credit Agreement is governed by the law of the State of New York. *See* Arawak Credit Agreement, at § 11.2. Arawak, pursuant to the Arawak Credit Agreement, specifically submitted to the jurisdiction of the State of New York. *Id.*, § 11.3. Arawak also waived any objection to the laying of venue or based on the grounds of forum *non conveniens*. *Id*.

273. Additionally, ███████████████████████, Arawak loaned money to CD&R portfolio companies (where CD&R Fund IX had invested in the borrower company's equity), located in the United States. Examples of this were ████████████████████████ ████████████████████████ High Ridge Brands. *See* CDR_00026816.

274. Thus, Arawak purposefully conducted business in the United States of America. Arawak could have reasonably anticipated that it would be sued in a court in the United States of America in connection with the Arawak Principal Transfer and the Arawak Prepayment Transfer.

## XI. CAUSES OF ACTION

**COUNT I**
**Actual Fraudulent Transfers Related to the Prepayment of the**
**Arawak Loan through the Arawak Principal Transfer**
**Pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(1),**
**Ct. Gen. Stat. § 55-552e(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279**
**(Against Defendant Arawak)**

275. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

276. Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor

could assert under applicable law. The claims of a number of existing unsecured creditors, including all holders of Notes, arose before the Arawak Principal Transfer occurred.

277. The Arawak Principal Transfer was a transfer to an insider of HRB Co. *See* 6 Del. C. § 1304(b)(1); Ct. Gen. Stat. § 55-552e(b)(i). An insider is defined for corporate debtors, to include a person in control of the debtor and "[a]n affiliate or an insider of an affiliate as if the affiliate were the debtor." 6 Del. C. § 1301(7); Ct. Gen. Stat. § 55-552b(7). An affiliate means "[a] corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the debtor or a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor,…" 6 Del. C. § 1301(1)(b); Ct. Gen. Stat. § 55-552b(1)(B). Separately, a partnership may be an affiliate if that partnership directly or indirectly owns, controls or holds power to vote, 20% of more of the outstanding voting securities of the debtor. The DUFTA and CTUFTA definition of an insider also includes non-statutory insiders who have a sufficiently close relationship with the debtor to be considered insiders.

278. Here, the Arawak Principal Transfer was made to insiders of HRB Co. because Arawak is an investment vehicle managed by CD&R at a time that another CD&R affiliated fund, CD&R Fund IX owned 98.4% of Debtor HRB Inc., the indirect parent company of HRB Co.

279. Moreover, CD&R, through the CD&R Directors, controlled HRB Co. in a variety of ways. First, HRB Co.'s Board was controlled by the CD&R Directors. The CD&R Directors held four of the five director seats on the HRB Co. Board and were selected to serve by CD&R, by its employees. The Bylaws required a majority of the HRB Co. Board members for a quorum. Even for action without a meeting, the HRB Co. Board could not take any action without at least two of the CD&R Directors' support.

280.    Second, CD&R provided management, consulting and advisory services to HRB Co., and its parents and subsidiaries under the CD&R Consulting Agreement.

281.    Third, CD&R Directors were directly involved in the marketing and sales of the Notes. For example, CD&R Director Pasqua was a direct participant in the marketing and sales of the Notes to investors. *See, e.g.*, CDR_00033245.

282.    These factors support a conclusion that CD&R maintained control of the general business affairs of HBR Co., as well as maintained specific control over the Arawak Principal Transfer.

283.    The value of the consideration received by HRB Co. in respect of the Arawak Principal Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1304(b)(8); Ct. Gen. Stat. § 55-552e(b)(8). HRB Co. merely replaced an antecedent debt owed to CD&R's affiliates, with debts owed to third-party investors. The recapitalization also obligated HRB Co. to pay the Arawak Principal Transfer at the outset of the recapitalization, without a corresponding benefit for the then foreseeable future. Moreover, since the Arawak Credit Agreement's principal obligation was not due until June 30, 2023, the Arawak Principal Transfer was not on account of an antecedent debt when HRB Co., at CD&R and the CD&R Directors' control, made the Arawak Principal Transfer.

284.    Moreover, as demonstrated in **Figure 3** above, HRB Co. could reasonably project to receive no economic value for the replacement of the Arawak Term Loan indebtedness with the Notes' indebtedness until at least very late 2022, and if not later.

285.    The fact that the Arawak Prepayment Penalty did not correspond to the Applicable Premium calculated under the Arawak Credit Agreement only raises additional questions concerning the dubious nature of this transaction. After all, if there is no straightforward reason

why Arawak would agree to forego $5,415,523 from the Applicable Premium without good reason.

286. The Arawak Principal Transfer occurred shortly before or shortly after a substantial debt was incurred. *See* 6 Del. C. § 1304(b)(10); Ct. Gen. Stat. § 55-552e(b)(10). The Arawak Principal Transfer occurred shortly after HRB Co. issued the Notes. The proceeds of Notes were used, among other things, to fund the Arawak Principal Transfer before the maturity date of the Arawak Loan.

287. In addition to the statutory badges-of-fraud, the totality of the circumstances supports the existence of HRB Co.'s actual intent to hinder, delay or defraud creditors by prepaying the Arawak Loan, and making the Arawak Principal Transfer.

288. CD&R, through the CD&R Directors, made good on their goal of recapitalizing of the HRB Co. balance sheet with the issuance of the Notes, and returning 100% of Arawak's capital through the Arawak Principal Transfer. In doing so, HRB Co. under the control of the CD&R Directors, "deliver[ed a] 2.0x MOI and 202% IRR to Arawak." *See* CDR_00028523.

289. The CD&R Directors replaced the Arawak Loan with new debt (i.e., the Notes) from a new set of lenders (i.e., holders of Notes). The CD&R Directors engaged in a 'bait and switch,' whereby they were able to entice the eventual holders of Notes to purchase those notes and to use the proceeds of the Notes to make the Arawak Principal Transfer. Thus, the issuance of the Notes, in part, served to replace Arawak and leave a whole new set of investors holding the proverbial 'bag.' Pasqua referred to the March 2017 Recapitalization, and replacement of the Arawak Loan with Notes, as "highway robbery!" *See* CDR_00023908.

290. The CD&R Directors and HRB Co. management presented HRB Co. as a bond issuer that had a strong financial condition, with promising prospects, while the CD&R Directors were aware that HRB Co.'s financial performance was declining.

291. The CD&R Directors and HRB Co. management said that HRB Co.'s cash flow generation was strong and would provide stable free cash flow, while the CD&R Directors were aware that HRB Co. will not make targets and its financial performance trends were concerning.

292. The CD&R Directors and HRB Co. management bragged that HRB Co.'s "strong and experienced management team" had a "proven track record of acquiring, integrating, revitalizing and managing a wide variety of brands," while the CD&R Directors privately concluded that they had "overestimated the team's capabilities," that Compton wrote that he was "so mad at these guys. Truly incompetent, lazy, etc."

293. The CD&R Directors and HRB Co.'s management strongly endorsed the leadership prospects of Daniels, while the CD&R Directors privately concluded that "its increasingly unclear whether Jim Daniels is the right long-run leader for the business," "[u]nfortunately I think we are not going to get what we need from him", and that they are "ready to move on – he just doesn't get it. His attitude is laissez faire and constantly contradicts himself."

294. The CD&R Directors and HRB Co.'s management highlighted their relationships with key customers, and that their "experienced management team maintains direct relationships with senior management of many of [their] key customers, further enhancing the strength of our customer relationships," while the CD&R Directors privately concluded that the "[l]evel of engagement and nature of dialogue with top customers (notably Walmart) has been inadequate," and "[t]he sales team (which is horribly weak)."

295. The CD&R Directors pushed forward with the March 2017 Recapitalization, and the Prepayment of the Arawak Loan after they expressed misgivings about CD&R's investment in HRB Co. for CD&R and the limited partners of CD&R HRB Holdings, L.P.

296. HRB Co. and Arawak had a close relationship at the time of the Arawak Principal Transfer. *See infra*, ¶¶ 40-41, 277. The Arawak Principal Transfer was made to insiders of HRB Co. because Arawak is an investment vehicle managed by CD&R at a time that another CD&R affiliated fund, CD&R Fund IX owned 98.4% of Debtor HRB Inc., the indirect parent company of HRB Co.

297. Moreover, CD&R, through the CD&R Directors, controlled HRB Co. in a variety of ways. *See, e.g., infra*, ¶¶ 278 through 281.

298. All those things together provide ample additional evidence of HRB Co.'s intent to delay, hinder, or defraud HRB Co.'s creditors.

299. Pursuant to DUFTA section 1307 and/or CTUFTA section 52-552h(a), Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Arawak in connection with the Arawak Principal Transfer, or the proceeds of such assets now held by Arawak, or other property of Arawak, and/or to hold Arawak liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

300. Further, Arawak is not a good-faith transferee of the Arawak Principal Transfer, and the Prepayment of the Arawak Loan to Arawak, an entity controlled by CD&R and its tangled web of limited partnerships, was in all likelihood aware of HRB Co.'s financial difficulties.

301. Had CD&R not cashed Arawak out of its investment in the Arawak Loan as part of the March 2017 Recapitalization, Arawak would be a creditor of the Debtors, with its only source

of a significant recovery on its loans resting in recoveries from the Liquidating Trust. Thus, Arawak and CD&R were materially advantaged by cashing out of the Debtors capital structure when the Arawak Principal Transfer and Arawak Prepayment Payment occurred.

302. Plaintiff further reserves such other rights and remedies that may be available to it under DUFTA and CTUFTA as may be necessary to fully compensate Plaintiff for the damages and injuries HRB Co.'s Estate and its creditors, including the beneficiaries of the Liquidating Trust, have suffered as alleged in this Complaint.

303. The Arawak Principal Transfer to Arawak was the proximate cause, and or a substantial factor, in causing HRB Co. to be diminished by, and the creditors of HRB Co. to suffer losses of, at least $83,000,000.

304. In the alternative, the Plaintiff seeks relief pursuant to Section 276 of New York's Debtor and Creditor law ("N.Y. Debt. & Cred. Law" or "NY DCL"), against Arawak.

305. The consideration received by HRB Co. in return for the Arawak Principal Transfer to Arawak was inadequate. While the satisfaction of an antecedent debt may be "value," it may not be reasonably equivalent. HRB Co. merely replaced a debt owed to CD&R's affiliates, and replaced it with debts owed to third party investors.

306. HRB Co. and Arawak had a close relationship at the time of the Arawak Principal Transfer. *See infra,* ¶¶ 40-41, 277. The Arawak Principal Transfer was made to insiders of HRB Co. *See infra,* ¶ 296.

307. Moreover, CD&R, through the CD&R Directors, controlled HRB Co. in a variety of ways. *See infra,* ¶¶ 278 through 281.

308. HRB Co. engaged in a series of transactions and/or course of conduct after the incurring of debt, coupled with the onset of financial difficulties, at the time of the Arawak Principal Transfer.

309. The Arawak Principal Transfer occurred after the indebtedness for the Notes was incurred.

310. Pursuant to NY DCL sections 278 and 279, the Plaintiff seeks, to the extent necessary to satisfy Plaintiffs' claims brought in this Complaint, (i) the avoidance of the conveyance of Arawak Principal Transfer to Arawak, (ii) the avoidance of the Arawak Principal Transfer to Arawak, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Arawak in respect of Arawak Principal Transfer, and/or to hold Arawak liable for any damages or other remedies that may be awarded by the Court, (iv) restrain the Defendants from disposing of their property, (v) appoint a receiver to take charge of Arawak's property, and/or (vi) make any order which the circumstances of the case may require.

311. Plaintiff also seeks attorneys' fees under NY DCL section 276-a.

### COUNT II
**Actual Fraudulent Transfers Related to the Arawak Prepayment Transfer**
**Pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(1),**
**Ct. Gen. Stat. § 55-552e(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279**
**(Against Defendant Arawak)**

312. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

313. Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors, including all holders of Notes, arose before the Arawak Prepayment Transfer occurred.

314. The Arawak Prepayment Transfer was a transfer to an insider of HRB Co. *See* 6 Del. C. § 1304(b)(1); Ct. Gen. Stat. § 55-552e(b)(i). An insider is defined for corporate debtors, to include a person in control of the debtor and "[a]n affiliate or an insider of an affiliate as if the affiliate were the debtor." 6 Del. C. § 1301(7); Ct. Gen. Stat. § 55-552b(7). An affiliate means "[a] corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the debtor or a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor,…" 6 Del. C. § 1301(1)(b); Ct. Gen. Stat. § 55-552b(1)(B). Separately, a partnership may be an affiliate if that partnership directly or indirectly owns, controls or holds power to vote, 20% of more of the outstanding voting securities of the debtor. The DUFTA and CTUFTA definition of an insider also includes non-statutory insiders who have a sufficiently close relationship with the debtor to be considered insiders.

315. Here, the Arawak Prepayment Transfer was made to insiders of HRB Co. because Arawak is an investment vehicle managed by CD&R at a time that another CD&R affiliated fund, CD&R Fund IX owned 98.4% of Debtor HRB Inc., the indirect parent company of HRB Co.

316. Moreover, CD&R, through the CD&R Directors, controlled HRB Co. in a variety of ways. *See infra*, ¶¶ 278 through 281.

317. The value of the consideration received by HRB Co. in respect of the Arawak Principal Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1304(b)(8); Ct. Gen. Stat. § 55-552e(b)(8). HRB Co. merely replaced an antecedent debt owed to CD&R's affiliates, and replaced it with debts owed to third-party investors. The recapitalization obligated HRB Co. to pay Arawak Principal Transfer at the outset of the recapitalization, without a corresponding benefit for the then foreseeable future. While the Arawak Prepayment Transfer

was on account of an antecedent debt, existence of the antecedent debt had only been a contingent antecedent debt prior to its triggering when HRB Co. made the Arawak Principal Transfer.

318. The Arawak Prepayment Transfer occurred shortly before or shortly after a substantial debt was incurred. *See* 6 Del. C. § 1304(b)(10); Ct. Gen. Stat. § 55-552e(b)(10). The Arawak Prepayment Transfer occurred shortly after HRB Co. issued the Notes. The proceeds of Notes were used, among other things, to fund the Arawak Prepayment Transfer.

319. In addition to the statutory badges-of-fraud, the totality of the circumstances supports the existence of HRB Co.'s actual intent to hinder, delay or defraud creditors by prepaying the Arawak Loan, and making the Arawak Prepayment Transfer. *See also infra* Count I.

320. All those things together provide ample additional evidence of HRB Co.'s intent to delay, hinder, or defraud HRB Co.'s creditors.

321. Pursuant to DUFTA section 1307 and/or CTUFTA section 52-552h(a), Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Arawak in connection with the Arawak Prepayment Transfer, or the proceeds of such assets now held by Arawak, or other property of Arawak, and/or to hold Arawak liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

322. Further, Arawak is not a good-faith transferee of the Arawak Prepayment Transfer, and the Prepayment of the Arawak Loan to Arawak, an entity controlled by CD&R and its tangled web of limited partnerships, was in all likelihood aware of HRB Co.'s financial difficulties.

323. Plaintiff further reserves such other rights and remedies that may be available to it under DUFTA and CTUFTA as may be necessary to fully compensate Plaintiff for the damages

and injuries HRB Co.'s Estate and its creditors, including the beneficiaries of the Liquidating Trust, have suffered as alleged in this Complaint.

324. The Arawak Prepayment Transfer to Arawak was the proximate cause, and or a substantial factor, in causing HRB Co. to be diminished by, and the creditors of HRB Co. to suffer losses of, at least $8,300,000.

325. In the alternative, the Plaintiff seeks relief pursuant to NYDCL Section 276, against Arawak.

326. The consideration received by HRB Co. in return for the Arawak Prepayment Transfer to Arawak was inadequate. While the satisfaction of an antecedent debt may be "value," it may not be reasonably equivalent. HRB Co. caused a contingent debt owed to CD&R's affiliates to mature, and to be replaced with debts owed to third party investors.

327. HRB Co. and Arawak had a close relationship at the time of the Arawak Prepayment Transfer. *See infra,* ¶¶ 40-41, 277. The Arawak Prepayment Transfer was made to insiders of HRB Co. (*see infra,* ¶ 293) because Arawak is an investment vehicle managed by CD&R at a time that another CD&R affiliated fund, CD&R Fund IX owned 98.4% of Debtor HRB Inc., the indirect parent company of HRB Co.

328. Moreover, CD&R, through the CD&R Directors, controlled HRB Co. in a variety of ways. *See infra*, ¶¶ 278 through 281.

329. HRB Co. engaged in a series of transactions and/or course of conduct, after the incurring of debt, coupled with the onset of financial difficulties, at the time of the Arawak Prepayment Transfer.

330. The Arawak Prepayment Transfer occurred after the indebtedness for the Notes was incurred.

331. Pursuant to NY DCL sections 278 and 279, the Plaintiff seeks, to the extent necessary to satisfy Plaintiffs' claims brought in this Complaint, (i) the avoidance of the conveyance of Arawak Prepayment Transfer to Arawak, (ii) the avoidance of the Arawak Prepayment Transfer to Arawak, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Arawak in respect of Arawak Prepayment Transfer, and/or to hold Arawak liable for any damages or other remedies that may be awarded by the Court, (iv) restrain the Defendants from disposing of their property, (v) appoint a receiver to take charge of Arawak's property, and/or (vi) make any order which the circumstances of the case may require.

332. Plaintiff also seeks attorneys' fees under NY DCL section 276-a.

<u>COUNT III</u>
**Breach of Fiduciary Duties of Loyalty Related to
the Arawak Principal Transfer, and the Arawak Prepayment Transfer
(Against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels)**

333. The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

334. Defendants Compton, Banga, Giuriceo, Pasqua, and Daniels, as HRB Co. Board members, owed fiduciary duties of Loyalty to HRB Co. to act in good faith and in the best interests of HRB Co. at all times.

335. Defendants Compton, Banga, Giuriceo, and Pasqua, as HRB Co. Board members, were not independent when the Arawak Principal Transfer and the Arawak Prepayment Transfer occurred.

336. The HRB Co. Board did not approve the Arawak Principal Transfer or the Arawak Prepayment Transfer.

337. The HRB Co. Board did not adopt board resolutions specifically authorizing the Arawak Principal Transfer or the Arawak Prepayment Transfer.

338. The HRB Co. Board did not consider whether the CD&R Directors were independent when the Arawak Principal Transfer and the Arawak Prepayment Transfer occurred.

339. The HRB Co. Board did not consult with outside counsel with respect to the Arawak Principal Transfer or the Arawak Prepayment Transfer.

340. The HRB Co. Board did not create a HRB Co. Board committee independent from CD&R to review and approve the Arawak Principal Transfer or the Arawak Prepayment Transfer.

341. Defendant CD&R was not independent when the Arawak Principal Transfer and the Arawak Prepayment Transfer occurred.

342. The HRB Co. Board did not create a HRB Co. Board committee independent from the CD&R Directors to review and approve the Arawak Principal Transfer and the Arawak Prepayment Transfer.

343. Thus, the facts surrounding the Arawak Principal Transfer and the Arawak Prepayment Transfer. indicate that the HRB Co. Board members did not act in with loyalty to HRB Co. with a view to the best interests of HRB Co. Moreover, Defendants Compton, Banga, Giuriceo, Pasqua, and Daniels, as HRB Co. Board members, acted without with gross negligence under the circumstances.

344. The facts surrounding the Arawak Principal Transfer and the Arawak Prepayment Transfer indicate that CD&R did not act with loyalty to HRB Co., and CD&R indeed breached its fiduciary duty of loyalty to HRB Co. to act in good faith and in the best interests of HRB Co. at all times.

345. CD&R benefitted from the Arawak Principal Transfer and the Arawak Prepayment Transfer, and the related issuance of the Notes, in two ways. First, the Arawak Principal Transfer and the Arawak Prepayment Transfer saved Arawak from the risk of loss that HRB Co. would be

unable to repay the Arawak Loan. By ensuring that Arawak received the Arawak Principal Transfer and the Arawak Prepayment Transfer (and an 202% IRR), CD&R and the CD&R Directors protected Arawak from an adverse outcome, and any related negative impact on CD&R's business and access to future capital for other deals that would result from such a negative outcome. Second, because Arawak appears to be CD&R's captive lender, funding CD&R portfolio companies, with CD&R employees making lending decisions for Arawak, the Arawak Principal Transfer and the Arawak Prepayment Transfer freed up capital that could then be used to fund other CD&R portfolio companies, and directly benefitting those same CD&R Directors with a partnership stake in CD&R.

346. CD&R, through the CD&R Directors, controlled HRB Co. in connection with the Arawak Principal Transfer and the Arawak Prepayment Transfer. Each of the CD&R Directors served as an employee and/or partner of CD&R, and exercised actual control over the management and operations of HRB Co. Defendants Giuriceo and Pasqua maintained functional control over HRB Co.'s decisions concerning the Arawak Principal Transfer and the Arawak Prepayment Transfer through their service on the Transaction Committee.

347. The March 2017 Recapitalization caused Arawak to be cashed-out of the Arawak Loan at a 202% internal rate of return. CD&R and the CD&R Directors were able to save Arawak from the risk of loss that HRB Co. would be unable to repay the Arawak Loan. CD&R and the CD&R Directors ensured that Arawak was paid the Arawak Prepayment Penalty for the privilege of being relieved of its risk. CD&R and the CD&R Directors were able to free up capital that could be used to fund other CD&R portfolio companies, benefitting those same CD&R Directors with a partnership stake in CD&R, namely Compton, Banga, and Giuriceo, and those who may have aspired to be a CD&R partner, namely Pasqua.

348. The breaches of fiduciary duties by Defendants Compton, Banga, Giuriceo, Pasqua, and Daniels, as HRB Co. Board members, as well as by Defendant CD&R, in connection with the Arawak Principal Transfer, and the Arawak Prepayment Transfer were the proximate cause, and or a substantial factor, in causing HRB Co., HRB Co.'s Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $91,300,000.

### COUNT IV
**Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. §§ 1305(b), 1307(a), Ct. Gen. Stat. §§ 55-552e(a)(1), 52-552h(a)(1), (2), (3) (Against Defendant CD&R)**

349. The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

350. On June 30, 2016, CD&R and the Debtors entered into the CD&R Consulting Agreement under which HRB Co. agreed to pay CD&R a fee for their consulting services. Under the CD&R Consulting Agreement, HRB Co. paid CD&R approximately $1 million per year, in four installments, plus expenses.

351. In the year prior to the Petition Date, CD&R was paid pursuant to the CD&R Consulting Agreement a total of $352,718.68 (the "CD&R Transfers"), as follows in **Figure 5**:

**Figure 5**

| Transferor | Transferee | Transfer Date | Amount of Transfer |
|---|---|---|---|
| HRB Co. | CD&R | 12/12/2019 | $3,909.38 |
| HRB Co. | CD&R | 11/14/2019 | $4,099.42 |
| HRB Co. | CD&R | 10/24/2019 | $4,257.56 |
| HRB Co. | CD&R | 9/26/2019 | $7,445.78 |
| HRB Co. | CD&R | 9/5/2019 | $4,154.88 |
| HRB Co. | CD&R | 7/24/2019 | $6,092.35 |
| HRB Co. | CD&R | 6/26/2019 | $4,019.61 |
| HRB Co. | CD&R | 5/22/2019 | $8,623.84 |
| HRB Co. | CD&R | 4/24/2019 | $10,942.75 |
| HRB Co. | CD&R | 3/20/2019 | $10,747.02 |
| HRB Co. | CD&R | 2/20/2019 | $7,253.32 |
| HRB Co. | CD&R | 1/23/2019 | $250,000.00 |

| HRB Co. | CD&R | 1/23/2019 | $14,031.01 |
|---|---|---|---|
| HRB Co. | CD&R | 1/4/2019 | $17,141.76 |

352. CD&R is listed by HRB Co. on its schedules of assets and liabilities as being owed $711,956.52 as of the Petition Date.

353. The CD&R Transfers were transfers of property of HRB Co.

354. CD&R was a creditor of HRB Co., as defined by 11 U.S.C. § 101.

355. In the year prior to the Petition Date, HRB Co. transferred property to CD&R.

356. The CD&R Transfers to CD&R were made for, or on account of, an antecedent debt.

357. The CD&R Transfers to CD&R were made while HRB Co. was insolvent.

358. As a result of the CD&R Transfers to CD&R, CD&R received more than it would have received if: (i) HRB Co.'s case was under Chapter 7 of the Bankruptcy Code; (ii) the CD&R Transfers to CD&R had not been made and (iii) CD&R received payments of such debts.

359. Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors, including all holders of Notes, arose before the CD&R Transfers occurred.

360. In accordance with the foregoing, the CD&R Transfers are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550.

361. Additionally, the CD&R Transfers were transfers made by HRB Co. CD&R, as an insider, for an antecedent debt under the CD&R Consulting Agreement, HRB Co. was insolvent when each pf the CD&R Transfers occurred, and CD&R had reasonable cause to believe that HRB Co. was insolvent. At the times of each of the CD&R Transfers, CD&R (through the actions of the

CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮ ), and the CD&R Directors were responsible for the business, property and affairs of HRB Co. CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮ ), the CD&R Directors, and other CD&R employees providing services under the CD&R Consulting Agreement, were provided, or had access to, copies of the documents evidencing HRB Co.'s insolvency when each of the CD&R Transfers occurred.

362. In accordance with the foregoing, the CD&R Transfers are avoidable pursuant to 6 Del. C. §§ 1305(b), 1307(a), Ct. Gen. Stat. §§ 55-552e(a)(1), 52-552h(a)(1), (2), (3).

## COUNT V
### Disallowance of Claims Under 11 U.S.C. §§ 502(b), and 502(d)
### (Against Defendant CD&R)

363. The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

364. The Debtors scheduled CD&R as holding a general unsecured claim totaling $711,956.52 against HRB Co. (the "CD&R Unsecured Claim"). *See* Schedule No. 4279045.

365. The CD&R Unsecured Claim is subject to disallowance under Section 502(b). As set forth above, CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮ ) and the CD&R Directors, committed multiple breaches of their fiduciary duties to HRB Co. Because of the breaches of fiduciaries duties committed by CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮ ), and the CD&R Directors, CD&R is no longer entitled to receive compensation for services provided under the Services Agreement.

366. Further, as set forth above, CD&R is the transferee of transfers avoidable under Section 547 of the Bankruptcy Code, and property is recoverable from CD&R under Section 550 of the Bankruptcy Code. Accordingly, pursuant to Section 502(d) of the Bankruptcy Code, all

96

claims asserted by CD&R should be disallowed unless and until CD&R pays to Plaintiff the value of any transfer avoided pursuant to this Complaint.

**COUNT VI**
**Common Law Fraud (New York Law)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels)**

367. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

368. This Count is asserted on behalf of all of the former holders of Notes, and/or the Indenture Trustee against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels for violations of New York common law.

369. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in New York. Additionally, CD&R Director Pasqua prepared and approved the Offering Memoranda, as well as prepared and approved the Investor Presentation while in New York, where CD&R's headquarters is located. HRB Co., under the control of CD&R, by and through the CD&R Directors, launched the marketing of the Notes from New York.

370. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in New York. Additionally, Pasqua, Daniels and Kirk conducted Roadshow Meetings with Brigade, MidOcean, KLS, Medley, Guardian Life, Riva Ridge, Nomura Corp., Lord Abbett, Scott's Cove Mgmt., CI Investments, Marathon, each acting for their institutions, or as investment managers acting on behalf of their clients) in New York on March 13, 2017. *See* CDR_00021155 through CDR_00021161. These investors (or investment managers acting on behalf of their managed accounts and clients) who met in person with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in New York purchased $51.5 million principal amount of Notes from the initial purchasers. *See* CDR_00021155 through CDR_00021161; CDR_00012613.

371. The Offering Memoranda omitted and/or misrepresented a number of material facts then known to CD&R, the CD&R Directors and Daniels.

372. The Offering Memoranda omitted the fact that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of CSO. The fact that HRB Co.'s CSO had been terminated in January 2017 was a material fact that investors in Notes would have been interested in knowing when deciding to purchase Notes. Further, the fact that Daniels had assumed the dual-roles of HRB Co.'s Chief Executive Officer and HRB Co.'s CSO was a material fact that investors in Notes would have been interested in knowing when deciding to purchase or sell Notes.

373. The Offering Memoranda omitted the material fact that Walmart's January 2017 planogram/modular change was adversely impacting HRB Co.'s sales in March 2017. The fact that Walmart had implemented a change to its planogram/modular in January 2017 and that the change was adversely impacting HRB Co.'s sales for January and February 2017, and that could not be changed until 2018 were material facts that investors in Notes would have been interested in knowing when deciding to purchase or sell Notes. Further, the fact that Walmart had implemented a change to its planogram/modular in January 2017 and that the change was adversely impacting HRB Co.'s sales for January and February 2017, and that could not be changed until 2018 were material facts that investors in Notes would have been interested in knowing when deciding to purchase or sell Notes.

374. Similarly, CD&R Director Pasqua and the HRB Co. team conducting the "Roadshow Meetings," namely Daniels and Kirk, omitted the material fact that Walmart's January 2017 planogram/modular change was adversely impacting HRB Co.'s sales in March 2017. The fact that Walmart had implemented a change to its planogram/modular in January 2017 and that

98

the change was adversely impacting HRB Co.'s sales for January and February 2017, and that could not be changed until 2018 were material facts that investors in Notes would have been interested in knowing when deciding to purchase Notes. Further, the fact that Walmart had implemented a change to its planogram/modular in January 2017 and that the change was adversely impacting HRB Co.'s sales for January and February 2017, and that could not be changed until 2018 were material facts that investors in Notes would have been interested in knowing when deciding to purchase or sell Notes.

375. The Offering Memoranda omitted that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time the Offering Memoranda were finalized and disseminated to potential investors of Notes. The fact that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known to CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ███████ and ███████████), the CD&R Directors, and Daniels at the time the Offering Memoranda were finalized and disseminated to potential investors of Notes were material facts that investors in Notes would have been interested in knowing when deciding to purchase Notes.

376. The Offering Memoranda omitted the material fact that HRB Co. was 'pencils down' on new strategic acquisitions when the Notes were marketed and sold to investors. This last omission holds particular significance because CD&R's whole acquisition thesis was premised on HRB Co.'s strategic acquisition and integration of new products to bolster HRB Co.'s financial performance. This statement contrasts statements made by CD&R Director Pasqua and Daniels at Roadshow Meetings. The fact that HRB Co. was 'pencils down' on new strategic acquisitions when the Notes were marketed and sold to investors was a material fact that investors in Notes

would have been interested in knowing when deciding to purchase Notes. The CD&R Directors' deliberately concealed these facts as they knew that HRB Co. was 'pencils down' on new strategic acquisitions when the Notes were marketed and sold to investors.

377. These omissions and misrepresentations were intended to and were in furtherance of the sale and trading of Notes to and by QIB investors.

378. As supported by his informal, preliminary investigation, Plaintiff is aware that the Par Noteholders purchased at least $68 million principal amount of Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings. As supported by his informal, preliminary investigation, Plaintiff is aware that the Par Noteholders would not have purchased the Notes from the Initial Purchasers had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation contained material misstatements or omissions. about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

379. As supported by his informal, preliminary investigation, Plaintiff is aware that the Par Noteholders purchased at least $49,367,000 principal amount of Notes in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, and would not have purchased Notes in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

380. Plaintiff expects to discover whether Brigade, MidOcean, KLS, Medley, Guardian Life, Riva Ridge, Nomura Corp., Lord Abbett, Scott's Cove Mgmt., CI Investments, and Marathon, (A) were "Holders of 2017 Senior Unsecured Notes" as such term is defined in the Plan, (B) purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (C) purchased Notes in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the

Roadshow Meetings, (D) would not have purchased Notes from the Initial Purchasers and/or in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

381. Plaintiff expects to discover whether other purchasers of Notes, who purchased Notes from the Initial Purchasers in March 2017, or who purchased Notes in the secondary market, (A) were "Holders of 2017 Senior Unsecured Notes" as such term is defined in the Plan, (B) purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (C) purchased Notes in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (D) would not have purchased Notes from the Initial Purchasers and/or in the secondary market had they known the truth, which was materially contrary to the

representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

382. Plaintiff also expects to discover whether purchasers of Notes, who purchased Notes in the secondary market did so with an assignment of claims, and if so, what the terms of that assignment are.

383. HRB Co. and Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ███ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels: (i) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading, and (ii) made untrue statements of material fact for the purpose of inducing purchasers of Notes to rely on those statements in an effort to sell the Notes in violation of New York common law.

384. Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ███ and ████████), Compton, Banga, Giuriceo, and Pasqua carried out a plan, scheme and course of conduct which was intended to and did (i) deceive investors,

including the former holders of Notes, as alleged herein, (ii) cause the former beneficial owners of Notes to purchase Notes at artificially inflated prices, and (iii) omit and conceal adverse material information about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

385. At the issuance of the Notes, Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), Compton, Banga, Giuriceo, Pasqua and Daniels disseminated or approved the false statements specified herein, among others, which they knew or recklessly disregarded were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

386. Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels acted with scienter at all times applicable to this count, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮ and ▮▮▮▮▮), Compton, Banga, Giuriceo, and Pasqua's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing adverse material information about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its Chief Sales Officer in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencils down' on new strategic acquisitions when the Notes were marketed and sold to investors. These omissions thereby artificially inflating the price of its Notes, and induced investors to purchase Notes.

387. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the offering price of the Notes, and the market price of Notes after those notes were issued, were artificially inflated. In ignorance of the fact that market prices of the Notes was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements made and approved by Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮ and ▮▮▮▮▮), Compton, Banga, Giuriceo, Pasqua, and Daniels or upon the integrity of the

market in which the Notes traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████ ), Compton, Banga, Giuriceo, Pasqua, and Daniels but not disclosed in public statements by Defendants Compton, Banga, Giuriceo, and Pasqua, or HRB Co.

388. Holders of Notes acquired their Notes without any knowledge of the extent of risk that HRB Co.'s disclosures of its financial condition and prospects, HRB Co.'s strength of management, the leadership of Daniels, and HRB Co.'s strength of customer relationships, were materially false.

389. At the time of said misrepresentations and omissions, the holders of the Notes were ignorant of their falsity and incompleteness, and believed them to be true and free of any omissions of material fact required to be disclosed. Had holders of the Notes and the marketplace known the truth regarding HRB Co.'s financial condition and prospects, HRB Co.'s strength of management, the leadership of Daniels, and HRB Co.'s strength of customer relationships, which was not disclosed by Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████ ), Compton, Banga, Giuriceo, Pasqua, and Daniels, holders of the Notes would not have purchased or otherwise acquired their Notes, or, if they had acquired such Notes, they would not have done so at the artificially inflated prices that they paid.

390. Defendants Compton, Banga and Giuriceo are liable for the statements that appeared in the Offering Memoranda as alleged in section V.H hereof because they approved those documents.

391. Defendant Pasqua is liable for the statements that appeared in the Offering Memoranda and Investor Presentation, as well as the statements made at the Roadshow Meetings,

as alleged in section V.H.1 hereof because he approved those documents, made statements at the Roadshow Meetings, or stood silently as others made statements at the Roadshow Meetings.

392. Defendant Daniels is liable for the statements that appeared in the Offering Memoranda and Investor Presentation, as well as the statements made at the Roadshow Meetings, as alleged in section V.H.1 hereof because he approved those documents, made statements at the Roadshow Meetings, or stood silently as others made statements at the Roadshow Meetings.

393. As a direct and proximate result of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ███████ and ███████████), Compton, Banga, Giuriceo, Pasqua, and Daniels' wrongful conduct, the original purchasers of the Notes and/or Plaintiff, as the transferee and assignee of the Retained Non-Estate Causes of Action of the holders of Notes or the Indenture Trustee on behalf of holders of Notes under the Indenture, suffered damages in connection with the holders of Notes' purchases and sales of Notes.

394. This action was filed within six (6) years of the purchases of Notes by holders of Notes giving rise to this cause of action.

### COUNT VII
**Common Law Fraud (the Laws of the Commonwealth of Massachusetts)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels)**

395. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

396. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels for violations of the common law of the Commonwealth Massachusetts.

397. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in the Commonwealth of Massachusetts. Additionally, Pasqua, Daniels and Kirk conducted Roadshow Meetings with Brown Advisory, DDJ, Geode, Pax World Management

107

Corp., Putman (or investment managers acting on behalf of their managed accounts and clients) in the Commonwealth of Massachusetts on March 14, 2017 and March 15, 2017. *See* CDR_00021189 through CDR_00021190. Brown Advisory, DDJ, Geode, Pax World Management Corp., Putman (or investment managers acting on behalf of their managed accounts and clients) who met in person with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in the Commonwealth of Massachusetts were "Holders" of Notes, having purchased $72.25 million principal amount of Notes from the initial purchasers. *See* CDR_00021189 through CDR_00021190; CDR_00012613. As supported by his informal, preliminary investigation, Plaintiff is aware that the Par Noteholders, acting on behalf of investors, met in-person with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in the Commonwealth of Massachusetts purchased $49,367,000 principal amount of Notes in the secondary market.

398. JPM, KLS, Blackrock, and Loews met via telephone with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in the Commonwealth of Massachusetts and purchased $27.5 million principal amount of Notes from the initial purchasers. *See* CDR_00021189 through CDR_00021190; CDR_00012613. As supported by his informal, preliminary investigation, Plaintiff is aware that JPM also purchased at least $6,243,000 principal amount of Notes in the secondary market.

399. Plaintiff expects to discover whether Putman, Geode, Pax World Management Corp., Brown Advisory, JPM, KLS, Blackrock, and Loews, (A) were "Holders of 2017 Senior Unsecured Notes" as such term is defined in the Plan, (B) purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (C) purchased Notes in the secondary market in reliance of the

truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (D) would not have purchased Notes from the Initial Purchasers and/or in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

400. The same allegations made in paragraphs 371 through 377 and 384 through 392 establish liability for common law fraud under of the common law of the Commonwealth Massachusetts for each of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels.

401. As supported by his informal, preliminary investigation, Plaintiff is aware that the Par Noteholders, owning at least $68,000,000 principal amount of Notes, purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk

during the Roadshow Meetings that were conducted in Massachusetts. As supported by his informal, preliminary investigation, Plaintiff is aware that the Par Noteholders would not have purchased the Notes from the Initial Purchasers had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

402. As supported by his informal, preliminary investigation, Plaintiff is aware that the Par Noteholders purchased at least $49,367,000 principal amount of Notes in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, and would not have purchased Notes in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart

had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

403. HRB Co. and Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮▮), Compton, Banga, Giuriceo, Pasqua, and Daniels: (i) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and (ii) made untrue statements of material fact for the purpose of inducing purchasers of Notes to rely on those statements in an effort to sell the Notes in violation of the common laws of the Commonwealth of Massachusetts.

404. As a direct and proximate result of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮), Compton, Banga, Giuriceo, Pasqua, and Daniels' wrongful conduct, the original purchasers of the Notes and/or Plaintiff, as the transferee and assignee of the Retained Non-Estate Causes of Action of the holders of Notes or the Indenture Trustee on behalf of holders of Notes under the Indenture, suffered damages in connection with the holders of Notes' purchases and sales of Notes.

405. This action was filed within three (3) years of when the purchasers of Notes learned or reasonably should have learned of the misrepresentations giving rise to this cause of action.

**COUNT VIII**
**Common Law Fraud (North Carolina Law)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels)**

406. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

407. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels for violations of North Carolina common law.

408. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in North Carolina. Pasqua, Daniels and Kirk conducted Roadshow Meetings while physically located in the Commonwealth of Massachusetts with one of the Par Noteholders, which was at all applicable times, located in North Carolina. *See* CDR_00021189 - CDR_00021190. Pasqua, Daniels and Kirk met during the Roadshow Meetings with employees of one of the Par Noteholders while physically located in the Commonwealth of Massachusetts and that the Par Noteholders purchased $8 million principal amount of Notes from the initial purchasers. *See* CDR_00021189 through CDR_00021190; CDR_00012613. As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Noteholders purchased at least $37,463,000 principal amount of Notes in the secondary market.

409. The same allegations made in paragraphs 371 through 377 and 384 through 392 establish liability for common law fraud under of the common law of North Carolina for each of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮), Compton, Banga, Giuriceo, Pasqua, and Daniels.

410. As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Noteholders was the "Holder" of at least $8,000,000 principal amount of Notes, purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings. As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Noteholders would not have

purchased the Notes from the Initial Purchasers had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation contained material misstatements or omissions about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

411.    As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Noteholders was the "Holder" of 37,463,000 principal amount of Notes purchased in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, and would not have purchased Notes in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation contained material misstatements or omissions about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January

113

and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

412. HRB Co. and Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ██████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels: (i) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and (ii) made untrue statements of material fact for the purpose of inducing purchasers of Notes to rely on those statements in an effort to sell the Notes in violation of North Carolina common law.

413. As a direct and proximate result of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ██████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels' wrongful conduct, the original purchasers of the Notes and/or Plaintiff, as the transferee and assignee of the Retained Non-Estate Causes of Action of the holders of Notes or the Indenture Trustee on behalf of holders of Notes under the Indenture, suffered damages in connection with the holders of Notes' purchases and sales of Notes.

414. This action was filed within three (3) years of the discovery by the aggrieved investors of Notes of the facts constituting the fraud, or until the facts should have been discovered in the exercise of due diligence by holders of Notes giving rise to this cause of action.

### COUNT IX
**Common Law Fraud (California Law)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels)**

415. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

416. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels for violations of California common law.

417. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in California. Additionally, Pasqua, Daniels and Kirk conducted Roadshow Meetings with Beach Point and PIMCO (or investment managers acting on behalf of their managed accounts and clients) in California on March 14, 2017, March 16, 2017, and March 17, 2017. *See* CDR_00021189 through CDR_00021191. Beach Point and PIMCO (or investment managers acting on behalf of their managed accounts and clients) who met in person with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in California purchased at least $18 million principal amount of Notes from the initial purchasers. *See* CDR_00021189 through CDR_00021191; CDR_00012613. As supported by his informal, preliminary investigation, Plaintiff is aware that PIMCO met in-person with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in California also purchased at least $8.25 million principal amount of Notes in the secondary market.

418. Plaintiff expects to discover whether Beach Point and PIMCO (A) were "Holders of 2017 Senior Unsecured Notes" as such term is defined in the Plan, (B) purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (C) purchased Notes in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (D) would not have purchased Notes from the Initial Purchasers and/or in the secondary

115

market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

419.    The same allegations made in paragraphs 371 through 377 and 384  through 392 establish liability for common law fraud under of the common law of California for each of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮ ), Compton, Banga, Giuriceo, Pasqua, and Daniels.

420.    HRB Co. and Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮ ), Compton, Banga, Giuriceo, Pasqua, and Daniels: (i) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and (ii) made untrue statements of material fact for the purpose of inducing purchasers of Notes to rely on those statements in an effort to sell the Notes in violation of California common law.

421.    As a direct and proximate result of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮▮ and ▮▮▮▮▮▮ ), Compton,

Banga, Giuriceo, Pasqua, and Daniels' wrongful conduct, the original purchasers of the Notes and/or Plaintiff, as the transferee and assignee of the Retained Non-Estate Causes of Action of the holders of Notes or the Indenture Trustee on behalf of holders of Notes under the Indenture, suffered damages in connection with the holders of Notes' purchases and sales of Notes.

422. This action was filed within three (3) years of the discovery by the aggrieved investors of Notes of the facts constituting the fraud, or until the facts should have been discovered in the exercise of due diligence by holders of Notes giving rise to this cause of action.

## COUNT X
**Violations of the North Carolina's Securities Act,**
**North Carolina Gen. St., §§ 78A-8, 78A-56(a), 78A-56(c)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels)**

423. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

424. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels for violations of North Carolina's Securities Act, North Carolina Gen. St., §§ 78A-8, 78A-56(a), 78A-56(c).

425. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in North Carolina. Pasqua, Daniels and Kirk conducted Roadshow Meetings while physically located in the Commonwealth of Massachusetts with one of the Par Noteholders' employees. *See* CDR_00021189 - CDR_00021190. One of the Par Noteholders' employees met in person with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in the Commonwealth of Massachusetts purchased $8 million principal amount of Notes from the initial purchasers. *See* CDR_00021189 through CDR_00021190; CDR_00012613. As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Noteholders was the "Holder" of at least $37,463,000 principal amount of Notes purchased in the secondary market.

426. The same allegations made in paragraphs 371 through 377 and 384 through 392 establish liability for violations of North Carolina's Securities Act, North Carolina Gen. St., §§ 78A-8, 78A-56(a), 78A-56(c) for each of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ███ and ██████), Compton, Banga, Giuriceo, Pasqua, and Daniels.

427. As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Noteholders was the "Holder" of at least $8,000,000 principal amount of Notes, and purchased those Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings. As supported by his informal, preliminary investigation, Plaintiff is aware that those investors would not have purchased the Notes from the Initial Purchasers had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

428. As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Noteholders was the "Holder" of $37,463,000 principal amount of Notes purchased in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, and would not have purchased Notes in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors. HRB Co. and Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ██████), Compton, Banga, Giuriceo, Pasqua, and Daniels: (i) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and (ii) made untrue statements of material fact for the purpose of inducing purchasers of Notes to rely on those statements in an effort to sell the Notes in violation of the North Carolina Securities Act.

429. As a direct and proximate result of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ██████), Compton,

119

Banga, Giuriceo, Pasqua, and Daniels' wrongful conduct, Plaintiff, as the transferee and assignee of the Retained Non-Estate Causes of Action of the holders of Notes or the Indenture Trustee on behalf of holders of Notes under the Indenture, suffered damages in connection with the holders of Notes' purchases and sales of Notes.

430. This action was filed within three years of discovery of the fraud and within five years of the purchases of Notes by holders of Notes giving rise to this cause of action.

**COUNT XI**
**Violations of the California Securities Act,**
**California Corporations Code, Sections 25401, 25403, 25501**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels)**

431. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

432. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels for violations of California' Securities Act, California Corporations Code, Sections 25401, 25403, and 25501.

433. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in California. Additionally, Pasqua, Daniels and Kirk conducted Roadshow Meetings with Beach Point and PIMCO in California on March 14, 2017, March 16, 2017, and March 17, 2017. *See* CDR_00021189 through CDR_00021191. Beach Point and PIMCO who met in person with Pasqua, Daniels and Kirk during the Roadshow Meetings conducted in California purchased at least $18 million principal amount of Notes from the initial purchasers. *See* CDR_00021189 through CDR_00021191; CDR_00012613. As supported by his informal, preliminary investigation, Plaintiff is aware that PIMCO also purchased at least $8.25 million principal amount of Notes in the secondary market.

434. HRB Co. and Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels: (i) employed devices, schemes, and artifices to defraud, (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Notes in an effort to sell the Notes in violation of Section 25401 of the California Corporations Code.

435. The same allegations made in paragraphs 371 through 377 and 384 through 392 establish liability for violations of California' Securities Act, California Corporations Code, Sections 25401, 25403, and 25501 for each of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels.

436. Plaintiff expects to discover whether Beach Point and PIMCO (A) were "Holders of 2017 Senior Unsecured Notes" as such term is defined in the Plan, (B) purchased Notes from the Initial Purchasers in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (C) purchased Notes in the secondary market in reliance of the truthfulness and accuracy of the information in the Offering Memoranda, and/or Investor Presentation, as well as statements made by Pasqua, Daniels and Kirk during the Roadshow Meetings, (D) would not have purchased Notes from the Initial Purchasers and/or in the secondary market had they known the truth, which was materially contrary to the representations in the Offering Memoranda, and/or Investor Presentation about (A) HRB Co.'s financial condition and prospects, (B) HRB Co.'s strength of management, (C) the leadership of Daniels, (D) HRB Co.'s

strength of customer relationships, (E) that HRB Co. had terminated its CSO in January 2017, and that in March 2017, Daniels had assumed the job responsibilities of HRB Co.'s Chief Sales Officer, (F) that Walmart had implemented a change to its planogram/modular in January 2017 that was adversely impacting HRB Co.'s sales for January and February 2017, and could not be changed until 2018 at the earliest, (G) that HRB Co.'s management had missed a number of sales forecasts for January and February 2017 even though these misses were known at the time Notes were initially marketed to investors, and (H) that HRB Co. was 'pencil[s'] down' on new strategic acquisitions when the Notes were marketed and sold to investors.

437. HRB Co. and Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮ and ▮▮▮▮▮), Compton, Banga, Giuriceo, Pasqua, and Daniels: (i) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and (ii) made untrue statements of material fact for the purpose of inducing purchasers of Notes to rely on those statements in an effort to sell the Notes in violation of the California Securities Act.

438. As described above, Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ▮▮▮ and ▮▮▮▮▮), Compton, Banga, Giuriceo, Pasqua, and Daniels acted with scienter at all times applicable to this count, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants Compton, Banga, Giuriceo, and Pasqua's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing adverse material information as set forth herein. *See infra,* ¶ 350.

439. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the offering price of the Notes, and the market price of Notes after those notes were issued, were artificially inflated. In ignorance of the fact that market prices of the Notes was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements made and approved by Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ███ and ███████), Compton, Banga, Giuriceo, Pasqua, and Daniels or upon the integrity of the market in which the Notes traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels but not disclosed in public statements by Defendants Compton, Banga, Giuriceo, and Pasqua, or HRB Co.

440. Holders of Notes acquired their Notes without any knowledge of the extent of risk that HRB Co.'s disclosures of its financial condition and prospects, HRB Co.'s strength of management, the leadership of Daniels, and HRB Co.'s strength of customer relationships, were materially false.

441. At the time of said misrepresentations and omissions, the holders of the Notes were ignorant of their falsity and incompleteness, and believed them to be true and free of any omissions of material fact required to be disclosed. Had holders of the Notes and the marketplace known the truth regarding HRB Co.'s financial condition and prospects, HRB Co.'s strength of management, the leadership of Daniels, and HRB Co.'s strength of customer relationships, which was not disclosed by Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels,

holders of the Notes would not have purchased or otherwise acquired their Notes, or, if they had acquired such Notes, they would not have done so at the artificially inflated prices that they paid.

442. Defendants Compton, Banga and Giuriceo are liable for the statements that appeared in the Offering Memoranda as alleged in section V.H hereof because they approved those documents.

443. Defendants CD&R (through the actions of the CD&R Director Pasqua) and Pasqua is liable for the statements that appeared in the Offering Memoranda and Investor Presentation, as well as the statements made at the Roadshow Meetings, as alleged in section V.H.1 hereof because he approved those documents, made statements at the Roadshow Meetings, or stood silently as others made statements at the Roadshow Meetings.

444. Defendant Daniels is liable for the statements that appeared in the Offering Memoranda and Investor Presentation, as well as the statements made at the Roadshow Meetings, as alleged in section V.H.1 hereof because he approved those documents, made statements at the Roadshow Meetings, or stood silently as others made statements at the Roadshow Meetings.

445. As a direct and proximate result of Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ██████ and ████████), Compton, Banga, Giuriceo, Pasqua, and Daniels' wrongful conduct, the original purchasers of the Notes and/or Plaintiff, as the transferee and assignee of the Retained Non-Estate Causes of Action of the holders of Notes or the Indenture Trustee on behalf of holders of Notes under the Indenture, suffered damages in connection with the holders of Notes' purchases and sales of Notes.

446. Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels directly or indirectly controlled HRB Co., the seller of the Notes.

447. By virtue of the foregoing, these Defendants have violated California' Securities Act, California Corporations Code, Sections 25401, 25403, and 25501.

448. This action was filed within two years of discovery of the fraud and within five years of the purchases of Notes by holders of Notes giving rise to this cause of action.

**COUNT XII**
**Common Law Fraud (New York Law)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua)**

449. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

450. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua, for violations of New York common law.

451. HRB Co., under the control of CD&R, by and through the CD&R Directors, offered to sell Notes in New York. Additionally, Defendants CD&R (through the actions of the CD&R Directors and the actions of CD&R employees ███████ and ████████), Compton, Banga, Giuriceo, Pasqua prepared and/or approved the Offering Memoranda, and/or Investor Presentation while in New York, where CD&R's headquarters is located. Defendants Compton, Giuriceo, Pasqua also served as members of the HRB Co. Board while residing and/or conducting business in New York.

452. HRB Co., under the control of CD&R and the CD&R Directors, made material misstatements concerning HRB Co.'s Skin Care and Hair Care Brands' sales in November 2018 and April 2019.

453. HRB Co. and the CD&R Directors knew, or should have known, that the SGX Points of Distribution Disclosure in the November 2018 Lender Presentation was false, and failed to adequately inform the Notes Investors how they were quantifying "points of distribution".

454. The SGX Points of Distribution Disclosure was verifiably false and lacked considerable context, which is highlighted by the fact that HRB Co. corrected itself on April 29, 2019 when it presented to the lenders for the quarter ended December 31, 2018 (the "April 2019 Presentation"). The April 2019 Presentation outlined the sales prospects for the new brand, "SGX NYC" and illustrated key customer sales/marketing status for SGX NYC. However, the number of 'points of distribution' disclosed in the April 2019 Presentation was a mere 19,460. *See* April 2019 Presentation, at 11. The "points of distribution", without more, has no custom and usage, or market acceptance. Moreover, there was no further context that would indicate to lenders, including the "Holders" of Notes, that the 83,600 figure signifies anything other than the number of retail stores where the SGX product will be sold. Plaintiff is not aware that HRB Co. management ever told lenders what it intended by "points of distribution," or how any such figure relates to the number of retailers at which SGX NYC was to be sold.

455. The Notes sold off from $40.01 per $100 principal amount of Notes to $22.50 per $100 principal amount on May 1, 2019 following the release of the April 2019 Presentation. This trading decline reflected a single-day loss in trading value for all Notes of $43.775 million. Over the following three weeks, the value of all Notes declined by another $38.75 million, trading from $22.50 per $100 principal amount on May 1, 2019 to $7.00 per $100 principal amount on May 23, 2019.

456. The SGX Points of Distribution Disclosure was false and lacked serious context as to what HRB Co. meant by the term "points of distribution" and further was known to be false by HRB Co. and the CD&R Directors. The SGX Points of Distribution Disclosure was made for the purposes of inducing investors as holders of Notes to rely on the accuracy of that statement. As

such Holders of Notes were left to make their own determinations as to how many actual retail stores the SGX NYC products were in as of November 18, 2016.

457. It was justifiable for the investors (or investment managers acting on behalf of their managed accounts and clients), as holders of Notes, to rely on the SGX Points of Distribution Disclosure.

458. As supported by his informal, preliminary investigation, Plaintiff is aware that investors, owning at least $49,367,000 principal amount of Notes, held their Notes in reliance of the truthfulness and accuracy of the SGX Points of Distribution Disclosure.

459. As described above, Defendants Compton, Banga, Giuriceo, and Pasqua acted with scienter at all times applicable to this count, in that they either had actual knowledge that the SGX Points of Distribution Disclosure was materially incorrect and misleading, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants Compton, Banga, Giuriceo, and Pasqua's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing adverse material information about HRB Co.'s business condition and prospects. The SGX Points of Distribution Disclosure artificially inflating the price of its Notes, and induced investors to purchase and hold Notes.

460. At the time of said misrepresentation, the holders of the Notes were ignorant of their falsity and incompleteness, and believed them to be true and free of any omissions of material fact required to be disclosed.

461. Had holders of the Notes and the marketplace known the truth regarding HRB Co.'s financial condition and prospects, and that the SGX Points of Distribution Disclosure was wrong,

holders of the Notes would not have purchased or otherwise acquired their Notes, or, if they had acquired such Notes, they would not have done so at the artificially inflated prices that they paid.

462. Defendants Compton, Banga, Giuriceo, and Pasqua are liable for the SGX Points of Distribution Disclosure because they were responsible for those statements as members of the HRB Co. Board and consultants to HRB Co. under the CD&R Consulting Agreement.

463. As a direct and proximate result of Defendants Compton, Banga, Giuriceo, and Pasqua's wrongful conduct with respect to the misstatements in the SGX Points of Distribution Disclosure, the holders of Notes and/or Plaintiff, as the transferee and assignee of the Retained Non-Estate Causes of Action of the holders of Notes or the Indenture Trustee on behalf of holders of Notes under the Indenture, suffered damages in connection with the holders of Notes' purchases and sales of Notes.

464. This action was filed within six (6) years of the purchases of Notes by holders of Notes giving rise to this cause of action.

### COUNT XIII
**Common Law Fraud (the Commonwealth of Massachusetts Law)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua)**

465. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

466. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua for violations of the Commonwealth of Massachusetts common law.

467. investors (or investment managers acting on behalf of their managed accounts and clients) holding Notes resided in the Commonwealth of Massachusetts at all times relevant to this complaint.

468. As supported by his informal, preliminary investigation, Plaintiff is aware that investors, owning at least $49,367,000 principal amount of Notes, held their Notes in reliance of the truthfulness and accuracy of the SGX Points of Distribution Disclosure.

469. The same allegations made in paragraphs 452 through 463 establish liability for common law fraud under of the common law of the Commonwealth Massachusetts for each of Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua.

470. This action was filed within three (3) years of the discovery by the aggrieved investors of Notes of the facts constituting the fraud, or until the facts should have been discovered in the exercise of due diligence by holders of Notes giving rise to this cause of action.

**COUNT XIV**
**Common Law Fraud (North Carolina Law)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua)**

471. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

472. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua for violations of North Carolina common law.

473. Investors (or investment managers acting on behalf of their managed accounts and clients) holding Notes resided in North Carolina at all times relevant to this complaint.

474. As supported by his informal, preliminary investigation, Plaintiff is aware that one of the Par Purchasers was the "Holder" of at least $47,548,000 principal amount of Notes, held their Notes in reliance of the truthfulness and accuracy of the SGX Points of Distribution Disclosure.

475. The same allegations made in paragraphs 452 through 463 establish liability for common law fraud under of the common law of the Commonwealth Massachusetts for each of Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua.

476. This action was filed within three (3) years of the discovery by the aggrieved investors of Notes of the facts constituting the fraud, or until the facts should have been discovered in the exercise of due diligence by holders of Notes giving rise to this cause of action.

**COUNT XV**
**Common Law Fraud (California Law)**
**(Against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua)**

477. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

478. This Count is asserted on behalf of all of the former holders of Notes against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua for violations of California common law.

479. Investors (or investment managers acting on behalf of their managed accounts and clients) holding Notes resided in North Carolina at all times relevant to this complaint.

480. The same allegations made in paragraphs 440 through 451 establish liability for common law fraud under of the common law of the Commonwealth Massachusetts for each of Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua.

481. As supported by his informal, preliminary investigation, Plaintiff is aware that investors located in California may have held their Notes in reliance of the truthfulness and accuracy of the SGX Points of Distribution Disclosure.

482. This action was filed within three (3) years of the discovery by the aggrieved investors of Notes of the facts constituting the fraud, or until the facts should have been discovered in the exercise of due diligence by holders of Notes giving rise to this cause of action.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

a)  On the First Cause of Action, entry of a judgment against Defendant Arawak by this Court that the prepayment of the Arawak Loan, the Arawak Principal Transfer, is avoidable Pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(1), Ct. Gen. Stat. § 55-552e(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279, and entering a judgment against Defendant Arawak pursuant to 6 Del. C. § 1307, § 55-552h(a)(1), (2), (3), and/or NY DCL § 279 allowing recovery of the Arawak Principal Transfer, in an amount of at least $83,000,000;

b)  On the Second Cause of Action, entry of a judgment against Defendant Arawak by this Court that the Arawak Prepayment Transfer is avoidable Pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(1), Ct. Gen. Stat. § 55-552e(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279, and entering a judgment against Defendant Arawak pursuant to 6 Del. C. § 1307, § 55-552h(a)(1), (2), (3), and/or NY DCL § 279 allowing recovery of the Arawak Prepayment Transfer, in an amount of at least $8,300,000;

c)  On the Third Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua by this Court in an amount to be determined at trial, in an amount of at least $91,300,000, plus pre-judgment interest, as available under applicable law;

d)  On the Fourth Cause of Action, entry of a judgment against CD&R by this Court avoiding and recovering the CD&R Transfers, in an amount of $352,718.68, plus pre-judgment interest, as available under applicable law;

e)  On the Fifth Cause of Action, entry of a judgment against CD&R by this Court, disallowing the CD&R Unsecured Claim;

f)  On the Sixth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels by this Court in an amount to be determined at trial, of at least $68,000,000, plus pre-judgment interest, as available under applicable law;

g)  On the Seventh Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels by this Court in an amount to be determined at trial, of at least $195,117,000, plus pre-judgment interest, as available under applicable law;

h)  On the Eighth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels by this Court in an amount to be determined at trial, of at least $45,463,000 plus pre-judgment interest, as available under applicable law;

i) On the Ninth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels by this Court in an amount to be determined at trial, of at least $26,250,000, plus pre-judgment interest, as available under applicable law;

j) On the Tenth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels by this Court in an amount to be determined at trial, of at least $45,463,000 plus pre-judgment interest, as available under applicable law;

k) On the Eleventh Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, Pasqua, and Daniels by this Court in an amount to be determined at trial, of at least $26,250,000, plus pre-judgment interest, as available under applicable law;

l) On the Twelfth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua, by this Court in an amount to be determined at trial, of at least $45,463,000, plus pre-judgment interest, as available under applicable law;

m) On the Thirteenth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua, by this Court in an amount to be determined at trial, of at least $43,775,000, plus pre-judgment interest, as available under applicable law;

n) On the Fourteenth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua, by this Court in an amount to be determined at trial, of at least $43,775,000, plus pre-judgment interest, as available under applicable law;

o) On the Fifteenth Cause of Action, entry of a judgment against Defendants CD&R, Compton, Banga, Giuriceo, and Pasqua, by this Court in an amount to be determined at trial, of at least $43,775,000, plus pre-judgment interest, as available under applicable law;

p) awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

q) awarding Plaintiff post-judgment interest at the maximum rate permitted by law; and

r) awarding Plaintiff such other and further relief as this Court deems just and proper.

Dated: October 21, 2022

**GRANT & EISENHOFER P.A.**

*/s/ Vivek Upadhya*
Vivek Upadhya (DE Bar No. 6241)
123 Justison Street
Wilmington, Delaware 19801
Tel: 302-622-7000
Email: vupadhya@gelaw.com

-and-

Gordon Z. Novod (admitted *pro hac vice*)
Thomas Walsh (admitted *pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com
        twalsh@gelaw.com

*Special Counsel for Plaintiff, Alan D. Halperin, as Trustee of the High Ridge Brands Co. Liquidating Trust*