# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HRB WINDDOWN INC., *et al.*,[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 19-12689-BLS<br>Jointly Administered |
| ALAN D. HALPERIN, AS LIQUIDATING TRUSTEE OF THE HIGH RIDGE BRANDS CO. LIQUIDATING TRUST,<br><br>      Plaintiff,<br><br>v.<br><br>ARAWAK IX, L.P., CLAYTON, DUBILIER & RICE, LLC, JOHN C. COMPTON, VINDI BANGA (A/K/A MANVINDER BANGA), KENNETH A. GIURICEO, GREGORY L. PASQUA, AND JAMES A. DANIELS,<br><br>      Defendants. | Adversary Proceeding<br><br>Adv. Proc. Case No. 21-51412-BLS |

## DEFENDANTS' OPENING MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

DEBEVOISE & PLIMPTON LLP
Mark P. Goodman (admitted PHV)
Shannon Rose Selden (admitted PHV)
Erica S. Weisgerber (admitted PHV)
Matthew J. Sorensen (admitted PHV)
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000

WOMBLE BOND DICKINSON (US) LLP
Ericka F. Johnson (Del. Bar No. 5024)
Nicholas T. Verna (Del. Bar. No. 6082)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4337

---

[1] The Debtors in the above-captioned cases, along with the last four digits of each Debtor's federal tax identification number, are: High Ridge Brands Holdings, Inc. (5996); HRB Midco, Inc. (8170); HRB Buyer, Inc. (3945); HRB Winddown, Inc. (f/k/a High Ridge Brands Co.) (5871); GSI Winddown, Inc. (f/k/a Golden Sun, Inc.) (4712); CFL Winddown, Inc. (f/k/a Continental Fragrances, Ltd.) (2541); FCI Winddown, Inc. (f/k/a Freshcorp, Inc.) (3238); COC Winddown, LLC (f/k/a Children Oral Care, LLC) (disregarded entity for tax purposes); and DRF Winddown, LLC (f/k/a Dr. Fresh, LLC) (5167).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS ........................................................... 3

STATEMENT OF FACTS ........................................................................................... 3

   I.   The Parties ........................................................................................................ 3

   II.   The High Ridge Investment .............................................................................. 4

      A.   Fund IX Invests in High Ridge. ................................................................ 4

      B.   High Ridge Acquires Dr. Fresh Using $45 Million Additional Equity from Fund IX and a $160 Million Bridge Loan. ................................... 6

      C.   High Ridge Refinances the Bridge Loan and the Arawak Loan Through the Issuance of Unsecured Notes. ................................................ 6

      D.   High Ridge Experiences Financial Difficulties and Files for Bankruptcy. .................... 9

      E.   Trustee Files Complaint. .......................................................................... 11

ARGUMENT ............................................................................................................. 11

   I.   The Complaint Fails to State a Claim for Actual Fraudulent Transfer. ........... 13

      A.   The Complaint Fails to Allege Relevant Badges of Fraud or Particularized Facts Evincing a Scheme to Defraud High Ridge's Creditors. .................... 13

      B.   The Payment to Arawak Is Protected by the Safe Harbor Provision of 11 U.S.C. § 546(e). ....................................................... 18

   II.   The Trustee Lacks Standing to Bring the Fraud Claims Asserted in the Complaint. ....... 21

   III.   The Complaint Fails to State a Claim for Common Law Fraud or State Securities Law Violations. ........................................................................... 24

      A.   The Complaint Fails to Allege an Actionable Misstatement or Omission. .................. 25

      B.   The Complaint Fails to Allege Reliance. ................................................. 37

      C.   The Complaint Fails to Allege Scienter. .................................................. 38

      D.   The Complaint Fails to Allege Loss Causation. ...................................... 40

      E.   The Complaint Fails to Adequately Plead a Fraud or State Securities Law Claim against CD&R LLC. ........................................................... 42

IV. The Complaint Fails to State a Claim for Breach of Fiduciary Duty. .............................. 44

    A. CD&R LLC Cannot Have Breached Fiduciary Duties It Did Not Owe. ...................... 44

    B. The Fiduciary Duty Claim Fails Because the Complaint Does Not Plead That the Refinancing Was Unfair to High Ridge. ................................................................. 47

V. The Complaint Fails to State a Claim for Voidable Preference. ...................................... 48

VI. The Complaint Fails to State a Claim for Disallowance. .................................................. 50

CONCLUSION ................................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**

*Aldridge v. Metro. Life Ins. Co.*,
2019 WL 7374878 (N.C. Super. Ct. Dec. 31, 2019)..........................................24

*Alexandra Glob. Master Fund, Ltd. v. Ikon Off. Sols., Inc.*,
2007 WL 2077153 (S.D.N.Y. July 20, 2007) ...........................................30

*Allran v. Branch Banking & Tr. Corp.*,
2011 WL 2652133 (N.C. Super. Ct. July 6, 2011) ...............................29

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
842 F. Supp. 2d 1216 (C.D. Cal. 2012) ...............................14, 17, 18

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*,
158 Cal. App. 4th 226 (Cal. Ct. App. 2007) .............................43

*Arena Riparian LLC v. CSDS Aircraft Sales & Leasing Co.*,
127 N.Y.S.3d 71 (N.Y. App. Div. 2020) ...............................41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................12

*ATV Broad., LLC v. Bahakel Commc'ns, Ltd.*,
2021 WL 134692 (W.D.N.C. Jan. 13, 2021) .............................44

*Auctus Fund, LLC v. MJ Biotech, Inc.*,
544 F. Supp. 3d 190 (D. Mass. 2021) ...............................31

*Brennan v. 3250 Rawlins Ave. Partners, LLC*,
171 A.D.3d 603 (N.Y. App. Div. 2019) ...............................14

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ...............................29

*BSN Med., Inc. v. Parker Med. Assocs. LLC*,
2011 WL 5509030 (W.D.N.C. Nov. 17, 2011)..........................23

*Bucci v. Burns*,
2018 WL 1975019 (N.C. Super. Ct. Apr. 25, 2018)..................40

*Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006)...............................................5

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)..............................................35

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ................................................................33

*City of Warren Police & Fire Ret. Sys. v. Natera Inc.*,
    46 Cal. App. 5th 946 (Cal. Ct. App. 2020) ........................................................27

*Collins & Aikman Corp. v. Stockman*,
    2009 WL 1530120 (D. Del. May 20, 2009) ........................................................46

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989) ................................................................................27

*Credit All. Corp. v. Arthur Andersen & Co.*,
    65 N.Y.2d 536 (N.Y. 1985) ............................................................................38, 39

*Davis v. Abington Mem'l Hosp.*,
    765 F.3d 236 (3d Cir. 2014) ................................................................................12

*DeSimone v. TIAA Bank, FSB*,
    2021 WL 4198274 (S.D.N.Y. Sept. 14, 2021) ..............................................22, 37

*Devaney v. Chester*,
    813 F.2d 566, 568 (2d Cir. 1987) ........................................................................39

*ECB USA, Inc. v. Savencia, S.A.*,
    2020 WL 11762200 (D. Del. July 10, 2020) ......................................................45

*Fitzer v. Sec. Dynamics Techs., Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) ...................................................................29

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
    964 F. Supp. 2d 875 (N.D. Ohio 2013) ..............................................................41

*Giant Grp., Ltd. v. Arthur Andersen, LLP*,
    770 N.Y.S.2d 291 (N.Y. App. Div. 2003) ..........................................................39

*Gomez-Jimenez v. N.Y. Law Sch.*,
    956 N.Y.S.2d 54 (N.Y. App. Div. 2012) ............................................................30

*Gruman Allied Indus., Inc. v. Rohr Indus., Inc.*,
    748 F.2d 729 (2d Cir. 1984) ..........................................................................31, 32

*Hanson v. Berthel Fisher & Co. Fin. Servs.*,
    2014 WL 2434000 (N.D. Iowa May 29, 2014) ..............................................42, 43

*Harton v. Harton*,
    81 N.C. App. 295 (N.C. 1986) ............................................................................30

*Heritage Pac. Fin., LLC v. Monroy*,
 156 Cal. Rptr. 3d 26 (Cal. Ct. App. 2013) ............................................................22

*Hoffman v. 162 N. Wolfe LLC*,
 228 Cal. App. 4th 1178 (Cal. Ct. App. 2014) ......................................................30

*Hoffman v. AT&T Inc.*,
 2020 N.Y. Misc. LEXIS 1791 (N.Y. Sup. Ct. May 6, 2020)................................27

*Hunt v. All. N. Am. Gov't Income Tr., Inc.*,
 159 F.3d 723 (2d Cir. 1998)..................................................................................36

*Husky Int'l Elecs., Inc. v. Ritz*,
 578 U.S. 356 (2016)...............................................................................................18

*In re Advanta Corp. Sec. Litig.*,
 180 F.3d 525 (3d Cir. 1999)..................................................................................26

*In re Archway Cookies*,
 435 B.R. 234 (Bankr. D. Del. 2010) ...............................................................49, 50

*In re Bernier*,
 282 B.R. 773 (Bankr. D. Del. 2002) .....................................................................16

*In re BioScrip, Inc. Sec. Litig.*,
 95 F. Supp. 3d 711 (S.D.N.Y. 2015).....................................................................44

*In re Boston Generating*, 6
 17 B.R. 442 (S.D.N.Y. 2020)................................................................................19

*In re Burlington Coat Factory*,
 114 F.3d 1410 (3d Cir. 1997)........................................................................ *passim*

*In re Campbell Soup Co. Sec. Litig.*,
 145 F. Supp. 2d 574 (D.N.J. 2001) .......................................................................27

*In re Chapman Lumber Co., Inc.*,
 2007 WL 2316528 (Bankr. N.D. Iowa Aug. 8, 2007) ...........................................17

*In re Cyr*,
 602 B.R. 315 (Bankr. W.D. Tex. 2019)............................................................14, 18

*In re Digital Island Sec. Litig.*,
 223 F. Supp. 2d 546 (D. Del. 2002).......................................................................30

*In re Duane Reade Inc. Sec. Litig.*,
 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)....................................................26

*In re ECS Ref., Inc.*,
625 B.R. 425 (Bankr. E.D. Cal. 2020) .................................................................49

*In re Enron Corp.*,
341 B.R. 451 (Bankr. S.D.N.Y. 2006) ................................................................19

*In re Essar Steel Minn. LLC*,
2019 WL 2246712 (Bankr. D. Del. May 23, 2019) ............................................50

*In re Fairfield Sentry Ltd.*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ...................................18, 19

*In re Fedders N. Am., Inc.*,
405 B.R. 527 (Bankr. D. Del. 2009) ..............................................................13, 15

*In re First Jersey Sec., Inc.*,
180 F.3d 504 (3rd Cir. 1999) ..............................................................................16

*In re Healthco Int'l, Inc.*,
203 B.R. 515 (Bankr. D. Mass. 1996) .................................................................44

*In re Hechinger Inv. Co. of Del.*,
274 B.R. 71 (D. Del. 2002) ...........................................................................18, 20

*In re High Ridge Brands Co., et al.*,
No. 19-12689-BLS, D.I. 2 (Bankr. D. Del. Dec. 18, 2019) .............................9, 11

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007) .....................................................................41

*In re KKR Fin. Holdings LLC S'holder Litig.*,
101 A.3d 980 (Del. Ch. 2014) .......................................................................46, 47

*In re Majestic Star Casino, LLC*,
716 F.3d 736 (3d Cir. 2013) ..........................................................................16, 48

*In re Marketxt Holdings Corp.*,
361 B.R. 369 (Bankr. S.D.N.Y. 2007) ................................................................14

*In re Merck & Co., Inc. Sec., Deriv. & Erisa Litig.*,
2012 WL 3779309 (D.N.J. Aug. 29, 2012) ..............................................26, 28, 30

*In re Morton's Rest. Grp., Inc. S'holders Litig.*,
74 A.3d 656 (Del. Ch. 2013) ..............................................................................46

*In re Nine West LBO Sec. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020) .................................................................18

*In re Our Alchemy, LLC*,
   2019 WL 4447535 (Bankr. D. Del. Sept. 16, 2019) ........................................14, 17

*In re Parker Sch. Uniforms, LLC*,
   2021 WL 4553016 (Bankr. D. Del. Oct. 5, 2021) ....................................15

*In re Pembroke Dev. Corp.*,
   124 B.R. 398 (Bankr. S.D. Fla. 1991)........................................................16

*In re Plassein Int'l Corp.*,
   590 F.3d 252 (3d Cir. 2009).......................................................................18

*In re Raytheon Sec. Litig.*,
   157 F. Supp. 2d 131 (D. Mass. 2001) ......................................................38

*In re Rite Way Elecs., Inc.*,
   510 B.R. 471 (Bankr. E.D. Pa. 2014) .................................................24, 38

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
   311 F.3d 198 (3d Cir. 2002)......................................................................12

*In re Rutledge*,
   510 B.R. 491 (Bankr. M.D.N.C. 2014)....................................................38

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)........................................................41

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005)........................................................................18

*In re Sportco Holdings, Inc.*,
   2021 WL 4823513 (Bankr. D. Del. Oct. 14, 2021) ..................................14

*In re SRC Liquidation LLC*,
   581 B.R. 78 (D. Del. 2017)........................................................................13

*In re Stone & Webster, Inc.*,
   547 B.R. 588 (Bankr. D. Del. 2016) .........................................................50

*In re Sundial Growers Inc.*,
   2020 N.Y. Misc. LEXIS 2095 (N.Y. Sup. Ct. May 15, 2020)..............28, 29, 30

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006).......................................................................24

*In re Syntax-Brillian Corp.*,
   2011 WL 3101809 (Bankr. D. Del. July 25, 2011)..................................12

*In re Tribune Co. Fraudulent Conv. Litig.*,
   2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ..................................................14, 16, 17

*In re Tribune Co. Fraudulent Conv. Litig.*,
   2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019) .......................................................18

*In re Tribune Co. Fraudulent Conv. Litig.*,
   946 F.3d 66 (2d Cir.2019) ..........................................................................18, 19

*In re Vonage Initial Pub. Offering (IPO) Sec. Litig.*,
   2009 WL 936872 (D.N.J. Apr. 6, 2009) ..............................................................32

*In re W.T. Grant Co.*,
   699 F.2d 599 (2d Cir. 1983) ...............................................................................16

*In re Wonderwork, Inc.*,
   611 B.R. 169 (Bankr. S.D.N.Y. 2020) ................................................................45

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
   2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) ........................................................33

*Inventory Recovery Corp. v. Gabriel*,
   2012 WL 2990693 (D.N.J. July 20, 2012) ...........................................................44

*Invs. Title Ins. Co. v. Herzig*,
   330 N.C. 681 (N.C. 1992) ...................................................................................23

*Ivanhoe Partners v. Newmont Min. Corp.*,
   535 A.2d 1334 (Del. 1987) ..................................................................................45

*Joffee v. Lehman Bros.*,
   410 F. Supp. 2d 187 (S.D.N.Y. 2006) .................................................................41

*Kahn v. Lynch Commc'n Sys., Inc.*,
   638 A.2d 1110 (Del. 1994) ..................................................................................45

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
   821 F. Supp. 2d 616 (S.D.N.Y. 2011) .................................................................26

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ...............................................................................41

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) ............................................................31, 34

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   13 F.4th 247 (2d Cir. 2021) ................................................................................31

*Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*,
 978 N.Y.S.2d 615 (N.Y. Sup. Ct. 2013) ...........................................................42

*MacDonald v. Thomas M. Cooley Law School*,
 880 F. Supp. 2d 785 (W.D. Mich. 2012) ..........................................................36

*Madonna v. United States*,
 878 F.2d 62 (2d Cir. 1989).................................................................23, 37, 38

*Marciano v. Nakash*,
 535 A.2d 400 (Del. 1987) ..............................................................................47

*Martin v. Prudential-Bache Sec., Inc.*,
 820 F. Supp. 980 (W.D.N.C. 1991) ................................................................29

*Mass Op LLC v. Principal Life Ins. Co.*,
 2010 WL 4056072 (N.Y. Sup. Ct. Sept. 30, 2010)...........................................29

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*,
 910 F. Supp. 913 (S.D.N.Y. 1995) .............................................................16, 17

*Mirkin v. Wasserman*,
 858 P.2d 568 (Cal. 1993) ...............................................................................38

*Nat'l Shawmut Bank of Bos. v. Johnson*,
 317 Mass. 485 (Mass. 1945) ..........................................................................23

*New York City Waterfront Dev. Fund II, LLC v. Pier A Battery Park Assocs., LLC*,
 172 N.Y.S.3d 7 (N.Y. App. Div. 2022) ......................................................30, 31

*Nixon v. Blackwell*,
 626 A.2d 1366 (Del. 1993) ............................................................................47

*Oran v. Stafford*,
 226 F.3d 275 (3d Cir. 2000)...........................................................................20

*Pa. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*,
 25 N.Y.3d 543 (N.Y. 2015) ............................................................................22

*Peil v. Speiser*,
 806 F.2d 1154 (3d Cir. 1986)..........................................................................37

*Quidore v. All. Plastics, LLC*,
 2020 WL 7082566 (N.C. Super. Ct. Dec. 3, 2020)...........................................29

*Emps.' Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co.*,
 814 F. Supp. 2d 344 (S.D.N.Y. 2011).......................................................28, 42, 43

*Monroe Cty. Emps.' Ret. Sys. v. Carlson*,
    2010 WL 2376890 (Del. Ch. June 7, 2010) ................................................47

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir.1994) .........................................................................40, 41

*Revolutionary Concepts, Inc. v. Clements Walker PLLC*,
    227 N.C. App. 102 (N.C. Ct. App. 2013) .................................................23

*Rodden v. Savin Hill Enters., LLC*,
    2016 WL 1688688 (Mass. Super. Ct. Apr. 21, 2016) ...............................38

*Royal Bus. Grp., Inc. v. Realist, Inc.*,
    933 F.2d 1056 (1st Cir. 1991) ..................................................................30

*Royal Park Invs. SA/NV v. Morgan Stanley*,
    2017 WL 1379447 (N.Y. Sup. Ct. Apr. 11, 2017) ...............................22, 23

*S'holder Representative Servs. LLC v. Sandoz Inc.*,
    2015 WL 1209358 (N.Y. Sup. Ct. Mar. 16, 2015) ...................................38

*Sahni v. Emerald Mortg. Corp.*,
    2008 WL 5394937 (Cal. Ct. App. Nov. 19, 2008).....................................38

*Satellite Fin. Plan. Corp. v. First Nat. Bank of Wilmington*,
    633 F. Supp. 386 (D. Del. 1986) ......................................................37, 39, 40

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    2015 WL 3833849 (M.D. Pa. June 22, 2015) ..........................................33

*Sheridan Drive-In, Inc. v. State*,
    228 N.Y.S.2d 576 (N.Y. App. Div. 1962) ................................................36

*Siegal v. Gamble*,
    2016 WL 3648503 (N.D. Cal. July 7, 2016).............................................24

*Silverman v. Liberty Mut. Ins. Co.*,
    2001 WL 810157 (Mass. Super. Ct. July 11, 2001) .................................34

*Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*,
    2020 WL 881544 (Del. Ch. Feb. 24, 2020) .............................................47

*Small v. Fritz Cos.*,
    30 Cal. 4th 167 (Cal. 2003) ................................................................40, 42

*Sollberger v. Wachovia Sec., LLC*,
    2010 WL 11595839 (C.D. Cal. Feb. 22, 2010) ........................................43

*Solomon v. Pathe Commons Corp.*,
    1995 WL 250374 (Del. Ch. Apr. 21, 1995) ...................................................47, 48

*Stella v. Asset Mgmt. Consultants, Inc.*,
    8 Cal. App. 5th 181 (Cal. Ct. App. 2017) .......................................................32

*Stern v. Leucadia Nat. Corp.*,
    844 F.2d 997 (2d Cir. 1988).........................................................................37

*Tesoriero v. Metlife*,
    800 N.Y.S.2d 357 (N.Y. Sup. Ct. 2004) ........................................................36

*Tillery Env't LLC v. A & D Holdings, Inc.*,
    2018 WL 802515 (N.C. Super. Ct. Feb. 9, 2018) ...........................................44

*Trahan v. Interactive Intel. Grp., Inc.*,
    308 F. Supp. 3d 977 (S.D. Ind. 2018) ...........................................................27

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
    2013 WL 12124306 (N.D. Tex. June 18, 2013) ...................................14, 17, 18

*UBS Fin. Servs., Inc. v. Zimmerman*,
    2016 WL 7017278 (E.D.N.C. Dec. 1, 2016) ...................................................30

*Urman v. S. Bos. Sav. Bank*,
    1994 WL 878815 (Mass. Super. Ct. Oct. 19, 1994) ........................................30

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ...........................................................................47

*Wilbush v. Ambac Fin. Grp., Inc.*,
    271 F. Supp. 3d 473 (S.D.N.Y. 2017)............................................................27

*Williams v. Houston Plants & Garden World, Inc.*,
    508 B.R. 19 (S.D. Tex. 2014) .......................................................................17

*World Surveillance Grp. Inc. v. La Jolla Cove Invs., Inc.*,
    66 F. Supp. 3d 1233 (N.D. Cal. 2014) ...........................................................29

*Wright v. Robinson*,
    2010 WL 3724273 (D.N.J. Sept. 14, 2010) .........................................12, 21, 39

*Zalmanoff v. Hardy*,
    2018 WL 5994762 (Del. Ch. Nov. 13, 2018) .................................................41

*Zeitlin v. Palumbo*,
    532 F. Supp. 3d 64 (E.D.N.Y. 2021) .......................................................21, 22

*Zide v. McNiff*,
  2010 WL 6451867 (Mass. Super. Ct. Feb. 22, 2010) ............................................23

*Zimmerman v. Kent*,
  31 Mass. App. Ct. 72 (Mass. Ct. App. 1991) ..........................................34

*Zucker v. Quasha*,
  891 F. Supp. 1010 (D.N.J. 1995) ....................................................32

*Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*,
  2011 WL 5962804 (N.Y. Sup. Ct. Apr. 15, 2011)....................................39

**Statutes and Rules**

6 *Del. C.* § 1303 .....................................................................15

11 U.S.C. § 101 ...............................................................19, 20

11 U.S.C. § 502 ...................................................................50

11 U.S.C. § 546(e) ..................................................2, 18, 19, 20

11 U.S.C. § 561 ...................................................................19

11 U.S.C. § 547 ...................................................................49

11 U.S.C. § 741(7) ................................................................20

Cal. Corp. Code § 160(a) ..........................................................44

Cal. Corp. Code § 25501 ...........................................................43

Conn. Gen. Stat. Ann. § 52-552d(a) ................................................15

N.C. Gen. Stat. § 78A-56(a) .......................................................43

N.Y. Debt. & Cred. Law § 270 (2014) ...............................................16

N.Y. Debt. & Cred. Law § 272 (2014) ...............................................15

Fed. R. Bankr. P. 7008 .............................................................3

Fed. R. Bankr. P. 7009 .............................................................3

Fed. R. Bankr. P. 7012 .........................................................11, 12

Fed. R. Civ. P. 8 ...............................................................3, 35

Fed. R. Civ. P. 9(b) ......................................................... *passim*

Fed. R. Civ. P. 12(b)(6).............................................................................................11, 45

**Other Authorities**

Restatement (Second) of Torts § 527.........................................................................36

## PRELIMINARY STATEMENT

Despite having two years to investigate, access to thousands of relevant documents—including documents produced by Defendants—and a second bite at the pleading apple, the Trustee's Second Amended Complaint (the "Complaint") nevertheless falls short of stating viable claims. Distilled to its essence, the Complaint is an attempt, with the benefit of hindsight, to transform a routine refinancing into a fraudulent scheme based entirely on the fact that High Ridge Brands Co. ("High Ridge" or the "Company") filed for bankruptcy nearly three years later. Even after amending his allegations in light of Defendants' prior motion to dismiss, the Trustee is unable to plead the core elements of his claims and is forced, instead, to rely on conclusory assertions and rank speculation that he *might* uncover evidence in discovery that *might* support his claims. The Complaint comes nowhere near pleading the specific facts the federal rules require to state a plausible claim for relief.

The Trustee focuses on a 2017 transaction in which High Ridge refinanced a loan from defendant Arawak IX, L.P. ("Arawak") with proceeds from the sale of unsecured notes to a group of sophisticated investors. Bizarrely, the Trustee claims that both High Ridge itself and the note purchasers were deceived and harmed by the refinancing, notwithstanding that, as the Complaint makes clear, it reduced High Ridge's interest rate from 11.5% to 8.875%, eliminated a second lien encumbering substantially all of High Ridge's assets, and extended the maturity date by two years. And the investors received ample (and accurate) disclosures concerning High Ridge's business before electing to purchase the notes.

The Trustee's objection to an ordinary course transaction that rebalanced High Ridge's debt appears to arise from the fact that High Ridge was at the time owned by a private equity fund that had connections to High Ridge's directors and to Arawak, the original lender. The Complaint misstates the economic substance of the transaction, resorting to generalized

allegations about connections between High Ridge, the directors appointed by its equity holder CD&R HRB Holdings, L.P. ("HRB Holdings"), its contractual investment manager, Clayton, Dubilier & Rice, LLC ("CD&R LLC"), and Arawak, the affiliated vehicle that provided the refinanced loan. These connections, and excerpts from a handful of emails taken out of context, comprise the bulk of the Complaint and utterly fail to support the thesis that the professionals who helped effectuate a transaction that improved the Company's financial position did so in order to leave creditors holding the bag (an allegation that rings particularly hollow in light of the $45 million equity investment the purported wrongdoers had just made in the Company.)

The Complaint alleges, in Counts I and II, actual fraudulent transfer (based on the repayment of the Arawak loan to obtain financing at a lower rate) but (i) fails to allege any of the traditional badges of fraud or any other factual bases to infer fraudulent intent, (ii) concedes that the refinancing provided net value to High Ridge, and (iii) confirms the transaction is protected by the § 546(e) safe harbor.

With respect to the common law fraud claims set forth in Counts VI–IX and XII–XV, the Complaint fails both to establish that the Trustee has standing to pursue them or to allege the central elements of the claims—an actionable misstatement or omission, reliance, scienter, or loss causation—with the requisite particularity. Counts X and XI suffer from many of the same defects.

The Trustee's claim for breach of fiduciary duty, in Count III, similarly rests on generalized accusations of conflicted interest without providing any facts to suggest that the alleged conflicts resulted in a transaction that was not entirely fair to High Ridge. At most, the allegations support an inference that both High Ridge and Arawak benefitted from the prepayment and refinancing, not that Arawak was favored to the Company's detriment. And, as

to CD&R LLC, the claim for breach of fiduciary duty fails for the simplest reason of all: the Complaint does not and cannot allege that CD&R LLC—which owned no High Ridge stock and served only as a contractual advisor—was a fiduciary of High Ridge. The Complaint tacks on two additional claims—avoidable preference and disallowance (Counts IV and V)—which suffer from their own pleading defects.

This Complaint cannot withstand the scrutiny required by even the generous standard of Federal Rule of Civil Procedure 8 and Bankruptcy Rule 7008, much less the exacting requirements imposed by Federal Rule of Civil Procedure 9(b) and Bankruptcy Rule 7009, to plead claims of fraud and fraudulent transfer with particularity. The Court should reject the Trustee's second attempt to spin a hindsight-laden revisionist history of High Ridge and dismiss the Complaint in its entirety with prejudice.

## NATURE AND STAGE OF PROCEEDINGS

The Trustee commenced this action on December 16, 2021. Complaint, D.I. 1. On September 16, 2022, the Trustee filed its First Amended Complaint. Amended Complaint, D.I. 25. Defendants moved to dismiss on September 30, 2022. D.I. 36 & 37. The Trustee filed its Second Amended Complaint on October 21, 2022. D.I. 59. This is Defendants' opening brief in support of their motion to dismiss the Second Amended Complaint.

## STATEMENT OF FACTS

### I.     The Parties

High Ridge was a consumer products company that owned and managed a large portfolio of brands in the personal care sector. Compl. ¶ 39. At all relevant times, High Ridge was a portfolio company owned by an investment fund managed by private equity firm Clayton, Dubilier & Rice. The Complaint misuses the general label of "CD&R" to refer to multiple entities that are legally and factually distinct from one another:

- Defendant CD&R LLC is a registered investment advisor that serves as an investment manager for funds affiliated with the private equity firm Clayton, Dubilier & Rice.

- Non-party Clayton, Dubilier & Rice Fund IX, L.P. ("Fund IX") is a limited partnership for which CD&R LLC serves as investment manager. *Id.* ¶ 28.

- Non-party HRB Holdings is a limited partnership formed as an investment vehicle to hold Fund IX's interest in High Ridge. *Id.* ¶ 29.

- Defendant Arawak is a special purpose investment vehicle affiliated with Fund IX. *Id.* ¶ 18.

Throughout the relevant period, HRB Holdings held approximately 98.4% of High Ridge's common stock. *Id.* ¶ 40. CD&R LLC is not a general or limited partner of Fund IX and does not control the Fund's investments. Nor did CD&R LLC own High Ridge stock itself. The only direct relationship between CD&R LLC and High Ridge was a consulting agreement, under which CD&R LLC provided management advisory services as discussed below.

Defendants John C. Compton, Vindi Banga, Kenneth A. Giuriceo, and Gregory Pasqua (the "CD&R Director Defendants") served on the High Ridge board of directors from Fund IX's initial investment through the effective date (the "Effective Date") of High Ridge's Plan of Liquidation (the "Plan"), October 30, 2020. *Id.* ¶¶ 21–24. Defendant James Daniels (together with the CD&R Director Defendants, the "Director Defendants") was High Ridge's CEO and sat on the board from June 30, 2016, through June 30, 2017, when he left the Company. *Id.* ¶ 25.

## II. The High Ridge Investment

### A. Fund IX Invests in High Ridge.

On June 30, 2016, Fund IX, through HRB Holdings, acquired High Ridge's equity, financed in relevant part by a combination of $130 million in equity capital from Fund IX; a first lien term loan of $220 million from a syndicate of seven banks (the "First Lien Term Loan"); and a second lien loan of $83 million provided by Arawak (the "Arawak Loan"). Compl. ¶¶ 3,

52. High Ridge entered into numerous agreements in connection with the acquisition, two of which are particularly relevant to this motion:

*First*, High Ridge entered into a second lien credit agreement with Arawak and certain other parties (the "Arawak Credit Agreement"). Under the Arawak Credit Agreement, Arawak extended to High Ridge an $83 million loan, which High Ridge agreed to repay, plus 11.5% interest, by June 30, 2023. Compl. ¶ 56. As is typical in loan agreements, the loan was secured by a second lien on substantially all of High Ridge's assets, and there was a provision requiring High Ridge to pay a prepayment premium in the event it elected to retire the debt early, before June 30, 2019. Ex. 1, Arawak Credit Agreement § 2.12(d), A-00091.[2] Neither the initial complaint, nor the current Complaint, alleges that the terms of the Arawak Loan were unfair or not market at the time.

*Second*, High Ridge entered into a consulting agreement with CD&R LLC (the "Consulting Agreement"). Under the Consulting Agreement, CD&R LLC agreed to provide High Ridge with management advisory services including strategic, financial, and operational guidance, as well as assistance with strategic transactions, in exchange for an annual base consulting fee of $1 million, payable by High Ridge in $250,000 quarterly increments due in January, April, July, and October. Ex. 2, Consulting Agreement, §§ 2(b), 3(a), A-00505–06; Compl. ¶¶ 58–60. High Ridge also agreed to reimburse CD&R LLC for expenses incurred in providing the services. Ex. 2, § 3(c), A-00507–08. The Consulting Agreement designated CD&R LLC as an independent contractor and confirmed that the advisory services did not

---

[2] References to numbered exhibits herein (e.g., "Ex. 1") are to the Appendix in Support of Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint. Those materials may be considered on this motion because they are either part of the bankruptcy record or incorporated by reference, attached to, or integral to the Complaint or otherwise subject to judicial notice. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

constitute control over High Ridge. *Id.* § 2(e), A-00506 ("[T]he parties acknowledge and agree that CD&R Manager's services hereunder shall be limited to providing the Consulting Services and shall not extend to the right to exercise control over the Company or its controlled Affiliates."); *id.* § 6, A-00509–10 ("CD&R Manager has performed and shall perform the services hereunder as an independent contractor.").

**B.      High Ridge Acquires Dr. Fresh Using $45 Million Additional Equity from Fund IX and a $160 Million Bridge Loan.**

Consistent with its historical strategy of pursuing growth organically as well as by acquisition, on December 29, 2016, High Ridge purchased for approximately $200 million Dr. Fresh Holdings LLC and Dr. Fresh Blocker LLC (collectively, "Dr. Fresh"), an oral care business that complemented High Ridge's existing business lines in hair care and skin care. Compl. ¶ 61. The acquisition was financed by a $160 million bridge loan ("Bridge Loan") extended by a lending syndicate led by Bank of Montreal ("BMO Bank"), plus an additional injection of $45 million in equity from Fund IX. *Id.* ¶¶ 61–62; Compl. Ex. C at 8.

**C.      High Ridge Refinances the Bridge Loan and the Arawak Loan Through the Issuance of Unsecured Notes.**

Neither the Arawak Loan nor the Bridge Loan was intended to be a long-term funding solution for High Ridge. *See* Compl. ¶ 65. As early as November 2016, BMO Bank had agreed to refinance both loans (the "Refinancing") through an offering of $250 million of senior unsecured notes (the "Notes"), with BMO Capital Markets Corp. ("BMO Capital") to serve as the lead bookrunner for the offering, which would proceed through a private placement and be offered only to sophisticated investors qualified to participate in such an offering (the "Offering"). *Id.*; Compl. Ex. F at 6. High Ridge and the members of the lending syndicate memorialized this arrangement in a formal purchase agreement (the "Notes Purchase Agreement"), under which BMO Capital and the other syndicate members committed to

purchase the Notes at a small discount to their face value and then resell them to qualified institutional buyers.  Ex. 3, Notes Purchase Agreement, A-00518–97; *see also* Compl. ¶ 86–87; Compl. Ex. C at 185.  Under this agreement, BMO Capital would wire the purchase price to the accounts specified by High Ridge.  Ex. 3, §4 (a), A-00528; Compl. ¶ 65.  High Ridge was required to use the net proceeds received from the sale of the Notes for specified purposes identified in the offering memorandum accompanying the Notes (the "Offering Memorandum"), including the repayment of the Arawak Loan.  *See* Ex. 3, §§ 5(i), 7(m), A-00530, A-00534.

High Ridge prepared the Offering Memorandum and other disclosures to be circulated to potential investors in connection with the Offering.  Compl. ¶ 87; Compl. Ex. C.  The Offering Memorandum contained detailed historical financial information, projected synergies anticipated from the acquisition of Dr. Fresh and the Refinancing, and numerous disclosures warning investors of risks to High Ridge's business, including that:

- High Ridge is dependent on certain key customers and "[a]ny loss of a key customer or a significant reduction in net sales to a key customer could have a material adverse effect on [High Ridge's] business, financial condition and results of operations," Compl. ¶ 127; Compl. Ex. C at 29;

- "Walmart and Dollar Tree are High Ridge's two largest customers, representing approximately 30% and 11% of High Ridge's net sales," Compl. Ex. C at 29;

- The "historical data presented [in the Offering Memorandum] are not necessarily indicative of results to be expected for any future period," *id.* at 14;

- "The results of [High Ridge's] operations for the interim period is [sic] not necessarily indicative of the results to be expected for the full year or any future period," *id.* at 14;

- "The unaudited pro forma consolidated financial information" contained in the Offering Memorandum is "presented for informational purposes only and does not . . . purport to project the results of operations or financial condition for any future period or as of any future date," *id.* at 53;

- The company's net sales, gross profits, and contribution margin are down 4.4%, 4.3%, and 6.4%, respectively, in the second half of 2016 as compared to the same period in 2015, *id.* at 73; and

- High Ridge is dependent on key employees, who "have substantial experience within [High Ridge's] industry," many of whom "serve multiple executive functions beyond the scope of traditional job titles," and that "the loss of the services provided by any of [High Ridge's] executive officers or other key employees could harm [High Ridge's] business, financial condition and results of operations." *Id.* at 36–37.

The Offering Memorandum invited investors to request further information from High Ridge, stating up front: "You acknowledge that [] you have been afforded an opportunity to request from us, and to review, and have received, all additional information considered by you to be necessary to verify the accuracy of, or to supplement, the information contained in this offering memorandum." *Id.* at ii. In a subsection titled "Use of Proceeds," the Offering Memorandum stated that the proceeds from the Notes would be used to refinance the Bridge Loan and prepay the Arawak Loan, including "an estimated make-whole premium of $8.3 million." *Id.* at 50.[3]

High Ridge conducted roadshow presentations in connection with the Offering, led by Daniels, CFO Scott Kirk, and Pasqua, in which potential investors were invited to, and in some cases did, seek additional information about the Company. Compl. ¶ 97. The Offering was a success. The Notes, which had a coupon rate of 8.875% and a maturity date of March 15, 2025, were sold to BMO Capital, HSBC Securities (USA) Inc., ING Financial Markets LLC, and SG Americas Securities, LLC (the "Initial Purchasers") in accordance with the Notes Purchase Agreement, and BMO Capital wired a portion of the proceeds from the sale to pay off the Arawak Loan, including paying accrued interest and the required prepayment premium. Compl. ¶¶ 73–74; Ex. 3, § 4(a), A-00528.

The Initial Purchasers then immediately resold the Notes to a range of highly sophisticated qualified institutional buyers. Compl. ¶ 86; Compl. Ex. C at 185. According to the

---

3   This premium was substantially less than the approximately $14 million High Ridge was required to pay under the written terms of the Arawak Credit Agreement. Compl. ¶ 78; Ex. 1, § 2.12(d), A-00091.

Complaint, there was a secondary market for the Notes, which appear to have changed hands multiple times. *See, e.g.*, Compl. ¶ 209. The Complaint repeatedly speculates that the Trustee "suspects that fact discovery" of certain investors or advisors "may reveal that such investors" purchased Notes from the Initial Purchasers or on the secondary market. Compl. ¶¶ 209–10, 262–64, 380, 418, 436. The Complaint contains no factual allegations, however, about who held the Notes as of the Effective Date, when any particular holder of Notes ("Noteholder" or "Holder") acquired its securities, from whom it acquired them, or on what terms they were acquired, including whether any Noteholder's predecessors-in-interest (if any) transferred alleged fraud claims personal to them to their successors.

### D. High Ridge Experiences Financial Difficulties and Files for Bankruptcy.

Around the time of the Offering, Defendants were optimistic about High Ridge's potential for growth, noting that they "ha[d] made meaningful progress at High Ridge on a number of key fronts." Compl. ¶¶ 76, 151. For example, in connection with broader efforts to update the company's business model, High Ridge developed a new hair care line branded "SGX NYC." Compl. ¶ 13. Information concerning this new brand, including the size of its distribution network, was reported along with other information about the Company overall in regular quarterly presentations to Noteholders. Compl. ¶¶ 13, 173–74.

Notwithstanding these and other efforts to address a broad shift in consumer preferences across the personal care market, High Ridge's liquidity declined over the course of 2019, driven by a softness in demand and increased production costs. *See* Ex. 4, Plan § 3.2, A-00625–26; Declaration of M. Benjamin Jones in Support of Debtors' Chapter 11 Petitions and First Day Motions and Application ("First Day Declaration") ¶¶ 34, 36–37, *In re High Ridge Brands Co., et al.*, No. 19-12689-BLS, D.I. 2 (Bankr. D. Del. Dec. 18, 2019). This liquidity decline put High Ridge at risk of breaching certain leverage ratio covenants applicable to the First Lien Term

Loan and missing interest payments due under the Notes. Ex. 4, § 3.2, A-00625–26; First Day Declaration ¶ 38. As a result, on April 26, 2019, the lenders for the First Lien Term Loan executed a waiver and forbearance "that, among other things, waived the leverage ratio financial covenant under [such loan] for the financial covenant periods ending March 31, 2019, and June 30, 2019." Ex. 4, § 3.2, A-00625–26; *see also* Compl. ¶ 182 (incorporating by reference such forbearance agreement). This waiver and forbearance was disclosed to Noteholders in a quarterly presentation on April 29, 2019. Ex. 5, QE 12-18 Draft Bondholder Call Script at 2, A-00706; *see* Compl. ¶ 182.[4] Similarly, on October 11, 2019, High Ridge and an ad hoc group of Holders of the Notes entered into a forbearance agreement of their own, under which such Noteholders agreed to forbear from exercising their rights with respect to past due interest payments in exchange "for a fee of 0.25% of the outstanding principal amount of [Notes] held by each forbearing Noteholder." First Day Declaration ¶ 47; Ex. 4, § 3.2, A-00625–26.

These waivers and forbearances were extended multiple times—including until December 18, 2019—in order to allow High Ridge and its creditors, including the Noteholders, "to consider possible restructuring alternatives . . . to effectuate a consensual restructuring out of court." First Day Declaration ¶¶ 41–42, 48–50; Ex. 4, § 3.2, A-00625–26; *see* Compl. ¶ 182. Those "negotiations ultimately dwindled such that [High Ridge] decided [it] needed to pivot to other restructuring alternatives," namely, filing a Chapter 11 petition. First Day Declaration ¶¶ 42, 51; Ex. 4, § 3.2, A-00625–26.

High Ridge filed for Chapter 11 relief on December 18, 2019 (the "Petition Date"), and

---

[4]   The Court may consider the talking points that accompanied the April 2019 Lender Presentation because such presentation is attached to and integral to the Complaint. Compl. ¶ 454; *see In re Burlington Coat Factory*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited.").

the Court confirmed the Plan on October 8, 2020. Compl. ¶¶ 183–84; *In re High Ridge Brands Co.*, D.I. 619. The Plan provided for the formation of a Liquidating Trust to be overseen by a trustee (the "Trustee") appointed by the creditors' committee. *Id.* ¶¶ 186–88. The Plan assigned to the Liquidating Trust two types of causes of action: Retained Estate Causes of Action and Retained Non-Estate Causes of Action. The Retained Estate Causes of Action are causes of action formerly held by the Debtors. *Id.* ¶ 191. The Retained Non-Estate Causes of Action are causes of action formerly held by the "Holders" of the Notes as of the Petition Date, which were transferred from such Holders to the Liquidating Trust under § 9.18 of the Plan. Compl. ¶ 198; Ex. 4, § 9.18, A-00664.

### E. Trustee Files Complaint.

The Complaint includes both estate and non-estate causes of action. For Retained Estate Causes of Action, the Complaint asserts claims of fraudulent transfer in connection with the loan payment to Arawak, breach of fiduciary duty in connection with the Refinancing, and voidable preference in connection with payments made to CD&R LLC under the Consulting Agreement (Counts I–IV). Purporting to exercise the rights assigned to the Liquidating Trust by the Holders, the Complaint also asserts alleged Retained Non-Estate Causes of Action, namely, claims alleging common law fraud and state securities law violations in connection with the Offering and an alleged misstatement made in an investor presentation in 2018 (Counts VI–XV). The Trustee's recoveries (if any) on the Estate Causes of Action inure to the benefit of all of High Ridge's unsecured creditors, whereas recoveries (if any) on the Non-Estate Causes of Action inure solely to the benefit of the Holders. Ex. 4, § 9.18, A-00664.

### ARGUMENT

The Complaint should be dismissed in its entirety for failure to state a plausible claim for relief under Federal Rule of Civil Procedure 12(b)(6), as applied under Federal Rule of

Bankruptcy Procedure 7012. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 240 (3d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 241 (quoting *Iqbal*, 556 U.S. at 678). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quotations omitted). The Court is "not required to," and, indeed, cannot "credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Nor can the Trustee bring claims based on the "hope[] that, upon discovery, he might encounter certain facts favorable to his position." *Wright v. Robinson*, 2010 WL 3724273, at *2 n.3 (D.N.J. Sept. 14, 2010) (citing *Iqbal*, 556 U.S. at 677–87).

Where, as here, a plaintiff alleges fraud-based claims, the heightened pleading standard of Rule 9(b) applies. *In re Syntax-Brillian Corp.*, 2011 WL 3101809, at *7 (Bankr. D. Del. July 25, 2011). "The Third Circuit has explained that the purpose of the requirement in Rule 9(b) that plaintiffs plead with particularity the circumstances of the alleged fraud is to 'place the defendants on notice of the precise misconduct [alleged], and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'" *Id.* (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). The Complaint comes nowhere close to alleging facts stating a plausible claim for relief, much less does it satisfy Rule 9(b)'s requirement to plead claims of actual fraudulent transfer, common law fraud, and violations of state securities laws with particularity.

## I.      The Complaint Fails to State a Claim for Actual Fraudulent Transfer.

The Complaint purports to assert claims for actual fraudulent transfer based on the repayment of the Arawak Loan (Count I) and the payment of the prepayment premium in connection with the same loan (Count II). These claims fail because (1) the Complaint fails to allege with requisite particularity that the payment to Arawak was made with intent to defraud High Ridge's creditors, and (2) they are barred by the Bankruptcy Code's safe harbor provision for transfers made in connection with a securities contract.

### A.      The Complaint Fails to Allege Relevant Badges of Fraud or Particularized Facts Evincing a Scheme to Defraud High Ridge's Creditors.

The Complaint attacks the payment to Arawak on the basis of only three conclusory allegations: (1) the transfer was not for reasonably equivalent value; (2) it occurred shortly after a substantial debt was incurred; and (3) the transfer was to an insider. Compl. ¶¶ 277–86. These allegations are insufficient to state a plausible claim for actual fraudulent transfer.

At the outset, because the Trustee's actual fraudulent transfer claims are rooted in fraud, the heightened pleading requirements of Rule 9(b) apply. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).[5] While plaintiffs are given some leeway in pleading a

---

[5]      Trustees are not absolved of this requirement where they have had access to pre-suit discovery. *See In re SRC Liquidation LLC*, 581 B.R. 78, 86–87 (D. Del. 2017) ("Courts sometimes relax the heightened standard for bankruptcy trustees . . . *where the trustee has not been afforded any discovery prior to filing a complaint*.") (emphasis added); *In re Fedders N. Am., Inc.*, 405 B.R. at 544 (relaxation of Rule 9(b) is based on "the trustee's inevitable lack of knowledge concerning acts of fraud previously committed against the debtor, a third party") (quotations omitted). Here, the Trustee attempts to plead around this requirement by minimizing the ample pre-suit discovery that was available to him. *See* Compl. ¶¶ 206–10. Those very allegations confirm, however, that the Trustee has access to "extensive documents and information" provided to the Creditors' Committee by CD&R LLC and the Debtors and that "the Trustee, with the assistance of counsel, has conducted an informal preliminary investigation of certain subjects." Compl. ¶¶ 206, 209. The fact that the Trustee has elected not to investigate his claims more diligently in the two years since the Effective Date does not relieve him of the obligation to plead fraud with particularity.

defendant's intent, "this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *In re Tribune Co. Fraudulent Conv. Litig.*, 2017 WL 82391, at *4 (S.D.N.Y. Jan. 6, 2017) (quotations omitted). Rather, "a complaint alleging an actual fraudulent conveyance must allege facts that give rise to a *strong inference* of fraudulent intent." *Id.* (emphasis added and quotations omitted). While a plaintiff may allege fraud by pleading sufficient facts plausibly suggesting the presence of multiple "badges of fraud" giving rise to an inference of fraudulent intent, it is not sufficient to merely allege isolated badges of fraud that, when considered in context, do not give rise to such an inference.[6] The Complaint comes nowhere close to meeting this burden, as it fails to allege specific facts demonstrating sufficient badges of fraud to infer fraudulent intent or other facts giving rise to a strong inference that High Ridge intended to defraud creditors in connection with the Refinancing.

As a threshold matter, the Complaint does not and cannot even attempt to plead the vast majority of the traditional badges of fraud. For example, the Complaint alleges no facts bearing on: (1) High Ridge's solvency at the time of the transfer; (2) the absence of consideration for the transfer; (3) the transfer was of substantially all of the company's assets; (4) the transfer was secret or concealed; and (5) the transferor retained control over the property transferred. *See*,

---

[6] *See, e.g.*, *In re Our Alchemy, LLC*, 2019 WL 4447535, at *11 (Bankr. D. Del. Sept. 16, 2019) (dismissing claim where bona fide debt was repaid to affiliate of an insider and no other circumstances suggested fraud); *In re Sportco Holdings, Inc.*, 2021 WL 4823513, at *15 (Bankr. D. Del. Oct. 14, 2021) (a single badge of fraud with "conclusory allegations" of other badges insufficient); *In re Marketxt Holdings Corp.*, 361 B.R. 369, 397 (Bankr. S.D.N.Y. 2007) (allegations of insider relationship and lack of consideration insufficient); *see also U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 2013 WL 12124306, at *3 (N.D. Tex. June 18, 2013) (transfer to an insider shortly after debt was incurred not indicative of fraud in context); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1230 (C.D. Cal. 2012) (badges "consistent both with liability and with an innocent explanation" are insufficient); *In re Cyr*, 602 B.R. 315, 331–32 (Bankr. W.D. Tex. 2019) (dismissing complaint alleging two badges where context did not permit inference of fraudulent intent); *Brennan v. 3250 Rawlins Ave. Partners, LLC*, 171 A.D.3d 603, 604 (N.Y. App. Div. 2019) (insider relationship plus unfair consideration insufficient).

*e.g.*, *In re Fedders*, 405 B.R. at 545; *see also* 6 *Del. C.* § 1304(b). The three so-called badges of fraud the Complaint does attempt to plead detail nothing more than an ordinary course refinancing, where favorable market conditions allowed the Company to obtain new unsecured debt with a more favorable interest rate and longer maturity and to repay a prior secured debt owed to an affiliated lender. Compl. ¶¶ 56, 73–74, 85. This is wholly insufficient to raise a plausible inference that High Ridge intended to defraud its creditors by repaying Arawak.

*First*, the Complaint attempts to allege that the payment to Arawak was not for reasonably equivalent value by asserting that High Ridge "merely replaced an antecedent debt owed to CD&R's affiliates, with debts owed to third-party investors." Compl. ¶ 283. But it is well settled that a "transfer made in satisfaction of an antecedent debt . . . presumptively constitutes reasonably equivalent value." *In re Parker Sch. Uniforms, LLC*, 2021 WL 4553016, at *7 (Bankr. D. Del. Oct. 5, 2021) (Sontchi, J.) (quotation omitted).[7] The Arawak Loan and High Ridge's contractual obligation to pay the prepayment premium plainly were satisfied in exchange for High Ridge's payment.

The Complaint does not and cannot allege otherwise. In fact, the Complaint concedes that High Ridge would ultimately be in a better financial position as a result of the Refinancing. Compl. ¶¶ 82–84, 284–85. The Notes' interest rate was meaningfully lower, and the Notes' maturity date was nearly two years later, than those of the Arawak Loan. Compl. ¶¶ 56, 73–74, 85. The dubious allegation that the benefit of a lower interest rate would not be fully realized until 2022 is irrelevant. Compl. ¶¶ 83–84, 284. The "opportunity to receive an economic benefit

---

[7]    *See also* N.Y. Debt. & Cred. Law § 272 (2014) ("[F]air consideration is given" as a matter of law "[w]hen, in exchange . . . an antecedent debt is satisfied."); Conn. Gen. Stat. Ann. § 52-552d(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."); 6 *Del. C.* § 1303(a) (same).

in the future constitutes value," *In re Majestic Star Casino, LLC*, 716 F.3d 736, 750–51 (3d Cir. 2013) (quotations omitted), and companies benefit from extended maturity dates as well.[8]  The Complaint's conclusory statement that the Arawak Loan was not an antecedent debt because it had not matured as of the date of the Refinancing is also contrary to law.  *See In re First Jersey Sec., Inc.*, 180 F.3d 504, 511 (3rd Cir. 1999) (debt incurred "when a right to payment arises— *even if the claim is not fixed, liquidated, or matured*") (emphasis added); N.Y. Debt. & Cred. Law § 270 (2014) ("debt" is "*any* legal liability, *whether matured or unmatured*") (emphasis added).  Accordingly, the Complaint fails to plausibly allege that High Ridge did not receive reasonably equivalent value in repaying the Arawak Loan and making the prepayment premium.

*Second*, the observation that the payment to Arawak occurred shortly after a substantial debt was incurred, Compl. ¶¶ 286, 318, is utterly unremarkable in the context of a refinancing and does not support an inference of scienter, much less the required "strong" inference.  As this Court has acknowledged, "[e]vidence of some other convincing explanation other than an intent to hinder, delay or defraud" must be considered in analyzing the badges of fraud at the pleading stage.  *In re Bernier*, 282 B.R. 773, 781–82 (Bankr. D. Del. 2002).  For example, in *Tribune*, the court dismissed on the pleadings a fraudulent transfer claim alleging as a badge of fraud that the transfer occurred "at the same time as, or with the proceeds of, the incurrence of a new debt" because such allegation "simply describe[d] the basic features of any LBO, which, by its nature . . . invariably requires a company to incur debt." *Tribune*, 2017 WL 82391, at *15; *see also MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995) (dismissing fraudulent transfer claim where transaction structure was not

---

[8]  *See, e.g.*, *In re Pembroke Dev. Corp.*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991) (extended maturity date valid consideration and reasonably equivalent value for alleged fraudulent transfer); *see also In re W.T. Grant Co.*, 699 F.2d 599, 608–09 (2d Cir. 1983) (full benefit of extended maturity date considered fair consideration for a settlement).

unusual given commercial context); *U.S. Bank.*, 2013 WL 12124306, at \*3 (incurring a

substantial debt is a "feature[] of every spinoff transaction that involves debt"). So too here.

The payment to Arawak was one component of the overall Refinancing of High Ridge's short-

term lending facilities, namely, the Bridge Loan[9] and the Arawak Loan. That fact was disclosed

to investors at the time. Compl. Ex. C at 50. As such, High Ridge's payment *necessarily* took

place at the same time as it took on replacement debt. *Id.* at 8–9; *Tribune*, 2017 WL 82391, at

\*15 (no inference of fraud where transaction involved "sophisticated parties" and "received

widespread publicity").

      *Third*, the conclusory allegation that the transfer was to an insider because Fund IX or

"CD&R" controlled both High Ridge and Arawak is not probative of fraud. Compl. ¶¶ 277–78,

296, 306, 314–15, 327. Arawak was not an insider looting the firm—it was a creditor that had

extended $83 million in financing to High Ridge. Fund IX made an additional $45 million

equity investment in High Ridge not long before the payment to Arawak, rendering it

implausible that Fund IX or any affiliated CD&R entity or person viewed High Ridge as a

proverbial "sinking ship." Compl. ¶ 4; Compl. Ex. C at 8. Even if Arawak were an insider, a

single badge of fraud is insufficient to sustain a claim for actual fraudulent transfer. *See In re*

*Our Alchemy, LLC*, 2019 WL 4447535, at \*11 (one badge—transfer to insider—insufficient).[10]

Even two badges of fraud, such as those alleged in conclusory fashion here, are insufficient to

state a claim for actual fraudulent transfer. *See U.S. Bank*, 2013 WL 12124306, at \*3; *Allstate*,

---

9    The Complaint only challenges repayment of the Arawak Loan and ignores entirely the Bridge Loan—even though the latter would share two of the three purported badges of fraud alleged here, *i.e.*, "merely replac[ing] an antecedent debt" and occurring "shortly after a substantial debt was incurred." *See* Compl. ¶¶ 283, 286.

10   *See also Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 19, 27 (S.D. Tex. 2014) ("[A] single badge is generally insufficient to show actual intent."); *In re Chapman Lumber Co., Inc.*, 2007 WL 2316528, at \*3 (Bankr. N.D. Iowa Aug. 8, 2007) ("Ordinarily, the presence of more than one of the badges of fraud is necessary.").

842 F. Supp. 2d at 1229 (dismissing complaint where "the two badges of fraud that [plaintiff] pleads are consistent both with liability and with an innocent explanation"); *In re Cyr*, 602 B.R. at 331 ("At most, the Trustee has properly plead two of six badges of fraud" and "does not allege any facts indicating that creditors were pursuing claims against Debtor at the time of or after the transfers were made.").[11]

### B. The Payment to Arawak Is Protected by the Safe Harbor Provision of 11 U.S.C. § 546(e).

The Trustee's fraudulent transfer claims are also barred by the Bankruptcy Code's securities safe harbor, pursuant to which a transfer made (1) "by or to" a "financial participant," and (2) "in connection with a securities contract" is not avoidable as a fraudulent transfer. *See* 11 U.S.C § 546(e). The payment to Arawak satisfies both elements, requiring dismissal of the fraudulent transfer claims. *See, e.g., In re Plassein Int'l Corp.*, 590 F.3d 252, 259 (3d Cir. 2009) (affirming dismissal where transfer fell within § 546(e)).[12]

---

[11] The Complaint's conclusory allegations that investors were fraudulently induced to acquire the Notes are irrelevant to the fraudulent transfer claims because the latter seek to avoid High Ridge's transfer to Arawak—not the transfer of the Notes. *See, e.g., In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (affirming dismissal of complaint that "inadequately allege[d] fraud *with respect to the transaction that [plaintiff] seeks to avoid . . . .* The fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street" in satisfaction of a pre-existing debt) (emphasis added); *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 361 (2016) ("As a basic point, fraudulent conveyances are not an inducement-based fraud," and "the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt."). Anyway, for the reasons discussed below, the Complaint fails to adequately allege a claim for fraud in connection with the Offering.

[12] *See also In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 98 (D. Del. 2002) (granting motion to dismiss where transfer fell within § 546(e)); *In re Tribune Co. Fraudulent Conv. Litig.*, 2019 WL 1771786, at *7 (S.D.N.Y. Apr. 23, 2019) (application of § 546(e) a question of statutory interpretation for pleading stage); *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 80–81 (2d Cir. 2019) (affirming dismissal of claim on the pleadings under § 546(e)); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 194 (S.D.N.Y. 2020) (safe harbor defense ripe at the pleading stage); *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *5 (Bankr.

*First*, BMO Capital—the transferor of the funds to repay Arawak—qualifies as a "financial participant" under § 546(e).[13]  As provided in 11 U.S.C. § 101(22A), "an entity" qualifies as a "financial participant" if "at the time it enters into a securities contract . . . or at the time of the date of the filing of the [bankruptcy] petition," such entity "has one or more agreements or transactions described in" 11 U.S.C. § 561(a)(1)-(6), which includes securities repurchase transactions, "of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition."  11 U.S.C. § 101(22A).  BMO Capital's SEC filings confirm that it qualifies as a "financial participant" because it engaged in, among other transactions, for example, securities repurchase transactions in excess of $1 billion in the relevant time periods.[14]

---

S.D.N.Y. Dec. 14, 2020) (same); *In re Enron Corp.*, 341 B.R. 451, 455 n.3 (Bankr. S.D.N.Y. 2006) (same).

[13]  Arawak also qualifies as a "financial institution" under the safe harbor because it was a customer of a financial institution, namely, JPMorgan Chase Bank in connection with the Refinancing.  *See* Compl. ¶ 75 ("The Arawak Principal Transfer, the Arawak Prepayment Transfer, and the Arawak Interest Transfer were accomplished through a transfer to Arawak's account at JPMorgan Chase Bank.").  JPMorgan Chase Bank, N.A. is a "financial institution" because it is recognized as a "commercial bank" by the Office of the Comptroller of the Currency.  *See* Office of the Comptroller of the Currency, Financial Institutions List, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/index-financial-institution-lists.html; *see generally* 11 U.S.C. § 101(22A) (defining "financial institution" to include a commercial bank).  Accordingly, Arawak, the transferee, is also a covered entity under the safe harbor.  *See In re Tribune*, 946 F.3d at 78; *see also In re Nine West*, 482. F. Supp. 3d at 199–202 (customer of bank facilitating transaction is a financial institution under safe harbor provision); *In re Boston Generating*, 617 B.R. 442, 487–88 (S.D.N.Y. 2020) (same).  The Complaint's conclusory allegation that the bank "did not serve as an agent of Arawak" in the transaction, Compl. ¶ 75, is a legal conclusion entitled to no weight.  *See In re Nine West,* 482. F. Supp. 3d at 195 ("The Complaint goes out of its way to describe [bank] as a 'non-agent contractor,' a legal conclusion that is not entitled to the assumption of truth.").

[14]  *See* BMO Capital, Form X-17A-5 at 7 (Feb. 28, 2018), https://www.sec.gov/Archives/edgar/data/772028/000077202818000004/bmocmcsofcpubl2017.pdf (showing, *e.g.*, gross obligations under securities repurchase agreements in excess of $8 billion as of December 31,

*Second*, the payment to Arawak was made in connection with a securities contract: the Notes Purchase Agreement. Section 741(7) of the Bankruptcy Code defines "securities contract" as "a contract for the purchase, sale, or loan of a security." The Offering Memorandum states that "[t]he notes are a new issue of securities," Compl. Ex. C at 185, which comports with the Bankruptcy Code's definition of "security" to include a "note." 11 U.S.C. § 101(49)(A)(i). There is no question that the payment to Arawak was made "in connection with" the Notes Purchase Agreement, as the Agreement expressly requires that funds from the purchase be used as outlined in the Offering Memorandum. Ex. 3, §§ 5(i), 7(m), A-00530, A-00534. And the Offering Memorandum repeatedly states that the proceeds from the Offering would be used to repay the Arawak Loan, and that the repayment would "occur in connection with the offering and sale of the notes." Compl. Ex. C at 8–9; *see also id.* at 13 ("We intend to use the proceeds from this offering [to] prepay the [Arawak Loan] and pay related fees and expenses."); *id.* at 50–51.

Because the payment to Arawak falls within the § 546(e) safe harbor, the Bankruptcy Code's safe harbor bars the Trustee's state law fraudulent transfer claims. 11 U.S.C. § 546(e); *see*, *e.g.*, *Hechinger*, 274 B.R. 71. Accordingly, Counts I and II of the Complaint, asserting claims of actual fraudulent transfer against Arawak in connection with the loan payment to

---

2017); BMO Capital, Form X-17A-5 at 7 (Feb. 25, 2020), https://www.sec.gov/Archives/edgar/data/772028/000077202820000003/bmocmcpublicversion123119.pdf (showing, *e.g.*, gross obligations under securities repurchase agreements in excess of $20 billion as of December 31, 2019). BMO Capital's SEC filings are subject to judicial notice on this motion. *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (courts permitted to take judicial notice of SEC filings). In fact, all of the Initial Purchasers were financial participants. HSBC Securities (USA) Inc., Form X-17A-5 at 26 (Mar. 5, 2018), https://www.sec.gov/Archives/edgar/data/853784/ 000085378418000006/Public.pdf; ING Financial Markets LLC, Form X-17A-5 at 10 (Apr. 2, 2018), https://www.sec.gov/Archives/ edgar/ data/877559/000087755918000004 /ING_FM_SOFC_17.pdf; SG Americas Securities, LLC, Form X-17A-5/A at 20 (Apr. 13, 2018), https://www.sec.gov/Archives/ edgar/data/1261467/000126146718000012/SGAS_2017_Public_SEC.pdf.

Arawak, should be dismissed.

## II. The Trustee Lacks Standing to Bring the Fraud Claims Asserted in the Complaint.

The Complaint fails to establish that the Trustee has standing to pursue the fraud claims asserted in Counts VI through IX and XII through XV under New York, Massachusetts, North Carolina, and California common law. Although the Liquidating Trust was assigned all "Causes of Action . . . arising from or related to the 2017 Senior Unsecured Notes" "held by [the] Holders of 2017 Senior Unsecured Notes," Ex. 4, § 1.134, A-00617, the Complaint does not allege with the requisite specificity that such "Holders" purchased their Notes in the Offering or received an assignment of fraud claims from someone who did.

*First*, the Trustee points to "substantial overlap" between a list of purchasers from the Offering in March 2017 and the creditors listed in High Ridge's bankruptcy petition, but this is insufficient to give him standing on behalf of purchasers in the Offering. Compl. ¶ 204.[15] Crucially, the Complaint offers no meaningful allegation that any one of these "overlapping" investors owned their Notes continuously from purchase through the *Effective Date* when then-current "Holders of 2017 Senior Unsecured Notes" assigned their claims to the Liquidating Trust; instead, the Trustee alleges only that he "believes" this to be the case and "expects to discover" whether his belief is founded. *Id.* ¶¶ 205, 380, 399, 418. This is basic identifying information about the alleged assignors whose claims the Trustee purports to assert and for whom the Trustee seeks recovery. It is black-letter law that a plaintiff cannot rely on discovery to cure otherwise defective claims. *See, e.g., Robinson*, 2010 WL 3724273, at *2 n. 3; *Zeitlin v.*

---

[15] At most, the overlap between these lists is only partial: the Complaint identifies only nine of 46 entities that purchased Notes in the Offering and that also allegedly held Notes when High Ridge filed for bankruptcy, *id.* ¶¶ 203–05, yet Counts VI through IX purport to seek relief on behalf of a much larger group of entities. *Id.* ¶¶ 370, 378, 380, 397–99, 401–02, 408, 410–11, 417–18.

*Palumbo*, 532 F. Supp. 3d 64, 70 (E.D.N.Y. 2021) ("In stating that he needs discovery to [make factual allegations], however, plaintiff all but admits that he cannot satisfy the *Twombly/Iqbal* standard."); *DeSimone v. TIAA Bank, FSB*, 2021 WL 4198274, at *5 (S.D.N.Y. Sept. 14, 2021) (allegations that plaintiffs "intend to show through discovery" and "seek discovery to demonstrate" grounds for their claims rejected as "mere speculation" and "fishing expeditions"). The prohibition against relying on subsequent discovery is even more appropriate here, where the Trustee has had two years to identify the parties whose claims he was assigned. Yet, the Trustee can only speculate as to the status of the "Holders" he purports to represent and cannot definitively identify a single "Holder" who held Notes on the Effective Date.

*Second*, as to the Trustee's claims under New York and California Law, the Complaint offers no specific allegation that any Noteholder who purchased its Notes on the secondary market obtained an explicit transfer of fraud claims. Under the laws of New York and California, "the right to assert a fraud claim related to a contract or note does not automatically transfer with the respective contract or note." *Royal Park Invs. SA/NV v. Morgan Stanley*, 2017 WL 1379447, at *4 (N.Y. Sup. Ct. Apr. 11, 2017); *Heritage Pac. Fin., LLC v. Monroy*, 156 Cal. Rptr. 3d 26, 40 (Cal. Ct. App. 2013) (assignment does not include tort claim unless "the assignor manifests an intention to transfer the right") (quotation omitted). Instead, "[t]here must be some language" in the contract of sale "that evinces an intent to transfer fraud claims." *Royal Park Invs. SA/NV*, 2017 WL 1379447, at *4. "Without a valid assignment, only the assignor may . . . sue for damages for fraud . . . because the representations were made to it and it alone had the right to rely upon them." *Pa. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 25 N.Y.3d 543, 550 (N.Y. 2015) (quotation omitted).

The Complaint is devoid of a single specific allegation that the New York and California

"Holders" who assigned claims to the Liquidating Trustee received a written contract transferring the right to assert fraud claims belonging to their predecessors-in-interest. *Royal Park Invs. SA/NV*, 2017 WL 1379447, at *4 (dismissing complaint for failure to allege standing to assert fraud claims belonging to predecessors-in-interest). This is not a hypothetical concern: the Complaint's allegations that the Notes were actively traded on the secondary market raise serious doubts whether the "Holders" who assigned claims to the Liquidating Trust purchased their securities in the Offering or received assignments of fraud claims from someone who did. The halfhearted assertion that the Trustee "expects to discover" if such assignments exist and "if so, what the terms of [the] assignment[s] are," Compl. ¶ 382, is a far cry from what is required to state a valid claim. *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989).

*Third*, as to the fraud claims under Massachusetts and North Carolina law such claims are not actionable by the Trustee. Under well-settled Massachusetts and North Carolina law (which the Trustee concedes applies here, Compl. ¶¶ 396, 407, 466, 472), fraud claims are not assignable. *See*, *e.g.*, *Nat'l Shawmut Bank of Bos. v. Johnson*, 317 Mass. 485, 488 (Mass. 1945) ("[A] right to litigate a fraud perpetrated upon a person is not assignable at law or in equity."); *Invs. Title Ins. Co. v. Herzig*, 330 N.C. 681, 688 (N.C. 1992) ("No North Carolina statute allows the assignment of fraud . . . claims.").[16]

The Trustee has had two years to investigate his claims, yet the Complaint fails to identify a single Holder (i) who held Notes as of the Effective Date, and (ii) whose Notes included the right to assert a fraud claim. The Trustee's argument that these pleading

---

[16] *See also Zide v. McNiff*, 2010 WL 6451867 (Mass. Super. Ct. Feb. 22, 2010) ("Claims of fraud are not assignable."); *Revolutionary Concepts, Inc. v. Clements Walker PLLC*, 227 N.C. App. 102, 107 (N.C. Ct. App. 2013) ("[A]ssignments of personal tort claims are void as against public policy." (quotation omitted).); *cf. BSN Med., Inc. v. Parker Med. Assocs. LLC*, 2011 WL 5509030, at *21 (W.D.N.C. Nov. 17, 2011) ("[A] personal tort claim such as fraud is not assignable.").

deficiencies should be excused because he has conducted only an "informal, preliminary investigation of certain subjects" ignores well-established pleading standards and should be rejected. Compl. ¶ 209. The Complaint concedes that the Trustee has had access to "extensive documents and information" from CD&R LLC and High Ridge, *id.* ¶ 206, while at the same time asserting that he has been "limited to [] minimal discovery," *id.* ¶ 207. The deficiencies in the Complaint involve basic information known to the very Holders whose interests the Trustee purports to represent—not facts uniquely within Defendants' knowledge. Where, as here, the information lacking from the Complaint is "quite straightforward," despite "adequate time and resources available to [the trustee] to make a reasonable inquiry," the Trustee's "shoot first and ask questions later approach" should not be countenanced. *In re Rite Way Elecs., Inc.*, 510 B.R. 471, 489 (Bankr. E.D. Pa. 2014).

## III. The Complaint Fails to State a Claim for Common Law Fraud or State Securities Law Violations.

Even if the Trustee had standing, the Complaint still fails to state a claim for common law fraud or violations of state securities laws under Rule 9(b)'s heightened pleading standards. "Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quotations omitted).[17] Each of the 10 counts asserting these disclosure-based claims is deficient for multiple, independent reasons, including that they fail to allege

---

[17] *See also Siegal v. Gamble*, 2016 WL 3648503, at *4 (N.D. Cal. July 7, 2016) (when alleging California securities fraud claims, "complaint must satisfy Rule 9(b)'s pleading standard"); *Aldridge v. Metro. Life Ins. Co.*, 2019 WL 7374878, at *38 (N.C. Super. Ct. Dec. 31, 2019) ("Where an NCSA claim is based on fraud, the claim must be stated with particularity.").

(i) an actionable misstatement or omission, (ii) reliance on same, (iii) facts giving rise to a strong inference of scienter, or (iv) loss causation.

A.     **The Complaint Fails to Allege an Actionable Misstatement or Omission.**

The Complaint pleads a hodgepodge of alleged misstatements and omissions—none of which are actionable. The Trustee's allegations concern purported deficiencies in the Offering Memorandum and roadshow presentations, including: (i) the description of High Ridge's financial condition; (ii) the strength of High Ridge's customer relationships; (iii) the strength of High Ridge's management team and the termination of its chief sales officer; and (iv) High Ridge's pursuit of growth through strategic M&A. The Complaint also dedicates two counts to alleged misstatements in post-Offering investor presentations regarding the number of points of distribution for High Ridge's SGX NYC branded products. None of these allegations is sufficient to plead an actionable misstatement or omission.

1.     **High Ridge's Disclosures Concerning Its Financial Performance and Business Prospects.**

Despite repeated assertions that Defendants misled investors as to High Ridge's financial prospects, the Complaint does not contain a single specific factual allegation that the Company's disclosures of its historical financial performance were false in any way. Compl. ¶¶ 10, 123, 131, 138, 172, 211, 249, 259, 384, 386, 388–89, 440–41, 461. Recognizing this, the Trustee claims that High Ridge's historical disclosures suggested that it would post similarly positive results in the future. That theory is contrary to law.

*First*, the Complaint's conclusory assertion that the historical data disclosed by High Ridge through the end of 2016 "did not accurately depict HRB Co.'s financial condition and prospects" two and a half months later as of the Offering is insufficient to state a fraud claim under well-settled law. Compl. ¶ 123. "Factual recitations of past earnings, so long as they are

accurate, do not create liability" for fraud.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538

(3d Cir. 1999).[18]  For example, in *In re Merck & Co., Inc. Sec., Deriv. & Erisa Litig.*, the

plaintiff argued that while earnings statements regarding past commercial performance may have

been literally true, they were "not a reliable metric" in light of "undisclosed adverse

information," and that the defendant, by putting earnings statements into play, had "a duty [to]

speak fully and truthfully."  2012 WL 3779309, at *2 (D.N.J. Aug. 29, 2012).  The court rejected

this categorically: "Plaintiffs' theory of liability regarding the past earnings statements distorts

governing securities law so as to make a company's disclosure obligations almost limitless."  *Id.*

The court correctly reasoned that adopting such a theory of liability "would expose a company to

liability every time it reported previous successes without disclosing any and every reason,

established or not, the company had for second-guessing the reported performance."  *Id.*  The

court held that "[s]o long as a statement is accurate at the time it is made or does not require

further disclosure to render it accurate," it is not actionable.  *Id.*

    *Second*, the Trustee's allegation that High Ridge's historical financials represented that

past results would continue, Compl. ¶¶ 123–24, 137–38, 172, is negated by unambiguous

language in the Offering Memorandum to the contrary.  The Offering Memorandum made clear

that it was not attempting to offer a projection (let alone assurance) of future results:

- The "historical data presented [in the Offering Memorandum] *are not necessarily indicative of results to be expected* for any future period," Compl. Ex. C at 14 (emphasis added);

---

[18]   *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (it is "well settled . . . that an accurate report of past successes does not contain an implicit representation that the trend is going to continue"); *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623 (S.D.N.Y. 2011) (allegation defendants knew mortgages would fail was "fraud by hindsight" and could not survive motion to dismiss); *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) ("[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.") (quotation omitted).

- "The results of [High Ridge's] operations for the interim period is *not necessarily indicative of the results to be expected for the full year or any future period*," *id.* (emphasis added); and

- "The unaudited pro forma consolidated financial information" contained in the Offering Memorandum "is presented for informational purposes only and . . . *does not purport . . . to project the results of operations or financial condition for any future period or as of any future date*." *Id.* at 53 (emphasis added).

The Offering Memorandum clearly warned that High Ridge's historical financial performance was not indicative of how it would perform in the future and, under well-settled law, investors who ignored those warnings did so at their own peril.[19]  *See Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 493 (S.D.N.Y. 2017); *Hoffman v. AT&T Inc.*, 2020 N.Y. Misc. LEXIS 1791, at *24 (N.Y. Sup. Ct. May 6, 2020) (dismissing complaint where "the Offering Documents expressly stated that the information in them was true and accurate only as of the date of the offering documents and not a warranty of any future developments."); *City of Warren Police & Fire Ret. Sys. v. Natera Inc.*, 46 Cal. App. 5th 946, 955–57 (Cal. Ct. App. 2020) (affirming judgment on the pleadings because defendants provided negative financial information and included a similar warning); *Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d 977, 998 (S.D. Ind. 2018) (granting dismissal where disclosures were "accompanied by meaningful cautionary statements" like "[a]ny estimates . . . are not necessarily indicative of future results").

---

[19]  The Complaint points to certain historical EBITDA and Adjusted EBITDA financial disclosures and alleges such figures are "forward looking" projections.  Compl. ¶ 124.  Those allegations are contradicted by the disclosures themselves, however, which state that the figures are a "presentation of the results for the interim period" ended December 31, 2016, and that "[t]he results of operations for the interim period is not necessarily indicative of the results to be expected for the full year or any future period."  Compl. Ex. C at 14; *see also id.* at 16, 20–21.  That is, the Offering Memorandum was clear that those were *historical* numbers.  *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 590 (D.N.J. 2001) ("The fact that investors might make future predictions and investment decisions based on [historical] information does not somehow make the information itself 'forward-looking.'"); *cf. Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989) (defining "forward looking statements" to include "projections, estimates, and forecasts").

*Third*, to the extent the Complaint asserts that the Offering Memorandum and other disclosures selectively disclosed only positive historical information or stated that High Ridge faced no business headwinds, Compl. ¶¶ 8–9, 114–16, 121, such allegations are contradicted by the disclosures themselves, which explicitly acknowledged that performance had been trending downward. In a section dedicated to "Results of Operations: Comparison of six months ended December 31, 2016 and 2015," the Company disclosed declines in a variety of financial metrics over the prior year, including a 4.3% decline in gross profit, 4.4% decrease in net sales, and 6.4% decrease in contribution margin. Compl. Ex. C at 73–74. *See Emps.' Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co.*, 814 F. Supp. 2d 344, 353 (S.D.N.Y. 2011) ("If a plaintiff's allegations are contradicted by [a document incorporated into the complaint by reference] those allegations are insufficient to defeat a motion to dismiss.") (citation omitted). Thus, this claim fails. Other supposed omissions, like the allegation that High Ridge appeared likely to miss its sales projections for the first quarter of 2017, are irrelevant because High Ridge never disclosed such projections, let alone stated that it was likely to meet them. *See* Compl. ¶¶ 132–36; *cf.* Compl. Ex. C (containing no such projections). In any event, these supposed "omissions" are precisely the kind that courts hold the defendant is *not* required to disclose. *See In re Merck & Co.*, 2012 WL 3779309, at *2; *see also infra* § III.A.2.

*Fourth*, the four puffing statements about High Ridge's performance cited by Plaintiffs—non-specific references in the Offering Memorandum to the company's "Strong Cash Flow Generation," "capital-efficient business model," "strong operating margins," and "stable free cash flow," Compl. ¶¶ 115, 291—are not actionable under well-settled law because they "are too general to cause a reasonable investor to rely upon them, and thus cannot have misled a reasonable investor" as a matter of law. *In re Sundial Growers Inc.*, 2020 N.Y. Misc. LEXIS

2095, at *12 (N.Y. Sup. Ct. May 15, 2020) (quotations omitted).[20]

## 2. Statements about Customer Relationships.

The Complaint's suggestion that High Ridge misled investors as to the strength of its relationship with customers—Walmart, in particular—is unavailing. Compl. ¶¶ 6–7, 9, 119–20. The Offering Memorandum disclosed that Walmart was High Ridge's largest customer, historically accounting for 28% of net sales in the period ending June 30, 2015 and 30% in the period ending June 30, 2016. Compl. Ex. C at 6, 95. The Complaint does not allege that these historical disclosures were false, only that Walmart had changed its product displays in early 2017 in a way that could adversely impact High Ridge's future sales, and that High Ridge failed to disclose that fact. Compl. ¶¶ 9, 127–28, 159–60, 165, 373–74, 384, 386. [21]

High Ridge was not required to disclose every single business development in real time

---

[20] *See also Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250, 258 (D. Mass. 2006) (puffery is not actionable because"[t]he statements in question are so vague [and] so lacking in specificity . . . that no reasonable investor could find them important to the total mix of information available.") (quotations omitted); *Quidore v. All. Plastics, LLC*, 2020 WL 7082566, at *4 (N.C. Super. Ct. Dec. 3, 2020) ("When a statement at most reflects puffery, which cannot be proven true or false, there can be no actionable fraud because there is no allegation of a material fact.") (quotations omitted). *Martin v. Prudential-Bache Sec., Inc.*, 820 F. Supp. 980, 983–84 (W.D.N.C. 1991) ("[P]uzzlingly vague" statements regarding the value of future stock were "conclusory and fail[ed] to provide an adequate factual basis for an inference of fraud."). The statements cited in the Complaint fall squarely within this category as they are not capable of objective verification, and are not a "representation of material fact upon which [sophisticated investors] were entitled to rely." *Mass Op LLC v. Principal Life Ins. Co.*, 2010 WL 4056072, at *6 (N.Y. Sup. Ct. Sept. 30, 2010) (statement that servicer would be "extraordinarily accessible in servicing the loan" was puffery); *World Surveillance Grp. Inc. v. La Jolla Cove Invs., Inc.*, 66 F. Supp. 3d 1233, 1236 (N.D. Cal. 2014) (statement that defendant would be "perfect [] financial partner" was puffery); *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 23 (D. Mass. 2000) (statement that the company was "well positioned" to succeed was puffery); *Allran v. Branch Banking & Tr. Corp.*, 2011 WL 2652133, at *4 (N.C. Super. Ct. July 6, 2011) (statement that certain properties were "good investments" was insufficient).

[21] High Ridge's generalized statements about its "Deep and Strategic Customer Relationships," Compl. Ex. C at 6, are inactionable puffery. *In re Sundial Growers Inc.*, 2020 N.Y. Misc. LEXIS 2095, at *5.

to potential investors.  Courts have made clear that "there is no general duty on the part of a company to provide [investors] with all material information."  *Burlington*, 114 F.3d at 1432 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 551–52 (D. Del. 2002) (same).  Rather, an omission is actionable only where there is a specific duty to disclose the omitted information.  *See Gomez-Jimenez v. N.Y. Law Sch.*, 956 N.Y.S.2d 54, 59 (N.Y. App. Div. 2012) ("A cause of action for fraudulent concealment requires . . . an allegation that the defendant had a duty to disclose material information and that it failed to do so.") (quotation omitted); *Royal Bus. Grp., Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991) ("[N]o actionable claim of fraud for failure to disclose in the absence of a duty to disclose."); *UBS Fin. Servs., Inc. v. Zimmerman*, 2016 WL 7017278, at *4 (E.D.N.C. Dec. 1, 2016) ("[F]raud based upon concealment requires a duty to disclose."); *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1186 (Cal. Ct. App. 2014) (same).  Such a duty arises in only two circumstances relevant here: where (i) there is a special fiduciary relationship between the parties or (ii) disclosure is necessary to render other statements not misleading.  *See, e.g.*, *In re Merck & Co.*, 2012 WL 3779309, at *2; *Urman v. S. Bos. Sav. Bank*, 1994 WL 878815, at *4 (Mass. Super. Ct. Oct. 19, 1994) ("[N]ondisclosure can be actionable only where there is a 'duty' to disclose such as when the parties are in a fiduciary relationship.") (quotation omitted); *Harton v. Harton*, 81 N.C. App. 295, 297 (N.C. 1986); *Hoffman*, 228 Cal. App. 4th at 1186.

As to the first, the Complaint does not and cannot allege that High Ridge owed any special or fiduciary duty to Note purchasers.  *Alexandra Glob. Master Fund, Ltd. v. Ikon Off. Sols., Inc.*, 2007 WL 2077153, at *5 (S.D.N.Y. July 20, 2007) ("[C]orporations do not have a fiduciary relationship with their unsecured creditors, including debt security holders."); *New*

*York City Waterfront Dev. Fund II, LLC v. Pier A Battery Park Assocs., LLC*, 172 N.Y.S.3d 7, 9–10 (N.Y. App. Div. 2022) ("[T]he arm's length transaction between the sophisticated parties did not give rise to a 'special relationship' requiring defendants to speak with care about Borrower's financial condition."); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 263 (2d Cir. 2021) (no fiduciary relationship between investors and hedge fund managers of CDOs); *Auctus Fund, LLC v. MJ Biotech, Inc.*, 544 F. Supp. 3d 190, 194 (D. Mass. 2021) (no special relationship between company and noteholders).

As to the second, disclosure of the fact that Walmart had changed its product displays for 2017 in a manner that could negatively affect High Ridge's sales in Q1 2017 was not necessary to render what High Ridge did disclose about the Walmart relationship not misleading. *See, e.g.*, *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 791 (S.D.N.Y. 2020) (omissions only actionable where necessary to make a statement not misleading). The Offering Memorandum describes High Ridge's *historical* relationship with Walmart and does not contain any representations or statements that its past relationship with Walmart would continue. To the contrary, the Offering Memorandum disclosed that "changes in the strategies of our largest customers, including a reduction in the number of brands they carry or a ***shift of shelf space*** . . . may harm our net sales." Compl. Ex. C at 29 (emphasis added). And it is a "well settled []principle that an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update [investors] as to the state of the quarter in progress."[22] *Burlington*, 114 F.3d at 1432; *see*

---

[22] The Offering Memorandum also invited investors to seek additional information from the Company if they wished. Compl. Ex. C at ii. As sophisticated investors, the Notes purchasers had a duty and right to investigate the current status of major customer relationships, including Walmart, if that information was material to their investment decision. *See, e.g., Gruman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d

*also Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D.N.J. 1995) (dismissing claim that company "had a duty to disclose a negative trend in returns for the quarter that was in progress and largely completed when the [offering document] became effective"); *In re Vonage Initial Pub. Offering (IPO) Sec. Litig.*, 2009 WL 936872, at *8 (D.N.J. Apr. 6, 2009) ("[T]he fact that a company has reported accurately about past successes does not by itself burden the company with a duty to inform [investors] that the present circumstances are less positive.") (quotation omitted).

### 3. Statements About the Management Team.

High Ridge's statements regarding its management team and its alleged failure to disclose a temporary vacancy in the role of Chief Sales Officer are not actionable either. Compl. ¶¶ 117–18, 156–57.

*First*, the Complaint alleges that Defendants misrepresented the strength of High Ridge's management team in the Offering Memorandum and communications to investors. Compl. ¶ 118; *see also* Compl. ¶¶ 10, 123, 141–56, 172, 211, 249, 259, 292–93, 384, 386, 388–89, 440–41. Those statements disclosed:

> **Management Team with Proven Ability to Acquire, Integrate and Manage Brands.** Our management team has extensive industry experience and a proven track record of acquiring, integrating, revitalizing and managing a wide variety of brands in several personal care categories. Moreover, our senior management team has expertise in building and scaling a highly efficient supply chain to support growth while maintaining a disciplined approach to cost and quality management.

Compl. Ex. C at 6; Compl. ¶ 117 (substantively identical statements in investor presentation). But the Complaint does not and cannot allege that High Ridge's management team, in fact,

---

Cir. 1984) (where purchasers "enjoy access to critical information but fail to take advantage of that access," courts are less receptive to fraud claims); *Stella v. Asset Mgmt. Consultants, Inc.*, 8 Cal. App. 5th 181, 193 (Cal. Ct. App. 2017) (statements in private placement memoranda "put . . . sophisticated investors . . . on notice that further inquiry was necessary").

lacked the experience or expertise in such matters. Accordingly, there was nothing false or misleading in those statements about management.

The Trustee attempts to claim that these statements were misleading in light of certain Defendants' occasional criticisms of Daniels' performance as CEO, but evolving personal impressions of a CEO's performance do not make descriptions of his experience and background false.[23] At most, those statements about the management team's experience are classic examples of non-actionable puffery. *See, e.g.*, *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("soft adjectives" such as "strong," "experienced," and "capable," were "nothing more than puffery, which is not actionable."); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 400 (S.D.N.Y. 2020) ("experienced management team with proven operational capabilities" is puffery; statements were "general, delivered in corporate jargon, and relate to future expectations"); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at *30 (M.D. Pa. June 22, 2015) (statements that management was "'deep and experienced,' 'strong,' and 'proven track record' are all examples of corporate puffery on which no reasonable investor would rely").[24]

*Second*, High Ridge's alleged failure to disclose that it had terminated its Chief Sales Officer in January 2017 and assigned those responsibilities to Daniels, Compl. ¶¶ 156–57, is not actionable because High Ridge had no duty to disclose such information. *See supra* § III.A.2. The Complaint's allegation that investors "would have been interested in knowing" this fact misstates the applicable legal standard. Compl. ¶ 372. Only material misstatements or omissions are actionable, and a fact is material only if a reasonable investor "would attach

---

[23] The allegation that Defendants "endorsed Daniels' occupancy of the role of" CEO because his job title was listed on an investor presentation strains credulity. Compl. ¶ 118.

[24] The Complaint ignores the rest of the C-suite and makes no allegation that their performance was deficient in any way.

importance" to it such that it would "significantly alter the total mix of information" underlying

her investment decision. *Silverman v. Liberty Mut. Ins. Co.*, 2001 WL 810157, at *16 (Mass.

Super. Ct. July 11, 2001); *Zimmerman v. Kent*, 31 Mass. App. Ct. 72 at 78 (Mass. Ct. App.

1991); *see also Long Miao*, 442 F. Supp. 3d at 791 ("materiality hurdle" is a "meaningful

pleading obstacle").  The Complaint contains no allegations that High Ridge's past successes

were driven by the terminated Chief Sales Officer or any other allegations that would render his

termination material.  Nor does it suggest that no one was performing the Chief Sales Officer

responsibilities.  In fact, the Complaint admits that there was no disclosure that a Chief Sales

Officer position even existed.  Compl. ¶ 156.  The notion that a reasonable investor would find it

material that there was a temporary vacancy in the Chief Sales Officer role and those duties were

being performed by other executives on an interim basis—and that such information would

"significantly alter the total mix of information"—is neither credible nor actually alleged.

### 4. Statements About Acquisition Strategy.

The Complaint's allegation that High Ridge misled investors by claiming that it was

seeking to grow through strategic M&A despite being "pencils down" on new acquisitions

misstates both the document on which this allegation relies and the Offering Memorandum.

Compl. ¶¶ 130, 170.  The "pencils down" allegation is from an email in which Compton told

Daniels and another High Ridge executive to focus on customer issues "since we are pencils

down on any new deals right now."  Compl. ¶ 170 (citing CDR_0009799).  That statement does

not contradict High Ridge's statement that part of its overall "Growth Strategy" was to "Pursue

Strategic Acquisitions."  *Id.* Ex. C at 94.  The disclosures make no representations about any

particular acquisition pending at that time, and the Complaint fails to explain how a statement

that the Company was "pencils down" on one particular day indicates that statements about High

Ridge's overall long-term growth strategy were false.  Rule 8 and Rule 9(b) require the Trustee

to allege *how* and *why* Defendants' statements were purportedly fraudulent. *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 142 (3d Cir. 2004) (affirming dismissal where plaintiff "failed to plead with particularity . . . *how* or *why* those statements are false") (emphasis in original); *Burlington,* 114 F.3d at 1422 ("allegations fell below the 'who, what, when, where and how' elements necessary to establish an intentional or reckless misstatement or omission under Rule 9(b)"). The Trustee's claims based on these statements do not even attempt to meet this basic pleading requirement.

### 5. Statements About the SGX NY Distribution Channel.

The Complaint fails to show that Defendants are responsible for any misconceptions investors may (or may not) have had about the distribution network for the SGX NYC product line. *See* Compl. ¶¶ 13–14, 173–79. The Complaint identifies a supposed discrepancy between a lender presentation from November 2018 and one from April 2019, suggesting that the former misleadingly suggested that SGX NYC was sold in 83,600 stores, while the latter "corrected" that number to 17,879. *Id.* ¶¶ 13–14. But these disclosures refer to *two different and distinct concepts*. The 83,600 disclosure correctly stated the number of "points of distribution," or shelf-facings, while the 17,879 disclosure was the number of retail stores carrying the products.[25]

The Trustee alleges that the statement that SGX had 83,600 points of distribution "lacked considerable context" because "Plaintiff is not aware that HRB Co.'s management ever told lenders what it intended by 'points of distribution,'" Compl. ¶ 14, but this alleged ambiguity is insufficient to state claim. An ambiguous statement can only be fraudulent if made with the *intent* that it be understood in its false sense or with reckless disregard as to how it would be

---

[25] In fact, High Ridge disclosed in the April 2019 lender presentation that the number of points of distribution for SGX NYC had increased to 90,000. Ex. 5 at 5, A-00709 ("SGX NYC is available at 90,000 points of distribution.")

understood. Restatement (Second) of Torts § 527; *see also Sheridan Drive-In, Inc. v. State*, 228 N.Y.S.2d 576, 585 (N.Y. App. Div. 1962) ("If an ambiguous term is used in making a representation in a business transaction, and the other party, *to the knowledge of the one making the representation*, interprets the term in the sense in which it is false, there is liability for fraud if the erroneous impression created by the [ambiguity] is not corrected.") (emphasis added); *Tesoriero v. Metlife*, 800 N.Y.S.2d 357 (N.Y. Sup. Ct. 2004) (rejecting plaintiffs' contention that defendant's "ambiguous representations" were fraudulent; "[i]n the absence of any specific allegation concerning the substance of a particular representation and the manner in which it is claimed to be false . . . the pleading is inadequate to state a" fraud claim); *MacDonald v. Thomas M. Cooley Law School,* 880 F. Supp. 2d 785, 794 (W.D. Mich. 2012) (plaintiffs' "subjective misunderstanding of information that is not objectively false or misleading cannot mean that [Defendant] has committed the tort of fraudulent misrepresentation"). The Trustee makes no allegation even suggesting any Defendant intended the 83,600 figure to be misunderstood.[26] In any event, the presentations cited by the Trustee confirm that the Company concluded its presentations with a Q&A period, *see* Compl. Ex. G at 13, allowing any investor who was confused by the term "points of distribution" to inquire further. *See Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) (dismissing claim where "through minimal diligence, the investor should have discovered the truth" about allegedly fraudulent statement).

---

[26] In fact, the SGX NY disclosures were not ambiguous because, contrary to the Complaint's assertions, "points of distribution" is a common metric used in the retail industry, specifically to account for the fact that stores have variable shelf space and product displays: "[T]here are a few different ways [to] measure [sales velocity]. While the most obvious is looking as sales per store, a much better unit of measurement . . . is known as sales per point of distribution. . . . The main difference between [] sales per point of distribution and [] sales per store is that measuring sales per store on its own doesn't provide . . . the full picture since it only takes into account the number of stores you are selling in while disregarding . . . the 'size,' of the stores." Melissa Sonntag, *How to Measure Sales Per Point of Distribution (SPPD)*, Repsly, https://www.repsly.com/blog/sales-per-point-of-distribution.

In sum, the Complaint fails to plead with particularity an actionable misstatement or omission, requiring dismissal of Counts VI through XV.

## B. The Complaint Fails to Allege Reliance.

To assert his fraud-based claims, the Trustee cannot rely on the fraud on the market theory, but rather must plead with specificity each Noteholder's reliance on the particular misstatements and omissions identified in the Complaint.[27]

Recognizing that he cannot even identify specific Noteholders who held fraud claims at the Effective Date, let alone plead that each such Holder relied on each alleged misstatement and omission herein, the Trustee attempts to plead reliance on information and belief and the hope of discovery. This is insufficient as a matter of law; reliance, "if alleged on information and belief, generally will not satisfy Rule 9(b)'s particularity requirement." *Satellite Fin. Plan. Corp. v. First Nat. Bank of Wilmington*, 633 F. Supp. 386, 403 (D. Del. 1986); *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 999 n.1 (2d Cir. 1988) ("[F]raud allegations premised upon information and belief do not satisfy Rule 9(b).").

The Complaint does not remotely approach the required specificity, offering no more than the conclusory allegation that the Trustee "will rely on evidence that will be elicited" from certain Noteholders, Compl. ¶¶ 260–62, and that he "suspects that fact discovery" may reveal evidence of reliance for others, *id.* ¶¶ 263–64. The speculation that discovery will yield supporting evidence does not obviate the requirement under the rules to plead *some* specific factual allegation that would entitle him to relief—particularly here, under the heightened pleading standard for fraud claims. *See*, *e.g.*, *DeSimone*, 2021 WL 4198274, at *5; *Madonna*,

---

[27] "While the fraud on the market theory is good law with respect to the [federal] Securities Acts, no state courts have adopted the theory, and thus direct reliance remains a requirement of a common law securities fraud claim." *Peil v. Speiser*, 806 F.2d 1154, 1163 n.17 (3d Cir. 1986).

878 F.2d at 66 (rejecting contention that "discovery will unearth information tending to prove . . . fraud" under Rule 9(b)). The Trustee has had two years to obtain this basic information from the very creditors whose interests he represents—his failure to do so, even after repleading, is inexcusable. *See Rite Way Electronics*, 510 B.R. at 489.[28] Counts VI–IX and XII–XV should be dismissed for failure to plead reliance.

### C.    The Complaint Fails to Allege Scienter.

The Complaint's assertions that Defendants acted with scienter are wholly conclusory, factually unsupported, and fail to state a claim. Scienter must be pled with particularity as to each Defendant. *See, e.g.*, *Credit All. Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 554 (N.Y. 1985).[29]

The Complaint's scienter allegations focus exclusively on the fact that the Director Defendants would have been generally familiar with the Company by virtue of their role as directors or would have had some involvement in the Offering. There is, however, no suggestion that any one of them was aware of a specific allegedly false statement made in the Offering or thereafter, much less that any of them intended to deceive investors. Compl. ¶¶ 211–240. The Complaint repeatedly asserts that "internal communications" contradicted the contents of the

---

[28]   *See also In re Rutledge*, 510 B.R. 491, 506 (Bankr. M.D.N.C. 2014) ("[L]ack of reliance . . . results in the failure of these allegations to plead all elements of actual fraud"); *Mirkin v. Wasserman*, 858 P.2d 568 (Cal. 1993) ("California courts have always required plaintiffs in actions for deceit to plead and prove the common law element of actual reliance."); *S'holder Representative Servs. LLC v. Sandoz Inc.*, 2015 WL 1209358, at *8 (N.Y. Sup. Ct. Mar. 16, 2015) (dismissing common-law fraud claim in part because the complaint "fails to plead reliance with the requisite particularity"); *Rodden v. Savin Hill Enters., LLC*, 2016 WL 1688688, at *7 (Mass. Super. Ct. Apr. 21, 2016) (granting motion to dismiss fraud claim for failing to adequately allege reliance).

[29]   *See also In re Rutledge*, 510 B.R. 491, 505 (Bankr. M.D.N.C. 2014) ("The required scienter for fraud is not present without both knowledge and an intent to deceive, manipulate, or defraud."); *Sahni v. Emerald Mortg. Corp.*, 2008 WL 5394937, at *7 (Cal. Ct. App. Nov. 19, 2008) (same); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 146 (D. Mass. 2001) (same).

disclosures but, as described above, does not provide any particularized facts to support that assertion. Compl. ¶¶ 7, 140–41, 154.[30] The Complaint instead attempts to impermissibly group plead scienter instead of providing factual allegations of scienter for each Defendant. *See, e.g.*, *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987). Indeed, as to Defendant Banga, the Complaint lacks any allegations of scienter or anything else other than receipt of two emails, Compl. ¶¶ 145, 229 Indeed, as to Defendant Banga, the Complaint lacks *any* allegations of scienter or anything else other than receipt of two emails. Compl. ¶¶ 145, 229. And, again, the Trustee's belief that "discovery will shed additional light" on the Director Defendants' role is wholly insufficient to fill the obvious void in his pleading. *See, e.g.*, *Robinson*, 2010 WL 3724273, at *2 n.3; *see also supra* at 12, 22, 38.

As for Counts based on the SGX presentation, the Complaint fails to plead scienter because there is no allegation that the CD&R Director Defendants reviewed or approved the relevant investor presentations, much less facts supporting an inference that such defendants intended to deceive investors as to the points of distribution figure. Compl. ¶¶ 211–248.[31] The best the Complaint can muster are conclusory allegations that the Director Defendants "either had actual knowledge that" those presentations were "materially incorrect or acted with reckless disregard for the truth" because contrary "facts were available to them." Compl. ¶ 459. Wholly speculative and conclusory assertions of this sort are entitled to no weight. *Satellite Fin. Plan.*

---

[30] *See Credit All. Corp.*, 65 N.Y.2d at 554 (conclusory allegations that auditor disregarded unidentified "facts which would have apprised it that its reports were misleading" were insufficient at the pleading stage); *Giant Grp., Ltd. v. Arthur Andersen, LLP*, 770 N.Y.S.2d 291, 292 (N.Y. App. Div. 2003) (allegations that "defendants knew or recklessly failed to discover certain improprieties in the financial statements" insufficient to allege scienter); *Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*, 2011 WL 5962804, *11 (N.Y. Sup. Ct. Apr. 15, 2011) ("boilerplate allegations" that defendants knew statements were false "insufficient to plead scienter").

[31] Daniels is not a Defendant on Counts XII through XVI. He had left the Company by the time the alleged statements underlying those counts were made.

*Corp.* 633 F. Supp. at 403 ("Conclusory statements without supporting factual allegations similarly will not suffice."). The Trustee's failure to allege scienter requires dismissal of Counts XII through XV as well Counts VI through XI.

### D. The Complaint Fails to Allege Loss Causation.

As to Counts VI, VIII, IX, XII, XIV, and XV, the Complaint also fails to plead loss causation, an essential element of traditional common law fraud that must be established by demonstrating that "the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes." *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 89–90 (2d Cir.1994) (affirming dismissal of common law fraud claims related to debt instrument because failure to plead loss causation was "fatal") (citations omitted).[32]

The Complaint makes no attempt to plead loss causation as to any alleged fraud in connection with the Offering and is devoid of any allegation that there was a corrective disclosure that revealed the alleged "fraud," resulting in losses for Noteholders. Compl. ¶¶ 249–59; *see Revak*, 18 F.3d at 89–90 ("The requisite causation is established only where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes."). Instead, the Complaint half-heartedly asserts that the unspecified "truth" "leaked out over the years," and asserts that this "leaking" resulted in losses of 95% of the value of the Notes. Compl. ¶ 249.[33] This non-explanation is too vague and conclusory to plead loss

---

[32] *See also Small v. Fritz Cos.*, 30 Cal. 4th 167, 202 (Cal. 2003) (requiring "complete causal relationship" between the alleged fraud and price drop) (citation omitted); *Bucci v. Burns*, 2018 WL 1975019, at *7 (N.C. Super. Ct. Apr. 25, 2018) ("Pinpointing the causal link between the alleged misrepresentations and Plaintiffs' loss is no easy task.").

[33] The Complaint misleadingly suggests that High Ridge continuously withheld from investors knowledge of Walmart's planogram change and cites a series of investor communications from June 2017 to March 2019, noting the absence of such a disclosure. Compl. ¶¶ 250–257. But the Complaint conveniently ignores that the May 2017 investor presentation disclosed this very fact, telling investors explicitly that "the first quarter planogram changes at Walmart

causation.  *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 297 (D.N.J. 2007)

("[C]omplaint must contain facts sufficient to indicate that disclosure of the alleged fraud

directly and proximately caused" loss in value) (quotations omitted).[34]

With respect to the fraud claims directed at the SGX NYC disclosures, the Complaint

nowhere alleges that those disclosures directly caused the Notes to lose value.  Compl. ¶¶ 455,

463.  The Complaint alleges that High Ridge "corrected" its prior disclosure about the number of

the points of distribution in the investor presentation on April 29, 2019 and alleges that starting

on May 1, 2019, the value of the Notes declined significantly.  Compl. ¶¶ 173–74, 454–55.  But

the Complaint does *not* allege that the decline in price was the "direct result" (or even the result)

of the disclosure, as required to state a claim for fraud.  *Revak*, 18 F.3d at 89–90 (dismissing

claim where "plaintiffs have not identified *any* loss attributable to the [defendant's actions],

much less a loss that was the direct result of such [actions].");  *Arena Riparian LLC v. CSDS*

*Aircraft Sales & Leasing Co.*, 127 N.Y.S.3d 71, 73 (N.Y. App. Div. 2020) (same).  The Trustee's

failure to plead that direct connection is unsurprising: High Ridge disclosed to investors on the

very same call that it had executed a forbearance agreement with the First Lien Term Loan

lenders two days earlier.  *See* Ex. 5 at 2, A-00706.  Any subsequent movement in the Notes'

trading value is far more reasonably explained by this disclosure; loss causation simply cannot be

---

had a significant impact on shipments," and the Company had "provided corrective actions in
partnership with Walmart that have been very well received."  Ex. 6, May Investor Call
Narrative at 8–9, A-00718–19.  Having disclosed these facts to investors, High Ridge was
not obligated to continuously or repeatedly provide the same information.  *See Zalmanoff v.
Hardy*, 2018 WL 5994762, at *4 (Del. Ch. Nov. 13, 2018) (previously disclosed information
need not be repeated); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 547–49 (S.D.N.Y. 2015)
(company not "obligated to reproduce a comprehensive enumeration of adverse events").

[34]  *See also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 176 (2d Cir. 2005) (conclusory
allegations of loss causation "missing . . . the necessary allegations of fact to support the
conclusion"); *Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187, 191 (S.D.N.Y. 2006) (conclusory
allegations of artificial price inflation insufficient); *Fla. Carpenters Reg'l Council Pension
Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 892 (N.D. Ohio 2013) (same).

inferred based on temporal proximity of the SGX NYC disclosure to the price movement. *See*, *e.g.*, *Small*, 30 Cal. 4th at 202 (failure to plead loss causation where drop in stock price could have been attributed to events other than the alleged misrepresentations); *Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*, 978 N.Y.S.2d 615, 619–21 (N.Y. Sup. Ct. 2013) ("Misconduct may have occurred, but if the misconduct was not the basis for the loss, a viable claim is not pled.").

### E. The Complaint Fails to Adequately Plead a Fraud or State Securities Law Claim against CD&R LLC.

CD&R LLC should be dismissed entirely because it is not a proper defendant on the fraud and state securities law claims—it was not involved in drafting, reviewing, or distributing any of the materials that the Complaint alleges contain material misstatements, and it did not exercise control over High Ridge.

#### 1. CD&R LLC Cannot Be Liable for Common Law Fraud Because It Made No Statements in Connection with the Offering.

The Complaint fails to state a common law fraud claim against CD&R LLC for one simple reason: it does not allege that CD&R LLC itself made a single misstatement or omission—or any statement at all—with respect to the Offering. The Complaint must state a claim that *CD&R LLC itself* committed fraud—not merely allege that others did so under its control. *Hanson v. Berthel Fisher & Co. Fin. Servs.*, 2014 WL 2434000, at *38 (N.D. Iowa May 29, 2014) ("[C]ontrol person liability is statutorily imposed and does not exist at common law."). It is axiomatic that to be liable for fraud, the defendant—CD&R LLC—must have made an actionable misrepresentation or omission. *See, e.g.*, *Emps.' Ret. Sys. of Gov't of Virgin Islands*, 814 F. Supp. 2d at 353 ("To be liable for fraud . . . *the defendant must actually make* a materially false statement *to the plaintiff*.") (emphasis added). The Complaint does not and cannot allege that CD&R LLC sold the Notes, made any statements, or took any part in the Offering. Instead, it asserts that *High Ridge* made material misstatements "under the control of CD&R," and that

CD&R is liable "through the actions of the CD&R Directors," Compl. ¶¶ 393, 451, which is insufficient to state a fraud claim. *Emps.' Ret. Sys. of Gov't of Virgin Islands*, 814 F. Supp. 2d at 353; *Hanson*, 2014 WL 2434000 at *38.

**2.      CD&R LLC Is Not Liable Under North Carolina's and California's State Securities Laws Because It Did Not Control High Ridge.**

The Trustee also attempts to assert state securities law claims against CD&R LLC.  Both North Carolina's and California's securities laws provide two routes to liability: primary liability and secondary liability.  CD&R LLC cannot be held primarily liable because it did not sell the Notes—and both states require *strict privity* for primary liability.  N.C. Gen. Stat. § 78A-56(a) ("Any person who [violates the securities law] is liable to the person purchasing the security from him."); Cal. Corp. Code § 25501 ("Any person who violates Section 25401 shall be liable to the person who purchases a security from [] that person."); *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 252–53 (Cal. Ct. App. 2007) ("Section 25501 on its face requires privity between the plaintiff and the defendant.").

To the extent that the Complaint suggests that CD&R LLC should face secondary liability as a control person, such claim also fails.  The Complaint offers only a few conclusory allegations as to CD&R LLC's purported "control" over High Ridge, namely that (1) the CD&R Directors are CD&R LLC employees and (2) CD&R LLC had a Consulting Agreement with High Ridge.  Compl. ¶¶ 46–50, 113, 278–81, 446.  This is inadequate.  *Sollberger v. Wachovia Sec., LLC*, 2010 WL 11595839, at *3 (C.D. Cal. Feb. 22, 2010) (statements that alleged controller "had the power to influence and control and did influence and control, directly or indirectly, the decision making" of the company were "too conclusory to support a claim").  Critically (and as described in further detail below), there is no allegation that CD&R LLC owned any stock in High Ridge, appointed any directors, or otherwise had the ability to exercise

"actual control" over the day-to-day affairs of the Company. *See* Cal. Corp. Code § 160(a) (defining control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation"); *Tillery Env't LLC v. A & D Holdings, Inc.*, 2018 WL 802515, at *23 (N.C. Super. Ct. Feb. 9, 2018) (alleged control person "must have exercised general control over the operations of the wrongdoer," with power "to control the specific transaction" at issue). Even "[s]ubstantial influence is not the same as actual control, and actual control is essential to control person liability." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015); *In re Healthco Int'l, Inc.*, 203 B.R. 515, 518 (Bankr. D. Mass. 1996) ("some influence" not enough to establish control). The Complaint offers no factual allegations that CD&R LLC "actually controlled" High Ridge; to the contrary, the CD&R Director Defendants acted as High Ridge directors, not as investment professionals affiliated with CD&R LLC, when they participated in the Offering. Conclusory allegations of employment relationships and advisory services are not a basis to impose control liability on a non-stockholder.[35] Accordingly, Counts X and XI must be dismissed as to CD&R LLC.

## IV. The Complaint Fails to State a Claim for Breach of Fiduciary Duty.

The Complaint fails to state a claim for breach of fiduciary duty by CD&R and the Director Defendants because it does not, and cannot, allege that (i) CD&R owed such a duty to the Company or (ii) the Refinancing was unfair to High Ridge.

### A. CD&R LLC Cannot Have Breached Fiduciary Duties It Did Not Owe.

CD&R LLC had a contractual relationship with High Ridge, not a fiduciary one. This

---

[35] *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 740; *see also Inventory Recovery Corp. v. Gabriel*, 2012 WL 2990693, at *4 (D.N.J. July 20, 2012) (dismissing breach of fiduciary duty claim where "Plaintiff wholly fails to articulate how a [] Consulting Agreement gives rise to a fiduciary relationship"); *ATV Broad., LLC v. Bahakel Commc'ns, Ltd.*, 2021 WL 134692, at *3 (W.D.N.C. Jan. 13, 2021) (pleadings demonstrating existence of consulting agreement failed to establish fiduciary duty).

relationship is delineated in the Consulting Agreement and does not create fiduciary duties.  The Complaint lumps all CD&R individuals and entities together, but duties are not owed, and cannot be alleged, in an undifferentiated lump.  This Court—even on a Rule 12(b)(6) motion—must consider the existence of a duty on the part of each defendant alleged to have breached it.  *See ECB USA, Inc. v. Savencia, S.A.*, 2020 WL 11762200, at *22 (D. Del. July 10, 2020) (dismissing for failure to plead fiduciary duty claims with specificity as to each defendant); *In re Wonderwork, Inc.*, 611 B.R. 169, 199 (Bankr. S.D.N.Y. 2020) (group pleading not permitted for fiduciary duty claim).  The Trustee has failed to allege such a duty with respect to CD&R LLC.

Under Delaware law, for an entity to owe a fiduciary duty, it must either (1) own a majority interest in the company or (2) "exercise[] control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987).  With respect to the latter, before a court will consider taking the very serious step of ascribing fiduciary duties to even a minority stockholder—much less an entity that owns *no* stock—a complaint must contain detailed factual allegations demonstrating control over the company on a day-to-day basis or control of the company with respect to the transaction at issue.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) ("For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporation conduct.").  The Complaint admits that CD&R LLC *was not a stockholder of High Ridge*.  CD&R Fund IX, L.P., through CD&R HRB Holdings L.P., owned approximately 98.4% of High Ridge's equity.  Compl. ¶¶ 41, 50.

The Complaint fails to allege anything approaching the level of control *by CD&R LLC* that is required to impose fiduciary duties.  It is not enough that some of the individuals on the board are associated with an alleged controller—there must be a pleading that the alleged

controller actually controlled the board in such a way that the board members "could not freely exercise their judgement" in evaluating the transaction. *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 993 (Del. Ch. 2014).[36]  The Complaint's conclusory assertion—that because the CD&R Directors "served as [] employee[s] and/or partner[s] of CD&R," any control they exercised as board members was attributable to CD&R—is unsupported. Compl. ¶ 346.

The Second Amended Complaint added a handful of allegations regarding CD&R LLC's relationship with High Ridge—but none allege that CD&R LLC exercised the degree of day-to-day control that is required to impose fiduciary duties. *Id.* ¶¶ 42, 51, 58–59.  While the Complaint quotes from the Consulting Agreement, it does not and cannot allege that this contract—which designated CD&R LLC as an independent contractor that would provide "General Consulting Services" to High Ridge's board of directors—gave CD&R LLC the authority to control the Company's day-to-day affairs. *Id.* ¶¶ 58–59.

*In re KKR* is illustrative. 101 A.3d at 989.  There, the plaintiff sought to sue private equity firm KKR for breach of fiduciary duties allegedly owed to an entity called KFN in connection with its acquisition by KKR.  The plaintiff argued that KKR was a controlling stockholder in KFN—and therefore owed it fiduciary duties—despite owning less than 1% of its equity. *Id.* at 994.  The court determined that although KFN had been created by KKR as an acquisition platform; there was a management agreement between KKR and KFN; the majority of KFN's board members were affiliated with KKR; and KKR benefited from the merger, *even still*, KKR did not control KFN. *Id.*  The court refused to impose fiduciary obligations because

---

[36]  *See also In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (allegation that company had 27.7% stake in the company and two employees on the board is not enough to establish "actual domination"); *Collins & Aikman Corp. v. Stockman*, 2009 WL 1530120, at *25 (D. Del. May 20, 2009) ("general allegations" that key positions at the company were held by defendant employees was insufficient to show control).

the plaintiff had failed to demonstrate "any coercive power [KKR] could wield over the board's ability to independently decide whether or not to approve the merger." *Id.* This standard is even harder to meet where, as here, the alleged controller owned *no stock*. *See, e.g., Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *27 (Del. Ch. Feb. 24, 2020) ("not reasonably conceivable" that non-stockholders "exercised actual control over the company because they owned no units, appointed none of [the company]'s Board members and held no contractual blocking rights"). Count III must thus be dismissed as to CD&R LLC.

**B.  The Fiduciary Duty Claim Fails Because the Complaint Does Not Plead That the Refinancing Was Unfair to High Ridge.**

The fiduciary duty claim also fails against the remaining Defendants. To state a claim, a plaintiff cannot merely allege that directors have interests on both sides of a transaction; allegations of such a conflict may shift the standard of review from business judgment to entire fairness, but a plaintiff still must make factual allegations sufficient to support a finding of liability on that standard. *See, e.g., Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *Marciano v. Nakash*, 535 A.2d 400, 403–05 (Del. 1987) (loans made to a corporation by its half owners were valid despite origin in self-dealing); *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) ("Application of the entire fairness rule does not, however, always implicate liability of the conflicted corporate decision maker, nor does it necessarily render the decision void."). Where the Trustee has alleged a claim based on a purported conflict of interest subject to entire fairness review, he still must allege facts to show unfair process and an unfair price. *See Weinberger*, 457 A.2d at 711. A breach of fiduciary duty claim cannot survive unless *both* are sufficiently pled. *Monroe Cty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) (dismissing claim where complaint alleged only unfair dealing and did not allege facts that the price was unfair); *Solomon v. Pathe Commons Corp.*, 1995 WL 250374, at *5 (Del.

Ch. Apr. 21, 1995) ("Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair.").

The Complaint fails to plausibly allege that High Ridge paid an unfair price in the Refinancing. The Trustee acknowledges that the Refinancing yielded a considerably better interest rate of 8.875% on the Notes, as opposed to 11.5% on the Arawak Loan, Compl. ¶¶ 3, 5, and in fact admits that the Refinancing would benefit High Ridge over time, *id.* ¶¶ 83–84. He does not even attempt to allege that High Ridge could have refinanced its debts at a better rate, nor does he allege that the prepayment premium of $8.3 million, or 10% of the outstanding loan, was unfair or not market. The Complaint's repeated assertions that Arawak benefitted from the Refinancing, *see id.* ¶ 347, are irrelevant because it fails to allege that those benefits were received at High Ridge's expense. *See Solomon*, 1995 WL 250374 at *6 (plaintiff must show more than benefit to the majority shareholder; conclusory allegations that transaction was "self-dealing" and "ill-informed, coercive, grossly unfair, etc." are insufficient); *Monroe*, 2010 WL 2376890, at *2 (dismissing complaint that "only alleges facts geared towards demonstrating unfair dealing" as "insufficient to meet the requisite pleading standard."). Similarly irrelevant are the allegations that High Ridge would not realize the full benefit of the Refinancing until sometime in the future. The Trustee's focus on the timing of the benefits received underscores his inability to plausibly plead the transaction was unfair. *See Majestic*, 716 F.3d at 750–51. The Complaint's remaining allegations concerning High Ridge's processes (that CD&R LLC was not independent, and that CD&R LLC controlled the Board) are conclusory and entitled to no weight. *Id.* ¶¶ 340–44, 346; *see supra* § IV.A.

## V.     The Complaint Fails to State a Claim for Voidable Preference.

The claim for voidable preference (Count III) also fails. To start, the Complaint is devoid of any allegations that the Trustee conducted reasonable due diligence regarding his preference

claims and Defendants' defenses thereto as required by 11 U.S.C. § 547(b). That failure alone warrants dismissal of the preference claim. *See In re ECS Ref., Inc.*, 625 B.R. 425, 458 (Bankr. E.D. Cal. 2020).[37]

In any event, to establish a preference, a plaintiff must show that the creditor received a higher recovery from the transfer than it would have received if the transfer was not made and the creditor was paid in a Chapter 7 liquidation. 11 U.S.C. § 547(b)(5). The Trustee does not even attempt to plead this, other than one conclusory allegation that restates this legal element. Compl. ¶ 358. Nor could he. The Complaint admits that under the Consulting Agreement, CD&R was entitled to fees of $1 million per year (paid in four installments), plus reimbursement of expenses. *Id.* ¶¶ 58–60, 350; *see also* Ex. 2, § 3(a), A-00506. During the preference period, High Ridge paid CD&R LLC only $352,718.68—far less than the $1 million plus expenses to which CD&R LLC was contractually entitled. The Complaint acknowledges that the Consulting Agreement has been in place since 2016, Compl. ¶¶ 58–60, and that CD&R LLC was paid less, not more, than it was historically paid. The Complaint thus fails to allege that CD&R LLC received a preference, *i.e.*, "an amount more than usually paid," *In re Archway Cookies*, 435 B.R. 234, 242 (Bankr. D. Del. 2010), or more than it would have received in a liquidation.

The preference also fails because the Complaint makes clear the transfers were made (i) in the ordinary course of business of the debtor and the transferee, and (ii) according to ordinary business terms. 11 U.S.C. § 547(c)(2). Courts apply a five-factor test to determine whether this defense applies, including examining: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the transfers were in an amount more than usually paid; (3) whether

---

[37] The Complaint also fails to allege facts that High Ridge was controlled by CD&R LLC such that it is an "insider" subject to the one-year (as opposed to a 90-day) lookback period under 11 U.S.C. § 547(b)(4)(B). *See supra* §§ III.E.2, IV.A.

the . . . payments were tendered in a manner different from previous payments; (4) whether there appears to have been unusual action by the creditor or debtor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition. *Archway Cookies*, 435 B.R. at 242. The same allegations, *see* Compl. ¶¶ 58–60, confirm these payments were ordinary course payments under the Consulting Agreement.

## VI. The Complaint Fails to State a Claim for Disallowance

The Trustee's claim seeking disallowance of CD&R LLC's general unsecured claim (Count V) pursuant to 11 U.S.C. §§ 502(b), 502(d) fails because the Trustee's claims for breach of fiduciary duty and avoidable preference fail, *see supra* §§ IV, V. *In re Essar Steel Minn. LLC*, 2019 WL 2246712, at *11 (Bankr. D. Del. May 23, 2019); *In re Stone & Webster, Inc.*, 547 B.R. 588, 597–98 (Bankr. D. Del. 2016) (claims for disallowance fail where underlying avoidance claims fail).

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court dismiss the Complaint in its entirety.

[intentionally left blank, signature page follows]

Respectfully submitted,

Dated:    November 28, 2022
          Wilmington, Delaware

DEBEVOISE & PLIMPTON LLP

  */s/ Erica S. Weisgerber*
Mark P. Goodman (*admitted PHV*)
Shannon Rose Selden (*admitted PHV*)
Erica S. Weisgerber (*admitted PHV*)
Matthew J. Sorensen (*admitted PHV*)
919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
Email:    srselden@debevoise.com
          mpgoodman@debevoise.com
          eweisgerber@debevoise.com
          mjsorensen@debevoise.com


WOMBLE BOND DICKINSON (US) LLP

  */s/ Ericka F. Johnson*
Ericka F. Johnson (Del. Bar No. 5024)
Nicholas T. Verna (Del. Bar. No. 6082)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 252-4337
Email:    Ericka.Johnson@wbd-us.com
          Nick.Verna@wbd-us.com


*Counsel to Defendants Arawak IX, L.P.,
Clayton, Dubilier & Rice, LLC, John C.
Compton, Vindi Banga (a/k/a Manvinder
Banga), Kenneth A. Giuriceo, Gregory L.
Pasqua, and James A. Daniels*