## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HRB WINDDOWN INC., *et al.*[1]<br><br>    Debtors | Chapter 11<br><br>Case No. 19-12689 (BLS) |
| ALAN D. HALPERIN, as Liquidating Trustee of the HIGH RIDGE BRANDS CO. LIQUIDATING TRUST,<br><br>        Plaintiff,<br>v.<br><br>ARAWAK IX, L.P., CLAYTON, DUBILIER & RICE, LLC, JOHN C. COMPTON, VINDI BANGA (A/K/A MANVINDER BANGA), KENNETH A. GIURICEO, GREGORY L. PASQUA, and JAMES A. DANIELS,<br><br>        Defendants. | Adv. Pro. No. 21-51412 (BLS)<br><br>Re: Adv. D.I. 72, 73, 103, 113, 119, 125 |

## OPINION REGARDING DEFENDANTS'
## MOTION TO DISMISS THE SECOND AMENDED COMPLAINT[2]

    Alan D. Halperin, the Liquidating Trustee (the "Trustee") of the High Ridge

Brands Co. Liquidating Trust (the "Liquidating Trust")[3] has commenced this

---

[1] The debtors in this jointly administered Chapter 11 case are: HRB Winddown, Inc. (f/k/a High Ridge Brands Co.); High Ridge Brands Holdings, Inc.; HRB Midco, Inc.; HRB Buyer, Inc.; GSI Winddown, Inc. (f/k/a Golden Sun, Inc.); CFL Winddown, Inc. (f/k/a Continental Fragrances, Ltd.); FCI Winddown, Inc. (f/k/a Freshcorp, Inc.); COC Winddown, LLC (f/k/a/ Children Oral Care, LLC); and DRF Winddown, LLC (f/k/a Dr. Fresh, LLC) (together, the "Debtors").

[2] This Court has jurisdiction to decide the Motion to Dismiss pursuant to 28 U.S.C. § 157 and § 1334(b). Pursuant to Fed.R.Civ.P. 52 (made applicable here through Fed. R. Bankr. P. 7052), the Court does not make findings of fact when deciding a motion to dismiss under Fed. R. Civ. P. 12(b).

adversary proceeding by filing a complaint against the following defendants: Clayton, Dubilier & Rice, LLC ("CD&R"); certain CD&R employees[4] that served as directors of High Ridge Brands Co. (the "CD&R Directors"); Arawak IX, L.P. ("Arawak"), and James A. Daniels ("Daniels"), the former chief executive officer and a director of High Ridge Brands Company.  The Trustee timely filed a Second Amended Complaint (hereinafter referred to as the "Complaint")[5] asserting fifteen claims against the Defendants, including claims for avoidance of actual fraudulent transfers, avoidance of preference payments, breach of fiduciary duties, common law fraud under various states' laws, and violation of various states' securities acts.

The Defendants filed a Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6),[6] arguing that the fraudulent transfer claims are protected by the safe harbor provision of Bankruptcy Code § 546(e), that the Trustee lacks standing to bring the fraud claims, and that the Complaint otherwise fails to adequately plead the claims.  Briefing is complete and the Court has heard oral argument on this matter.

For the reasons set forth below, the Court will deny the Motion to Dismiss. Viewing the Complaint in the light most favorable to the Trustee, the Court determines that the allegations at this stage are sufficient to support the claims asserted therein.

---

[3] On October 8, 2020, this Court entered an Order (Main Case Docket No. 619) confirming the Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of High Ridge Brands Co. and its Affiliated Debtors dated October 5, 2020 (Main Case Docket No. 619, Ex. 1) (the "Plan").  The Plan established the High Ridge Brands Co. Liquidating Trust.
[4] The CD&R Directors are John C. Compton, Vindi Banga (a/k/a Manvinder Banga), Kenneth A. Giuriceo and Gregory L. Pasqua.
[5] Adv. Docket Nos. 59, 60.
[6] Adv. Docket No. 73 (the "Motion to Dismiss").

FACTUAL ALLEGATIONS

High Ridge Brands[7] was formed in January 2011 to acquire the rights to Zest soap brand from the Procter & Gamble Company.[8]  From 2011 to 2015, High Ridge Brands focused its portfolio on skin cleansing and hair care products, developing a broad mix of value brands and channels of distribution.[9]

The Complaint asserts that CD&R is a private equity investment firm which serves as an investment manager for a series of its affiliated investment funds and other vehicles.[10]  On June 30, 2016, CD&R HRB Holdings, L.P.[11] acquired 98.4% of the outstanding common stock of High Ridge Brands Holdings, Inc., the parent of HRB Co. (the "Acquisition").[12]  The Acquisition was funded with the proceeds of (i) $220 million in First Lien Term Loans;[13] (ii) the $83 million second lien Arawak loan;[14] and (iii) $130 million in equity capital from Clayton, Dubilier & Rice Fund IX, L.P. ("CD&R Fund IX"), Clayton, Dubilier & Rice Fund IX-A, L.P., and CD&R Advisor Fund IX, L.P.[15]

The Trustee alleges that, following the Acquisition, CD&R established control over HRB Co. in two ways.  First, CD&R installed four of its employees as directors

---

[7] The Complaint defines "High Ridge Brands" as including High Ridge Brands Co. ("HRB Co."), together with its subsidiaries and affiliates.  Compl. ¶ 2.

[8] Compl. ¶ 39.

[9] *Id.*

[10] Compl. ¶¶ 17-18, 20, 28.

[11] The Complaint alleges that CD&R HRB Holdings, L.P. is an investment vehicle controlled and managed by CD&R and was formed to hold CD&R's investment in the Debtors.  Compl. ¶ 29.

[12] Compl. ¶¶ 40, 52.

[13] The First Lien Term Loans were made by seven banks and/or their affiliates, with BMO Harris Bank N.A. serving as administrative agent and collateral agent thereunder.  Compl. ¶ 53.

[14] Arawak is "an investment vehicle managed by CD&R." Compl. ¶ 17.  The Trustee alleges that on at least half a dozen occasions, Arawak loaned money to CD&R portfolio companies, where Fund IX (defined below) had invested in the borrower company's equity.  Compl. ¶ 19.

[15] Compl. ¶ 52.  CD&R Fund IX is one of CD&R's investment funds. Compl. ¶ 28.

on the five-seat HRB Co. Board.[16]  Second, CD&R caused HRB Co. to enter into a

consulting agreement whereby CD&R would provide "intensive" management,

consulting and advisory services to HRB Co., its parents and subsidiaries (the

"Consulting Agreement").[17]  CD&R was to be paid $1 million per year for its

General Consulting Services, plus additional fees for any Special Consulting

Services.[18]

The Complaint alleges that in the fall of 2016, HRB Co.'s Board discussed the

opportunity to acquire Dr. Fresh Blocker LLC ("Dr. Fresh"), which sold oral health

products.[19]  The Trustee alleges that CD&R (through its employees and the CD&R

Directors) saw the Dr. Fresh acquisition as an opportunity to recapitalize HRB Co.

by paying off the Arawak Loan with notes arranged by Bank of Montreal ("BMO")

and third-party investment banks.[20]  The Complaint asserts that:

> CD&R, through the efforts of its employees, had lined up a back-stop
> in order to ensure that it could cash-out the Arawak Loan, at a
> significant internal rate of return, no matter what the prospects of
> HRB Co.'s business were.  In doing so, CD&R would offload risk to
> investors in Notes irrespective of whether it would have been in the
> best interests of HRB Co.[21]

On December 15, 2016, the HRB Co. Board met and later executed a

"Unanimous Written Consent" approving the Dr. Fresh acquisition, funded by $160

million in bridge loans borrowed under an Interim Term Loan Facility (the "Bridge

---

[16] Compl. ¶ 46.
[17] Compl. ¶ 58.
[18] Compl. ¶ 59.
[19] Compl. ¶ 67.
[20] Compl. ¶ 65.
[21] *Id.*

Loan Credit Facility").[22] The Complaint alleges that the HRB Co.'s board minutes do not reflect any discussion or consideration of prepaying the Arawak Loan or incurring the prepayment penalty that would result from the Arawak payment.[23] On December 29, 2016, HRB Co. acquired Dr. Fresh for approximately $160 million, funded by the Bridge Loan Credit Facility.[24]

The Trustee further alleges that, in early 2017, CD&R became aware of problems at HRB Co. that made CD&R question its investment in HRB Co. These allegations are based (in part) on the CD&R Directors' internal communications:

(i)     As of January 4, 2017, Compton and Giuricea were aware that HRB Co.'s sales were dropping and that pro forma projections were being missed by "3mm or so."[25]

(ii)    By January 8, 2017, Pasqua knew that HRB management anticipated missing their 2017 international sales goals by 35%.[26]

(iii)   By February 8, 2017, the CD&R Directors knew that HRB Co.'s performance for the prior eight weeks (back to December 2016) was "concerning."[27]

(iv)    CD&R Directors were informed that EBITDA for January 2017 was "far from what we planned" primarily due to a $5 million shortfall in the sales of HRB Co.'s highest margin brands.[28]

(v)     In January 2017, HRB Co. fired its Chief Sales Officer ("CSO"), without a planned replacement.[29]

(vi)    At the same time, Walmart – HRB Co.'s largest and most important customer – changed its "planogram" and moved certain HRB Co.

---

[22] Compl. ¶¶ 61, 69, 71.  The Bridge Loan Credit Facility was a senior unsecured credit facility with a one-year term, with BMO Harris Bank, N.A. as administrative agent.  Compl. ¶ 62.
[23] Compl. ¶ 70.
[24] Compl. ¶¶ 61-63.
[25] Compl. ¶ 132.
[26] Compl. ¶ 133.
[27] Compl. ¶ 134.
[28] Compl. ¶ 135.
[29] Compl. ¶¶ 9, 126.

products from eye-level to less-attractive placements on the shelves.[30]
As a result, Walmart sales plunged in early 2017.[31]

(vii)   The CD&R Directors were concerned about Daniels' performance, particularly as he assumed the CSO responsibilities and the relationship with Walmart.[32] On February 28, 2017, some CD&R Directors interviewed a potential replacement for Daniels.[33] The directors discussed their frustration with his leadership, stating on March 9, 2017 that "[u]nfortunately, I think we are not going to get what we need from [Daniels]."[34]

(viii)  The confluence of these issues cased the CD&R Directors to express misgivings and regret for risking CD&R's capital in HRB Co.[35]

On March 22, 2017, HRB Co. recapitalized its capital structure by issuing $250 million in unsecured notes (the "Notes") and using the proceeds of those Notes to: (i) repay the $160.1 million Bridge Loan, (ii) prepay the Arawak Loan, (iii) pay Arawak $8.3 million for the Arawak Prepayment Penalty, and (iv) pay transaction fees.[36] The Notes had a coupon rate of 8.875% and a maturity date of March 15, 2025.[37]

HRB Co. promoted the Notes through (i) Offering Memoranda, dated March 10 and 17, 2017, respectively (the "Offering Memoranda"), (ii) a March 2017 presentation to potential investors (the "Investor Presentation"), and (iii) a series of telephonic meetings with investors between March 14 and March 17, 2017 (the

---

[30] Compl. ¶¶ 120, 159-60.
[31] Compl. ¶¶ 164-69.
[32] Compl. ¶¶ 143-49, 161-63.
[33] Compl. ¶¶ 146-47.
[34] Compl. ¶ 149.
[35] Compl. ¶ 171.
[36] Compl. ¶ 73. The issuance of the Notes and these payments are referred to as the "March 2017 Recapitalization." *Id.*
[37] Compl. ¶ 85.

"Roadshow Meetings").[38]  The Complaint alleges that one or more CD&R Directors and/or CD&R employees participated in the preparation of the Offering Memoranda and Investor Presentation, and also in the Roadshow Meetings, including an investor lunch.[39]

The Trustee alleges that the Offering Memoranda and Investor Presentation omitted information regarding HRB Co's declining performance in 2017 by limiting the financial information to "as of" December 31, 2016.[40] The Trustee also alleges that the Offering Memoranda and Investor Presentation made numerous representations regarding the strength and experience of HRB Co.'s management team, while omitting that HRB Co. had fired its Chief Sales Officer in January 2017 and shifted responsibilities to Daniels, who CD&R Directors increasingly viewed as incompetent.[41]  The Trustee further alleges that the Offering Memoranda touted the strength of HRB Co.'s customer relationships, and emphasized the financial importance of Walmart to the business, but omitted key information that Walmart sales were declining as a result of 2017 changes to planogram.[42]  The Trustee also alleges that the Offering Memoranda highlighted HRB Co.'s strategy of pursing growth through strategic acquisitions, and CR&B Directors told investors that HRB Co. was pursuing such acquisitions during the Roadshow Meetings.[43]  However, the Trustee claims these statements misrepresented or failed to disclose that HRB was

---

[38] Compl. ¶¶ 96-97, 114-22.
[39] Compl. ¶¶ 97, 114-23.
[40] Compl. ¶¶ 115, 121, 137.
[41] Compl. ¶¶ 117-18, 141,
[42] Compl. ¶¶ 119-20, 127, 158-60, 165.
[43] Compl. ¶ 170.

"pencils down" on pursuing any new transactions due to its poor financial performance in 2017.[44]

The Complaint alleges that through the Offering Memoranda, Investor Presentation and Roadshow Meetings (which allegedly contained numerous misrepresentations and omissions known to the Defendants), HRB Co. was able to complete the March 2017 Recapitalization by selling the Notes, prepaying the Arawak Loan and shifting the risk to third-party investors.[45]  When including the cost of financing the prepayment of the Arawak Loan and payment of the Arawak Prepayment Penalty, the Trustee alleges that the prepayment of the Arawak Loan provided no economic benefit to HRB Co. at a time when its financial performance was declining.[46]

## MOTION TO DISMISS – STANDARDS

A. <u>Federal Rule of Civil Procedure 12(b)(6), Federal Rule of Bankruptcy Procedure 7012</u>

When reviewing a motion to dismiss, the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[47]  In *Twombly*, the Supreme Court instructed that a pleading must nudge claims "across the line from conceivable to plausible."[48]  "A claim has facial plausibility when the pleaded factual content allows the court to

---

[44] *Id.*
[45] Compl. ¶¶ 73, 78, 96.
[46] Compl. ¶¶ 83-84.

draw the reasonable inference that the defendant is liable for the misconduct alleged."[49]

The Third Circuit follows a three-step process to determine the sufficiency of a complaint:

> First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[50]

The movant carries the burden of showing that the dismissal is appropriate.[51]

B. Federal Rule of Civil Procedure 9(b), Federal Rule of Bankruptcy Procedure 7009

Fraud-based claims implicate a heightened standard of pleading under Fed.R.Civ.P. 9(b), which provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.[52]

"To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."[53]  The requirements of Rule 9(b), however,

---

[47] *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018).
[48] *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[49] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).
[50] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).
[51] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).
[52] Fed.R.Civ.P. 9(b), made applicable hereto by Fed.R.Bankr.P. 7009.
[53] *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

are relaxed and interpreted liberally where a trustee, or trust formed for the benefit of creditors, is asserting fraud claims because "the trustee often does not have all the facts that the debtor in possession would have about the conduct of parties pre-petition."[54]

With these standards in mind, the Court now considers the parties' arguments in the motion before it.

## DISCUSSION

A. <u>The Actual Fraudulent Transfer Claims</u>

The first two counts of the Complaint, asserted against Arawak, seek to avoid the Debtors' prepayment of the Arawak Loan through the Arawak Principal Transfer (Count I) and the Arawak Prepayment Transfer (Count II)) as actual fraudulent transfers.[55]  The Defendants move to dismiss these claims arguing that (i) the Complaint fails to allege relevant badges of fraud or particularized facts evincing a scheme to defraud creditors, and (ii) the transfers are protected from avoidance under the safe harbor provision of Bankruptcy Code § 546(e).  The Trustee opposes such relief, arguing that (i) the Complaint adequately alleges multiple badges of fraud and other facts showing the Defendants' fraudulent intent, and (ii) the transfers do not fall within the securities safe harbor provision.

---

[54] *Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus., Inc.)*, 2015 WL 3827003, *4 (Bankr. D. Del. June 19, 2015) (citing *Off'l Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 544 (Bankr. D. Del. 2009)).

[55] The claims are brought under Bankruptcy Code § 544(b) and applicable Delaware, New York, and Connecticut state fraudulent transfer laws, specifically 6 Del. C. § 1304(a)(1), Ct. Gen. Stat. §§ 52-552e(a)(1), and NY DCL §§ 276, 276-a, 278 and 279.  The Arawak Principal Transfer and the Arawak Prepayment Transfer are referred to jointly herein as the "Arawak Transfers."

(1)     <u>Badges of fraud</u>

Laws for avoiding fraudulent transfers in Delaware, Connecticut, and New York focus on whether a transfer was made, or an obligation was incurred, with the actual intent to "hinder, delay, or defraud" the debtor's creditors.[56]  Because direct evidence of intent is typically unavailable, plaintiffs may demonstrate intent circumstantially with the well-known "badges of fraud."[57]  "Badges of fraud are 'circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"[58]

The Delaware statute provides examples of badges of fraud, suggesting that a court analyzing fraudulent intent may consider whether:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was undisclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[59]

---

[56] 6 Del. C. § 1304(a), Ct. Gen. Stat. §52-552e(a), NY DCL § 273(a).

[57] *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at \*4-\*5 (Bankr. D. Del. 2016) (citing *Fedders N. Am.*, 405 B.R. at 545).

[58] *Id.* (quoting *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005)).

[59] 6 Del. C. § 1304(b).  *See also* Ct. Gen. Stat. §52-552e(b), NY DCL § 273(b).

"A court need not find that all - - or even a majority - - of the badges of fraud are present to find that a debtor acted with actual intent to hinder, delay, or defraud."[60] Moreover, "[d]etermining whether a transfer was made with fraudulent intent is a fact intensive inquiry 'rarely susceptible to resolution at the [pleading] stage.'"[61]

The Trustee argues that the Complaint alleges at least three badges of fraud. First, the Trustee argues that the Arawak Transfers were made to an insider because both Arawak and HRB Co. were controlled by CD&R.[62]  Second, the Trustee claims that the Arawak Transfers occurred shortly after a substantial debt was incurred, *i.e.*, the March 2017 Recapitalization.[63] And, third, the Trustee asserts that the Arawak Transfers were made for less than reasonably equivalent value because, in short, any economic benefits of prepaying the Arawak Loan were reduced by (i) payment of the Arawak Prepayment Penalty;[64] (ii) payment of approximately $6 million in transaction fees;[65] (iii) repayment of the Arawak Loan's original issue discount;[66] and (iv) consideration of the time value of money.[67]

---

[60] *In re Our Alchemy, LLC*, 642 B.R. 155, 164 (Bankr. D. Del. 2022) (citing *Osherow  v. Charles (In re Wolf)*, 2016 Bankr. LEXIS 3397, *74 (Bankr. W.D. Tex. Sep. 15, 2016)).

[61] *Alchemy*, 642 B.R. at 164 (quoting *In re Polichuk*, 506 B.R. 405, 418 (Bankr. E.D. Pa. 2014)).

[62] The Trustee asserts that the Complaint alleges numerous facts to support CD&R's control over HRB Co., including HRB Co.'s ownership structure (Compl. ¶¶ 40-43), CD&R's employees' holding four of five seats on the HRB Co. Board (Compl. ¶¶46-51), and the influence provided by CD&R's services under the Consulting Agreement (Compl. ¶¶ 58-60).

[63] Compl. ¶¶ 73-75; 99-109.

[64] The Trustee calculated that any savings the HRB Co. could realize from replacing the 11.5% interest rate on the Arawak Loan with an interest rate of 8.875% on the Notes could not be realized until late 2022, when the cumulative savings would exceed the Arawak Prepayment Penalty. (Compl. ¶¶ 83, 84).

[65] The Trustee argued that the $6 million in transactions fees would have been materially reduced if HRB Co. refinanced the $160.1 million Bridge Loan indebtedness rather than $250.4 million Bridge Loan, Arawak Loan and Arawak Prepayment Penalty.  (Compl. ¶ 84).

[66] The Trustee argued that the Arawak Loan was issued at an origination price of 98% of par; thus, he claims of the $83 million repayment, $1.66 million represented repayment of the original issuance discount on the Arawak Loan. (Compl. ¶ 84).

The Trustee further contends that the Court's analysis should not be limited to the badges of fraud but should also consider other facts establishing fraudulent intent.  In particular, the Trustee asserts that "the gravamen of the Plaintiff's actual fraudulent transfer claims is that the Arawak Transfers are the product of the Defendants' scheme to defraud investors by representing HRB Co. as a business with a strong financial position and promising prospects at a time when they knew the company's performance was declining."[68]

In response, the Defendants argue that the Complaint does not assert facts to support the badges of fraud or any inference that HRB Co. intended to defraud creditors.  Instead, the Defendants argue that the Complaint pleads details describing "an ordinary course refinancing, where favorable market conditions allowed the Company to obtain new unsecured debt with a more favorable interest rate and longer maturity and to repay a prior secured debt owed to an affiliated lender."[69]  The Defendants point out that payments on account of antecedent debt are transfers in exchange for reasonably equivalent value.[70]

The Court agrees that a claim alleging a constructive fraudulent transfer will likely fail "when a transfer to a creditor is in dollar-for-dollar satisfaction of an antecedent debt … because the goal of fraudulent transfer law is the preservation of the estate against diminution and a payment which reduced a debt dollar-for-dollar

---

[67] The Trustee asserted that "prepayment [of the Arawak Loan] on March 22, 2017 was worth more than the eventual benefit that HRB Co. could expect to receive in the future."  (Compl. ¶ 84).
[68] Trustee Mem. of Law (Adv. Docket No. 103) at 17 (citing Compl. ¶¶ 287-301).
[69] Defendants' Mem. of Law (Adv. Docket No. 73) at 15.
[70] *See, e.g., Gellert v. Coltec Ind., Inc. (In re Crucible Materials Corp.)*, 2012 WL 5360945, *8 (Bankr. D. Del. Oct. 31, 2012).

does not diminish the estate."[71]   However, the Complaint before the Court alleges a claim for an *actual* fraudulent transfer.  "[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given."[72]  Actual intent is adequately alleged if a complaint claims that the transfer in question "effectively transferred substantial assets from the corporation to [insiders] with the potential intent of defrauding future judgment creditors."[73]

Here, the Complaint contains specific allegations claiming that the Defendants arranged for the transfer of substantial funds to an entity controlled by insiders while defrauding other creditors – the Noteholders – through the sale of unsecured notes with materials that allegedly contained misrepresentations and omissions about HRB Co.'s current financial position.  These allegations nudge the claims across the line from conceivable to plausible and, therefore, claims to avoid transfers based on actual fraud will not be dismissed at this stage of the proceeding.

(2)    Safe Harbor

The Defendants also argue that the fraudulent transfer claims should be dismissed because the Arawak Transfers are protected by the safe harbor of Bankruptcy Code § 546(e), which provides in relevant part that:

---

[71] *Id.*

[72] *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (quoting *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994)).  *See Crucible Materials*, 2012 WL 5360945, *8 (citing *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) (holding that repayment of an antecedent debt constitutes fair consideration unless the transferee is an insider)).

[73] *Sharp*, 403 F.3d at 56-57 (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (2d Cir. 1995)).

Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, **the trustee may not avoid ... a transfer made by or to (or for the benefit of) a ... financial institution, [or] financial participant ... in connection with a securities contract,** as defined in section 741(7), ... **that is made before the commencement of the case,** except under section 548(a)(1)(A).[74]

The safe harbor of § 546(e) applies when two requirements are met:

"(1) there is a *qualifying transaction* (i.e., there is a 'settlement payment' or a transfer payment . . . made in connection with a securities contract), and (2) there is a *qualifying participant* (i.e., the transfer was 'made by or to (or for the benefit of) a … financial institution, [or financial participant]')."[75]

The Defendants describe the relevant overarching transfers at issue here as made by BMO Capital to Arawak.  The Defendants assert that those transfers were qualifying transactions because they were payments to Arawak in connection with the Notes Purchase Agreement, which is a securities contract under Bankruptcy Code § 741(7).   The Defendants also contend the relevant transfers involved a qualifying participant because BMO Capital is a financial participant as defined in Bankruptcy Code § 101(22A).  Accordingly, the Defendants argue that the transfer falls within the securities safe harbor of § 546(e).

The Trustee disagrees with the Defendants' description of the transfers.[76] The Complaint states that on March 22, 2017, HRB Co. agreed to transfer to

---

[74] 11 U.S.C. § 546(e) (emphasis added). The Complaint does not assert any claims under § 548(a)(1)(A).

[75] *SunEdison Litig. Trust v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505, 513 (Bankr. S.D.N.Y. 2020) (quoting *In re Nine West LBO Sec. Litig.*, 482 F.Supp.3d 187, 197 (S.D.N.Y. 2020), *aff'd in part, vacated in part*, 87 F.4th 130 (2d Cir. 2023)).

[76] Compl. ¶¶ 74, 75.  "HRB Co. [and its subsidiaries who were borrowers and/or guarantors under the Arawak Credit Agreement] agreed to transfer to Arawak (i) $83 million to prepay the Arawak Loan (the "Arawak Principal Transfer"), (ii) $8.3 million to pay the Arawak Prepayment Penalty (the

Arawak: (i) the Arawak Principal Transfer, (ii) the Arawak Prepayment Transfer, and (iii) the Arawak Interest Transfer.[77]  The Trustee argues that it is irrelevant that BMO Capital provided HRB Co. with the proceeds from the sale of the Notes to fund the transfers.  In other words, the Trustee argues that there was no qualifying participant. Instead, he claims the relevant transfers are between HRB Co. and Arawak only.

The first step of a § 546(e) analysis requires the Court to identify the relevant transfer.[78]  Here, the parties dispute how to identify the transfers because each describes the relevant transfers as between different entities.  The Defendants claim the transfers were from BMO Capital to Arawak.  The Trustee describes the relevant transfers from HRB Co. to Arawak.  In the *Quorum* decision, the Court was able to analyze the transfers on a motion to dismiss the complaint because there was no dispute regarding the identity of the relevant transfers.[79]  Here, more information is needed to identify the transfers, including (in particular) the parties to the relevant transfers.  Under these circumstances, this issue would be better addressed in the context of a motion for summary judgment.  At this point, therefore, the Court will deny the Defendants' request to dismiss Counts I and II under the securities safe harbor.[80]

---

"Arawak Prepayment Transfer"), [and] (iii) $2,121,111.12 to pay accrued interest (the "Arawak Interest Transfer").  Compl. ¶ 74.

[77] Compl. ¶ 75.

[78] *Golden v. Community Health Systems, Inc. (In re Quorum Health Corp.)*, 2023 WL 2552399, *5 (Bankr. D. Del. Mar. 16, 2023) (citing *SunEdison Litig. Trust*, 620 B.R. at 513 (citing *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 377-78, 138 S.Ct. 883, 892, 200 L.Ed.2 183 (2018)).

[79] *Quorum*, 2023 WL 2552399 at *5.

[80] The Defendants also argue that, even without considering BMO Capital as part of the transfer, Arawak itself falls within the § 546(e) safe harbor as a "financial institution" because it was a

B.  <u>The Trustee's Standing to Assert State Law Fraud Claims</u>

The Plan assigned to the Liquidating Trust any "Causes of Action held by Holders of 2017 Senior Unsecured Notes … arising from or related to the 2017 Senior Unsecured Notes and the Indenture."[81]  The Defendants argue that the Trustee lacks standing to bring common law fraud claims under New York, Massachusetts, North Carolina, and California common law[82] because the Complaint does not allege with specificity that the Holders purchased their Notes in the Offering or received an assignment of the fraud claims from someone who did.

The Trustee responds by pointing out that the Complaint identifies two Holders who purchased their Notes at the time of the Offering and allegedly continued to hold the Notes until the Plan's Effective Date.[83]  The Trustee further asserts that, although he received some documents from the Creditor Committee's initial investigation, he expects to receive additional information on this matter since he demanded more access to the Debtors' documents through formal discovery, which have not been made available to him to date.[84]

---

customer of a financial institution, namely, JP Morgan Chase Bank, N.A. Compl. ¶ 75. *See* 11 U.S.C. § 101(22).  This issue cannot be decided on the Motion to Dismiss because more facts are needed before the Court can consider (for example) whether there was an agency or custody agreement between a party to the transfer and the bank. *Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II, Corp.)*, 646 B.R. 617, 686 (Bankr. S.D.N.Y. 2022).

[81] Plan §§ 1.34, 9.18.

[82] The Trustee asserts common law fraud claims against CD&R, the CD&R Directors, and Daniels under the laws of New York, Massachusetts, North Carolina, and California in Counts VI – IX and Counts XII – XV of the Complaint (the "Common Law Fraud Claims").

[83] Compl. ¶ 205, defining the "Par Noteholders."

[84] Comp. ¶ 207.

The Defendants contend that the Complaint's allegations are insufficient because the Trustee's response relies on further discovery.[85]  However, here, the Trustee's allegations rise above mere speculation, and the Complaint "establishes enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the cause of action."[86]  The Common Law Fraud Claims will not be dismissed on the grounds of standing at this early stage of the litigation.

The Defendants also argue that the Trustee cannot pursue the Holders' common law fraud claims under North Carolina and Massachusetts law because those claims are not assignable under state law.[87] The Trustee responds that his standing to pursue the fraud claims arises not by an assignment under state law, but rather exists pursuant to the Plan Confirmation Order.  The Trustee claims that, upon the Effective Date, the Trustee was vested with standing to bring the Holders' fraud claims, not for his own benefit, but for the benefit of the Holders and other creditors of the Debtors' estates.

The Trustee relies upon the *Seaboard Hotel* decision, in which the bankruptcy court rejected the argument that the debtor's legal malpractice claims could not be pursued by a plan trust because such claims are not assignable under

---

[85] The Defendants cite *DeSimone v. TIAA Bank, FSB*, 2021 WL 4198274 (S.D.N.Y. Sept. 14, 2021) in which the Court dismissed claims based on the statute of limitations and rejected the plaintiffs' allegations of equitable tolling when the plaintiffs did not assert any facts in support of equitable tolling, but instead stated they "intend to show [potential grounds] through discovery."  The *DeSimone* Court wrote "Mere 'speculation' is insufficient 'to show the existence of rare and exceptional circumstances to warrant equitable tolling."' *Id.* at *5.

[86] *Trzaska v. L'Oreal USA, Inc.*, 865 F.3d 155, 162 (3d Cir. 2017) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016) (internal punctuation omitted)).

[87] In support of this argument, the Defendants cite, *e.g.*, *Nat'l Shawmut Bank of Bos. v. Johnson*, 317 Mass. 485, 488 (Mass. 1945) ("[A] right to litigate a fraud perpetrated upon a person is not assignable at law or in equity."); *Inv. Title Ins. Co. v. Herzig*, 330 N.C. 681, 688 (N.C. 1992) ("No North Carolina statute allows the assignment of fraud … claims.").

Connecticut state law.[88]  In *Seaboard Hotel,* Chief Judge Silverstein recognized that

the assignment of a legal malpractice claim from the plan debtors to the

§ 1123(b)(3)(B) representative of the estate[89] was "no different than Plan Debtors

themselves suing on behalf of their estates with recoveries going to

creditors/investors – or here, a subset of those creditors/investors."[90]  However, the

Defendants argue, and the Court agrees, that the Trustee's position is not

supported by *Seaboard Hotel* since that case considered the transfer of *the debtors'*

claims into a plan trust, as permitted by the Bankruptcy Code,[91] whereas the

situation here involves the transfer to the Litigation Trust of non-debtor, individual

creditors' claims against non-debtors.[92]

The Trustee argues that the Holders' fraud claims are assignable here

because they do not implicate the public policy concerns underlying Massachusetts

and North Carolina restrictions on assignment.  The Trustee argues that

Massachusetts state courts have permitted assignment of fraud claims that do not

---

[88] *NCA Inv. Liquidating Trust v. Berkowitz, Trager & Trager, LLC (In re Seaboard Hotel Member Assoc., LLC)*, Case No. 15-12510 (LSS), 2021 Bankr. LEXIS 1564, *30 -*36 (Bankr. D. Del. June 10, 2021).
[89] Bankruptcy Code § 1123(b)(3) provides in applicable part that a plan may "provide for (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."  11 U.S.C. § 1123(b)(3).  Further, Bankruptcy Code § 541(c)(1)(A) provides that "an interest of the debtor in property becomes property of the estate … notwithstanding … applicable nonbankruptcy law that restricts or conditions transfer of such interest by the debtor."  11 U.S.C. § 541(c)(1)(A).
[90] *Seaboard Hotel*, 2021 Bankr. LEXIS 1564 at *35.
[91] *See* 11 U.S.C. § 541(c)(1)(A) and § 1123(b)(3) discussed *supra*.
[92] *See Irving Tanning Co. v. Maine Superintendent of Ins. (In re Irving Tanning Co.)*, 496 B.R. 644, 664 (1st Cir. B.A.P. 2013) (deciding that the broad preemptive reach of § 1123(a)(5)(B) "cannot extend to laws defining and protecting the property rights of third parties," considering the statute's repeated use of the phase "property of the estate.").

involve personal injury but rather are based upon economic harm.[93] Similarly, the

Trustee also claims that while North Carolina state courts have disallowed

assignment of personal tort claims for promoting champerty,[94] there are no

champerty concerns when (as here) the Holders' claims are assigned to a trust to

pursue those claims for the benefit of the Holders.

> North Carolina courts have defined champerty and maintenance as follows:
>
> > Maintenance [is] an officious intermeddling in a suit, which in no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it.  Champerty is a form of maintenance whereby a stranger makes a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense …[A]n agreement will not be held to be within the condemnation of the principles unless the interference is clearly officious and for the purpose of stirring up strife and continuing litigation.[95]

There is no indication that the Holders' assignment of fraud claims to the Trust was

done for the purpose of transferring claims to a "stranger" for "stirring up strife and

continuing litigation."  If the claims are successful, the beneficiaries of any recovery

will not be "strangers," but instead will include the Noteholders, who originally

possessed the right to pursue the claims against the Defendants. The Holders'

---

[93] *See Nova Assignments, Inc. v. Kunian*, 77 Mass. App. Ct. 34, 42, 928 N.E.2d 364 (2010).  In *Nova*, the Appeals Court of Massachusetts recognized that the rule against assignment of fraud claims described in the 1945 decision *National Shawmut Bank v. Johnson* (317 Mass. 485, 488, 58 N.E.2d 849 (1945)) "is in substantial tension with the modern cases concerning the assignability of claims." *Nova*, 77 Mass. App. at 41.  The *Nova* court relied, in part, on a Massachusetts Supreme Court decision, *New Hampshire Ins. Co. v. McCann*, 429 Mass. 202, 210-212, 707 N.E.2d 332 (1999) (deciding that a legal malpractice claim, while not traditionally assignable, could be assigned when "the allegation is not for personal injury, but for economic loss.")).

[94] *Horton v. New S. Ins. Co.*, 122 N.C. App. 265, 268, 468 S.E.2d 856, 858 (1996).  *See also Charlotte-Mecklenburg Hosp. Authority v. First of Georgia Ins. Co.*, 340 N.C. 88, 91, 455 S.E.2d 655 (1995) ("The assignment of a claim gives the assignee control of the claim and promotes champerty.  Such a contract is against public policy and void.").

[95] *Odell v. Legal Bucks, LLC*, 192 N.C. App. 298, 307, 665 S.E.2d 767, 773 (2008) (quoting *Smith v. Hartsell*, 150 N.C. 71, 76, 63 S.E. 172, 174 (1908) (internal punctuation omitted)).

assignment was not part of an underhanded scheme, but rather was completed with full notice as part of a court-run chapter 11 plan confirmation process.[96]   The public policy concerns about champerty underlying the prohibition of assignment of fraud claims have not been shown here.[97]   At this point in the litigation, the Defendants' request to dismiss the Massachusetts and North Carolina fraud claims on this ground will be denied.

## C. The Common Law Fraud Claims

To state a fraud claim, "Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it is made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage."[98]   Rule 9(b)'s heightened pleading standard provides that a pleading must

---

[96] The Court notes that the Defendants' objection to the Plan's transfer of the Holders' state law fraud claims to the Trust could have been raised at confirmation and the Defendants' argument here could thus be viewed as a collateral attack on the Confirmation Order. As the Third Circuit has explained:

> When a bankruptcy court enters a confirmation order, it renders a final judgment. That judgment, like any other judgment, is res judicata.  It bars all challenges to the plan that could have been raised.   Challengers must instead raise any issues beforehand and by objecting to confirmation.  A plan's preclusive effect is a principle that anchors bankruptcy law:  A confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation.

*In re Oklahoma Merge, L.P.*, 2022 WL 2720025, *7 (Bankr. D. Del. July 13, 2022) (quoting *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018)).

[97] *See Haarhuis v. Cheek*, 261 N.C. App. 358, 365-66, 820 S.E.2d 844 (2018) (deciding that placing a tort claim with a court-appointed receiver was not against public policy); *Seaboard Hotel*, 2021 Bankr. LEXIS 1564, * 36-*38 (Deciding that assigning the debtor's malpractice claims to a plan trust did not raise champerty concerns when (i) nothing showed that the debtors were unwilling to prosecute the malpractice claims absent assignment, and (ii) the trust's pursuit of claims for its beneficiaries was no different than the debtors suing on behalf of their estates for their creditors/investors.

[98] *In re Suprema Specialties, Inc. Securities Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992)).  The elements of a common law fraud case for the states listed in Counts VI, VII, VIII and IX are similar.  *See In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 584 (S.D.N.Y. 2015); *Robinson v. Bodoff*, 355 F.Supp.2d 578, 584 (D. Mass. 2005); *In re*

state the circumstances giving rise to fraud with particularity to give defendants notice of the claims against them.[99]

The Trustee contends that the Complaint meets the Rule 9(b) requirements because its fraud allegations are supported by factual allegations that establish "the first paragraph of any newspaper story - - that is, the who, what, when, where, and how of all the events at issue."[100] The Trustee asserts that the Complaint specifies the material misrepresentations and omissions contained in the Offering Memorandum, Investor Presentations, and repeated orally by Defendants at Roadshow Meetings, as well as misrepresentations related to HRB Co.'s SGX NYC product line.

(1) Misrepresentations and Omissions

Relying on federal securities law, the Defendants argue that the alleged misrepresentations are not actionable because those statements were not misleading, were immaterial, or were mere "puffery."  The Defendants first challenge allegations about misrepresentations of the Company's financial prospects, asserting that the Complaint does not allege that any historical financial data in the Offering Memoranda was false.  Further, the Defendants note that the Offering Memoranda included "cautionary language" to make it clear that it was not presenting a projection (let alone assurances) of future results, stating, for example:

---

*Hoch*, 577 B.R. 202, 222 (Bankr. E.D.N.C. 2017); *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 259, 134 Cal. Rptr.3d 588, 596 (Cal. App. 3d Dist. 2011).
[99] *Suprema*, 438 F.3d at 270.
[100] *Id*. at 276-77 (quoting *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997) (internal punctuation omitted)).

- The "historical data presented [in the Offering Memoranda] *are not necessarily indicative of results to be expected* for any future period," Compl. Ex. C at 14 (emphasis added); and

- "the unaudited pro forma consolidated financial information" contained in the Offering Memorandum "*is presented for informational purposes only and … does not purport … to project the results of operations or financial condition for any future period or as of any future date.*" *Id.* at 53 (emphasis added).

At bottom, the Defendants argue that there is no duty to update accurate historic financial information, especially when the document advises that the information does not guarantee future results. When considering federal securities disclosure requirements, the Third Circuit has noted that, "an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in progress."[101]

The Trustee, however, disagrees with the Defendants' characterization of the allegations and describes part of the fraud claim as follows:

> The financial information conveyed in the Offering Memorandum, Investor Presentation and Roadshow Meetings was fraudulent because Defendants knew it was not an accurate portrayal of HRB Co. at the time they presented to investors in March 2017. … As alleged in the Complaint, by March 2017 Defendants knew, among other things, that sales were declining, EBITDA was declining, that forecasts were regularly and significantly missed, and -- as CD&R Directors' own emails admit -- that HRB Co.'s financial performance was "disastrous," "awful," and "pitiful." … Defendants told investors that they were disclosing this information through December 2016 to "assist investors in understanding our ***ongoing*** financial performance."[102]

The Trustee's allegations thus assert that historical financials were presented as more than past results, but also as indicators of *ongoing* financial performance. To

---

[101] *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997).
[102] Trustee Br. at 25 (citing Compl. ¶¶ 124, 131-39, 375).

rebut the Defendants' argument that cautionary language in the materials negates

those claims, the Trustee notes that "[c]autionary words about future risk cannot

insulate from liability the failure to disclose that the risk has transpired."[103]  The

Complaint alleges that a serious decline in financial performance (and other factors)

had already occurred and was well-known to the Defendants at the very time that

the Notes were being marketed and sold.

The Defendants also argue that the allegations are based on "puffery" - - that

is, vague and general statements of optimism – which is not actionable under

securities law.[104]  However, statements of "soft information" (such as opinions,

predictions, and other forward-looking statements) "may be actionable

misrepresentations if the speaker does not genuinely and reasonably believe

them."[105]

The parties also focus on four other areas of alleged misstatements and

omissions in the Complaint:  (i) customer relationships (*i.e.*, the failure to disclose

the weakening relationship between HRB Co. and its largest customer, Walmart),

---

[103] *Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, Case No. 3:09-CV-2083 (RNC), 2018 U.S. Dist. LEXIS 55359, *44 (D. Ct. Mar. 31, 2018) (quoting *Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004)). *See also In re Prudential Secs. Inc. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y. 1996) (The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with certainty that the Grand Canyon lies one foot away.").

[104] *In re Merck & Co., Inc. Securities, Derivative, & ERISA Litig.*, 2012 WL 3779309, *4 (D. N.J. Aug. 29, 2012).  "The context in which optimistic statements are made is critical to the distinction between misrepresentation and puffery … In general, the more the statement diverges from known facts about the entity or the more precise and concrete the statement, the less likely courts have been to dismiss the statement as inactionable puffery." *Id.* at *5.  "[T]he expression of such optimism for the future together with accurate statements of present fact or past successes does not render the projections materially misleading." *Id.*

[105] *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, Civ. No. 09-799, 2011 U.S. Dist. LEXIS 62551, *28 (D. Del. June 14, 2011) (citing *In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 368 (3d Cir. 1993)).

(ii) management team (*i.e.*, the failure to disclose that HRB Co. had fired the chief sales officer in January 2017 and doubts about the competency of the chief executive officer); (iii) acquisition strategy (*i.e.*, portraying the company as pursuing growth through acquisition, when internal emails stated the company was "pencils down" on acquisitions at that time); and (iv) the SGX NYC product distribution information (*i.e.*, a material misstatement regarding the number of distribution points for the products during a 2018 lender presentation). Again, the Defendants argue that the foregoing alleged misrepresentations were immaterial, puffery, or not misleading based on cautionary language in the Offering Memoranda. The Trustee responds that the Defendants had a duty to disclose the foregoing information because (i) they had superior knowledge of material information concerning HRB Co.'s financial performance that was unavailable to the Holders at the time, and/or (ii) the disclosure of that information was necessary to render the partial disclosures in the Offering Materials not misleading.[106]

---

[106] *See, e.g., Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115, 132, 61 Cal.Rptr.3d 221 (Cal. App. 6th Dist. 2007) (a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff); *Knapp v. Neptune Towers Associates*, 892 N.E. 2d 820, 824 (Mass. App. Ct. 2008)(a duty to disclose exists when (a) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of facts from being misleading, or (b) the non-disclosed fact is basic to, or goes to the essence of, the transaction); *Swersky v. Deryer & Traub*, 643 N.Y.S.2d 33, 37 (N.Y. App. Ct. 1996) (under the "special facts" doctrine, a duty to disclose arises where the defendant has superior knowledge of essential facts that renders a transaction without disclosure inherently unfair); *Hardin v. KCS Int'l, Inc.*, 682 S.E.2d 726, 733 (N.C. Ct. App. 2009) (Duty to disclose arises where (1) a fiduciary relationship exists between the parties to the transaction; (2) there is no fiduciary relationship and a party takes affirmative steps to conceal material facts from the other, and (3) there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence).

Considering the Complaint as a whole and viewing the alleged facts in the light most favorable to the Trustee, as the Court is required to do, the Court finds that the Complaint asserts sufficient, specific factual allegations to support actionable claims based on misrepresentations or omissions.  The Defendants' arguments here challenge underlying facts and cannot support a motion to dismiss.

(2) <u>Reliance</u>

The Defendants also argue that the Trustee has failed to allege with specificity that any named Holder actually relied upon the alleged misstatements or omissions in connection with the Offering or the SGX NYC disclosures and, therefore, the Defendants assert that all fraud claims should be dismissed.  The Trustee responds that the Complaint identified the Par Noteholders and, based on his pre-suit informal investigation, he will be able to present evidence from those same Par Noteholders demonstrating that they relied on the representations in the Offering Memoranda, Investor Presentation, and at the Roadshow Meetings when purchasing in excess of $117 million principal amount of Notes, and would not have purchased the same had they known about the material misrepresentations and omissions contained in those materials that are detailed in the Complaint.[107]

As mentioned earlier, the Trustee has asserted that his investigation is ongoing, but the Complaint sufficiently identifies the time, place, and the contents of the alleged misrepresentations and omissions, and also identifies the Par Noteholders the Trustee contends will provide evidence of reliance through further

---

[107] Compl. ¶¶ 260-62.

discovery.  These allegations are more than "mere speculation" and the Defendants

motion to dismiss the fraud claims on this basis will be denied.

(3) <u>Scienter</u>

The Defendants argue that the Complaint's allegations that the Defendants

acted with scienter are wholly conclusory, factually unsupported, and fail to state a

claim.  The Trustee disagrees and claims that the allegations are sufficient to meet

the applicable standard.

"Scienter is defined as a 'mental state embracing intent to deceive,

manipulate, or defraud' which requires 'a knowing or reckless state of mind.'"[108]

"To determine if plaintiffs have met their burden, the court will review whether all

of the alleged facts, collectively, give rise to a strong inference of scienter.[109]

Rule 9(b) provides that "[m]alice, intent, knowledge and other conditions of a

person's mind may be alleged generally."[110]  A strong inference of fraud may be

established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute circumstantial

evidence of conscious misbehavior.[111]

Here, the Trustee asserts that the Complaint adequately alleges that the

Defendants had motive – i.e., they were motivated to complete the March 2017

Recapitalization to eliminate risk associated with the Arawak Loan and obtain a

---

[108] *City of Roseville Emp. Ret. Sys. v. Horizon Lines, Inc.*, 713 F.Supp.2d 378, 386 (D. Del. 2010) (quoting *Inst. Inv'r Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)).
[109] *Roseville Emp.*, 713 F.Supp.2d at 386.
[110] Fed.R.Bank.P. 7009, incorporating Fed.R.Civ.P. 9(b).
[111] *Barry v. Santander Bank, N.A. (In re Liberty State Benefits of Del., Inc.)*, 541 B.R. 219, 240-41 (Bankr. D. Del. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 687, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).

202% IRR on the loan.[112]  The Trustee further asserts that the Complaint pleads

opportunity to commit fraud by alleging, among other things, that Defendants

Compton, Bang, Giuriceo, Pasqua, and Daniels all participated in the issuance of

the Notes by approving the Offering Memoranda, and preparing the Investor

Presentation or participating in the Roadshow Meetings.  Moreover, the Trustee

disputes that Defendants' assertion that the Complaint improperly pleads scienter

on a group basis by claiming that the Complaint (in paragraphs 211-248) details

particularized allegations to each Defendant.

Again, the Court concludes that the Complaint here, taken as a whole and

considered in the light most favorable to the Trustee, contains sufficient factual

allegations to support the element of scienter.

(4) <u>Loss Causation</u>

The Defendants also claim that the Complaint fails to allege loss causation by

offering only vague and conclusory assertions that any alleged fraud in connection

with the Offering resulted in a loss to the Noteholders.  The Trustee responds that

the Complaint adequately alleges that the value of the Notes was artificially

inflated at the time of the Offering as a result of the Defendants'

misrepresentations and omissions.[113]

Discussing causation, the Second Circuit has noted:

[T]he proximate cause element of common law fraud requires that the
plaintiff adequately allege a causal connection between defendants'
non-disclosures and the subsequent decline in the value of [the]
securities. [I]f the loss was caused by an intervening event … the chain

---

[112] Compl. ¶¶ 65, 76, 78, 285.
[113] Compl. ¶ 249.

of causation will not have been established.  But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.[114]

The allegations of causation are adequate here and the Court will not delve into a further analysis of causation on the pending Motion to Dismiss.

### D. Fraud and State Securities Law Claims against Defendant CD&R

The Defendants contend that CD&R must be dismissed from the Common Law Fraud Claims because CD&R itself was not involved in drafting, reviewing, or distributing any of the materials the Complaint alleges contains material misstatements.  The Defendants rely in part, upon *Employees Retirement System of the Government of the Virgin Islands v. Morgan Stanley & Co.*[115]  In that case, the court dismissed fraud claims against Morgan Stanley because the complaint did not allege Morgan Stanley made a materially false misrepresentation or omission of fact to the plaintiff.[116]  The court noted it was undisputed that Morgan Stanley did not issue Triple-A ratings for the notes at issue and the allegation that Morgan Stanley "collaborated" with the ratings agencies, with nothing more, did not plead sufficient factual content from which the Court could draw any reasonable inference about Morgan Stanley's alleged involvement in generating the Triple-A ratings.[117]  Further, the court determined that the offering memorandum used to sell the notes

---

[114] *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  *See also McCoy v. Goldberg*, 883 F. Supp. 927, 939 (S.D.N.Y. 1995) (A common law fraud claim must allege that "the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes.")(citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 89-90 (2d Cir. 1994)).
[115] 814 F.Supp.2d 344 (S.D.N.Y. 2011).
[116] *Id.* at 351.  The plaintiff alleged that Morgan Stanley arranged and promoted the sale of notes that were issued as part of a collateralized debt obligation ("CDO").  *Id.* at 346.  The plaintiff alleged that Morgan Stanley collaborated with Moody's Investors Service, Inc. and Standard & Poors to produce false and misleading Triple-A credit ratings in connection with the notes.  *Id.*
[117] *Id.* at 351-52.

clearly stated on its face that it was *not* a statement by Morgan Stanley, but had been prepared by co-issuers of the notes and that none of the "arrangers" (including Morgan Stanley) had separately verified the information contained therein.[118] Likewise, the Defendants here argue, the Complaint fails to allege that CD&R itself made any false misrepresentation or omission of fact to any Noteholder.

The Trustee responds that the Defendants ignore the allegations that CD&R is responsible for fraud committed by its employees under the doctrine of *respondeat superior*.[119] The Trustee asserts that the Complaint contains numerous allegations specifying that certain CD&R partners and employees (i) participated in the issuance of the Notes,[120] (ii) received drafts of the Offering Memoranda and Investor Presentation prior to dissemination,[121] (iii) promoted the Offering at an investor lunch on March 13, 2017,[122] all while being engaged in email communications in the weeks preceding the Offering discussing HRB Co.'s financial difficulties and struggles.[123] Moreover, the Trustee asserts that the Complaint contains a myriad of allegations concerning specific conduct by the CD&R Directors, who are alleged to have acted in the interests of CD&R rather than HRB Co.[124] The Trustee points out that the *Morgan Stanley* court distinguished the vague "collaboration" allegation before it with a properly pleaded complaint in another case alleging that Morgan Stanley engaged in fraud when it worked with the agencies and "knowingly

---

[118] *Id.* at 353.
[119] *See* Restatement (Third) Agency, § 2.04 ("An employer is subject to liability for torts committed by employees while acting within the scope of their employment").
[120] Compl. ¶ 33.
[121] Compl. ¶¶ 217, 219.
[122] Compl. ¶ 97.
[123] Compl. ¶¶ 134, 161.
[124] *E.g.,* Compl. ¶¶ 6-7, 46-51, 114-72, 383-93.

designed models to yield the false and misleading Top Ratings" using "'irrelevant historical information preceding 2000' that produced inflated ratings, a process known as 'grandfathering'."[125]  The Trustee argues that, here, the Complaint's allegations contain specific descriptions of conduct by CD&R employees and representatives, along with where and when the alleged conduct took place.  The Court agrees and will not grant the motion to dismiss CD&R as a defendant in the Common Law Fraud Claims.

The Defendants also argue that CD&R should be dismissed from claims under North Carolina's and California's state securities laws because, they allege, the Complaint's allegations about CD&R's control over HRB Co. allege in a conclusory fashion only that (i) the CD&R Directors are also CD&R employees, and (ii) CD&R had a Consulting Agreement with HRB Co.

The Trustee responds that courts have "recognized that the question of whether someone qualifies as a controlling person is 'a complex factual question,'

---

[125] *Morgan Stanley*, 814 F.Supp.2d at 352 n. 6 (quoting *King Cty., Washington v. IKB Deutsche Industriebank AG*, 751 F.Supp.2d 652, 656-57 (S.D.N.Y. 2010)).  *See also Pludeman v. N. Leasing Sys., Inc.,* 10 N.Y.3d 486, 860 N.Y.S.2d 422, 890 N.E.2d 184, 186–88 (2008) (although noting that New York courts "have never required talismanic, unbending allegations," finding complaint adequately alleged a claim for fraud against corporate officers where, among other things, their "'day-to-day'" management "'of [the] corporate defendant'" "gives rise to the reasonable inference ... that the officers, as individuals and in the key positions they held, knew of and/or were involved in the [alleged] fraud") (citations omitted); *Polonetsky v. Better Homes Depot, Inc.*, 97 N.Y.2d 46, 735 N.Y.S.2d 479, 760 N.E.2d 1274, 1278–79 (2001) (finding the complaint stated a claim for fraud against the defendant, president of the defendant corporation, because it alleged "Fessler 'participate[d] in [Better Homes'] operations on a day-to-day basis and [was] actively involved in its marketing and sales activities' " and because of "the degree of his personal activities."); *CPC Int'l Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116, 124–25 (1987) (finding the plaintiffs stated a claim for aiding and abetting the principal in the commission of a fraud where, among other things, "[t]he complaint includes allegations that the defendants knowingly engaged in a scheme to provide 'substantial assistance' to McKesson in presenting 'an enhanced financial picture' of Mueller in order to 'raise the price that McKesson would ultimately receive for the Mueller stock'.").

[and] [a]s such, it is 'not ordinarily subject to resolution on a motion to dismiss.'"[126]

"[D]ismissal is appropriate only when 'a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person.'"[127]

Second, the Trustee asserts that the Complaint includes many factual allegations from which the Court can infer that CD&R controlled HRB Co. because CD&R (i) controlled HRB Co.'s voting power;[128] (ii) controlled the HRB Co. Board of Directors,[129] and (iii) had the practical ability under the Consulting Agreement to control every area of HRB Co.'s business.[130]

At the pleading stage, a plaintiff can plead control "by alleging facts from which an inference can be drawn that the defendant 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the

---

[126] *Hellum v. Breyer*, 194 Cal.App.4th 1300, 1317, 123 Cal.Rptr.3d 803, 815 (Cal. App. Ct. 2011) (citations omitted).

[127] *Hellum*, 194 Cal.App.4th at 1317.

[128] The Complaint alleges that CD&R expressly identified High Ridge Brands as one of its portfolio companies (Compl. ¶ 42); CD&R HRB Holdings, L.P. is an investment vehicle controlled and managed by CD&R and was formed to hold CD&R's investment in the Debtors (Compl. ¶ 29); CD&R HRB Holdings, L.P. owned 98.4% of the common stock equity of High Ridge Brands Holdings, Inc. and its acquisition of the stock was funded by transfers of cash from CD&R Fund IX, from Clayton, Dubilier & Rice Fund IX-A, L.P., and CD&R Advisor Fund IX, L.P. (Compl. ¶¶ 40-41); and CD&R Fund XI's Form D filed with the U.S. Securities and Exchange Commission states that Clayton, Dubilier & Rice, LLC is a "Related Person," and that certain employees of CD&R were "executive officers of the general partner of the general partner." (Compl. ¶ 28).

[129] The Complaint alleges that after the Acquisition, four CD&R employees sat on the five-person HRB Co. Board (Compl. ¶ 46); HRB Co.'s Bylaws empowered the HRB Co. Board to manage the business, property, and affairs of HRB Co. (Compl. ¶ 50); and the Board established a 3-person Transaction Committee, which included two CD&R employees, to make decisions regarding the March 2017 Recapitalization (Compl. ¶100).

[130] The Complaint alleges that, following the Acquisition, CD&R caused HRB to enter into a Consulting Agreement with it (Compl. ¶ 58); the Consulting Agreement provides that CD&R, at the request of the CD&R majority board, will provide "strategic and operational consulting services" which pervade every aspect of HRB Co.'s business (Adv. D.I. 66 at B-0001, 3).

securities laws … [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.'"[131]

Considering the foregoing, the Court finds that the Complaint contains sufficient factual allegations to support a claim of control in connection with the claims for violations of state securities laws.

E. Fiduciary Duty Claim against CD&R

The Defendants argue that the Trustee cannot assert a breach of fiduciary duty claim against CD&R[132] because the Complaint's allegations do not support a finding that (i) CD&R owes a fiduciary duty to HRB Co., or that (ii) the March 2017 Recapitalization was unfair to HRB Co.  The Trustee disputes this, arguing that the Complaint adequately alleges that (i) CD&R owed a fiduciary duty to HRB Co. based on its control of the company, and (ii) the March 2017 Recapitalization was unfair when reviewed under Delaware's "entire fairness" standard.

"Delaware law imposes fiduciary duties on those who effectively control a corporation."[133]  "A plaintiff can plead that a defendant had the ability to exercise actual control by alleging facts that support a reasonable inference of either (i) control over the corporation's business and affairs in general, or (ii) control over the corporation specifically for the purposes of the challenged transaction."[134]  "[T]here is no magic formula to find control; rather it is a highly fact specific

---

[131] *Hellum*, 194 Cal.App.4th at 1317 (quoting *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) and *In re MicroStrategy, Inc. Securities Litig.*, 115 F.Supp.2d 620, 661 (E.D. Va. 2000)).
[132] Compl., Count III.
[133] *Quadrant Structured Products Co., Ltd. v. Vertin*, 102 A.3d 155, 183-84 (Del. Ch. 2014).
[134] *Voight v. Metcalf*, 2020 WL 614999, *11 (Del. Ch. Feb. 10, 2020).

inquiry."[135]  As discussed in the prior section, the Complaint includes numerous

factual allegations to support a plausible claim of CD&R's control over HRB Co.[136]

The Defendants also assert that the Trustee cannot allege that HRB Co.

repaid the Arawak Loan at an "unfair price," pointing out that the Complaint

acknowledges that the refinancing would benefit HRB Co. over time.[137]  The

Trustee responds that, due to the alleged conflicts of interest, the March 2017

Recapitalization should be reviewed under the "entire fairness" standard of

review,[138] and the Complaint, as a whole, adequately alleges that the transaction

was both an "unfair process" and "unfair price."

Delaware Courts have described the "entire fairness" standard as follows:

> The concept of fairness has two basic aspects: fair dealing and fair
> price. The former embraces questions of when the transaction was
> timed, how it was initiated, structured, negotiated, disclosed to the
> directors, and how the approvals of the directors and the stockholders
> were obtained. The latter aspect of fairness relates to the economic and
> financial considerations of [the transaction], including all relevant
> factors: assets, market value, earnings, future prospects, and any other
> elements that affect the intrinsic or inherent value of a company's
> stock.... However, the test for fairness is not a bifurcated one as

---

[135] *Id*. at *12.

[136] *See, supra.*, n. 128, 129, 130.

[137] Compl. ¶¶ 83-85.

[138] "Under Delaware law, the standard of review [when evaluating a breach of fiduciary duty claim]
depends initially on whether the board members (i) were disinterested and independent (the
business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics
present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted
actual conflicts of interest such that the directors making the decision did not comprise a
disinterested and independent board majority (entire fairness)."  *In re Trados Inc. Shareholder
Litig.*, 73 A.3d 17. 36 (Del. Ch. 2013).  "Entire fairness, Delaware's most onerous standard, applies
when the board labors under actual conflicts of interest. Once entire fairness applies, the defendants
must establish 'to the court's satisfaction that the transaction was the product of both fair dealing
*and* fair price.'" *Id*. at 44 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del.
1995)).

between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.[139]

"The fair dealing and fair price inquiries interact."[140]  "Just as 'a strong record of fair dealing can influence the fair price inquiry, … process can infect price.'"[141]  The Complaint alleges irregularities in the process for repaying the Arawak Loan as part of the 2017 Recapitalization, including that none of the HRB Co. Board resolutions or unanimous written consents related to the Offering specifically authorized the Arawak Transfers,[142] and that the Board did not engage outside counsel or form a board committee independent of CD&R Directors to review and approve the Arawak Transfer.[143]  The Complaint also alleges that prepayment of the Arawak Loan required HRB Co. to incur and pay the $8.3 million prepayment penalty at a time when CD&R knew that the Company was struggling financially,[144] and that HRB Co. was worse off financially for having prepaid the Arawak Loan (and incurring the Arawak Prepayment Penalty) than if it had left the Arawak Loan in place at all times prior to the Petition Date.[145]

"[T]he possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under rule 12(b)(6)."[146]  At

---

[139] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162-63 (Del. Super. Ct. 1995) (quoting *Weinberger v. UOP, Inc.* 457 A.2d 701, 711 (Del. Super. Ct. 1983)).
[140] *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, *12 (Del. Ch. Dec. 20, 2019) (citing *In re Dole Foods Co., Inc. S'holder Litig.*, 2015 WL 5052214, *34 (Del. Ch. Aug. 27, 2015)).
[141] *Id.* (quoting *Reis v. Hazlett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011)).
[142] Compl. 99-105.
[143] Compl. 107-09.
[144] Compl. ¶¶ 125-172.
[145] Compl. ¶¶ 83-84.
[146] *Garfield*, 2019 WL 7168004, *11 (quoting *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, *16 (Del. Ch. Dec. 19, 2018)).

this stage in the proceeding, the Court concludes that the alleged facts in the Complaint support a plausible claim against CD&R for a breach of fiduciary duty.

F. <u>Voidable Preference Claim</u>

Count IV of the Complaint seeks to avoid transfers made by the Debtors to CD&R in the year prior to the Petition Date for services under the Consulting Agreement.  The Defendants seek to dismiss this claim because they assert the Complaint does not adequately allege that CD&R received more than it would be paid in a Chapter 7 liquidation (as required by § 547(b)(5)) and because the transfers were made in the ordinary course of business under 11 U.S.C. § 547(c)(2).[147]

"The question of whether a creditor received more through a prepetition transfer than it would have in a liquidation scenario is generally a factual one that is not best resolved on a motion to dismiss."[148]  Rule 8(a) of the Federal Rules of Civil Procedure does not require that a plaintiff prove its allegations in the complaint, rather it demands only a short plain statement of the claim 'that gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"[149] To survive a motion to dismiss, a preference claim must include: (a) an identification of the nature and amount of each antecedent debt, and (b) an identification of each alleged preference transfer by (i) date, (ii) name of

---

[147] CD&R also argues that the Complaint fails to allege facts that CD&R controlled the Debtor such that it would be considered an "insider" subject to the one-year (rather than 90-day) look-back period for preference claims under § 547(b)(4)(B).  However, as discussed previously in this opinion, the Court concluded that the Complaint adequately alleges that CD&R controlled HRB Co.

[148] *Insys Liquidation Trust v. McKesson Corp. (In re Insys Therapeutics, Inc.)*, 2021 WL 3083325, *3 (Bankr. D. Del. July 21, 2021).

[149] *Id.* (quoting *HLI Creditor Trust v. Export Corp. (In re Hayes Lemmerz Int'l, Inc.)*, 313 B.R. 189, 192 (Bankr. D. Del. 2004)).

debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer.[150]

The Complaint alleges that the transfers were made for antecedent debt under the

Consulting Agreement between HRB Co. and CD&R, and details the dates and

amounts of each transfer from HRB Co. to CD&R that the Trustee seeks to avoid.[151]

The Defendants also seek to dismiss the claim to avoid preferential transfers

based on the ordinary course of business defense of § 547(c)(2).  CD&R claims that

the Complaint acknowledges that the payments were made to CD&R under the

Consulting Agreement which required HRB Co. to pay CD&R approximately

$1 million per year, in four installments, plus expenses.  The Defendants argue that

this demonstrates that the transfers were made in the ordinary course of business

between the debtor and the transferee and according to ordinary business terms.

The Trustee responds that describing the terms of the Consulting Agreement,

without more, is not enough to support a valid ordinary course of business defense.

"When an affirmative defense appears on the fact of the complaint and

presents an 'insuperable barrier to recovery by the plaintiff,' the court may dismiss

the count."[152]  To create an "insuperable barrier to recovery," the defendant must

establish that the face of the complaint satisfies all of the elements of the section

547(c)(2) defense.[153]  The *Crucible Materials* court determined that the complaint

---

[150] *Id.*

[151] Compl. ¶¶ 349-361.

[152] *Gellert v. Coltec Ind., Inc. (In re Crucible Materials Corp.)*, 2021 WL 5360945, *4 (Bankr. D. Del. Oct. 31, 2012) (quoting *Cont'l Collieries v. Shober*, 130 F.2d 631, 635-36 (3d Cir. 1942)).

[153] *Id.*  The *Crucible Materials* court noted that a court should consider "whether the payments to a creditor made in the 90 days preceding a filing for bankruptcy were in response to a zealous creditor's attempt to collect on a debt through preferential treatment ahead of other creditors, or an attempt by the debtor to maintain normal business practices in hope of staving off bankruptcy."  *Id.* (quoting *Troisio v. E.B. Eddy Forest Prods. (In re Global Tissue L.L.C.)*, 106 Fed. App's 99, 102 (3d

before it contained sufficient allegations to establish that the debtor had been

making payments according to a financing lease's amortization schedule from the

time it was executed in 1985 until the disputed payment in 2009.  In that case, the

court determined the preference claim failed as a matter of law on the face of the

complaint.[154]  Here, the facts are not so plain.  CD&R's ordinary course of business

defense cannot be resolved on a Rule 12(b)(6) motion.  The request for dismissal of

Count IV will be denied.

<u>CONCLUSION</u>

The Defendants' Motion to Dismiss the Second Amended Complaint pursuant

to Federal Rule of Civil Procedure 12(b)(6) is denied.  An appropriate Order will

issue.

FOR THE COURT:


BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE


Dated:  March 13, 2024

---

Cir. 2004).  "Additional factors to consider include: the length of the parties' relationship, the number of transactions that occurred prior to the preference, the method of payment, the timing of payment, and the behavior relating to payment, i.e., did the creditor have to make dunning calls or otherwise push the debtor to make its payments."  *Id.* at \*5 (citing *In re Sierra Concrete Design, Inc.*, 463 B.R. 302, 306 (Bankr. D. Del. 2012)).

[154] *Crucible Materials*, 2021 WL 5360945 at \*5.