# EXHIBIT A

**Proposed Redacted Version of Memorandum of Law**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HRB WINDDOWN INC., *et al.*,[1]<br><br>     Debtors. | Chapter 11<br><br>Case No. 19-12689-BLS<br>Jointly Administered |
| ALAN D. HALPERIN, AS LIQUIDATING TRUSTEE OF THE HIGH RIDGE BRANDS CO. LIQUIDATING TRUST,<br><br>     Plaintiff,<br><br>v.<br><br>ARAWAK IX, L.P., CLAYTON, DUBILIER & RICE, LLC, JOHN C. COMPTON, VINDI BANGA (A/K/A MANVINDER BANGA), KENNETH A. GIURICEO, GREGORY L. PASQUA, AND JAMES A. DANIELS,<br><br>     Defendants. | Adversary Proceeding<br><br>Adv. Proc. Case No. 21-51412-BLS |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

---

[1] The Debtors in the above-captioned cases, along with the last four digits of each Debtor's federal tax identification number, are: High Ridge Brands Holdings, Inc. (5996); HRB Midco, Inc. (8170); HRB Buyer, Inc. (3945); HRB Winddown, Inc. (f/k/a High Ridge Brands Co.) (5871); GSI Winddown, Inc. (f/k/a Golden Sun, Inc.) (4712); CFL Winddown, Inc. (f/k/a Continental Fragrances, Ltd.) (2541); FCI Winddown, Inc. (f/k/a Freshcorp, Inc.) (3238); COC Winddown, LLC (f/k/a Children Oral Care, LLC) (disregarded entity for tax purposes); and DRF Winddown, LLC (f/k/a Dr. Fresh, LLC) (5167).

**BAYARD, P.A.**
Ericka F. Johnson (Del. Bar No. 5024)
Steven D. Adler (Del. Bar. No. 6257)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Tel: (302) 655-5000
Email:  ejohnson@bayardlaw.com
         sadler@bayardlaw.com


**DEBEVOISE & PLIMPTON LLP**
Mark P. Goodman
Erica S. Weisgerber
Zachary H. Saltzman
Matthew J. Sorensen
66 Hudson Boulevard
New York, New York 10001
Tel: (212) 909-6000
Email:  mpgoodman@debevoise.com
         eweisgerber@debevoise.com
         zhsaltzman@debevoise.com
         mjsorensen@debevoise.com

*Counsel to Defendants Arawak IX, L.P., Clayton,
Dubilier & Rice, LLC, John C. Compton, Vindi
Banga (a/k/a Manvinder Banga), Kenneth A.
Giuriceo, and Gregory L. Pasqua*

**THE ROSNER LAW GROUP**
Frederick B. Rosner (Del. Bar No. 3995)
Zhao (Ruby) Liu (Del. Bar No. 6436)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Tel: (302) 777-1111
Email:  rosner@teamrosner.com
         liu@teamrosner.com


**VEDDER PRICE P.C.**
S. Preston Ricardo
1633 Broadway, 31st Floor
New York, New York 10019
Tel: (212) 407-7700
Email:  pricardo@vedderprice.com

*Counsel to Defendant James A. Daniels*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................................ 4

    I.     CD&R Acquires HRB and Expands Its Platform Through the Dr. Fresh Acquisition. ................................................................................ 4

    II.    HRB Markets and Issues the Notes Through a New York-Centered Offering. ......................................................................................... 4

    III.   The Offering Memorandum's Disclosures and the Alleged Misstatements. ....................................................................................... 6

    IV.   The Notes Were Purchased by a Wide Range of Sophisticated Investors. ............................................................................................. 8

    V.    Following the Offering, HRB Continued Providing Disclosures and the Assigning Noteholders Purchased More Notes. ........................... 9

        A.    The May 2017 Disclosures. ............................................... 9

        B.    The Company's Other Quarterly Disclosures. ............................ 10

        C.    HRB Files for Bankruptcy. ............................................... 12

PROCEDURAL HISTORY ....................................................................................... 12

ARGUMENT ............................................................................................................. 13

    I.     New York Law Governs the Trustee's Fraud and Blue Sky Law Claims ................................................................................................ 14

        A.    The Indenture Contains a New York Choice of Law Clause ........ 16

        B.    New York Has a Material Relationship to the Transaction. .......... 17

    II.    Summary Judgment Should Be Entered in Favor of Defendants on the Trustee's Blue Sky and Common Law Fraud Claims. ........................ 20

A.      Defendants Are Entitled to Summary Judgment on the
        Fraud Claims (Counts VI, VII, VIII) and Blue Sky Claim
        (Count X) Because the Trustee Cannot Establish Loss
        Causation.................................................................................. 21

B.      Defendants Are Entitled to Summary Judgment on the
        Fraud Claims (Counts VI, VII, VIII and X) Because the
        Trustee Cannot Establish Loss Causation. ................................... 22

        1.      The Trustee Fails to Show Any Correlation Between
                the Alleged Misstatements and the Price of the
                Notes ................................................................................ 24
        2.      The Trustee Fails to Disaggregate the Effect of Numerous
                Confounding Factors from Those of the Alleged
                Misstatements ................................................................. 25

CONCLUSION............................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Abry Partners V, L.P. v. F & W Acquisition LLC*,
891 A.2d 1032 (Del. Ch. 2006)............................................................................. *passim*

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
2019 WL 1436993 (S.D.N.Y. Mar. 30, 2019) ........................................................22

*Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*,
56 N.Y.S.3d 21 (N.Y. App. Div. 2017) .......................................................14, 21, 22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................13

*Aquino by Convergent Distributors of Texas, LLC v. Alexander Cap., LP*,
642 B.R. 106 (S.D.N.Y. 2022)....................................................................26, 28, 30

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
969 F. Supp. 2d 339 (S.D.N.Y. 2013)........................................................19, 22, 23

*Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*,
48 N.Y.S.3d 654 (N.Y. App. Div. 2017) ..............................................14, 21, 22, 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................13, 14

*Century Pac., Inc. v. Hilton Hotels Corp.*,
528 F. Supp. 2d 206 (S.D.N.Y. 2007)......................................................................22

*Claggett v. Wake Forest Univ.*,
126 N.C. App. 602 (1997) ........................................................................................15

*CLEAResult Consulting, Inc. v. EnerNOC, Inc.*,
2017 WL 4638592 (D. Del. Oct. 16, 2017) ......................................................15, 20

*CPC Int'l Inc. v. McKesson Corp.*,
70 N.Y.2d 268 (N.Y. 1987) ......................................................................................20

*Deutsch v. Integrated Barter Int'l, Inc.*,
700 F. Supp. 194 (S.D.N.Y. 1988) ...........................................................................20

*Dodona I, LLC v. Goldman Sachs & Co.*,
132 F. Supp. 3d 505 (S.D.N.Y. 2015).......................................................................22

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005).........................................................................................25

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
2020 WL 5518146 (S.D.N.Y. Sept. 14, 2020)...........................................19, 23, 26, 30

*Gen. Ret. Sys. of City of Detroit v. UBS, AG,*
799 F. Supp. 2d 749 (E.D. Mich. 2011).......................................................19

*Gordon Partners v. Blumenthal,*
2007 WL 431864 (S.D.N.Y. Feb. 9, 2007)..................................................23, 24

*Greenberg Traurig of New York, P.C. v. Moody,*
161 S.W.3d 56 (Tex. App. 2004)..................................................................21

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
761 F. Supp. 2d 504 (S.D. Tex. 2011) ........................................................20

*In re Moody's Corp. Sec. Litig.,*
2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013)..............................................25

*In re Mylan N.V. Sec. Litig.,*
666 F. Supp. 3d 266 (S.D.N.Y. 2023)................................................23, 24, 25, 28, 30

*In re OSC 1 Liquidating Corp.,*
529 B.R. 825 (Bankr. D. Del. 2015) ............................................................15

*In re PMTS Liquidating Corp.,*
452 B.R. 498 (Bankr. D. Del. 2011) ............................................................15

*In re Teleglobe Commc'ns Corp.,*
493 F.3d 345 (3d Cir. 2007).........................................................................14

*Israel Disc. Bank of New York v. Eisneramper LLP,*
2014 WL 6092093 (N.Y. Sup. Ct. Nov. 14, 2014)......................................22

*Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,*
313 U.S. 487 (1941).....................................................................................15

*Lattanzio v. Deloitte & Touche LLP,*
476 F.3d 147 (2d Cir. 2007).........................................................................25

*Lee v. McDowell,*
2020 WL 6067769 (N.C. Super. Oct. 14, 2020)..........................................21

*Loreley Financing (Jersey) No. 4 Ltd. v. UBS Ltd.*,
 978 N.Y.S.2d 615 (N.Y. Sup. Ct. 2013) ....................................................................19

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,
 747 F. Supp. 2d 406 (S.D.N.Y. 2010)......................................................................22

*Pits, Ltd. v. Am. Express Bank Int'l*,
 911 F. Supp. 710 (S.D.N.Y. 1996) ...........................................................................22

*Pivotal Payments Direct Corp. v. Planet Payment, Inc.*,
 2020 WL 7028597 (Del. Super. Ct. Nov. 30, 2020) .................................15, 16, 17, 19

*Reisman v. KPMG Peat Marwick LLP*,
 57 Mass. App. Ct. 100 (2003)...................................................................................15

*Sciallo v. Tyco Int'l Ltd.*,
 2012 WL 2861340 (S.D.N.Y. July 9, 2012) ..............................................................25

*Wi-LAN Inc. v. Sharp Elec. Corp.*,
 362 F. Supp. 3d 226 (D. Del. 2019).........................................................................13

*William L. Thorp Revocable Tr. v. Ameritas Inv. Corp.*,
 57 F. Supp. 3d 508 (E.D.N.C. 2014).......................................................................21

*WTW Inv. Co. LTD v. Jefferies, LLC*,
 2019 WL 13194124 (N.D. Tex. Feb. 5, 2019)..........................................................21

*Zhou v. Deng*,
 2022 WL 1024809 (Del. Ch. Apr. 6, 2022) .............................................................16

**Statutes**

N.C. Gen. Stat. Ann. § 78A .........................................................................................15

N.Y. Gen. Bus. Law § 352 *et seq.*................................................................................15

**Other Authorities**

Fed. R. Civ. P. 56.........................................................................................................14

Restatement (Second) of Conflict of Laws § 148 (1971) ...............................................20

The above-captioned defendants ("Defendants") respectfully submit this memorandum of law in support of their motion for partial summary judgment (the "Motion for Partial Summary Judgment") against Alan D. Halperin, as Liquidating Trustee ("Plaintiff" or the "Trustee") of the High Ridge Brands Co. Liquidating Trust, with respect to Counts VI, VII, VIII, and X of the Second Amended Complaint, Adv. D.I. 59 (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Partial summary judgment is appropriate because the Trustee cannot carry his burden under New York law to establish loss causation, *i.e.*, that any alleged misstatement or omission caused the price of the notes at issue to decline. The Trustee seeks—with limited exceptions—the full difference between the price paid for notes issued by the borrower, High Ridge Brands Co. ("HRB" or the "Company"), and the amounts recovered by the noteholders after HRB filed for bankruptcy nearly three years after the refinancing. He makes no effort to disaggregate losses entirely unrelated to the alleged misrepresentations. Because the Trustee cannot show loss causation, the Trustee cannot make his case as a matter of law. The Court should grant this Motion for Partial Summary Judgment, thereby eliminating claims for which there is no genuine dispute of material fact and substantially narrowing the issues for trial.

In March 2017, HRB issued $250 million of senior unsecured notes (the "Notes") in a private offering (the "Offering") to refinance existing debt, including debt incurred in connection with its acquisition of an oral care business. The Notes were offered only to sophisticated institutional investors through a New York-centered process that included an offering memorandum (the "Offering Memorandum"), a roadshow presentation, and in-person and telephonic meetings with prospective investors. The Offering disclosures included backward-looking statements concerning the Company's financial performance, its customer relationships,

1

its management team, as well as a description of its growth strategy. Ultimately, 45 qualified institutional buyers purchased the Notes in the Offering.

Nearly three years later, HRB filed for bankruptcy. After the bankruptcy, the Trustee asserted claims purportedly belonging to investors in the Notes. By the close of fact discovery, only two of the original 45 investors—Polen Capital Credit (f/k/a DDJ Capital Management LLC) ("DDJ") and Barings LLC ("Barings") (together, the "Assigning Noteholders")—remained willing to support those claims. Accordingly, the Trustee seeks to recover the difference between the prices DDJ and Barings paid for Notes purchased between the Offering in March 2017 and July 6, 2017, and the value of the Notes as of their sale or, in most cases, the value recovered through the bankruptcy.[2]

The Trustee purports to bring claims under, variously, New York, Massachusetts, and North Carolina law, but Delaware choice of law rules—which apply here—mandate application of New York law. The Notes were issued under indentures that provide for New York law and submission to the jurisdiction of New York courts, and the Offering itself was overwhelmingly centered in New York: it was structured, underwritten, launched, documented, and closed there, with the assistance of New York-based financial institutions and professionals, auditors, and counsel. Because New York law applies, the Trustee must prove loss causation—an essential element of his fraud claims—by showing that the alleged misstatements or omissions directly caused a decline in the value of the Notes. He cannot do so. The Trustee's claim under state blue sky law (the "blue

---

[2] The Trustee's damages expert Stephen Kempainen purportedly "reduced the damages for [any] negative market return" using an index published by Merrill Lynch in order to incorporate the impact of external factors, Ex. 51, Expert Report of Stephen Kempainen ¶ 102, but none of the damages for the period at issue were adjusted, *see id.* at Exhibits 8-1, 8-2.

sky claim") independently fails for the additional reason that New York law does not recognize a private right of action under the Martin Act.

Despite years of fact and expert discovery, the Trustee has no evidence that any alleged misstatement or omission caused a decline in the price of the Notes. The Trustee's damages expert, Stephen Kempainen, conceded that ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████ Ex 52,[3] Transcript of February 4, 2026 Deposition of Stephen J. Kempainen ("Kempainen Tr."), at 157:13–158:1. He also admitted that ████████████████████████ ███████████████████████████████████████████████ *Id.* at 32:19–23. He confirmed that, under his approach, ██████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████ *Id.* at 33:19–34:4. In other words, his damages analysis encompasses all losses with no regard to their cause. His opinions and testimony are subject to a contemporaneously filed *Daubert* motion.

The Trustee's failure to adduce evidence tying any specific price decline to any alleged corrective disclosure or to disaggregate losses caused by alleged misstatements from unrelated factors is particularly problematic because the undisputed facts show that after HRB disclosed some of the information the Trustee contends had been misstated or omitted during a May 19, 2017 investor call, the Notes continued to trade at or near par, and the Assigning Noteholders increased their holdings. The Notes' eventual price declines occurred months and even years later, after a host of intervening developments—including rising commodity costs, industry-wide demand

---

[3] References to "Ex." in this motion are to the Exhibits as described in the Declaration of Matthew J. Sorensen attached hereto.

pressures, operational challenges, credit rating downgrades, and declining earnings. Because the Trustee makes no attempt to disaggregate those effects from the alleged fraud, he cannot establish loss causation as a matter of law.

For these and other reasons discussed below, summary judgment should be entered in Defendants' favor on the Trustee's blue sky claim and fraud claims.

**STATEMENT OF UNDISPUTED FACTS**

**I.     CD&R Acquires HRB and Expands Its Platform Through the Dr. Fresh Acquisition.**

HRB was a consumer products company established in 2010 that owned and managed a large portfolio of personal care brands, including Zest, Alberto VO5, and Coast. Compl. ¶ 39; Ex. 8 at 89, F-8. On June 30, 2016, a fund affiliated with the New York City-based private equity firm CD&R LLC ("Fund IX") acquired HRB, intending to use it as a platform for acquiring other mature complementary brands. Compl. ¶¶ 29, 52; Ex. 8 at 2, 9. Following that acquisition, Defendants John C. Compton, Kenneth A. Giuriceo, Gregory L. Pasqua, and Vindi Banga—the first three of whom are based in CD&R's New York office—joined HRB's board. Ex. 8 at 100; Declaration of Gregory L. Pasqua ("Pasqua Decl.") ¶¶ 5–6.

Consistent with this strategy, on December 29, 2016, HRB purchased Dr. Fresh Holdings LLC and Dr. Fresh Blocker LLC (collectively, "Dr. Fresh"), an oral care business that complemented HRB's existing hair and skincare lines, for approximately $200 million. Ex. 8 at 7. This transaction was financed through an additional $45 million equity contribution from Fund IX and a $160 million bridge loan (the "Bridge Loan"). *Id.* at 8.

**II.    HRB Markets and Issues the Notes Through a New York-Centered Offering.**

In late March 2017, HRB undertook the Offering to refinance the Bridge Loan and other existing indebtedness. Ex. 1 at -6657–58. The Offering was conducted as a private placement available only to qualified institutional investors. *See* Ex. 8. BMO Capital Markets Corp.

4

("BMO") served as lead bookrunner through its New York office.  *See* Ex. 57 at A-00518 (Notes Purchase Agreement listing BMO's New York address); Ex. 50, Transcript of September 11, 2025 Deposition of BMO, by and through its corporate designee, Darryl Jacobson ("Jacobson Tr.") at 34:18–19.  HRB sold the Notes to a syndicate of initial purchasers—a consortium of financial institutions operating out of New York (the "Initial Purchasers") who would then sell the Notes to qualified investors, pursuant to a notes purchase agreement (the "Notes Purchase Agreement").  Ex. 57 at A-00518.  That agreement contains a New York choice of law provision and identifies New York as the closing location of the Offering.  *Id.* at A-00528, A-00540.

The Offering was launched from New York on March 10, 2017.  Ex. 4 at -1159; *see also* Ex. 2; Pasqua Decl. ¶ 8.  In connection with the Offering, HRB prepared the Offering Memorandum in New York with the assistance of investment professionals from BMO's New York office and counsel from Debevoise & Plimpton LLP's New York Office.  Pasqua Decl. ¶ 7; *see* Compl. ¶ 369.  The financial statements included therein were audited by Grant Thornton, LLP, in New York.  Ex. 8 at 189, F-2.  The Offering Memorandum disclosed that the Notes and accompanying Indenture would be governed by New York law.  *See id.* at 139.  Together with BMO, HRB broadly marketed the Notes through in-person roadshow presentations and telephonic meetings with potential investors located in New York and elsewhere in the United States.  Ex. 4 at -1160–61; Pasqua Decl. ¶ 8.

Following the distribution of the Offering Memorandum and the roadshow, HRB issued the Notes on March 22, 2017 under a Base Indenture (the "Base Indenture") and a First Supplemental Indenture (together, the "Indenture").  Ex. 8 at 106.  The Indenture provides that both it and the Notes are governed by New York law.  Ex. 9 § 115.  It also provides that "HRB Co., the Indenture Trustee, and the holders of the Notes agree to submit to the jurisdiction of the Courts

located in New York with respect to any action or proceeding arising out of or relating to the Indenture or the Notes." Compl. ¶ 91; *see also* Ex. 9 § 115.

In addition to preparing and distributing the Offering Memorandum to potential investors, members of HRB's management team, along with representatives from BMO, gave roadshow presentations in New York, Boston, and California. Ex. 4 at -1157–59; Ex. 6; Ex. 50, Jacobson Tr., at 167:4–168:22; Pasqua Decl. ¶ 8. They also held meetings with potential investors telephonically. Ex. 4 at -1160–61; Ex. 5. Investors located across the United States and abroad participated in roadshow presentations for the broadly marketed Notes . Ex. 4 at -1160–61. Concurrently with the roadshow, the Notes were rated CCC+ by S&P and Caa1 by Moody's. Ex. 3.

**III.     The Offering Memorandum's Disclosures and the Alleged Misstatements.**

The Offering Memorandum contained disclosures regarding HRB's historical financial performance; its relationships with its customers and its management team; as well as disclosures concerning its growth strategy. Ex. 8 at 6, 7, 14–27. HRB disclosed audited historical financial information, and unaudited consolidated historical pro forma financial results, both through the period ending December 31, 2016. *Id.* at 52–80. Those disclosures indicated that HRB's legacy business net sales, gross profits, and contribution margin were down 4.4%, 4.3%, and 6.4%, respectively, in the second half of 2016 as compared to the same period in 2015. *Id.* at 73. HRB management did not disclose projections of the Company's future financial performance or include interim quarterly results for the first two months of 2017. *See generally id.*

HRB also made disclosures concerning its relationships with its customers. *Id.* at 1–2, 6, 29, 89, 95. Walmart and Dollar Tree were identified as HRB's "two largest customers, representing approximately 30% and 11% of High Ridge's net sales," and HRB disclosed that "[a]ny loss of a key customer or a significant reduction in net sales to a key customer could have a material adverse effect on [its] business, financial condition and results of operations." *Id.* at 29. It further disclosed

6

that "changes in the strategies of our largest customers, including a reduction in the number of brands they carry or a shift of shelf space . . . may harm our net sales." *Id.*

HRB also stated that its management had "extensive industry experience" and a "proven track record of acquiring, integrating, revitalizing, and managing a wide variety of brands in several personal care categories." *Id.* at 6, 94; *see also* Ex. 7 at 14. It listed certain HRB executives' relevant professional experiences. Ex. 8 at 100–101. HRB also disclosed that its growth strategy included pursuing strategic acquisitions. *Id.* at 94. Finally, HRB disclosed numerous risk factors associated with investing in the Notes, including its "[d]ependence on key customers" such as Walmart and Dollar Tree, which had made up over 40% of its net sales during fiscal year ending June 30, 2016; the risk that the Company "may not be able to identify suitable targets" for strategic acquisitions; changes in consumer behavior; price increases for raw materials; dependence on "key personnel"; and the possibility that the Company "may not realize the anticipated synergies, cost savings, and growth opportunities from the Acquisition" of Dr. Fresh. *Id.* at 29, 32, 34–37, 40.

The Trustee broadly alleges that the following categories of statements or "omissions" in the Offering Memorandum and roadshow presentations were misleading:

- The Company's non-disclosure that Walmart made a year-end planogram change. Compl. ¶ 9; Ex. 55 at 26–27.

- The Company's statement that it had "Strong Cash Flow Generation" based on the 12-month period ended December 31, 2016. Compl. ¶ 115; Ex. 55 at 15–16.

- The Company's description of its management team as having a "Proven Ability to Acquire, Integrate, and Manage Brands" and "extensive industry experience." Compl. ¶ 117; Ex. 55 at 18–19.

- The Company's description that it had "deep and strategic" relationships with its customers. Compl. ¶ 119; Ex. 55 at 21–22.

- The Company's non-disclosure of non-final interim financial results and of purported "forward looking statements." Compl. ¶¶ 124, 129; Ex. 55 at 14–17.

7

- The Company's non-disclosure of the fact that CEO Daniels had stepped in to cover the "vacant" CSO role following the prior CSO's departure. Compl. ¶ 126; Ex. 55 at 24–25.

- The Company's description of its acquisition growth strategy. Compl. ¶ 130; Ex. 55 at 29–30.

## IV. The Notes Were Purchased by a Wide Range of Sophisticated Investors.

The Notes were ultimately purchased by 45 sophisticated institutional investors, located in at least 11 different states and four countries. Compl. ¶ 203 Fig. 4; Ex. 11 at -0370; *see* Ex. 50, Jacobson Tr., at 38:2–39:2 (explaining that the initial purchasers distribute or sell notes to investors who purchase those notes). The Notes were held by the Depository Trust Company, a New York-organized entity, for the benefit of all Noteholders. Ex. 8 at 107, 172–73.

Two of the investors were the Assigning Noteholders, whose claims the Trustee is asserting. Compl. ¶¶ 367–414, 423–30. Representatives of both investors testified that they read and relied upon the entirety of the Offering Memorandum, including disclosures regarding risk factors. Ex. 49, Transcript of August 14, 2025 Deposition of Barings, LLC, by and through its corporate designee, Sean Feeley, at 465:4–8 (confirming that Barings "relied on every single word in the offering memorandum in making its investment"); Ex. 47, Transcript of July 18, 2025 and November 13, 2025 Deposition of Doug Wooden, in his personal capacity and as the corporate designee of Polen Capital ("Wooden Tr."), at 54:10–24 (DDJ's corporate representative confirming that "[w]hen reviewing offering memoranda," he "read[s] the entire offering memorandum cover to cover," and that he did not focus on certain sections of the Offering Memorandum but rather "focused on" "the detail within" the "entire offering memorandum"). DDJ purchased the Notes as part of its "DDJ Capital Management Group Trust – High Yield Investment Fund," which was organized under the laws of New York. Ex. 32; Ex. 43 at 18; *see* Ex. 47, Wooden Tr., at 288:13–18.

**V. Following the Offering, HRB Continued Providing Disclosures and the Assigning Noteholders Purchased More Notes.**

Following the Offering, HRB kept Noteholders apprised of developments through quarterly presentations, financial statements and reports, and press releases. *See infra* V.A.–B. Over that period, the Assigning Noteholders increased their holdings in the Notes.

**A. The May 2017 Disclosures.**

In its first scheduled post-Offering presentation to the Noteholders on May 19, 2017, HRB disclosed its financial results and performance for the quarter ending March 31, 2017, including updated adjusted EBITDA and sales in the legacy business. Ex. 14 at -5263; Ex. 15; Ex. 13 at -5259–61; *see also* Ex. 16. HRB disclosed that sales had been negatively impacted by a number of factors, including increases in the costs of palm kernel oil and coconut oil, political and economic instability in the Middle East/North Africa region, inventory rationalization by customers, generally lower consumption across the consumer packaged goods ("CPG") industry, and Walmart's annual planogram reset. Ex. 13 at -5260–63; Ex. 14 at -5263 (Barings noting that the "big miss was a combination of lower sales YoY in the legacy brands and higher costs"; that "the input cost pressure will have impact on the company"; that "Walmart tightened inventory on everyone this quarter and that is a theme we have heard from other consumer product companies as well"; and that "[t]he cost of tallow and palm kernel oil increased 55% YoY and resulted in a $2.2 million increase in COGS"); Ex. 15 (email from Wooden noting "weakness in [the Company's] Mid East/North Africa Markets" and that the "decline stemmed from the decline in revenues, as well as $2MM increased costs related to commodities"); Ex. 47, Wooden Tr., at 112:1–11, 118:13–119:13, 120:21–121:13, 122:2–123:2 (recounting same disclosures); *see also* Ex. 12 at -4813 (internal CD&R deck attributing EBITDA shortfall in part to "MENA market dislocation," "[a]bove average commodity costs (notably, palm oil and tallow)," and planogram resets at

9

Walmart).  The Company also disclosed that it had "hired four senior level employees to support the business expansion," including a "Chief Sales Officer."  Ex. 13 at -5266.  Between May 19, 2017 and the end of June, the price of the Notes stayed between $97.86 and $99.50.  Ex. 40.

No investor raised concerns to HRB or CD&R regarding the adequacy of the disclosures made in connection with the Offering then or at any time prior to the filing of this lawsuit.  Indeed, both Assigning Noteholders increased their holdings significantly between the Offering and the petition date.  Following the May 2017 disclosures, DDJ purchased $1.07 million in face value of the Notes at $98.75 on May 30, 2017.  Ex. 42.  Two weeks later, on June 19, 2017, it purchased an additional $8.91 million in face value of Notes at $99.5.  *Id.*  The Noteholders continued to purchase Notes thereafter, at or near par.  *See* Exs. 40–42.  In total, DDJ increased its holdings from an initial $50 million in par value to a high of $108 million.  Ex. 42.  Barings, for its part, had initially bought $8 million in par value from the Initial Purchasers, and subsequently increased its position to $47.6 million.  Ex. 41.

**B.      The Company's Other Quarterly Disclosures.**

Over the next two years, the Company continued to provide quarterly updates to investors regarding its finances and operations.  On July 6, 2017, HRB publicly announced that Patricia Lopez had replaced Jim Daniels as CEO.  Ex. 18 at -5779–80; Ex. 19 at -8705; Ex. 20.  The price of the Notes remained between $99.56 and $98.78 in the month of July.  Ex. 40.

In its October 27, 2017 investor presentation, the Company disclosed that total legacy sales and gross profit margins were negatively impacted by ███████████████████████

███████████████████████████████████████████████

at -6635.[4]  In the days following the presentation, the Notes traded at $93.  Ex. 40.

During its April 20, 2018 lender presentation (covering the period ending December 31, 2017) and its May 16, 2018 lender presentation (covering the quarter ending March 31, 2018), the Company explained that its EBITDA decline—down 38% compared to the prior year—was driven by commodity inflation and substantial increases in freight and warehousing costs.  Ex. 24 at 7–8; Ex. 27 at -0257; Ex. 23; Ex. 47, Wooden Tr., at 181:2–16; Ex. 25 at -0101; Ex. 28 at 5.  Following these presentations and earnings releases, Moody's and S&P downgraded the Notes to Caa2 and CCC, respectively.  Ex. 54; Ex. 29.  Between April 19 and June 1, 2018, the price of the Notes fell from $88 to $45.  Ex. 40.  In November 2018, the Company disclosed its financial results and explained to investors that ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████  Ex. 31.

During the April 29, 2019 lender presentation (covering the period ending December 31, 2018), the Company informed investors that its EBITDA and net sales had further decreased, and attributed the decreases to supplier issues, inflationary pressures on outputs, and increased labor rates.  Ex. 34 at 3–4.  It also disclosed that it had executed a limited covenant waiver to the Credit Agreement governing its First Lien Term Loan.  Ex. 33 at -9936; *see also* Ex. 35, at -1323–578;

---

[4] The Company also informed investors in November 2017 that premiumization—wherein individual customers would "trade up to premium brands . . . rather than swap to a similar value peer"—affected sales, particularly at Walmart.  Ex. 22; *see also* Ex. 45, Transcript of July 8, 2025 Deposition dated July 8, 2025 of Kenneth A. Giuriceo, at 318:12–18, 319:2–3 ("███████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████.").

Ex. 36; Ex. 37. Following this disclosure, the price of the Notes dropped from $40.91 on April 20, 2019 to $22.45 on May 1, 2019. Ex. 40. Shortly thereafter, S&P downgraded the rating of the Notes from CC to C and the Notes lost further value. Ex. 38; Ex. 40.

### C. HRB Files for Bankruptcy.

Notwithstanding efforts to address continued supply chain issues and a broad shift in consumer preferences, HRB's liquidity declined over time, driven by a softness in demand and increased production costs. *See* Second Am. Combined Disclosure Statement & Joint Chapter 11 Plan of Liquidation of High Ridge Brands Co. and Its Affiliated Debtors, D.I. 609 (the "Plan") § 3.2; Declaration of M. Benjamin Jones in Support of Debtors' Chapter 11 Petitions and First Day Motions and Application, D.I. 2 ¶¶ 34, 36–37.

The Company filed for chapter 11 relief in this Court on December 18, 2019, and the Court confirmed the Company's plan of reorganization on October 8, 2020. Compl. ¶¶ 183–84; *In re High Ridge Brands Co.*, Main Case Dkt. No. 619. A Liquidating Trust was formed and was assigned certain causes of action, including those formerly held by noteholders as of the petition date. Compl. ¶¶ 186–88, 198; Plan § 9.18.

### PROCEDURAL HISTORY

In December 2021, the Trustee commenced this Action against Defendants and asserted, among other causes of action, common law fraud claims and claims under state securities laws. D.I. 1. He subsequently amended that complaint twice, Adv. D.I. 25, 59, and Defendants twice moved to dismiss. Dismissal was denied and the case proceeded to discovery.

In discovery, the Trustee issued 45 third-party subpoenas, in addition to numerous requests for production to the Defendants. Over 170,000 documents were produced over the course of discovery. The parties conducted a total of 17 depositions, including three expert depositions.

During fact discovery, the Trustee initially identified Barings LLC, DDJ Capital, and JPMorgan Securities LLC as the noteholders whose claims he was asserting. Ex. 44. On July 10, 2025, the Trustee withdrew the claims for JPMorgan Securities. Ex. 46; Ex. 48. Three months later (and prior to any expert discovery), the Trustee voluntarily dismissed Counts I, II, III, IX, XI, and XV of his Complaint, comprising two counts of fraudulent transfer, one count of breach of fiduciary duty, two counts of common law fraud under California law, and a count alleging violations of the California Securities Act. Adv. D.I. 287, 288.

On April 6, 2026—after the close of fact and expert discovery—the Trustee voluntarily dismissed three of the remaining fraud claims (Counts XII, XIII, and XIV), which were based on statements made by the Company after July 6, 2017. Adv. D.I. 294, 295. The Trustee acknowledged that dismissal of these claims was warranted because he would not rely on his expert's calculation of damages for those claims. Ex. 53 at 4.

Only six of the Trustee's 15 original claims remain in dispute: one count of avoidable preference (Count IV), one count of disallowance of claims (Count V), three counts of common law fraud under New York, Massachusetts, and North Carolina law, respectively (Counts VI, VII, VIII), and one count for violations of the North Carolina Securities Act (the "N.C. Act") (Count X). This motion for partial summary judgment seeks dismissal of Counts VI, VII, VIII, and X.

## ARGUMENT

Summary judgment is appropriate where there is no genuine dispute of material fact, *i.e.*, where plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where there is no evidence on which the jury could reasonably find for the nonmoving party, summary judgment must be granted. *See Wi-LAN Inc. v. Sharp Elec. Corp.*, 362 F. Supp. 3d 226, 230 (D. Del. 2019); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

252 (1986). A grant of partial summary judgment "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact," Fed. R. Civ. P. 56 advisory committee's note to 1946 amendment, and aligns with the principal purpose of summary judgment "to isolate and dispose of factually unsupported claims or defenses," *Celotex Corp.*, 477 U.S. at 323−24.

As discussed below, under Delaware choice of law principles, New York law applies to the Trustee's common law fraud and blue sky claims and, accordingly, Defendants are entitled to summary judgment on such claims. As to the blue sky claims, New York law provides no private right of action under the Martin Act (the relevant New York statute applicable to the Offering). As to the fraud claims, and setting aside the other elements of fraud, there is no genuine dispute of material fact that the Trustee cannot show loss causation, *i.e.*, that the alleged "misrepresentations directly caused the loss about which plaintiff complain[s]." *Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 48 N.Y.S.3d 654, 656 (N.Y. App. Div. 2017).

## I.     New York Law Governs the Trustee's Fraud and Blue Sky Law Claims

Although the Trustee purports to bring common law fraud claims under New York, Massachusetts, and North Carolina law, as well as a blue sky claim under the N.C. Act, New York law governs the Trustee's fraud and blue sky claims. Delaware courts engage in a choice of law analysis when "proffered legal regimes actually conflict on a relevant point." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 358 (3d Cir. 2007), *as amended* (Oct. 12, 2007). Here, two distinct conflicts between the laws of New York, Massachusetts, and North Carolina require such an analysis. First, with respect to the fraud claims: New York's and Massachusetts' common law fraud regimes differ because New York law requires proof of loss causation, while Massachusetts arguably has disposed of this requirement. *See Ambac Assur. Corp. v. Countrywide Home Loans, Inc.* 56 N.Y.S.3d 21, 24 (N.Y. App. Div. 2017), *aff'd sub nom. Ambac Assur. Corp. v. Countrywide*

*Home Loans, Inc.*, 31 N.Y.3d 569 (2018) ("Loss causation is . . . an essential element of a fraud claim.") (cleaned up) *with Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 120 (2003) (declining to require loss causation for Massachusetts common law fraud claim).[5] Second, with respect to the blue sky claim: New York and North Carolina blue sky laws conflict because New York has no private right of action under the Martin Act while the N.C. Act does provide a private right of action. *Compare* N.Y. Gen. Bus. Law § 352 et seq. *with* N.C. Gen. Stat. Ann. § 78A-56. Applying Delaware's choice of law principles, New York law governs the Trustee's common law fraud claims and blue sky claim.

New York law applies—it is both the law selected in the Indenture's choice of law provision applicable to the Notes and the jurisdiction with the most significant relationship to the claims. This Court applies Delaware's choice of law rules in accordance with *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941). *See In re PMTS Liquidating Corp.*, 452 B.R. 498, 507 (Bankr. D. Del. 2011) (Shannon, J.). "Delaware law is contractarian, and the parties' contractual choices are respected." *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2020 WL 7028597 at * 7 (Del. Super. Ct. Nov. 30, 2020). Thus, a contract's choice of law clause governs related fraud claims so long as the selected law bears a material relationship to the transaction and application of that law does not offend a fundamental policy of a state with a materially greater interest. *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1047–49 (Del. Ch. 2006) (Strine, V.C.). Absent a choice of law clause, the law of the jurisdiction with the most significant relationship to the transaction governs. *Abry*, 891 A.2d at 1047; *CLEAResult Consulting, Inc. v.*

---

[5] North Carolina requires fraud plaintiffs to show proximate cause, an element that is analogous to loss causation. *See, e.g.*, *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 610 (1997) (requiring plaintiff to prove that it "suffered damage *resulting from defendant's misrepresentation or concealment*" (emphasis added)). To the extent the Court considers those requirements to be distinct, New York law applies for the reasons discussed below.

*EnerNOC, Inc.*, 2017 WL 4638592, at *4 (D. Del. Oct. 16, 2017) (applying § 6 of the Restatement (Second) of Conflict of Laws to fraud claims).

Delaware courts routinely apply the contractually selected law in resolving fraud claims arising in connection with a contract. *See, e.g., Abry*, 891 A.2d at 1048; *In re OSC 1 Liquidating Corp.*, 529 B.R. 825, 831 (Bankr. D. Del. 2015) (holding that where the material-relationship requirement is met, Delaware courts "will uphold a choice of law provision even as to the determination of fraud claims"); *Pivotal Payments*, 2020 WL 7028597, at *7 (applying New York law to fraudulent inducement claims); *Zhou v. Deng*, 2022 WL 1024809, at *8 (Del. Ch. Apr. 6, 2022), *aff'd*, 287 A.3d 633 (Del. 2022) (applying New York law to fraud claims based on New York choice of law clause because "Delaware courts generally respect parties' choice of law.").

Applying a contract's choice of law clause to related fraud claims reflects the reality that "[p]arties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship" and that not applying such a provision to related tort claims would create the very uncertainty "that the parties' choice of law provision sought to avoid." *Abry*, 891 A.2d at 1048 (recognizing that "layer[ing] the tort law of one state on the contract law of another state [creates undue] complexity and makes the outcome of disputes less predictable)"; *see also Pivotal Payments*, 2020 WL 7028597, at *7 (Applying a contract's choice of law provision to related tort claims prevents "uncertainty of precisely the kind that the parties' choice of law provision sought to avoid.").

### A.      The Indenture Contains a New York Choice of Law Clause.

The parties selected New York law in the documents governing the Notes, the purchase of which gives rise to the claims at issue here. The Base Indenture contains a New York choice of law provision providing that both the "Indenture and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York." Ex. 9, at -67994. It further provides that

the Indenture Trustee, the Company, the Notes' obligors, and the noteholders "agree to submit to the jurisdiction of any United States federal or state court located in the Borough of Manhattan, in the City of New York in any action or proceeding arising out of or relating to this Indenture or the Notes." *Id.* The Offering Memorandum likewise made clear that New York law would govern the sale of the Notes. *See* Ex. 8 at 139. ("The Indenture will provide that it and the Notes will be governed by, and construed in accordance with, the laws of the State of New York."). Moreover, other transaction documents—including the First Supplemental Indenture, the Notes Purchase Agreement, and the Notes Forbearance Agreement—also contain the same New York choice of law provision. Ex. 10 at -0792; Ex. 57 at A-00540; Ex. 39 at -3619; *see also Abry*, 891 A.2d at 1046 (choice of law clause provided that the agreement at issue "shall be governed by, and construed in accordance with, the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law."); *Pivotal Payments*, 2020 WL 7028597, at *1 (choice of law clause provided "This Agreement shall be construed in accordance with the laws of the State of New York.").

> **B.      New York Has a Material Relationship to the Transaction.**

Because the parties selected New York law in the applicable transactional documents, that law must be applied so long as New York has a material relationship to the transaction. The material-relationship requirement may be satisfied where "a majority of the activity underlying the action occurred within the [chosen state.]" *Pivotal Payments*, 2020 WL 7028597, at *7 (material relationship found where underlying conduct, including marketing, business development, and drafting of contract, happened in New York).

The undisputed facts here establish that New York has a material relationship to the transaction:

- The Offering Memorandum and Investor Presentation containing the alleged misrepresentations were prepared in New York. Pasqua Decl.¶ 7; Compl. ¶ 369.

- HRB and CD&R launched the roadshow meetings for the Notes in New York. *See* Ex. 4 at -1159; *see also* Ex. 2.

- The entire Offering was underwritten, structured, and executed through the New York offices of investment banking firms. Ex. 57 at A-00518; Ex. 50, Jacobson Tr., at 34:18–19.

- The Offering Memorandum's financial statements were audited out of Grant Thornton's New York office. Ex. 8 at 189, F-2.

- The Offering closed at the New York office of Debevoise & Plimpton LLP. Ex. 57 at A-00528 (Notes Purchase Agreement listing the location of the closing at Debevoise & Plimpton's New York office). HRB was advised in connection with the Offering by Debevoise lawyers working out of the New York office. Pasqua Decl. ¶ 7.

- The Depository Trust Company, which held the Notes in trust for the Noteholders, is organized under New York Law. Ex. 8 at 173.

- DDJ held its Notes investment in a New York-organized trust. Ex. 43 at 23; Ex. 32; Ex. 47, Wooden Tr., at 288:13–18.

- Three of four of the CD&R-affiliated Defendants—and CD&R itself—are based in New York. Pasqua Decl. ¶¶ 1, 6. The other is based in the UK. *Id.*

- DDJ and Barings are sophisticated, global alternative asset managers who regularly transact in New York and submitted to the jurisdiction of New York courts for any action arising out of or relating to the Notes in the Indenture. Ex. 9 at -67994.

- Both Barings and DDJ availed themselves of the New York financial market by purchasing Notes through the Initial Purchasers, all of whose relevant offices were in New York. Ex. 57 at A-00518 (Notes Purchase Agreement listing Initial Purchasers' New York addresses); Ex. 47, Wooden Tr., at 288:2–16; Ex. 32.

Given the overwhelming number of connections the transaction had to New York, no other state—including Massachusetts or North Carolina—can claim a materially greater interest in applying its law to the Trustee's claims arising out of the Offering. The Notes were marketed nationwide, and the location of particular investors is largely coincidental. *See* Ex. 11 at -0370 (listing investors based in a range of localities, including Iowa, London, Toronto, Maryland, Florida, and Pennsylvania); *see also Locations*, BARINGS, https://www.barings.com/en-

us/individual/contact/locations (last visited April 28, 2026) (indicating that Barings has a New York office).  The Company did not target investors in Massachusetts or North Carolina as such; rather, two of the noteholders who happened to assign their claims to the Trustee happened to be based in those states.  Investors' receipt of the representations at issue in a different state—even if they believe that state's law is more favorable to that of the contractually chosen law—does not change the analysis where, as here, they are a "sophisticated [investor] operating in interstate commerce."  *See Abry*, 891 A.2d at 1049.[6]

Nor is there any reason to disrupt the parties' choice of law and apply the law of some other state.  New York has an interest in ensuring its citizens' ability "to use [New York] law as a common language for their commercial relationships."  *Id.* at *1050; *see also Pivotal Payments*, 2020 WL 7028597, at *7 ("Applying New York law in this case [] encourages certainty in commercial transactions.").  New York's interest is demonstrated by its well-developed and widely applied body of law governing common law fraud in complex financial transactions, including clear standards for loss causation and damages.  *See, e.g.*, *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5518146, at *97 (S.D.N.Y. Sept. 14, 2020); *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 358 (S.D.N.Y. 2013), *Loreley Financing (Jersey) No. 4 Ltd. v. UBS Ltd.*, 978 N.Y.S.2d 615, 619 (N.Y. Sup. Ct. 2013).  By contrast, Massachusetts and North Carolina

---

[6] As then-Vice Chancellor Strine observed in *Abry*, this is distinct from the classic case where, for example, "a Rhode Island driver collided with a Massachusetts driver on I–195 in Massachusetts and the Rhode Island driver should have expected to be judged under Massachusetts standards." *Id.* at 1049.  Instead, "the physical location of the [b]uyer in this case has less force" in the choice of law analysis.  *Id.  See also Gen. Ret. Sys. of City of Detroit v. UBS*, AG, 799 F. Supp. 2d 749, 757 (E.D. Mich. 2011) (applying New York choice of law provision to fraud claims where defendants are "global entities without any particular connection to New York" and "the representations giving rise to the investment took place in Detroit" because "New York [has] a highly developed body of commercial law, so it is reasonable in cases of complex financial transactions  for parties domiciled  in different states to  elect  New  York  law  to  govern  their dispute.").

case law construing common law fraud claims pertaining to securities is thinner and less developed. And no "fundamental policy" of Massachusetts or North Carolina is implicated, as common law fraud claims remain available under New York law to address purported misrepresentations made in connection with securities offerings. *CLEAResult Consulting, Inc.*, 2017 WL 4638592, at *4.

Accordingly, this Court should honor Delaware choice of law rules and apply New York law to the Trustee's claims.[7]

## II. Summary Judgment Should Be Entered in Favor of Defendants on the Trustee's Blue Sky and Common Law Fraud Claims.

The Trustee's blue sky and common law fraud claims fail because there is no private right of action under the Martin Act and the Trustee's expert's admissions establish that the Trustee cannot prove loss causation.

### A. Defendants Are Entitled to Summary Judgment on the Blue Sky Claim (Count X) Because There Is No Private Right of Action Under the Martin Act.

Because New York law applies, the Court should construe the Trustee's blue sky claim as having been brought under the Martin Act. It is well-settled that there is no private right of action under such act, requiring entry of summary judgment in favor of Defendants. *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 275 (N.Y. 1987) (affirming dismissal of Martin Act claim for lack of private right of action); *Deutsch v. Integrated Barter Int'l, Inc.*, 700 F. Supp. 194, 201–02 (S.D.N.Y. 1988) (dismissing claim under the Martin Act because the Act contains no private right of action); *cf. In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 574 (S.D.

---

[7] Even if the Court were to look beyond the *Abry* test, New York law would still govern because it bears the "most significant relationship" to the claims under the Restatement test given that the alleged misrepresentations were made, prepared, and disseminated from New York and the parties' relationship was centered in New York. Restatement (Second) of Conflict of Laws § 148 (1971).

Tex. 2011) (finding New York law applied because it had the most significant relationship to the dispute and "therefore the Martin Act controls," warranting dismissal of Texas Securities Act claims); *WTW Inv. Co. LTD v. Jefferies, LLC*, 2019 WL 13194124, at *7 (N.D. Tex. Feb. 5, 2019) (applying the most significant relationship test to determine that the Martin Act, not the Texas Securities Act, should apply to a private securities offering and dismissing the blue sky claims accordingly); *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56 (Tex. App. 2004) (dismissing plaintiffs' Texas blue sky law claims because New York law applied, and there is no private right of action under the Martin Act). Even if the Court were to apply the N.C. Act (and it should not), the Trustee's claim fails because, for the reasons discussed below, he cannot establish loss causation (a required element of a claim under such statute). *See, e.g.*, *Lee v. McDowell*, 2020 WL 6067769, at *5 (N.C. Super. Oct. 14, 2020) (In a claim under the N.C. Act, "Plaintiffs must allege that [defendants'] omissions caused Plaintiffs to invest in [the issuer] and *resulted in Plaintiffs' loss*." (emphasis added)); *William L. Thorp Revocable Tr. v. Ameritas Inv. Corp.*, 57 F. Supp. 3d 508, 519 (E.D.N.C. 2014) (loss causation required).

**B.     Defendants Are Entitled to Summary Judgment on the Fraud Claims (Counts VI, VII, VIII) and Blue Sky Claim (Count X) Because the Trustee Cannot Establish Loss Causation.**

To prevail on his fraud claims, the Trustee must show by clear and convincing evidence that (1) Defendants made a representation as to a material fact; (2) such representation was false; (3) Defendants intended to deceive the Assigning Noteholders; (4) the Assigning Noteholders believed and justifiably relied upon the statement and were induced by it to engage in a certain course of conduct; and (5) as a result of the misrepresentation, the Assigning Noteholders sustained pecuniary loss (*i.e.*, loss causation). *See Ambac Assur. Corp.*, 56 N.Y.S.3d at 24 (listing fraud elements); *Basis PAC-Rim Opportunity Fund (Master)* 48 N.Y.S.3d at 656 ("A fraud claim requires proof by clear and convincing evidence as to each element of the claim."). The "clear and

convincing evidence" standard "forbids the award of relief whenever the evidence is loose, equivocal, or contradictory." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009). Loss causation is also a necessary element of the Trustee's blue sky claim. *Supra* Section II.A.

Loss causation is the "fundamental core of the common-law concept of proximate cause" and "an essential element of a fraud claim" under New York law. *See Ambac Assur. Corp.*, 56 N.Y.S.3d at 25 ("This Court has repeatedly reaffirmed this principle.") (collecting cases); *see also Dodona I, LLC v. Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 512 (S.D.N.Y. 2015) ("Because the elements of common-law fraud are substantially identical to those governing [Section] 10(b), the identical analysis applies.").[8] A fraud plaintiff must show both "that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) *and* that the misrepresentations directly caused the loss about which the plaintiff complains (loss causation)." *Bank of Am.*, 969 F. Supp. 2d at 346 (S.D.N.Y. 2013) (emphasis added). Loss causation requires a plaintiff to show that "the [alleged] misrepresentations directly caused the loss about which plaintiff[] complain[s]." *Basis PAC-Rim Opportunity Fund (Master)*, 48 N.Y.S.3d at 656. In other words, "proof of loss causation requires demonstrating that the *subject* of the

---

[8] *See also Israel Disc. Bank of New York v. Eisneramper LLP*, 2014 WL 6092093 at *5 (N.Y. Sup. Ct. Nov. 14, 2014) (noting that "it is well settled that securities fraud claims are subject to the usual New York common law fraud elements" and dismissing common law fraud claims); *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010) (granting motion to dismiss common law fraud claims since plaintiffs had failed to allege Section 10(b) claims because "[c]ourts in the Second Circuit have found that the elements of common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b–5"); *Pits, Ltd. v. Am. Express Bank Int'l*, 911 F. Supp. 710, 716 (S.D.N.Y. 1996) (noting same and dismissing both common law fraud and 10b-5 claims because plaintiff failed to plead loss causation); *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2019 WL 1436993 at *12 (S.D.N.Y. Mar. 30, 2019) (noting same and dismissing common law fraud and federal securities law claims because plaintiff failed to plead loss causation).

fraudulent statement or omission was the cause of the actual loss suffered." *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 324 (S.D.N.Y. 2023), *aff'd sub nom. Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024) (emphasis in original). This element requires a plaintiff to establish that "it was [the] misrepresentations, rather than market forces [or some other factor], that caused the investment losses." *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at *97 (finding plaintiff failed to establish loss causation where plaintiff failed to offer any proof that the investment performed worse than it would have if the alleged misrepresentations were true).

Loss causation is not established "if the loss was caused by an intervening event." *Gordon Partners v. Blumenthal*, 2007 WL 431864, at *13 (S.D.N.Y. Feb. 9, 2007), *report and recommendation adopted*, 2007 WL 1438753 (S.D.N.Y. May 16, 2007), *aff'd*, 293 F. App'x 815 (2d Cir. 2008). Nor is it sufficient for the Trustee to claim, as he has throughout this litigation, that "damages consist of the entire price they paid for [the Notes] because the [Notes'] price eventually became zero as [the company] went through the bankruptcy reorganization." *Id.* Rather, loss causation must be supported by evidence showing the misstatement actually caused the loss claimed by a plaintiff—in other words, that the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Bank of Am.*, 969 F. Supp. 2d at 346.

Such evidence is typically presented through expert testimony. *Id.* (loss causation was lacking because expert's methodology was "inherently unreliable . . . thereby making it impossible to determine what amount, if any, of the losses he measured are attributable to the market's realization of the risks" the defendant disclosed). And, importantly, to survive summary judgment, a plaintiff must "(1) show a correlation between news of the event and the declines [in share price]; and (2) disaggregate the declines or some rough percentage of the declines . . . resulting from other,

non-fraud related events." *In re Mylan*, 666 F. Supp. 3d at 325 (cleaned up). The Trustee does not—and cannot—meet any of these requirements.

### 1. The Trustee Fails to Show Any Correlation Between the Alleged Misstatements and the Price of the Notes

The Trustee cannot prove loss causation because he relies entirely on the report of his damages expert, Stephen Kempainen, who admitted ███████████████████████████ Ex. 51, Expert Report of Stephen Kempainen ("Kempainen Rep."), ¶¶ 112–113. In that report, Kempainen calculates damages by ██████████████████████████████ ██████████████████████████████████████████ This approach measures ███████████████████████████████████████ ███████████████████████████████████████████ ████████████ He conceded as much, confirming that he ████████████ ███████████████████████████████████████████ ███████████████████████████ Ex. 52, Kempainen Tr., at 157:13–158:1.

The Trustee identifies no evidence—expert or otherwise—demonstrating that any alleged corrective disclosure resulted in a corresponding decline in the price of the Notes. He points to no trading data, event-based analysis, or contemporaneous market evidence linking any alleged disclosure to any price movement. Kempainen admitted that ████████████████ ███████████████████████████████████████████ ███████████████████ Ex. 52, Kempainen Tr., at 151:25–152:15. That failure alone precludes any showing of loss causation. *Gordon Partners*, 2007 WL 431864, at *13 ("If the Gordon plaintiffs cannot provide evidence showing what their losses are as a result of an inflation in NTL's stock price caused by defendants' misstatements or omissions, then summary judgment is appropriate.").

24

**2.  The Trustee Fails to Disaggregate the Effect of Numerous Confounding Factors from Those of the Alleged Misstatements**

Even if the Trustee could come forward with some evidence showing a linkage between the alleged misstatements and the value declines, summary judgment would still be appropriate because the Trustee cannot disaggregate the effect of the alleged fraud on the value of the Notes from the many factors bearing no relation to any such fraud.  To prove loss causation where, as here, a security's price may be affected by numerous market-, industry-, and company-specific forces, a plaintiff must present evidence that disaggregates the impact of the alleged fraud from other confounding factors.  *In re Mylan*, 666 F. Supp. 3d at 325; *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *10 (S.D.N.Y. Aug. 23, 2013)  (Plaintiffs must "disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events."); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).  Courts have repeatedly recognized that event studies or similar methodologies are the "prevalent" means of doing so because they control for unrelated influences on price movements.  *Sciallo v. Tyco Int'l Ltd.*, 2012 WL 2861340, at *3 (S.D.N.Y. July 9, 2012) ("[P]laintiff carries its burden of establishing [the] causal relationship . . . [by] a study that . . . seeks to isolate various 'events' and thereby determine[s] t[he] relationship between the alleged truthful disclosure, the misstatement and share price decline.").

Kempainen performs no analysis that disaggregates losses caused by the alleged fraud from losses caused by confounding variables, despite repeatedly admitting that ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 52, Kempainen Tr., at 117:8–118:23.  He does not conduct an event study or any comparable methodology capable of distinguishing between price movements attributable to the alleged misstatements and those

25

caused by other factors. *See id.* at 141:18–145:18, 154:21–158:18. He tried to conduct such a study and describes  Ex. 51, Kempainen Rep. ¶¶ 93–96.

When that effort failed, Kempainen ███████████████████████████████████ ███████████████████.[9] Ex. 52, Kempainen Tr., at 144:17–18. That approach treats the Trustee's damages as the difference between the purchase price of the Notes and their eventual decline in value—without ████████████████████████████████████ ███████████████████████████████████████████████ ██████████ *Id.* at 118:11–15. As Kempainen confirmed, ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████ *Id.* at 33:4–34:4. In other words, the Trustee does not isolate fraud-related losses from other unrelated potential sources of losses at all. That is insufficient as a matter of law. *See Aquino by Convergent Distributors of Texas, LLC v. Alexander Cap., LP*, 642 B.R. 106, 130 (S.D.N.Y. 2022), *aff'd sub nom. Aquino v. Alexander Cap. LP*, 2024 WL 2952497 (2d Cir. June 12, 2024) (to prove a fraud claim, a plaintiff must prove that the loss is not "the result of other intervening causes"); *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at *97 (finding a failure to prove a claim for damages where "'the lie' did not 'increase[] the . . . actual damage'").

---

[9]  In economic literature, the term "matched pair analysis" typically refers to a method in which "two [securities] whose prices have moved together historically" are paired together so that "price divergence" can be "observed" to determine anomalous activity in one of those securities. Ex. 56, Evan Gatev et al., *Pairs Trading: Performance of a Relative-Value Arbitrage Rule*, 19 REV. FIN. STUD. 797, 797, 807 (2006). However, Kempainen testified that ███████████████████████████████████████████████ Ex. 52, Kempainen Tr., at 141:18–142:8.

Kempainen's failure to adopt a method that disaggregates losses causes by the alleged misstatements from losses caused by other factors is particularly significant because the record reflects numerous confounding factors that may have affected HRB's performance and the value of the Notes during the relevant period.

For example, during a May 19, 2017 investor call, HRB made disclosures that at least partially "corrected" some of the alleged misstatements or omissions, including:

- financial performance for the first quarter of 2017, including updated adjusted EBITDA as well as a decrease in sales in HRB's legacy business;[10]

- customer dynamics, including Walmart;[11]

- planogram changes, including that the first quarter planogram changes had a "significant impact" on the business;[12] and

- management developments, including the hiring of a new Chief Sales Officer.[13]

During the same investor call, HRB also disclosed a number of factors unrelated to the alleged misstatements that negatively impacted the business during the first quarter of 2017, including increases in the costs of palm kernel oil and tallow, political and economic instability in the Middle East and North Africa, and generally lower consumption across the CPG industry. Ex. 13 at -5257, -5262, -5264; Ex. 15; Ex. 14 at -5263; Ex. 47, Wooden Tr., at 320:2–21; *see also* Ex. 12 at -4813 (discussing ███████████████████████████████████████████████████ ).
Following these disclosures, the Notes traded slightly down, at approximately 99% of par. Ex. 40.

---

[10] Ex. 13 at -5259–61; Ex. 14 at -5263; Ex. 15; *see also* Ex. 16; Ex. 51, Kempainen Rep. ¶ 37; *id.* ¶ 76 (noting ████████████████████████████████████████████ ); Ex. 52, Kempainen Tr., at 88:12–22 (████████████████████████████████████████ .

[11] Ex. 13 at -5261; Ex. 47, Wooden Tr., at 118:17–120:2; Ex. 51, Kempainen Rep. ¶ 41.

[12] Ex. 13 at -5261; *see also* Ex. 17 at -2703; Ex. 47, Wooden Tr., at 112:1–11, 321:14–322:4 (recalling ████████████████████████████████████████████████ ); Ex. 51, Kempainen Rep. ¶ 41.

[13] Ex. 13 at -5266; Ex. 51, Kempainen Rep., ¶ 54.

27

Kempainen's failure to disaggregate the effect of statements pertaining to the subject of the alleged fraud from other statements made *on the same day* underscores the Trustee's inability to prove loss causation. *See Aquino* 642 B.R. at 130 ("Damages are . . . not recoverable if they are so remote as not to be directly traceable to [fraud], or they may be the result of other intervening causes."). Without an analysis isolating the effect of the alleged misstatements from these factors, there is no basis to attribute any portion of the Trustee's claimed losses to the alleged fraud. *Id.* (granting summary judgment for defendants on plaintiffs' theory of damages where plaintiffs failed to establish a triable issue of fact as to proximate cause between the alleged fraud and the damages); *In re Mylan*, 666 F. Supp. at 325 (granting summary judgment where plaintiffs' "failure to 'isolate the effect' of the alleged corrective disclosure doom[ed] their claims, particularly given the highly complex and overlapping facts of this case.").

The Trustee's failure to prove loss causation is also evident from Kempainen's failure to disaggregate the impact of negative developments in the years following the Offering. The record shows that significant price declines occurred months or years later, following subsequent developments such as the announcement of declining earnings, credit downgrades, and operational challenges. *See* Ex. 51, Kempainen Rep., at Exhibit 6; *see supra* Section V.B. Over the next two years, HRB and market participants identified a range of issuer-specific and industry-wide challenges affecting performance, including:

- rising input costs, including significant increases in palm kernel oil and tallow prices;[14]

---

[14] *See* Exs. 47, Wooden Tr., at 181:2–8, 23, 24 (discussing April 20, 2018 disclosures pertaining to rising commodity costs).

28

- industry-wide headwinds, including declining consumption in core product categories and increased competition from both large incumbents and emerging brands;[15] and

- operational challenges, including supply chain disruptions, service shortfalls, and increased freight and labor costs.[16]

These developments were disclosed to investors over time, and were accompanied by credit downgrades and price declines. For example, S&P and Moody's downgraded the Notes multiple times based on declining earnings, competitive pressures, and an unsustainable capital structure. Exs. 26; 54; 29. In April 2018, a significant earnings decline—driven by commodity inflation and increased costs—was followed by a sharp drop in the Notes' price. Ex. 24 at 7–8; Ex. 27 at -0257, -0264; Ex. 23; Ex. 47, Wooden Tr., at 181:4–16; Ex. 25 at -0101; Ex. 51, Kempainen Rep. at 6. Similarly, the price of the Notes declined significantly following the announcement that the Company had executed a limited waiver to the Credit Agreement governing the First Lien Term Loan. Ex. 33 at -9936; *see also* Ex. 35 at -1323–1578; Exs. 36; 37; 40.

The Trustee does not even attempt to disentangle the effects of these events from the alleged misstatements. He instead attributes the entirety of the Notes' decline to the alleged fraud, through an expert who conceded that he ███████████████████████████████ ████████████████████████████████████████████████ ████████████ Ex. 52, Kempainen Tr., at 157:13-158:1. The Trustee's expert agreed that his methodology means that if the Notes █████████████████████████████ ████████████████████████████████████████████████

---

[15] *See* Ex. 24 at 5; Ex. 25 (discussing April 20, 2018 disclosures of increased competition); Exs. 30, 24 (discussing same on August 16, 2018).

[16] *See* Exs. 23–25 (discussing April 20, 2018 disclosures pertaining to operational challenges); Exs. 27, 28 (discussing May 16, 2018 disclosures pertaining to same); Ex. 30 (August 18, 2018 disclosures pertaining to same); Ex. 31 (discussing November 16, 2018 disclosures pertaining to same).

███████████████████████████████████████████████████████

███████████████████████████ Ex. 52, Kempainen Tr., at 33:4–34:4. In other words, the Trustee claims $100 of the loss despite lacking evidence linking even $1 to the alleged misstatements. But where, as here, "market forces [or other factors]" independently affect a security's value, a plaintiff cannot establish loss causation without evidence separating those effects. *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at \*97; *Aquino*, 642 B.R. at 130; *Basis PAC-Rim*, 48 N.Y.S.3d at 656–67.

In short, the Trustee has no evidence that any alleged misstatement was the direct, unconfounded cause of a decline in the price of the Notes. The Trustee fails to (i) show a relationship between any revelation of the alleged fraud and the resulting price of the Notes and (ii) disaggregate the losses he attributes to various alleged misstatements from losses resulting from a host of independent factors that he does not address. *See In re Mylan*, 666 F. Supp. at 325 ("Disaggregation is a threshold evidentiary showing that a plaintiff must meet to withstand summary judgment."). This fundamental failure of proof forecloses any showing of loss causation, which is fatal to the Trustee's fraud and blue sky claims.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion for partial summary judgment as to the Trustee's common law fraud claims and blue sky claim, Counts VI, VII, VIII, and X.

Dated: April 29, 2026
New York, New York

Respectfully submitted,

| | |
|---|---|
| BAYARD, P.A. | THE ROSNER LAW GROUP |
| By: */s/ Ericka F. Johnson* | By: */s/ Zhao Liu* |
| Ericka F. Johnson (Del. Bar No. 5024) | Frederick B. Rosner (Del. Bar No. 3995) |
| Steven D. Adler (Del. Bar. No. 6257) | Zhao (Ruby) Liu (Del. Bar. No. 6436) |
| 600 North King Street, Suite 400 | 824 N. Market Street, Suite 810 |
| Wilmington, Delaware 19801 | Wilmington, Delaware 19801 |
| Tel: (302) 655-5000 | Tel: (302) 777-1111 |
| Email: ejohnson@bayardlaw.com | Email: rosner@teamrosner.com |
| sadler@bayardlaw.com | liu@teamrosner.com |

DEBEVOISE & PLIMPTON LLP
Mark P. Goodman
Erica S. Weisgerber
Zachary H. Saltzman
Matthew J. Sorensen
66 Hudson Boulevard
New York, New York 10001
Tel: (212) 909-6000
Email: mpgoodman@debevoise.com
eweisgerber@debevoise.com
zhsaltzman@debevoise.com
mjsorensen@debevoise.com

*Counsel to Defendants Arawak IX, L.P., Clayton, Dubilier & Rice, LLC, John C. Compton, Vindi Banga (a/k/a Manvinder Banga), Kenneth A. Giuriceo, and Gregory L. Pasqua*

VEDDER PRICE P.C.
S. Preston Ricardo
1633 Broadway, 31st Floor
New York, New York 10019
Tel: (212) 407-7700
Email: pricardo@vedderprice.com

*Counsel to Defendant James A. Daniels*