# <u>EXHIBIT A</u>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>HRB WINDDOWN INC., *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-12689-BLS<br><br>Jointly Administered |
| ALAN D. HALPERIN, AS LIQUIDATING TRUSTEE OF THE HIGH RIDGE BRANDS CO. LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ARAWAK IX, L.P., CLAYTON, DUBILIER & RICE, LLC, JOHN C. COMPTON, VINDI BANGA (A/K/A MANVINDER BANGA), KENNETH A. GIURICEO, GREGORY L. PASQUA, AND JAMES A. DANIELS,<br><br>Defendants. | Adversary Proceeding<br><br>Adv. Proc. Case No. 21-51412-BLS |

### PLAINTIFF'S CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

[1] The term "Debtors" as used in this Motion shall mean the following debtors in the above-referenced chapter 11 cases (the "Chapter 11 Cases"): High Ridge Brands Holdings, Inc.; HRB Midco, Inc.; HRB Buyer, Inc.; HRB Winddown, Inc. (f/k/a High Ridge Brands Co.); GSI Winddown, Inc. (f/k/a Golden Sun, Inc.); CFL Winddown, Inc. (f/k/a Continental Fragrances, Ltd.); FCI Winddown, Inc. (f/k/a Freshcorp, Inc.); COC Winddown, LLC (f/k/a Children Oral Care, LLC); and DRF Winddown, LLC (f/k/a Dr. Fresh, LLC).

References to the docket in the jointly administered Chapter 11 Cases shall noted by "D.I." and references to the docket in this adversary proceeding shall be noted by "Adv. D.I."

Exhibits filed by the Defendants at Adv. D.I. 302 are referenced herein as "**D.Ex.**" followed by the exhibit number. Citations to Defendants' memorandum of law in support of their partial summary judgment motion (Adv. D.I. 300) are referenced as "**D.Br.**" followed by the page number. Exhibits filed by Plaintiff in support of this opposition are filed as attached to the Declaration of Gordon Z. Novod filed contemporaneously herewith and are referenced as "**P.Ex.**" followed by the exhibit number.

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................... 1

II. STATEMENT OF FACTS .................................................................................... 2

    A. The Parties ................................................................................................ 2

    B. CD&R Acquires HRB in June 2016 ......................................................... 2

    C. HRB Acquires Dr Fresh in December 2016 ............................................. 3

    D. CD&R and the CD&R Directors Understood That There was a "Full Blown Crisis" at HRB in Early 2017 ...................................................... 3

        1. CD&R and Its Directors Knew HRB's Performance Was Declining ......... 3

        2. CD&R Knew HRB Faced Significant Problems with Walmart ................ 4

            (a) The CD&R Directors Knew Walmart Had Reset its Planogram .... 4

            (b) CD&R Knew HRB's Walmart Relationship Was Strained ............ 5

        3. CD&R Lost Confidence in Daniels and HRB Management ...................... 6

        4. The CD&R Directors Knew That HRB Had Paused Its M&A Activity .... 6

    E. The Notes Offering ................................................................................... 7

    F. DDJ and Barings Maintain Their Holdings in Reliance on Defendants Post-Offering Misrepresentations and Omissions ....................................... 10

        1. HRB's May 19, 2017 Call Did Not Disclose the Truth .......................... 10

        2. Barings and DDJ Seek Additional Information After the Investor Call ... 11

        3. HRB Announces that Patrica Lopez Has Replaced Daniels as CEO ........ 13

        4. HRB Never Corrected the Offering Materials ......................................... 13

    G. The Notes Traded In An Illiquid Market ............................................... 14

    H. The Kempainen Report ........................................................................... 15

    I. The Chakraborty Rebuttal Report ........................................................... 17

III. ARGUMENT ....................................................................................................... 17

    A. Standard of Review ................................................................................. 17

    B. Massachusetts and North Carolina Law Govern the Noteholders' Claims ........... 18

1. The Base Indenture's Choice of Law Provision is Inapplicable............... 18

    (a) The Base Indenture's Choice of Law Provision Does Not Govern Plaintiff's Fraud Claims................................................................. 18

    (b) The Base Indenture's Choice of Law Provision Does Not Apply to the North Carolina Blue Sky Law Claim..................................... 20

2. Massachusetts and North Carolina Have the Most Significant Relationship to Plaintiff's Fraud Claims ....................................................................... 21

C. Neither Massachusetts Nor North Carolina Law Require Proof of "Loss Causation" as Defined By the Defendants............................................................ 23

1. "Loss Causation" is Not an Element of the DDJ Fraud Claim................. 23

2. North Carolina "Proximate Cause" Standard Does Not Require Proof of "Loss Causation" ..................................................................... 25

D. Even if New York law applies, Plaintiff can establish Causation ........................ 26

1. New York Law Does Not Impose Federal Securities-Law Loss Causation Requirements ......................................................................... 26

2. Defendants Proposed Loss Causation Standards Are Inapplicable .......... 28

IV. CONCLUSION................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*331DC, LLC v. Dassault Falcon Jet-Wilmington Corp.*,
2017 WL 385550 (D. Del. Jan. 27, 2017) ................................................................. 18

*Abry Partners V, L.P. v. F & W Acquisition LLC*,
891 A.2d 1032 (Del. Ch. 2006) ......................................................................... 19, 20

*Acquisition Corp. v. Krauss*,
2021 WL 282642 (Del. Ch. Jan. 28, 2021) ............................................................. 21

*Am Int'l Group, Inc. v. Bank of Am. Corp. (In re Countrywide Fin. Corp. Mortgage-Backed Secs.*
*Litig.*,
943 F. Supp. 2d 1035 (C.D. Cal. 2013) ................................................................... 29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................... 18

*Baloga v. Pittston Area Sch. Dist.*,
927 F.3d 742 (3d Cir. 2019) ................................................................................... 17

*Bank of Am, N.A. v. Bear Stearns Asset Mgmt.*,
969 F. Supp. 2d 339 (S.D.N.Y. 2013) .................................................................... 28

*Brown v. Neal*,
283 N.C. 604 (1973) ............................................................................................... 25

*Clews v. County of Schuylkill*,
12 F.4th 353 (3d Cir. 2021) .................................................................................... 18

*David v. Belmont*,
291 Mass. 450 (1935) ............................................................................................. 24

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................... 29

*Fed. Home Loan Bank of Bos. v. Ally Fin., Inc.*,
2019 Mass. Super. LEXIS 484 (Mass. Super. Ct. Aug. 20, 2019) ......................... 23

*Feldman v. Aspen Tech., Inc.*,
2007 U.S. Dist. LEXIS 118 (Mass. Sup. Ct. Feb, 26, 2007) ................................. 23

*FinancialApps, LLC v. Envestnet, Inc.*,
2020 WL 3640063 (D. Del. July 6, 2020) ......................................................... 18, 19

*Fottler v. Moseley*,
179 Mass. 295 (1901) ................................................................................... 24

*Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*,
832 A.2d 116 (Del. Ch. 2003)........................................................................ 19

*Gordon Partners v. Blumenthal*,
2007 U.S. Dist. LEXIS 9910 (S.D.N.Y. Feb. 9, 2007)................................. 30

*Hairston v. Alexander Tank & Equipment Co.*,
310 N.C. 227 (1984) ...................................................................................... 26

*Hotaling v. A.B. Leach & Co.*,
247 N.Y. 84 (1928) ................................................................................. 26, 27

*In re Moody's Corp. Secs. Litig.*,
2013 WL 4516788 (S.D.N.Y. Aug. 22, 2013) ............................................... 29

*In re Mylan N.V. Sec. Litig.*,
666 F. Supp. 3d 266 (S.D.N.Y. 2023)............................................................ 29

*In re OSC 1 Liquidating Corp.*,
529 B.R. 825 (Bankr. D. Del. 2015) .............................................................. 20

*Isbey v. Cooper Cos.*,
103 N.C. App. 774 (N.C. Ct. App. 1991) ...................................................... 26

*Jay Group, Ltd. v. Glasgow*,
139 N.C. App. 595 (N.C App. Ct. 2000) ....................................................... 25

*Kaufman v. Chase Manhattan Bank, N.A.*,
581 F. Supp. 350 (S.D.N.Y. 1984) ................................................................ 27

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941)........................................................................................ 21

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d. Cir. 2007).......................................................................... 29

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d. Cir. 2005)........................................................................... 29

*Marbury Management, Inc. v. Kohn*,
629 F.2d 705 (2d Cir. 1980)........................................................................... 27

*Montone v. City of Jersey City, et al.*,
709 F.3d 181 (3d Cir. 2013)........................................................................... 18

*Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*,
710 F. Supp. 2d 458 (D. Del. 2010)................................................................22

*Pivotal Payments Direct Corp. v. Planet Payment, Inc.*,
2020 WL 7028597 (Del. Super. Ct. Nov. 30, 2020)........................................20

*Primavera Familienstiftung v. Askin*,
130 F. Supp. 2d 450 (S.D.N.Y. 2001)..............................................................27

*Reisman v. KPMG Peat Marwick LLP*,
57 Mass. App. Ct. 100 (2003).....................................................................23, 25

*Rowan County Bd. of Educ. v. U.S. Gypsum Co.*,
332 N.C. 1 (1992) .............................................................................................25

*Saunders v. Goodman,*
8 Mass. App. Ct. 610 (Mass. App. Ct. 1979)...................................................24

*Sciallo v. Tyco Int'l Ltd.*,
2012 WL 2861340 (S.D.N.Y. July 7, 2012) .....................................................30

*Sciallo v. Tyco Int'l*,
2012 U.S. Dist. LEXIS 96967 (S.D.N.Y. July 9, 2012) ...................................30

*Self v. Yelton*,
201 N.C. App. 653 (N.C. App. Ct. 2010) .........................................................25

*Swipe Acquisition Corp. v. Krauss*,
2021 WL 282642 (Del. Ch. Jan. 28, 2021)..................................................20, 21

*Thomas H. Lee Equity Fund V L.P. v. Grant Thornton LLP (In re Refco Sec. Litig.)*,
2011 WL 12343284 (S.D.N.Y. Mar. 28, 2011) ................................................27

*Thrivent Fin. for Lutherans*,
2012 U.S. Dist. LEXIS 71376 (C.D. Cal. Feb. 17, 2012)................................29

*Travelers Indemnity Co. v. Lake*,
594 A.2d 38 (Del.1991) ....................................................................................21

*Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*,
319 F. App'x 137 (3d Cir. 2009) ...........................................................18, 19, 21

*Vichi v. Koninklijke Philips Elecs., N.V.*,
85 A.3d 725 (Del. Ch. 2014).............................................................................18

*VSI Sales, LLC v. Int'l Fid. Ins. Co.*,
2015 WL 5568623 (D. Del. Sept. 22, 2015) ....................................................19

*Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC*,
   2020 WL 5054791 (Del. Super. Ct. Aug. 17, 2020) ............................................ 20, 21

*Zhou v. Deng*,
   2022 WL 1024809 (Del. Ch. Apr. 6, 2022) ............................................................ 20

## **Rules**

Fed. R. Civ. P. 56 ........................................................................................................ 17

## **Other Authorities**

Restatement (Second) of Conflict of Laws § 148 ................................................... 21, 22

Plaintiff Alan D. Halperin hereby opposes Defendants' Motion for Partial Summary Judgment (Adv. D.I. 300) (the "Motion").

## I.      INTRODUCTION

In March 2017, High Ridge Brands Co. ("HRB") issued $250 million in Senior Unsecured Notes ("Notes") that were marketed and sold pursuant to an Offering Memorandum and Investor Presentation (together, "Offering Materials") that materially misrepresented HRB. The fraudulent misstatements and omissions contained in the Offering Materials are directly attributable to the Defendant Clayton, Dubilier and Rice ("CD&R"), HRB's sponsor, as well as the other Defendants, all members of HRB's Board of Directors. Plaintiff seeks to hold the Defendants accountable for common law fraud on behalf of two purchasers of the Notes: Polen Capital Credit (f/k/a DDJ Capital Management LLC) ("DDJ") and Barings LLC ("Barings") (together, the "Noteholders").

The Motion argues that Plaintiff cannot prevail on the Noteholders' common law fraud claims because he cannot establish "loss causation" (as Defendants define it). Defendants contend that New York law applies to the Noteholders' common law fraud claims and requires Plaintiff to establish "loss causation" in the same way as in a federal securities fraud case. Neither is correct.

First, under settled Delaware choice of law principles, DDJ and Barings' common law fraud claims (the "DDJ Fraud Claims" and the "Barings Fraud Claims," respectively) are governed by Massachusetts and North Carolina law, respectively. The Third Circuit has held that the indenture's choice of law clause does not extend to tort claims, and Defendants' cases concerning Section 2708 of the Delaware Code do not mandate a different result. Thus, Massachusetts and North Carolina law govern the DDJ Fraud claims and the Barings Fraud Claims, and neither require proof of loss causation (as Defendants define it) to prevail on such claims.

Second, even under New York law, the Motion must be denied. While loss causation is an element of a New York common law fraud claim, loss causation is not limited to proof as

1

prescribed by federal securities cases involving efficient markets and corrective disclosures. Here, Barings and DDJ were fraudulently induced to purchase and hold Notes in an illiquid market, and dispute that fully "corrective disclosures" were made while they held the Notes. In such circumstances, Plaintiff may establish that the Defendants' fraud caused the losses calculated by Plaintiff's damages expert, Stephen Kempainen. The Motion must be denied.

## II. STATEMENT OF FACTS

### A. THE PARTIES

Plaintiff is the Trustee of the High Ridge Liquidating Trust. Counts VI, VII, VIII, and X of the Second Amended Complaint (Adv. D.I. 59, "Complaint" or "Compl.") are "Retained Non-Estate Causes of Action" (as defined in the Plan, D.I. 536, §§ 1.134, 9.18) that Plaintiff asserts on behalf of DDJ and Barings. At all relevant times, DDJ was a Massachusetts limited liability company with its principal place of business located in Waltham, Massachusetts. P.Ex.1; 2. At all relevant times, Barings was a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. P.Ex.3; 4.

From June 30, 2016 to April 23, 2019, CD&R was HRB's sponsor and Vindi Banga, John Compton, Kenneth Giureceo, and Gregory Pasqua (together, the "CD&R Directors") were CD&R partners and/or principals who served as Directors of HRB. Compl. ¶¶ 20-24, 42; D.Ex.8 at 9; D.Br. at 4. Defendant James Daniels was the Chief Executive Officer and a Director of HRB between May 2011 and July 6, 2017. D.Ex.8 at 100; Compl. ¶ 25; D.Br. at 10.

### B. CD&R ACQUIRES HRB IN JUNE 2016

HRB engaged in the personal care business, focusing on skin cleansing, hair care, and later, oral care products. Compl. ¶ 39; D.Br. at 4; *see* D.Ex.8 at 1. On June 30, 2016, CD&R HRB Holdings, Inc., an investment company affiliated with CD&R, acquired HRB. *Id.* at 9. The acquisition was financed with (i) $220 million in 1st Lien Term Loans, (ii) an $83 million 2nd Lien

2

Loan provided by Arawak IX (an investment vehicle managed by CD&R), and (iii) $130 million in equity capital from CD&R-affiliates. P.Ex.5 at 4; D.Ex.8 at 90.

### C. HRB ACQUIRES DR FRESH IN DECEMBER 2016

On December 29, 2016, HRB acquired the "Dr. Fresh" oral care business. D.Br. at 4; D.Ex.8 at 7. This acquisition was initially financed by a $160 million "Bridge Loan", plus equity contributed by CD&R. D.Br. at 4. Ultimately, however, CD&R had planned to finance most of the transaction through the issuance of the Notes. *See* P.Ex.6 at 2-3; 7 at 3. CD&R planned to issue Notes to repay the Bridge Loan and prepay the Arawak Loan. P.Ex.7 at 3. Thus, for CD&R, the Notes' issuance was a necessary step in the Dr. Fresh acquisition.

### D. CD&R AND THE CD&R DIRECTORS UNDERSTOOD THAT THERE WAS A "FULL BLOWN CRISIS" AT HRB IN EARLY 2017

Prior to the issuance of the Notes, CD&R and the CD&R Directors learned of material problems concerning HRB's financial results, its customer relationships, and its leadership.

#### 1. CD&R and Its Directors Knew HRB's Performance Was Declining

In early January 2017, Daniels provided Compton with HRB's daily and weekly sales tracker through December 2016. P.Ex.8. Compton forwarded the reports to Giureceo, explaining that HRB had missed its December 2016 sales projections by $3 million. P.Ex.9. The situation had worsened by the time the CD&R Directors received the January 2017's financial results. On February 8, 2017, Compton wrote Daniels that "[t]he last [eight] week trends are very concerning and disappointed we could not better forecast" and expressed concern that "Feb[ruary] is a big month but the first week is off to a slow start against this new forecast." P.Ex.10.

On February 12, 2017, HRB's CFO provided updated January 2017 results to Pasqua and reported that *"[w]e are now concerned that we will not be able to hit our 6/30/17 target especially as it relates to the projection included in the Bond Offering." Id.* (emphasis added). After these

results were forwarded to other the other CD&R Directors, the reaction was uniform. Pasqua wrote that the results were "[t]errible." *Id.* at 1. Compton described the results as a "disaster." *Id.* Giuriceo wrote that "[i]t looks like we need to micromanage this company right now" and "wtf." *Id.* Giuriceo kept Banga informed of the results, explaining to him that "High Ridge has had rough couple of months – missing their revenue plan / forecast by about $9 mm." P.Ex.11.

On February 22, 2017, Compton emailed Giureceo and Pasqua to inform them that "we have a full blown crisis at High Ridge," after learning that Daniels was projecting that sales for February 2017 would be $5 million off an adjusted forecast. P.Ex.12. On March 24, 2017, Pasqua circulated a draft presentation to Compton and Giureceo that was intended for use in an internal CD&R review of HRB's operations. P.Ex.13; 14. That draft admitted that HRB's "financial performance has fallen short of plan, ***with particular weakness surfacing over the last few months***." P.Ex.14 at 2. At the time the draft presentation was prepared, HRB's projected adjusted EBITDA for Fiscal Year 2017 was $51 million off management's July 2016 projections.

### 2. CD&R Knew HRB Faced Significant Problems with Walmart

#### (a) The CD&R Directors Knew Walmart Had Reset its Planogram

Walmart represented approximately thirty percent of HRB's net sales during Fiscal Year's 2015 and 2016. D.Ex.8 at 89. In early 2017, Walmart reset its planogram in a manner that significantly harmed HRB's business. A "planogram" is a diagram that maps out where products are placed in retail stores, and how those products are displayed on shelves. Products placed at eye level are advantaged because they are easy for the consumer to find, while products placed on the top or bottom shelves may be disadvantaged because they are more difficult to find.

Walmart's planogram changes occurred January 2017. *See* P.Ex.15. The CD&R Directors were informed of the changes "in a timely manner." P.Ex.16 at 160:9-20. The CD&R Directors realized that Walmart's planogram changes would be problematic for HRB. For example, on

February 7, 2017, Compton wrote Daniels that "getting next year's plan[ogram] accepted by [Walmart] is critical as we didn't get that done this year." P.Ex.17 (referring to the "plan" rather than to the "planogram." *see* P.Ex.18 at 172:17-174:5). Also, HRB's management told a CD&R employee that "the planograms were set for the remainder of the year." P.Ex.19.

Thus, CD&R and the CD&R Directors were aware that Walmart had altered its planogram to HRB's detriment at the time of the Offering. Walmart's planogram reset proved disastrous. In late March 2017, CD&R attributed some of the financial shortfalls "surfacing over the last few months" to a "[f]ailure to anticipate distribution losses as planograms reset." P.Ex.14 at 2. After reviewing the entire presentation, Compton wrote that "the modular changes implemented in February [sic] are having a more negative effect" than had been realized. P.Ex.15. However, two days later, Giuriceo wrote that "[f]or the life of me, I don't know how Jim [Daniels] can claim the [planogram] reset was a surprise. Its all in the numbers." P.Ex.20.

### (b)    CD&R Knew HRB's Walmart Relationship Was Strained

CD&R and the CD&R Directors knew that there were problems with the Walmart relationship stemming from HRB's lack of customer engagement. On January 10, 2017, in anticipation of firing Steve Collins, HRB's Chief Sales Officer ("CSO"), Compton instructed Daniels to "take over [the Walmart relationship] personally." P.Ex.21. Unfortunately, the message was not received. On February 7, 2017 (after receiving January 2017 monthly results) Compton told Daniels that "you have to take over [Walmart] for the year" and "[y]ou need to be on the ground there once a month." P.Ex.17 at 1-2. Giuriceo expressed "shock[]" that Daniels appeared to be delegating responsibility for the Walmart relationship to others. *Id.* In a February 28, 2017 email that copied the other CD&R Directors, Compton once again instructed Daniels that "[w]e should be in Bentonville [Walmart headquarters] monthly until we return [sic] around the negative performance. *Id.* Importantly, the CD&R Directors necessarily relied on Daniels because he was

acting as both the CEO and CSO, as HRB had not hired a replacement CSO after firing Collins in January 2017. *See* P.Ex.19; 22 at 126:11-24.

### 3. CD&R Lost Confidence in Daniels and HRB Management

The CD&R Directors viewed HRB's declining performance, inability to forecast, and lack of customer engagement as an indictment of HRB's management, particularly Daniels. Thus, the CD&R Directors resolved to fire Daniels after the Offering and began searching for his replacement. On February 22, 2017, when Compton had determined that there was a "full blown crisis at High Ridge," he informed Giuriceo and Pasqua that he had "lost confidence in [Daniels'] ability to lead the business" and that "he is not going to work as CEO." P.Ex.12. Pasqua understood that Compton was "ready to move to a new CEO," but emphasized ***"the importance of getting [Daniels] through the roadshow (week of 3/13)."*** *Id.*

Still, the CD&R Directors patience grew thinner. On March 8, 2017, Compton wrote to Giuriceo that "I'm ready to move on – [Daniels] just doesn't get it," adding that Daniels had a "laissez faire" attitude an "constantly contradicts himself." P.Ex.23. Giuriceo agreed that the CD&R Directors should engage in additional diligence on a replacement CEO, expressing frustration with Daniels. *Id.*; *see also* P.Ex.24 ("pissed off that Jim Daniels refuses to consistently meet with our top customers."); P.Ex.25 ("High Ridge now seems like the exception in that our CEO doesn't engage with our best customers.").

### 4. The CD&R Directors Knew That HRB Had Paused Its M&A Activity

In light of HRB's deteriorating business, HRB placed any further M&A activity on hold in the lead up to the Offering. For example, on February 15, 2017, Diya Talwar explained to the CD&R Directors that she had been contacted concerning a potential M&A transaction. *See* P.Ex.26. In response, Giuriceo wrote that "my instinct is that we should stay 100% focused on the Dr. Fresh integration and hitting our revised forecast." *Id.* Compton agreed. *Id.* Daniels assured

6

the CD&R directors that "Diya will keep churning M&A activity but unless it is a VERY COMPELLING opportunity, we are focused on getting Legacy back to growth and smoothly transitioning Dr. Fresh so to maintain its growth." *Id.*

Weeks later, however, Compton directed that Talwar should focus her work on "building real customer level P&Ls-for top [ten] account." *Id.* Compton explained "this is exactly what the head of strategy should be doing since we are pencils down on any new deals right now." *Id.* Banga interpreted Compton's email to mean that there were "no live deals" occurring at that the time. P.Ex.27 at 39:11-25. Consistent with the email, Daniels recalled that Compton did not want HRB management to spend time on M&A at the time.[2] P.Ex.16 at 28:25-29:15. HRB was never seriously engaged in any potential M&A transaction after the Offering.

### E. THE NOTES OFFERING

The Notes were primarily marketed and sold through a preliminary and final Offering Memorandum, as well as a series of "Roadshow Meetings" conducted at in person or telephonically in various locations in the United States (and/or telephonically), at which CD&R and HRB gave an investor presentation ("Investor Presentation").

The Offering Memorandum was prepared by BMO, HRB, ***and CD&R***.[3] The Preliminary Offering Memorandum (P.Ex.31) was distributed to investors on March 10, 2017, and the Final Offering Memorandum was published on March 17, 2017. P.Ex.32. Both the Preliminary and Final Offering Memoranda included material representations regarding HRB's purported "Deep and

---

[2]   Plaintiff acknowledges a March 9, 2017 email exchange between Talwar and ▮▮▮▮▮▮▮▮ of William Blair in which ▮▮▮▮▮ provided materials concerning ▮▮▮▮▮▮▮ and stated that she would follow up regarding the submission of an initial indication of interest. *See* P.Ex.28. Nothing in the email suggests that HRB was engaged in M&A activity at the time of the Notes Offering.

[3]   *See, e.g.,* P.Ex. 30 (emails reflecting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; P.Ex 79 (excerpts from CD&R Defendants Joint Privilege Log ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Strategic Customer Relationships" (*id*. at 6, 89, 93), "Strong Cash Flow Generation" (*id.* at 6, 93-94), "Management Team with Proven Ability to Acquire, Integrate and Manage Brands" (*id.*). In addition, both the Preliminary and Final Offering Memoranda disclosed historical EBITDA and Adjusted EBITDA information for the six months ending December 31, 2016 "***to assist investors in understanding our ongoing performance***." P.Ex.32 at 16, 21, 24. However, neither the Preliminary nor Final Offering Memoranda disclosed: (i) HRB's deteriorating financial performance in 2017; (ii) Walmart's planogram change and its likely impact on HRB's prospects; (iii) the state of HRB's customer relationship with Walmart; (iv) CD&R's view that HRB's management (particularly Daniels) was inadequate and ill-suited to improve HRB's business; (v) HRB's ongoing operations without a CSO; or (vi) HRB's suspension of M&A activity.

On March 10, 2017, BMO provided the Preliminary Offering Memorandum to Roman Rajnikov, a portfolio manager at DDJ, at his office in Massachusetts. *See* P.Ex.33. Rjanikov forwarded the preliminary Offering Memorandum to a number of DDJ employees, including Doug Wooden, who was a senior investment analyst at DDJ, also working in Massachusetts. *Id.* Wooden was responsible for reviewing the Offering Memorandum and later became the analyst who oversaw DDJ's investment in the Notes. P.Ex.34 at 53:22-25, 54:10-55:6, 58:11-14.

On March 10, 2017, BMO also provided the Preliminary Offering Memorandum to Barings in North Carolina, where it was circulated by David Secrest to Jeffery J. Stewart (the Barings' investment analyst assigned to the HRB investment). *See* P.Ex.35; 36 at 29:19-31:18, 67:19-68:16. Stewart prepared the investment memorandum that Barings' investment committee used in deciding to purchase Notes. P.Ex.36 at 27:14-21; 172:14-173:16. Prior to purchasing the Notes, the Offering Memorandum was also reviewed by Sean Feeley, a Barings portfolio manager who purchased Notes for one of his accounts. *Id.* at 188:13-189:20. At all relevant times, Stewart and

Feeley were based in Barings' North Carolina headquarters. *See, e.g.* P.Ex.37; 38. The Investor Presentation was prepared in advance of the Roadshow Meetings at which the Notes were marketed to potential investors. As with the Offering Memoranda, the Investor Presentation was prepared by BMO, HRB, *and CD&R*.[4]

The Investor Presentation repeated and amplified the misrepresentations and omission contained in the Offering Memoranda. P.Ex.42. It identified Daniels, Pasqua and Scott Kirk (HRB's COO & CFO) as the speakers. *Id.*, at 2. The presentation touted HRB's purported "deep strategic relationships with leading retailers" and its "experienced management with a track record of success." *Id.* at 9. It also touted HRB's "Strong Cash Flow Profile," showing the same quarter over quarter EBITDA growth in 2016 as in the Offering Memoranda, buoyed by the acquisition of Dr. Fresh in December 2016. *Id.*; *see also id.* at 28. The presentation also highlighted HRB's "Committed Senior Management Team" (including Daniels) and emphasized management's "deep industry and retail relationships, among other things. *Id.* at 14. The presentation identified Walmart as one of the "Key Retailers." *Id.* at 21. It made no disclosure regarding: (i) HRB's deteriorating financial performance in 2017; (ii) Walmart's planogram change and its known impact on HRB; (iii) the deteriorating relationship with Walmart; (iv) the CD&R Directors' view that HRB's management, particularly Daniels, was inadequate and ill-suited to improve the business; (v) HRB's lack of a CSO; or (vi) HRB's suspension of M&A activity.

The Investor Presentation was given during Roadshow Meetings at locations across the United States. *See, e.g.,* P.Ex.43. Pasqua and HRB conducted meetings and calls in Boston on March 14-15, 2017. *See* P.Ex.44 (Roadshow schedule as of March 13, 2017, 1:40 pm). On March

---

[4] *See, e.g.*, P.Ex.39 (noting the then current draft presentation reflected comments from "BMO, CD&R, High Ridge, Jones Day and Debevoise."); 40 (email showing comments and questions raised by Pasqua regarding draft investor presentation); 41 (same).

14, 2017, CD&R and HRB had a teleconference with Stewart and Scott Roth of Barings in North Carolina. *Id.*; P.Ex.45. On March 15, 2017, Pasqua and HRB met in-person with Wooden in Massachusetts. P.Ex.44; *see also* P.Ex.34 at 85:19-24. Both DDJ and Barings received a copy of the Investor Presentation around the time of their meetings. *See* P.Ex.46; 37.

Following the Roadshow Meetings, John Sherman of DDJ arranged for Wooden to communicate directly with Pasqua regarding the Notes. P.Ex.47. Pasqua was aware that Wooden received communications from him in Massachusetts. *Id.* In reliance on the Offering Memorandum and Investor Presentation, DDJ purchased $60 million in Notes on March 17, 2017, representing 24% of the Notes. D. SJ Ex. 42. Barings purchased $8 million in Notes. D. SJ Ex. 41.

### F. DDJ AND BARINGS MAINTAIN THEIR HOLDINGS IN RELIANCE ON DEFENDANTS POST-OFFERING MISREPRESENTATIONS AND OMISSIONS

Following the Offering, Compton told Daniels that HRB's performance was "[p]robably the worst [q]uarterly performance I have ever seen in [the Consumer Products Group]" with "sales down 11%, profits down 55%, and market share losses across every category," among other things. P.Ex.48. Kirk emailed Pasqua that he was working on a spreadsheet that would plausibly explain the quarterly results "to BMO, the RA's and the Bond Holders." P.Ex.49. Pasqua responded noting that BMO would want to be "helpful in crafting the message," knowing that they would hear from frustrated bond holders. Kirk provided BMO with a preview of the results on or around May 10, 2017. D. SJ Ex. 126. After hearing the preview, BMO "emphasized the importance of management's 'story'" to maintain investor confidence and "*to protect BMO." Id.*

### 1. HRB's May 19, 2017 Call Did Not Disclose the Truth

On May 19, 2017, HRB hosted an investor call to disclose HRB's results for the March 31, 2017 quarter end. Stewart and Wooden participated in that call from their offices in North Carolina and Massachusetts, respectively. HRB disclosed a substantial earnings' miss as compared to the

earnings expected at the time of the Offering (*see, e.g.,* D.Ex.14

), leading to a contentious call

D.Ex.14 at 2. But neither HRB nor CD&R

corrected other material misstatements in the Offering Materials.

First, the investor call portrayed Walmart's planogram change as a temporary problem.

." D.Ex.17 at 1-2. Further, while the draft call script[5] states that "[planogram] changes had a significant impact on shipments in March," it immediately pivots to statements that HRB has "provided corrective actions" and the "issues have been addressed." D.Ex.13 at TCP-HRB-00035261-62. Second, there was no disclosure that the CD&R Directors considered Daniels and his team to be incompetent, and to have harmed the Walmart relationship. Third, there was no disclosure that the CD&R Directors had been trying to replace Daniels since prior to the Offering. Fourth, there was no disclosure that HRB had been operating without a CSO at the time of the Offering. Fifth, there is no disclosure that HRB had suspended M&A activity while attempting to address the deterioration of its legacy business and integration of Dr. Fresh. Thus, HRB did not provide fully corrective information to investors concerning the Offering Materials' misstatements and omissions.

### 2. Barings and DDJ Seek Additional Information After the Investor Call

Considering the quarterly earnings miss, both DDJ and Barings sought information from HRB, CD&R, and the CD&R Directors following the May 19, 2017 investor call.

---

[5] Defendants cite to a draft script of the investor call (D.Ex.13) as evidence of the May 19, 2017, call's content. However, there is no evidence that the script was read verbatim on the investor call. Indeed, the cover email for the draft script solicits Talwar's "suggestions for improvements" to the script. *Id.* at 1. Although Plaintiff does not concede that the script reflects precise statements made on the call, Plaintiff submits that Stewart's and Wooden's notes are a better contemporaneous accounts of the disclosures made during the call. *See* D.Ex.14, 15, 17.

██████████████████████████████████████████████

██████████████████████████████████████ *Id.*

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

DDJ similarly reached out to both CD&R and HRB. Wooden called Pasqua from Massachusetts on June 1, 2017. P.Ex.53. ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

Following their discussions with HRB management, Barings continued to hold the $8 million in Notes that it purchased at the time of the Offering. DDJ purchased an additional $1.07 million in Notes (at a price of $98.75) on May 30, 2017, and then an additional $8.9 million in Notes (at a price of $99.50) after Wooden spoke with Pasqua and was told that the quarterly results were entirely unanticipated by CD&R.

### 3. HRB Announces that Patrica Lopez Has Replaced Daniels as CEO

On July 6, 2017, HRB issued a press release announcing that Patricia Lopez had been appointed as CEO. P.Ex.55. The press release noted only that Daniels "will be leaving to explore other career opportunities." *Id.* Nothing in the press release suggests that Daniels had been replaced by CD&R because the CD&R Directors viewed him as incompetent and as having damaged HRB's relationship with Walmart. Further, nothing indicates that the CD&R Directors privately expressed those views to each other prior to the Offering.

Following the issuance of the press release, Wooden asked Pasqua for more information. P.Ex.56. ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████. *Id.* Wooden relied on his conversation with Pasqua when maintaining his recommendation that DDJ continue to hold Notes.

### 4. HRB Never Corrected the Offering Materials

HRB's later public disclosures do not address (and therefore do not correct) the misstatements and omissions in the Offering Materials. The presentation accompanying HRB's release of its results for the quarter ended June 30, 2017, contains a "Key Customer Update" on Walmart (P.Ex.59 at 10), but that presentation says nothing about the state of the planogram, which was still affecting Walmart sales. *See* II.F.2, *supra.* There is similarly no update about the planogram in presentations to Bond Holders following the close of third and fourth quarters of calendar year 2017. *E.g.,* P.Ex.57; 58. Further, none of these presentations provide any more insight into the reasons for Jim Daniels' departure or the competency of management, more generally. *See, e.g.,* P.Ex.57-60. Because Defendants contend that fully corrective disclosures were made in May and June 2017, they have made no argument that these later presentations contain any "corrective disclosures" with respect to the Offering Materials.

Subsequent to the July 6, 2017 press release, both DDJ and Barings purchased additional Notes. ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. *See* P.Ex.36 at 20:10-21:6, 509:14-511:11, 512:12-514:14. Having purchased 24% of the issuance at Offering, DDJ could not reasonably trade out of its position and purchased additional notes from time to time, but began attempting to sell when the trading price reached distressed levels. *See* D.Ex.42.

### G. THE NOTES TRADED IN AN ILLIQUID MARKET

Complicating matters for DDJ and Barings, the Notes traded in an illiquid market, such that their substantial holdings could not readily be sold even if HRB had made fully "corrective disclosures" (which they did not). ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ P.Ex.36 at 252:20-253:10. Accordingly, had Barings attempted to sell its Notes at the time, it would have necessarily sold those Notes at a loss well below the trading price. Similarly, when

Moody's downgraded the Notes in May 2018, ███████████████████████████

███████████████████████████████████████████████████████████████

██████ P.Ex.63; *see also* P.Ex.64 ████████████████████████████████

███████████████████████████████████████████████████

The Notes' illiquidity made it impossible for DDJ and Barings to trade out of their sizeable positions in the Notes at any given point in time. This is not an uncommon issue. ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████████████

████████

█████████████ Accordingly, there is substantial record evidence that the Notes traded in an illiquid market in which DDJ and Barings could not practically sell their holdings. This was particularly true for DDJ, which held no less than 24% of all Notes at all relevant times.

## H.     THE KEMPAINEN REPORT

Plaintiff retained Mr. Kempainen to serve as its damages' expert. ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

█ ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

[7]    While Counsel requested that Mr. Kempainen calculate damages with respect to all Notes purchased by DDJ and Barings between the Offering and the Petition Date, Plaintiff now seeks damages only with respect to the Notes purchased before July 7, 2016. D.Br. at 13.



---

[8] Plaintiff contends that Massachusetts law applies to DDJ's common law fraud claims and that North Carolina law applies to Barings' common law fraud claims. *See* Sec. III.B *infra.* ████████████████████████

[black redaction bars]

## I.    THE CHAKRABORTY REBUTTAL REPORT

Defendants served the operative rebuttal report of Dr. Maureen Chakraborty on December

10, 2025.  P.Ex.68. [black redaction bar]

[black redaction bars]

## III.    ARGUMENT

### A.    STANDARD OF REVIEW

Summary judgment is proper only when the moving party demonstrates that "there is no

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "[A] fact is 'material' where 'its existence or nonexistence might impact the outcome of the suit under the applicable substantive law.' *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021). In deciding a summary judgment motion, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. *See Montone v. City of Jersey City, et al.*, 709 F.3d 181 (3d Cir. 2013). All justifiable inferences are to be drawn in the non-moving party's favor. *Id.*

### B.     MASSACHUSETTS AND NORTH CAROLINA LAW GOVERN THE NOTEHOLDERS' CLAIMS

The Motion rests on Defendants' contention that New York law applies to the DDJ and Barings Fraud Claims. Defendants argue that New York law applies because (i) the Indenture contains a New York choice of law clause and (ii) New York has a "material relationship" to the transaction. Defendants are wrong. When Delaware's choice of law rules are properly applied, Massachusetts and North Carolina law govern the DDJ and Barings Fraud Claims.

### 1.     The Base Indenture's Choice of Law Provision is Inapplicable

#### (a)     The Base Indenture's Choice of Law Provision Does Not Govern Plaintiff's Fraud Claims

The Base Indenture's choice of law provision states which that the "Indenture and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York." D.Ex.9 at HRB-POLEN-00067994. It is inapplicable here, where Plaintiff is asserting tort claims on behalf of DDJ and Barings. Applying Delaware choice of law rules, the Third Circuit has held that this text applies only to pure contract claims. *Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*, 319 F. App'x 137, 140–41 (3d Cir. 2009). Courts in Delaware have reached the same result. *See FinancialApps, LLC v. Envestnet, Inc.*, 2020 WL 3640063, at *5 (D. Del. July 6,

2020); *VSI Sales, LLC v. Int'l Fid. Ins. Co.*, 2015 WL 5568623, at \*3 (D. Del. Sept. 22, 2015); *Huffington v. T.C. Group, LLC*, 2012 WL 1415390, at \*11 (Del. Super. Apr. 18, 2012).

In construing choice of law clauses, Delaware courts look to whether the language of the clause is broad or narrow. *VSI Sales, LLC*, 2015 WL 5568623, at \*3 (D. Del. Sept. 22, 2015) (stating "Delaware courts examine whether the contracting parties drafted the provision broadly or narrowly.") (citing *Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*, 832 A.2d 116, 124 (Del. Ch. 2003). Choice of law clauses that "explicitly apply to 'any claim arising out of or relating to' a contract are broad enough to cover quasi-contract and tort claims arising from contractual agreements." *VSI Sales, LLC,* 2015 WL 5568623, at \*3 (citations omitted). In contrast, choice of law provisions that provide that "*the agreement* shall be governed by and construed in accordance with" the chosen state's law are considered to be narrower and only cover contract claims. *Underhill Inv. Corp.*, 319 Fed.Appx. at 140; *FinancialApps, LLC*, 2020 WL 3640063, at \*5. The Indenture's choice of law clause is the latter, such that it does not govern Plaintiff's tort claims. D.Ex.9 at H RB-POLEN-00067994.

In arguing that the Base Indenture's choice of law clause applies here, Defendants rely principally on *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1047–49 (Del. Ch. 2006). That reliance is mistaken. In *Abry*, the Chancery Court found that a choice of law clause was applicable to the claims at issue pursuant to 6 Del. C. § 2708, which states that "[t]he parties to any contract…may agree in writing that the contract…shall be governed by or construed under the laws of [Delaware], without regard to principles of conflicts of laws." 6 Del. C. § 2708 (emphasis added). In *Abry*, the contract's *Delaware* choice of law provision contained language taken verbatim from 6 Del. C. § 2708, including a specification of rights and remedies. *Abry*, 891 A.2d at 1048. However, a Delaware statute that bears on Delaware contracts does not apply to an

indenture which Defendants claim is governed by New York law. It would be one thing if the Indenture incorporated 6 Del. C. §2708 or selected Delaware law.[9] But it does not, and Defendants' arguments fall short.

### (b) The Base Indenture's Choice of Law Provision Does Not Apply to the North Carolina Blue Sky Law Claim

Even if the Indenture's choice of law clause could be read to cover common law tort claims (which it cannot), it does not reach Plaintiff's North Carolina "blue sky law" claim. Adv. D.I. 59, ¶¶ 423-430. Delaware courts recognize that states have profound public policy interests in protecting investors within their state. *See e.g. Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *19 (Del. Super. Ct. Aug. 17, 2020) ("It is the fundamental policy of Texas to protect investors…Texas is the default state, it has a materially greater interest than Delaware, and enforcement of the SPA would be contrary to Texas' public policies."). As a result, Delaware courts do not apply even broad choice of law clauses to bar legitimate blue sky law claims. *Swipe Acquisition Corp. v. Krauss*, 2021 WL 282642, at *3 (Del. Ch. Jan. 28, 2021) (Delaware choice of law provision did not apply to a California Securities Act claim); *Wind Point Partners*, 2020 WL 5054791 at *20 (Delaware choice-of-law provision did not waive Texas state securities law claim.).

Additionally, blue sky law anti-waiver provisions prevent a party from contracting away, through a choice of law clause, their right to the blue sky law protections. *Swipe Acquisition Corp.*, 2021 WL 282642, at *3. Section 78A-56 (i) of the North Carolina Securities Act contains such a

---

[9] *In re OSC 1 Liquidating Corp.*, 529 B.R. 825, 831 (Bankr. D. Del. 2015) is similarly inapposite. *OSC* applied *Abry* to the same choice of law provision found in *Abry* which provided for application of Delaware law. *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2020 WL 7028597 (Del. Super. Ct. Nov. 30, 2020) applied New York law based on the law of the case doctrine and a finding that a prior ruling was not clearly erroneous. In *Zhou v. Deng*, 2022 WL 1024809 (Del. Ch. Apr. 6, 2022), *aff'd*, 287 A.3d 633 (Del. 2022), the Court applied New York law because the parties agreed that New York law applies and thus the Court was "given no reason not to."

provision and Delaware courts recognize and will enforce such statutes. *Swipe Acquisition Corp. v. Krauss*, 2021 WL 282642, at *3 (Del. Ch. Jan. 28, 2021); *Wind Point Partners*, 2020 WL 5054791 at *20. So should this Court, such that Defendants' sole grounds for dismissal of this claim fails.

### 2. Massachusetts and North Carolina Have the Most Significant Relationship to Plaintiff's Fraud Claims

Because the Indenture's choice of law clause does not govern Plaintiff's fraud claims, the Court must look to Delaware's default choice of law principles. "The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts." *Underhill Inv. Corp.*, 319 Fed. Appx. at 140 (*quoting Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The Supreme Court of Delaware has adopted the Restatement (Second) of Conflicts of Law's "most significant relationship" test for choice-of-law questions. *Travelers Indemnity Co. v. Lake*, 594 A.2d 38, 41, 47 (Del.1991).

Section 148 of the Restatement applies to claims for "Fraud and Misrepresentation." Restatement (Second) of Conflict of Laws § 148. Within that section, Section 148(2) applies to claims "when the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made." *Id.* Here, Section 148(2) applies because there is evidence that the Offering Memorandum and Investor Presentation were prepared in New York, but Offering Materials were received by DDJ and Barings in Massachusetts and North Carolina, respectively. Sec. II.E.2-3, *supra.* Under Section 148(2), the court uses six factors to determine the state with the most significant relationship to the case:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2). In considering the factors, "when a plaintiff acted in reliance in one jurisdiction, this state will usually be the state of the applicable law, with respect to most issues, if (a) the defendant's representations were received by the plaintiff in this state, or (b) this state is the state of the plaintiff's domicile or principal place of business." *Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 472 (D. Del. 2010) (citing comment j to Restatement (Second) Conflict of Laws § 148).

Under this framework, Massachusetts plainly has the most significant relationship to DDJ's fraud claim. DDJ received the Offering Memorandum in Massachusetts. Sec. II.E.2, *supra.* CD&R and HRB conducted an in-person "Roadshow Meeting" with DDJ in Massachusetts, where they delivered the Investor Presentation. Sec. II.E.3, *supra.* Wooden performed his analysis of the Offering Materials and recommended DDJ invest in the Notes from his office in Massachusetts. *Id.* Wooden communicated with Pasqua in connection with the Notes from Massachusetts, with Pasqua's knowledge that Wooden was in Massachusetts. DDJ is domiciled in Massachusetts. *Id.*

For similar reasons, North Carolina has the most significant relationship to Barings' fraud claim. Barings received the Offering Memorandum in North Carolina. Sec. II.E.2, *supra.* While in Boston, CD&R and HRB conducted a telephonic "Roadshow Meeting" with Barings representatives in North Carolina, where the Investor Presentation was given. Sec. II.E.3. Stewart analyzed the Offering Materials in North Carolina and the decision to invest in the Notes was made in North Carolina. Sec. II.E.2-3 Barings is domiciled in North Carolina. Sec. II.A, *supra.*

Accordingly, Delaware's conflict of law rules requires application of Massachusetts and North Carolina law to DDJ and Barings' Fraud Claims.

### C. NEITHER MASSACHUSETTS NOR NORTH CAROLINA LAW REQUIRE PROOF OF "LOSS CAUSATION" AS DEFINED BY THE DEFENDANTS

#### 1. "Loss Causation" is Not an Element of the DDJ Fraud Claim

Defendants concede that loss causation is not an element of a common law fraud claim under Massachusetts law. Def. Br. at 15 (citing *Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 116-17, 787 N.E.2d 1060 (2003)) (explaining that "loss causation" is not an element of a common law fraud claim); *see also Fed. Home Loan Bank of Bos. v. Ally Fin., Inc.*, SUC2011-1533-BLS1, 2019 Mass. Super. LEXIS 484, *23-26 (Mass. Super. Ct. Aug. 20, 2019); *Feldman v. Aspen Tech., Inc.*, No. SUCV2006-3021 BLS2, 2007 U.S. Dist. LEXIS 118, *31-32 (Mass. Sup. Ct. Feb, 26, 2007) ("loss causation" not an element of common law fraud claim).

*Reisman* is instructive. There, certain investors (the "Reismans") acquired stock in Marcam, a publicly traded company. *Reisman*, 57 Mass. App. Ct. at 100, 107. After the Reisman's incurred losses , Marcam restated its financials showing that, contrary to prior representations, Marcam had lost money for the prior three years. The Reismans sued Peat Marwick, asserting claims for common law fraud, negligent misrepresentations and violation of the Massachusetts unfair business practices act. *Id.* at 101. In defense, Peat Marwick argued that the Reismans were (or should be) required to establish loss causation, i.e., "that the post transaction decline in the value of [the] Marcam shares was itself caused by Peat Marwick." *Id.* at 111. The Appeals Court of Massachusetts disagreed:

> It has long been the law in Massachusetts that, where reliance on a fraudulent misrepresentation is a substantial factor in the decision to purchase and/or retain stock, the maker of a false representation is liable for a subsequent loss in the value of the stock suffered in reliance on the false representation.

*Id.* at 112. Such a loss is deemed "legally attributable to the fraud." *Id.* at 113 quoting *Fottler v. Moseley*, 179 Mass. 295, 299 (1901). "That other factors – in the case of stocks or bonds, general economic or market conditions – might also have contributed to the loss does not preclude recovery, so long as the reliance on the false representation was an operating factor." *Id.* at 114 citing *David v. Belmont*, 291 Mass. 450, 453 (1935); *Saunders v. Goodman,* 8 Mass. App. Ct. 610, 616 (Mass. App. Ct. 1979).

Because Massachusetts law applies to the DDJ Fraud Claims, Plaintiff need only prove that Defendants' misrepresentations and omissions were a "substantial factor" in causing the losses DDJ's incurred in connection with the Notes. *See Reisman*, 57 Mass. App. Ct. at 111. Answering the question of whether Plaintiff can meet that "substantial factor" standard raises fact disputes that cannot be resolved on this motion. For example, Defendants contend that DDJ did not incur any losses after July 6, 2017, because HRB had made fully "corrective disclosures" by that date. *See* P.Ex.68, ¶¶ 60-62. However, Plaintiff disputes the extent to which the information made available to HRB's bondholders during that time was in fact corrective of the misrepresentations and omissions in the Offering Materials. Sec. II.E-F, *supra.* Plaintiff further contends that DDJ held its Notes in reliance on post-offering representations made by the CD&R Defendants. *See* Secs II.F-G, *supra*; *see also* D.Ex.55 (Plaintiffs' Amended Responses to the CD&R Defendants Contention Interrogatories) at 33, 43. ███████████████████████████████ ███████████████████████████████████████████████████████ P.Ex.68, ¶¶ 60-62. However, Plaintiff contends that the Notes were traded in illiquid market such that DDJ could

not have done so. Other fact disputes abound. Because Plaintiff need only prove that Defendants' fraud was a "substantial factor" in causing DDJ's losses, their motion must be denied.[10]

### 2. North Carolina "Proximate Cause" Standard Does Not Require Proof of "Loss Causation"

There is similarly no requirement that Plaintiff meet Defendants' "loss causation" standard to prevail on the Barings Fraud Claim. The elements of a fraud claim under North Carolina law are: "'(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" *Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992) (citations omitted). Plaintiff is required to establish proximate causation to prevail on the Barings Fraud Claim. *See Self v. Yelton*, 201 N.C. App. 653, 659 (N.C. App. Ct. 2010) (citation omitted). To do so, however, Plaintiff need only show "that defendant's actions were a 'substantial factor'…of the particular injuries for which plaintiff seeks recovery." *Self*, 201 N.C. App. at 659 *quoting Brown v. Neal*, 283 N.C. 604, 511 (1973).

In North Carolina, proximate cause is defined similarly for common law torts. *See id*; *Jay Group, Ltd. v. Glasgow*, 139 N.C. App. 595, 600-01 (N.C App. Ct. 2000). At times, North Carolina courts define proximate cause as "'a cause which in the natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would have not occurred[.]" *Self*, 201 N.C. App. at 659 (quoting *Hairston v. Alexander Tank &*

---

[10] To be sure, Plaintiff will prove damages at trial. Under *Reisman*, "where a person has been induced to purchase shares of stock in reliance on a false representation, the measure of damages is the difference between the price paid and the value of the item received, as measured by the market value of the shares at the time the misrepresentation has been discovered." *Reisman,* 57 Mass. App. Ct. 100, 114 (citation omitted). However, *Reisman* concerned the measure of damages in connection with publicly traded stock, whereas the Notes traded in an illiquid market. *Sec.* II.G, *supra.* In any event, there are material disputes of fact as to whether and when the misrepresentations and omissions contained in the Offering Materials were disclosed to the Noteholders. Thus, even if the Court were to conclude that fully "corrective disclosures" occurred, there are material disputes of fact as to whether the Noteholders could have sold their Notes, leaving the Court to resolve such disputes at trial.

*Equipment Co.,* 310 N.C. 227, 233 (1984). This definition comes from *Hairston*, which was a negligence case. In *Hairston,* the North Carolina Supreme Court that ***"[t]here may be more than one proximate cause of an injury.*** " *Hairston,* 310 N.C. at 234. Accordingly, any argument that Plaintiff must meet Defendants' enhanced "loss causation" standard is entirely inconsistent with North Carolina's definition of "proximate cause.

The Barings Fraud Claims are governed by North Carolina law. As with DDJ, the question of whether Defendants' fraud was a "substantial factor" raises material disputes of fact that cannot be resolved on the Motion, including relating to corrective disclosures, market liquidity, and DDJ's and Barings' reliance on post-offering misrepresentations in continuing to hold their Notes.[11]

### D.   EVEN IF NEW YORK LAW APPLIES, PLAINTIFF CAN ESTABLISH CAUSATION

#### 1.   New York Law Does Not Impose Federal Securities-Law Loss Causation Requirements

Finally, even if New York law applies to the DDJ and Barings Fraud Claims (which it does not), Plaintiff can still establish causation at trial. As explained above, DDJ and Barings contend they were fraudulently induced to purchase Notes based on the Defendants' misrepresentations in the Offering Materials, *and* that they continued to hold those Notes in reliance on those misrepresentations, other post-offering misrepresentations, and the nature of the market for the Notes. *See* Secs II.E-F, *supra*; *see also* D.Ex.55 at 33, 43.

In New York, where a party is induced to make an investment by fraud and continues to hold that investment in reliance on the fraud, the party may recover up to the total loss on the investment. *See Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84, 87-92 (1928); *see also Thomas H. Lee Equity Fund V L.P. v. Grant Thornton LLP (In re Refco Sec. Litig.)*, No. 07 MDL 1092 (JSR),

---

[11] "[S]ummary judgment is generally improper in an action for fraud. *Isbey v. Cooper Cos.*, 103 N.C. App. 774, 776 (N.C. Ct. App. 1991).

2011 WL 12343284, *17, 28 (S.D.N.Y. Mar. 28, 2011) (explaining that *Hotaling* controls where the plaintiff claimed that he was both induced to invest and retain investment by fraud). In such circumstances, the fact that other factors may have contributed to the decline in investment value does not preclude proof of loss causation. *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 502-05 (S.D.N.Y. 2001); *see also Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 709-10 (2d Cir. 1980) (plaintiff established loss causation where securities were purchased and retained on the basis of defendant's false representation that he was licensed broker, even though the loss in value of securities was unrelated to the misrepresentation); *Kaufman v. Chase Manhattan Bank, N.A.*, 581 F. Supp. 350, 354 (S.D.N.Y. 1984) (denying motion to dismiss a fraud claim concerning the purchase and retention of an investment notwithstanding facts evidencing that the investment lost value due to industry recession and intervening business factors).

In *Hotaling*, the plaintiff purchased a $950 bond at par, secured by a first lien on the assets of the issuer. 29 N.Y. at 86. The bond was marketed and sold based on a "deceptive" circular which "present[ed] a picture which would lead the investors to believe that the security behind the bonds was far greater than was the fact." *Id.* at 88. Two years after the bond was purchased, the issuer "encountered financial difficulties" and was placed in receivership. *Id.* at 86. The plaintiff sued the defendants who sold the bonds and prevailed on his common law fraud claim at trial. *Id.* at 87. The trial court measured the damages as the difference between the purchase price (with accrued interest, $980) and the $5.84 *pro rata* distribution to which plaintiff became entitled after the company was placed in receivership. *Id.* at 87. On appeal, the Court of Appeals was asked "to consider whether the correct measure of damages was applied." *Id.*

The Court of Appeals sided with the trial court, writing that "[t]he damages awarded must represent the loss which the plaintiff sustained through the purchase and continued ownership of

the bond." *Id*. The court acknowledged that "actual pecuniary loss sustained as a result of the wrong is the measure to be applied in fixing damages." *Id.* at 88. However, as applied to the facts, the court emphasized that the bond was purchased *and* held for investment:

> The effect of the [pre-purchase] representations of the defendant did not cease with the plaintiff's purchase. He continued to hold the bond for investment in accordance with the defendant's recommendation. Loss of his investment followed because the weakness of the company had been concealed from him by defendant.

*Id.* at 92. Importantly, the court reached this conclusion despite its acceptance that the collapse of the issuer was due to changes in the oil market. *Id.* at 87, 89, 92. The collapse simply did not preclude recovery where the plaintiff's continued holding of the bond was tainted by the misrepresentations made at the time of purchase. *Id.* at 93[12]; *see also Primavera,* 130 F. Supp. 2d at 450 ("critical issue is…'the effect of the representations did not cease….'") (*quoting Hotaling*, 247 N.Y. at 92) Thus, loss causation on a common law fraud claim under New York law is not as fixed as Defendants would have it, and it is simply not true that Plaintiff cannot establish loss causation if New York law applies. Thus, loss causation on a common law fraud claim under New York law is not as fixed as Defendants would have it, and it is simply not true that Plaintiff cannot establish loss causation if New York law applies.

### 2. Defendants Proposed Loss Causation Standards Are Inapplicable

In contrast, the loss causation standards that the Defendants ask the Court to adopt are largely based on cases arising under the federal securities laws involving shares trading on efficient markets. These cases do not fit the facts. First, Defendants argue that to establish "loss causation,"

---

[12] The Court of Appeals also found that assessing damages was made difficult by the fact that the case concerned a bond, "a chose in action whose intrinsic value is dependent solely on the debtor's ability to pay when payment becomes due." *Id.* at 91. As a result, the bond's value could not be "fix[ed] with certainty." *Id.* This was true even if the assets securing the bonds could be properly valued because "[p]robability of payment of the bond depended primarily on the success of the business and its efficient management." *Id.* Furthermore, the court noted that even the market price of the bonds may not be reflective of its real value because it would be "naturally effected by the misrepresentations contained in the circular." *Id.* This uncertainty lent additional support for the Court of Appeals' endorsement of the awarded damages.

Plaintiff must show that the "Defendants' misrepresentations and omissions concealed something from the market that, when disclosed, negatively affected the value of the security." D.Br. at 23 *citing Bank of Am, N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 346 (S.D.N.Y. 2013) citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d. Cir. 2005) (federal securities law claim). However, this test assumes the existence of an efficient market whereas the Notes traded in an *illiquid* market. Sec. II.G, *supra.* "[P]roximate cause has a different implication when applied to a liquid, efficient market than it does when applied to an illiquid security" like the Notes. *Thrivent Fin. for Lutherans*, 2:11-cv-07154, 2012 U.S. Dist. LEXIS 71376, *11 (C.D. Cal. Feb. 17, 2012). "In illiquid markets, a corrective disclosure that a security was overvalued does not automatically lead to a corrective price decline." *Am Int'l Group, Inc. v. Bank of Am. Corp. (In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig.*, 943 F. Supp. 2d 1035, 1059 (C.D. Cal. 2013). That is precisely the case for the Notes, ███████████████████████████ ███████████ In the absence of a correlation between corrective disclosure and price decline, Plaintiff cannot be required to prove loss causation in this manner.

Additionally, Defendants ignore that Plaintiff disputes, as a factual matter, that HRB made even made fully "corrective disclosures" in the first instance. For example, there is no evidence that HRB ever publicly disclosed that the Walmart planogram change implemented in the quarter ended March 31, 2017 was likely to cause decreased sales for at least a year. *Sec.* II.F, *supra.* Because the information was *never* disclosed to the public, then it is impossible to show that the "information, once disclosed, negatively affected the value of" the Notes."[13]

---

[13] Nonetheless, any partial "corrective disclosures" made by the Defendants necessarily had a negative effect on the Notes, as evidenced by the decline in the trading price of the Notes. *See* D.Ex.40.

Relying solely entirely on federal securities fraud cases,[14] Defendants also argue that Plaintiff cannot establish loss causation because he has not disaggregated Defendants' fraud from other potential factors causing the decline in the value of the Notes. D.Br. at 25. ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████ ████████ . ████████████████████████████████

████████████████████████████████████████████████████████████████████

████ Further, Defendants cite *Sciallo v. Tyco Int'l Ltd.*, 2012 WL 2861340 (S.D.N.Y. July 7, 2012) for the prospect that such disaggregation can be established by an event study. ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

In sum, under New York law, Plaintiff can establish loss causation on his claims that Defendants fraudulently induced them to invest in the Notes and hold post-Offering. based on additional misrepresentations and the illiquid market for the Notes. Defendants may dispute Plaintiff's proof at trial, but they are not entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Motion.

---

[14] *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336 (2005) (federal securities fraud claims involving publicly traded Dura securities); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d. Cir. 2007) (federal securities fraud claims brought against issuer's accountant concerning audit opinions); *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266 (S.D.N.Y. 2023) (federal securities fraud claims involving publicly traded Mylan securities); *In re Moody's Corp. Secs. Litig.*, 2013 WL 4516788 (S.D.N.Y. Aug. 22, 2013) (federal securities fraud claims involving publicly traded Moody's securities); *Sciallo v. Tyco Int'l*, 2012 U.S. Dist. LEXIS 96967 (S.D.N.Y. July 9, 2012) (federal securities fraud claims concerning publicly traded Tyco securities); *Gordon Partners v. Blumenthal,* 2007 U.S. Dist. LEXIS 9910 (S.D.N.Y. Feb. 9, 2007) (federal securities fraud claims concerning publicly traded NTL securities).

Dated: June 5, 2026

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

By: *<u>/s/ Vivek Upadhya</u>*
Vivek Upadhya (DE Bar No. 6241)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
vupadhya@gelaw.com

**BOIES SCHILLER FLEXNER LLP**
Gordon Z. Novod (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
212-446-2352
gnovod@bsfllp.com

Frank H. Griffin (Delaware Bar No. 7318)
1401 New York Avenue
Washington, DC 20005
212-446-2347
fgriffin@bsfllp.com

*Special Counsel for Alan D. Halperin as Trustee of
the High Ridge Brands Liquidating Trust*